**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Raymond E. King, Inmate No. N54043,<br><br>Plaintiff,<br><br>v.<br><br>Dr. Chapman, Dr. Parthasarathi Goshe, Dr. Jacqueline Mitchell, Dr. Fattore-Bruno, Dr. Saffold, Robert Cuttano, Dr. Garg, Nurse Sha'riece, Dr. Adrian D. Feinerman, Dr. Newbold, and Wexford Health Sources, Inc.<br><br>Defendants. | Civil Action No.: 09 CV 1184<br><br>Judge Marvin J. Aspen<br>Magistrate Judge Sidney I. Schenkier<br><br>PLAINTIFF'S SECOND AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

Raymond E. King ("Plaintiff"), prisoner identification number N54043, presently confined in Stateville Correctional Center (hereinafter, "Stateville"), P.O. Box 112, Joliet, Illinois 60434, by his attorneys, Meredith Martin Addy, Manish K. Mehta, and Thomas C. Burton, files this Second Amended Complaint under the Civil Rights Act Title 42, Section 1983, against Doctor Chapman, Doctor LeDeanne K. Fattore-Bruno, Doctor Adrian D. Feinerman, and Doctor Steven M. Newbold (collectively, "Defendants I"), and Doctor Parthasarathi Goshe, Doctor Garg, Doctor Jacqueline Mitchell, Doctor Jeffrey C. Saffold, Nurse Sha'riece, Robert Cuttano, (collectively, "Defendants II"), and Wexford Health Sources, Inc., and states that:

1.      This is a civil action seeking injunctive relief and damages against Defendants for committing acts contrary to law, which deprived Plaintiff of his rights guaranteed by the Constitution and the Civil Rights Act, 42 U.S.C. § 1983 (2008).

## PARTIES

1.      Plaintiff, Raymond E. King, a citizen of the United States of America, presently is confined at Stateville, P.O. Box 112, Joliet, Illinois 60434, and is issued inmate identification number N54043.

2.      Defendant Wexford Health Services, Inc. (hereinafter "Wexford"), is a provider of health care professionals and services to health care correctional facilities, including those facilities at Menard Correctional Center and Stateville Correctional Center.

3.      Defendant Doctor Parthasarathi Goshe, (hereinafter, "Goshe"), is the medical director at Stateville and is responsible for actions of the medical staff he supervises and the medical treatment of Plaintiff.  He is currently employed by Stateville and has denied, and continues to deny, Plaintiff adequate treatment for his condition.  Dr. Goshe is an employee of Wexford and is sued in his professional and individual capacities.

4.      Defendant Doctor Jacqueline Mitchell, (hereinafter, "Mitchell") is a dentist at Stateville and is responsible for the medical treatment of Plaintiff.  She is currently employed by Stateville and has denied, and continues to deny, Plaintiff adequate treatment for his condition. She is sued in her professional and individual capacities.

5.      Defendant Doctor LeDeane K. Fattore-Bruno, (hereinafter, "Fattore-Bruno"), is a dentist at Stateville and is responsible for the dental treatment of Plaintiff.  She is currently employed by Stateville and has denied, and continues to deny, Plaintiff adequate treatment for his condition.  Dr. Fattore-Bruno is an employee of Wexford and is sued in her professional and individual capacities.

6.      Defendant Doctor Jeffery C. Saffold, (hereinafter, "Saffold"), is a dentist at Stateville and is responsible for the dental treatment of Plaintiff.  He is currently employed by

Stateville and has denied, and continues to deny, Plaintiff adequate treatment for his condition. He is sued in his professional and individual capacities.

7.      Defendant Doctor Garg, (hereinafter, "Garg"), is a dentist at Stateville and is responsible for the dental treatment of Plaintiff.  He is currently employed by Stateville and has denied, and continues to deny, Plaintiff adequate treatment for his condition.  He is sued in his professional and individual capacities.

8.      Defendant Robert Cuttano, (hereinafter, "Cuttano") is a medical technician at Stateville and is responsible for administering the prescribed medication and supplies to Plaintiff. He is currently employed by Stateville and has denied, and continues to deny, Plaintiff the prescribed medication and supplies for his condition.   He is sued in his professional and individual capacities.

9.      Defendant Nurse Sha'riece, (hereinafter, "Sha'riece"), is a registered nurse at Stateville, and is responsible for administering the prescribed medication and supplies to Plaintiff.  She is currently employed by Stateville and has denied, and continues to deny, Plaintiff the prescribed medication and supplies for his condition.  Upon information and belief, Sha'riece is an employee of Wexford.  She is sued in her professional and individual capacities.

10.     Defendant Doctor Adrian D. Feinerman, (hereinafter, "Feinerman"), was the medical director at Menard and was responsible for the medical treatment of Plaintiff.  He worked at Menard when he denied Plaintiff the adequate treatment for his condition.  He is sued in his individual capacity.

11.     Defendant Doctor Nathan Chapman, (hereinafter, "Chapman"), was the dental director at Menard and was responsible for the dental treatment of Plaintiff.  He worked at

Menard when he denied Plaintiff the adequate treatment for his condition. Dr. Chapman is an employee of Wexford and is sued in his individual capacity.

12.     Defendant Doctor Steven M. Newbold, (hereinafter "Newbold"), was a dentist at Menard and was responsible for the dental treatment of Plaintiff. He worked at Menard when he denied Plaintiff the adequate treatment for his condition. He is sued in his individual capacity.

## JURISDICTION

13.     This action arises under 42 U.S.C. § 1983 of the Civil Rights Act of the United States for injunctive, compensatory, and punitive damages over which this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

14.     This Court has personal jurisdiction over all Defendants because, on information and belief, all Defendants are domiciled, or doing business, within the state of Illinois.

## VENUE

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) because a substantial part of the events or omissions giving rise to the claim occurred within the Northern District of Illinois and, on information and belief, at least defendants Fattore-Bruno, Garg, Goshe, Mitchell, Saffold, and Sha'riece are believed to be domiciled in the Northern District of Illinois, and defendant Wexford does business in the Northern District of Illinois.

## STATEMENT OF FACTS

16.     From approximately September of 2004 to September 19, 2007 Plaintiff was incarcerated at Menard.

17.     Since September 19, 2007, Plaintiff has been incarcerated at Stateville and is assigned inmate number N54043.

18.     The Plaintiff has undergone four surgeries to repair his TMJ disorder, including the latest one in 2008.

19.     TMJ disorder involves acute or chronic inflammation of the temporomandibular joint, which connects the mandible to the skull.  Mild forms of TMJ can be treated with the use of a mouth guard.  However, if not properly treated in a timely manner, the disorder can result in significant pain and impairment and/or degradation of the joint.

20.     Plaintiff first received surgery to treat his TMJ disorder while at Pontiac, which was prior to his incarceration at Menard and Stateville.  The surgery was successful and Plaintiff no longer suffered any discomfort from the TMJ disorder.

21.     Upon information and belief, prior to being incarcerated at Menard, Plaintiff suffered an injury that reaggravated his TMJ disorder and caused the pain and swelling relating to the TMJ disorder to return.

### PLAINTIFF'S TREATMENT WHILE AT MENARD

22.     In September of 2004, upon Plaintiff's arrival at Menard, Plaintiff informed Menard's medical and dental staff that he was suffering pain and swelling in his right TMJ. Plaintiff was seen by Newbold in Menard's dental clinic.

23.     On September 8, 2004, during a visit to the dental clinic, Plaintiff explained to Newbold his history with TMJ disorder and the treatment he received prior to his current incarceration, including three successful surgeries to his right temporomandibular joint.  On information and belief, Plaintiff further informed Newbold that Dr. Walz, Plaintiff's TMJ specialist prior to his incarceration at Menard, had recommended that Plaintiff's temporomandibular joint be closely monitored because it had shown signs of slight deterioration.

24.     During that same visit Newbold ordered a new mouth guard and noted that Plaintiff's previous x-ray films were to be reviewed by a radiologist to help determine Plaintiff's condition.

5

25.     Upon information and belief, on or around September 16, 2004, Newbold ordered an x-ray of Plaintiff's jaw to further assess the condition of his temporomandibular joint. Newbold ordered a follow-up visit after the x-ray report issued.

26.     Upon information and belief, on around October 8, 2004, upon initial review of the x-ray film, Newbold diagnosed Plaintiff with TMJ disorder, and his initial assessment of the x-ray was that the right temporomandibular joint contained a hair-line fracture.  Despite his diagnosis, Newbold did not to refer Plaintiff to a TMJ specialist.  The official x-ray report had yet to issue.

27.     Upon information and belief, in or around November of 2004, after repeatedly requesting treatment for his TMJ disorder and informing the medical staff that he had been suffering from constant pain and other TMJ disorder related complications since his arrival at Menard, Plaintiff was again seen by Newbold and Chapman.  Plaintiff was told by both Newbold and Chapman that the Menard medical center did not have the expertise to treat his TMJ disorder.  Plaintiff was then informed by Newbold and Chapman that he would not be sent to a TMJ specialist, despite Newbold's TMJ diagnosis and the inability of the Menard medical and dental staff to treat Plaintiff's condition.  Plaintiff was prescribed Motrin (ibuprofen) for pain and returned to his cell.  No x-ray report had issued as of this visit.

28.     On January 25, 2005, Plaintiff again complained of pain and swelling in his right TMJ and noted to the medical department that he had yet to see the dental center since his x-rays to discuss the results of the x-ray report.  Nurse Janet Brauew noted that no dental visit was scheduled since x-rays taken in September of 2004 and that she "assured [Plaintiff] that scheduling would be discussed [with] dental."

29.     That same day, Plaintiff filed a grievance explaining that he suffered from TMJ and detailed the intense pain and swelling he was experiencing.  He also explained his successful treatment for TMJ disorder by specialists prior to his incarceration at Menard and requested that he be sent to see a TMJ specialist.

30.     On February 18, 2005, Plaintiff's January 25, 2005 grievance was denied on the grounds that Plaintiff's dental concerns were "being addressed" by the Menard dental care staff. Newbold and Chapman continued to refuse to send Plaintiff to see a TMJ specialist.  In denying Plaintiff's grievance, Grievance Officer Ryone Murray noted that Newbold had received the x-ray report on November 19, 2004, but had not requested or received the x-ray films and had made no effort to further assess Plaintiff's condition in over 6 months despite initially diagnosing plaintiff with TMJ disorder.

31.     On February 18, 2005, Newbold noted that Plaintiff may need a CT scan or a MRI of his right jaw, however no further action was taken by Newbold or Chapman to schedule these additional tests.

32.     On May 14, 2005, Plaintiff informed the Menard medical staff that he had stomach ulcers and was unable to take the prescribed Motrin.  Prolonged use of Motrin (ibuprofen) can cause ulceration of the stomach or intestines, and exacerbates the condition of existing ulcers.

33.     Throughout the remainder of 2005, Plaintiff's condition worsened.  Plaintiff's jaw started to "pop" and he began to experience difficulty opening and closing his mouth and chewing.  In addition to these new symptoms, Plaintiff continued to complain of severe pain and swelling caused by TMJ and request treatment by a specialist.  During several visits with Newbold and Chapman, Plaintiff was not given sufficient treatment for the pain associated with

his TMJ disorder and was consistently denied access to see a specialist.  Upon information and belief, on at least one occasion, Chapman stated that he had never treated a patient for TMJ and insisted that there was no known treatment for Plaintiff's condition, despite Plaintiff's explanation to Chapman of his successful treatment for TMJ disorder by specialists prior to his incarceration at Menard.

34.     Specifically, on October 31, 2005, Newbold told Plaintiff that "there may not be much else [Menard] can do" about Plaintiff's TMJ disorder and referred him to Feinerman, the Medical Director at Menard.

35.     Upon information and belief, on February 23, 2006, Plaintiff was seen by Feinerman.  Feinerman informed Plaintiff that, contrary to Newbold's and Chapman's assertions, it was possible for Plaintiff to be seen by a TMJ specialist, but that the request for the specialist would have to be instigated by Menard's dental department, i.e. Newbold or Chapman.  After Plaintiff's continued complaints of pain and swelling and requests to see a specialist, Feinerman requested Plaintiff's old medical records detailing his prior TMJ treatment for review – almost a year and a half after Newbold's initial assessment that Plaintiff suffered from TMJ disorder.

36.     On April 4, 2006, Plaintiff filed a grievance complaining about the dental department's continued refusal to refer him to a TMJ specialist.  Plaintiff explained that he had previously been successfully treated by an oral surgeon specializing in TMJ at the University of Illinois at Chicago Medical Center and that Newbold's and Chapman's insistence that TMJ was untreatable were false.  As with the January 25, 2005 grievance, this grievance was also denied on the grounds that Plaintiff's dental concerns were "being addressed" by the Menard dental care staff.  On May 2, 2006, Plaintiff's April 4, 2004 grievance was denied for the same reasons by

8

Warden Dan Halick and his appeal was denied by the Administrative Review Board on June 22, 2006.

37.     Upon information and belief, between June of 2006 through March of 2007, a period of 9 months, the Menard medical and dental staff continued to ignore Plaintiff's requests to see a TMJ specialist and Plaintiff's complaints of severe pain and swelling.  During this time, Plaintiff's jaw began to lock shut and he lost the ability to chew due to the lack of adequate and appropriate treatment.

38.     In March of 2007, after Plaintiff's jaw had begun to lock shut and he was no longer able to consume solid foods due to his inability to chew, Plaintiff was eventually seen by Newbold and Chapman, and later by Feinerman who finally agreed to send Plaintiff to a TMJ specialist and have a CT scan performed on his jaw.

39.     On April 3, 2007, the CT scan was performed and revealed fragmentation of the right TMJ, multiple "loose bodies" in the joint space, and irregularity of the mandibular condyle. The CT scan and x-rays revealed "abnormalities that were not seen before," and upon information and belief were likely a result of the delay associated with Plaintiff receiving the necessary medical treatment.  Chapman referred Plaintiff to Dr. Jay Swanson, an outside oral surgeon who treats TMJ disorders, for further treatment.

40.     On May 1, 2007, Plaintiff was seen by Dr. Jay Swanson.  After reviewing the CT scan, Dr. Swanson informed Plaintiff and Chapman that the "loose bodies" were bone fragments located in and around his TMJ area and that his condylar joint was too badly damaged for repair. Dr. Swanson recommended immediate joint transplant.  According to Dr. Swanson, the only institution performing such surgery in Illinois at the time was Loyola University Hospital in Chicago, (hereinafter, "Loyola").

41.     Upon information and belief, on May 10, 2007, Plaintiff was seen by Chapman and informed that treatment for his TMJ would require a bone transplant.  Plaintiff was also told that a MRI would be necessary before performing surgery.  On June 1, 2007, Plaintiff was sent to E. St. Louis for the MRI.

42.     Throughout this time, Plaintiff's condition remained untreated and he continued to suffer from severe pain and swelling that relegated him to a liquid diet.  By July of 2007, Plaintiff's pain had increased so much that he informed a social worker at Menard that he could not "go on anymore with pain in his jaw."

43.     Around July 19, 2007, Plaintiff was informed by Assistant Warden of Programs at Menard, Gary Conder, that he would be sent to the University of Illinois at Chicago Medical Center, (hereinafter, "U of I"), and not Loyola, despite Dr. Swanson's recommendation and belief that Loyola was the only hospital in the state capable of performing the necessary surgery to treat Plaintiff's TMJ.

## PLAINTIFF'S PRE-SURGERY TREATMENT AT STATEVILLE

44.     Upon information and belief, on September 19, 2007, Plaintiff was transferred to Stateville for purposes of receiving the necessary treatment for his TMJ disorder.  On September 26, 2007, Plaintiff was sent to the Oral Surgery Clinic at U of I where he was seen by two oral surgeons, one of whom was the director of the Oral Surgery Clinic.  The oral surgeons informed Plaintiff that there was no TMJ specialist on staff capable of performing the necessary transplant surgery at that time and referred him to Loyola for immediate for bone transplant surgery.  This information was relayed to Chapman at Menard and Mitchell, the dental director and acting health administrator at Stateville, by the correction officers accompanying Plaintiff during his medical visit to U of I.

45.     Upon information and belief, after his return to Stateville around September 26, 2007, Plaintiff informed Sha'riece of his TMJ disorder.  Plaintiff explained that he was in severe pain and that his jaw was locking shut, and requested to see any dentist, but preferably Mitchell. Mitchell was the dental director at Pontiac during Plaintiff's incarceration in 1988, and diagnosed and treated Plaintiff for TMJ.  As part of his treatment, Mitchell sent Plaintiff to U of I for surgery in 1989 and 1990 and prescribed muscle relaxers and heat treatment to prevent Plaintiff's jaw from locking shut.  Plaintiff's requests for treatment and to be seen by Mitchell or other dentists were ignored.

46.     Upon information and belief, on or around the first week in October of 2007, Plaintiff sent a request slip to Mitchell explaining his current condition and the severe pain and swelling he was experiencing.  The request slip was ignored.

47.     On October 18, 2007, Plaintiff subsequently filed a grievance requesting the joint transplant surgery prescribed by Dr. Swanson and explaining that he was in tremendous pain. Plaintiff also explained that the sole reason he was transferred to Stateville was to receive a bone transplant from a TMJ specialist at U of I, but that according to the oral surgeons at U of I, no such specialist was present to perform the operation.

48.     Upon information and belief, on October 19, 2007, Plaintiff's jaw locked shut causing intense pain and swelling of his face.  Despite Plaintiff's repeated attempts to receive treatment beginning at 9:00 AM that day, Plaintiff was ignored and left in his cell until 11:00 PM.

49.     On October 20, 2007, Plaintiff was finally taken to the U of I Emergency Room. The U of I doctors took x-rays of Plaintiff's jaw and administered pain medication.  An oral surgeon was consulted and a decision was made to perform a MRI at the oral surgery clinic at U

11

of I.  Upon information and belief, the MRI was scheduled for October 22, 2007, but was not conducted because Goshe and Mitchell refused to issue a writ authorizing the test.

50.     Around the end of October of 2007 and beginning of November of 2007, Plaintiff made several requests to be seen by Stateville's dental staff, and particularly Mitchell and Goshe, which were ignored.  As a result, Plaintiff filed grievances dated October 22, 2007, October 26, 2007 and November 7, 2007 detailing the excruciating pain he had endured for more than three years and requesting that he be sent to a TMJ specialist to receive the necessary surgery to treat his condition and mitigate his pain.  These grievances were consolidated with the October 18, 2007 grievance and were ultimately deemed an emergency grievance by Warden McCann on November 26, 2007.  Nonetheless, like the previous grievances, these grievances were also denied based on the assurances by Stateville's medical staff that Plaintiff's health needs were being met.

51.     Upon information and belief, between October and November of 2007, Plaintiff's gums began to bleed due to his jaw being locked shut and despite repeated pleas to Stateville's nursing and medical technician staff, including nurse Sha'riece and medical technician Cuttano, his requests to see dental staff and to receive pain medication were ignored.

52.     Upon information and belief, on November 27, 2007, Stateville health administrator Carol Vance arranged for Plaintiff to see Stateville's visiting oral surgeon, Dr. Craig.  However, as Stateville's medical staff was well aware, Dr. Craig does not treat TMJ disorders.  Accordingly, Dr. Craig recommended that Plaintiff been seen by a TMJ specialist immediately and advised Mitchell, Fattore-Bruno, and Goshe not to prescribe ibuprofen, Motrin, Roboxin, Naproxen or Tylenol as they were insufficient to treat Plaintiff's pain.  Plaintiff was

then sent back to his cell without receiving any pain medication and with his jaw still locked shut.

53.     Plaintiff wrote a formal complaint to Carol Vance on November 30, 2007, explaining the intense pain he was experiencing and that he was unable to open his mouth, as well as the failure of the Stateville dental staff to provide him with any treatment or pain medication during his visit of November 27, 2007.  Plaintiff also wrote a formal complaint to Mitchell, detailing the same facts, and inquiring why he was not receiving, at a minimum, the muscle relaxers and heat packs which had prevented Plaintiff's jaw from locking when she treated him at Pontiac Correctional Facility.  Neither Ms. Vance nor Mitchell responded to Plaintiff's complaints.

54.     Upon information and belief, at Carol Vance's request, Plaintiff was brought to the Stateville dental clinic on December 6, 2007, where he was seen and ultimately admitted to the infirmary by Mitchell and Fattore-Bruno.  Plaintiff was given Tylenol 3 for pain and Roboxin muscle relaxers to help try to unlock Plaintiff jaw, both of which were inadequate for their intended purposes, as noted previously by Dr. Craig.  Plaintiff was then informed by Goshe and Fattore-Bruno that he would be sent to Loyola the following week, nearly three months after his arrival at Stateville.  Plaintiff was never sent to Loyola.

55.     On December 10, 2007, Plaintiff was sent to U of I for the MRI that was originally ordered by the U of I emergency room physician and scheduled to be conducted on October 22, 2007.  The MRI revealed "complete disruption" of the right temporomandibular joint with deformity of the mandibular condyle and the "presence of multiple intra and extra-articular calcifications."  Further, the joint space was "completely obliterated," and the articular disk of the joint was so damaged that it was "not recognized."  In short, as Drs. Swanson and

13

Craig had previously indicated, Plaintiff's temporomandibular joint was completely beyond repair and needed to be immediately replaced with surgery. Upon information and belief, the delay in treatment for Plaintiff's condition exacerbated his TMJ condition beyond repair.

56. Upon information and belief, on December 17, 2007, over two and one half months after the oral surgeons at U of I recommended Plaintiff be sent immediately to Loyola to receive the necessary surgery, and nearly three months after he was transferred to Stateville to have this critical surgery, Goshe informed Plaintiff that he had faxed a referral that day to Loyola for bone transplant surgery, but that Loyola was not accepting any new patients.

57. On January 7, 2008, Plaintiff's appeal of his November 7, 2007 grievance was denied by the Administrative Review Board for appeal, on the ground that "inmate's medical needs were being addressed," despite the fact that Plaintiff's pain was completely unmitigated and that he had yet to be seen by a TMJ specialist capable of treating his condition.

58. On January 12, 2008, Plaintiff was seen by the Medical Center at Stateville. The registered nurse reported that Plaintiff was "crying and clenching his jaw" during his assessment.

59. Plaintiff filed another grievance on January 15, 2008, requesting to see a TMJ specialist regarding his condition and the necessary surgery. Plaintiff was finally sent to meet with Dr. James Edwards, an oral surgeon specializing in the treatment of TMJ at the U of I oral surgery clinic. Dr. Edwards immediately ordered a CT scan to determine the extent of damage to Plaintiff's TMJ area, which was performed toward the end of the same month.

60. In or around the month of February 2008, Plaintiff was sent to Dr. Edwards at U of I for a follow-up visit and was informed that his entire joint needed to be replaced. Dr. Edwards showed Plaintiff at least 10 bone fragments in and around his temporomandibular joint area and recommended immediate surgery.

14

61.    Upon information and belief, on March 16, 2008, Plaintiff was admitted into the U of I for surgery, and on March 19, 2008 his complete right condylar joint was successfully replaced.

## PLAINTIFF'S POST-SURGERY TREATMENT AT STATEVILLE

62.    Plaintiff was released on March 20, 2008 and Dr. Edwards sent instructions to Goshe, Mitchell, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite device." Dr. Edwards also requested that the Stateville medical staff contact him if there were questions on what type of physical therapy was required for Plaintiff. Dr. Edwards' mandatory post-operative treatment plan was ignored by the Stateville dental and medical staff and Plaintiff was not provided with the required physical therapy or the TheraBite device.

63.    From March 20, 2008 to March 25, 2008, Plaintiff did not receive the necessary post-operative treatment prescribed by Dr. Edwards.

64.    Upon information and belief, when Plaintiff returned to U of I for a follow-up visit on March 25, 2008 to have his stitches removed, Dr. Edwards was surprised to learn that Plaintiff had not received any physical therapy or the TheraBite device.

65.    On or around March 25, 2008, Dr. Edwards again informed Stateville's medical staff of the required post-operative care necessary to ensure a successful outcome for the surgery. Plaintiff did not receive the prescribed treatment.

66.    Upon information and belief, Plaintiff was again seen by Dr. Edwards for follow-up care on or around April 1, 2008. Dr. Edwards again prescribed mandatory physical therapy and use of the TheraBite device and sent his instructions to Goshe, Fattore-Bruno, and Mitchell.

Nonetheless, as before, Stateville's medical and dental staff failed to provide Plaintiff with either the device or the physical therapy.

67.     On April 24, 2008, acting on behalf of the Grievance Office, the director of nursing of Stateville, Mary Purvin, responded Plaintiff's January 15, 2008 grievance related to Stateville's medical staff's failure to provide him with pain medication and his jaw being locked shut.  On information and belief, Ms. Purvin falsely stated that Plaintiff was receiving weekly treatment by Fattore-Bruno and that physical therapy had been ordered for Plaintiff.  Upon information and believe, in actuality, Plaintiff had not been seen by Fattore-Bruno for months prior to his surgery, and even after his surgery he had only seen Fattore-Bruno twice.

68.     On May 13, 2008, Plaintiff filed a grievance because of the medical and dental staff's refusal to provide the prescribed physical therapy and the TheraBite device.

69.     On May 14, 2008, Plaintiff could only open his mouth 13mm, which was less than the 19mm that he could open his mouth on April 18, 2008.

70.     On May 15, 2008, Warden McCann deemed the May 13, 2008 grievance an emergency grievance.  In response to Plaintiff's grievance, Plaintiff was given tongue depressors for therapy.  However, Plaintiff was not given access to a physical therapist and did not receive the Therabite device or physical therapy prescribed by Dr. Edwards.

71.     Shortly thereafter, on information and belief, Plaintiff was subsequently seen by Garg at the Stateville dental clinic.  Plaintiff explained that he was suffering from severe pain in both his right and left temporomandibular joint areas and that he had been unable to open his mouth after surgery.  Plaintiff also inquired about the prescribed physical therapy and TheraBite device.  On information and belief, Garg responded that physical therapy was unnecessary despite the fact that he was not a TMJ specialist.

16

72.     On June 11, 2008, Plaintiff visited the Stateville dental clinic and reminded the staff that he "needs to go to UIC for follow up and pick a device to help his jaw heal." Plaintiff also reminded the staff that Dr. Edwards requested "physical therapy for [Plaintiff's] jaw."

73.     Upon information and belief, on June 19, 2008, Plaintiff approached Assistant Warden Melvin Reed and Major Wright regarding the TMJ surgery he had recently received and the medical/dental staffs' denial of the prescribed post-operative care. Despite Assistant Warden Reed's assurances that he would "look into it," the medical staff continued to deny Plaintiff the prescribed post-operative care.

74.     Upon information and belief, Plaintiff was taken to the Stateville medical unit on June 19, 2008 and seen by defendant Goshe regarding his TMJ condition. Goshe examined Plaintiff and noticed swelling of Plaintiff's right TMJ area where he had surgery and that Plaintiff could barely open his mouth. When Goshe asked Plaintiff what treatment the dental staff was providing, Plaintiff informed him that he was not receiving treatment of any kind. Goshe then asked Mitchell and Saffold why Plaintiff was not receiving the post-operative treatment prescribed by Dr. Edwards. Without even examining Plaintiff, Saffold replied that Plaintiff did not need physical therapy because it would not help and that no treatment existed for TMJ – despite Dr. Edward's post-operative instructions to the contrary.

75.     Upon information and belief, on July 9, 2008, Plaintiff was again sent to the U. of I. for follow up care. He was seen by Dr. Thomas Rogers, an oral surgeon familiar with Plaintiff's case. Dr. Rogers ordered physical therapy three times a week and the daily use of heat packs. Dr. Rogers also requested that a TheraBite device be ordered for Plaintiff. On information and belief, Dr. Roger's orders were completely ignored by Stateville's medical and dental staff.

17

76.     Upon information and belief, throughout the month of August of 2008, Plaintiff repeatedly attempted to gain access to heat packs, physical therapy, and the TheraBite device by sending request slips through medical staff to Mitchell and Goshe.  On information and belief, when Plaintiff inquired as to the status of his requests, the medical staff informed Plaintiff that Mitchell was still upset about a lawsuit that Plaintiff had instigated against her at Pontiac Correctional Center, and that she would address Plaintiff's requests, "when she does."

77.     On August 14, 2008, Acting Assistant Warden of Programs, Mark Hosey,

78.     Upon information and belief, on September 9, 2008, Plaintiff was seen by Dr. Edwards for another follow-up care visit.  When Plaintiff explained that he had yet to receive either the prescribed physical therapy or the TheraBite device, Dr. Edwards was frustrated and stated that he would personally order the Therabite device in view of the refusal of Stateville Medical Center's refusal to order the device for Plaintiff.  Six months had passed since Plaintiff's TMJ surgery and Plaintiff had yet to receive any of the prescribed physical therapy or the Therabite device.  At this point, Plaintiff weighed 194 lbs.

79.     Upon information and belief, on September 23, 2008, Plaintiff finally received the TheraBite device from Dr. Edwards during a follow-up visit.

80.     Upon information and belief, on September 29, 2008, Plaintiff sent a request slip to Mitchell explaining that his jaw was locking shut and that he was in severe pain.  Despite Plaintiff's requests to see Mitchell, Plaintiff was not seen by a dentist and instead given a muscle relaxer in an attempt to unlock his jaw.  The following day, Plaintiff was taken to health care unit at Stateville by a medical assistant, but none of the dentists would agree to see Plaintiff.  Instead, Plaintiff was seen in the emergency room by Dr. Zang, a non-dentist, who stated she didn't treat

TMJ because it is a dental issue.  Dr. Zang gave Plaintiff an injection for pain and sent him back to his cell.

81.     On October 3, 2008, Plaintiff was seen by Garg because his jaw was locked shut. The dental records indicate that physical therapy is required and list Edwards's phone number. Garg returned Plaintiff to his cell without treatment or physical therapy order.

82.     Upon information and belief, on October 6, 2008, Plaintiff informed Assistant Warden Mark Hosey that he was in incredible pain and that the medical and dental staff had refused to provide him with the prescribed physical therapy.

83.     In response to Assistant Warden Hosey's inquiries, Plaintiff was finally seen by a physical therapist on October 8, 2008 – over six months after his joint replacement surgery. During the physical therapy session, the therapist explained that he did not know what kind of therapy to provide, and simply measured Plaintiff's ability to open his mouth using tongue blades and provided Plaintiff with muscle relaxers.  On information and belief, the U of I dental department was never contacted to determine what type of physical therapy to provide to Plaintiff.

84.     Upon information and belief, throughout the month of October of 2008, Plaintiff sent multiple request slips to Mitchell and Saffold informing him that his jaw was locking shut but the requests went unanswered.

85.     Upon information and belief, on October 23, 2008, Plaintiff was sent to U of I for a follow-up visit with a new oral surgeon because Dr. Edwards had left the clinic.  The new surgeon prescribed muscle relaxers and vicodin for pain and explicitly ordered that Plaintiff not be given ibuprofen due to his ulcers.

86.     Upon information and belief, on October 28, 2008, Plaintiff was seen by Goshe, who informed Plaintiff that the only pain medication he would prescribe was ibuprofen, despite his knowledge of Plaintiff's ulcers and the oral surgeon's notes to the contrary.

87.     Upon information and belief, throughout the month of November of 2008, Plaintiff submitted multiple request slips to be seen by Garg, Mitchell, Saffold, and Goshe and for the prescribed muscle relaxers and vicodin.  Plaintiff never received vicodin during this period.

88.     On December 30, 2008, Plaintiff submitted a grievance again detailing the intense pain he was experiencing and the failure of Stateville's medical and dental staff to provide the prescribed treatment.

89.     Upon information and belief, on January 6, 2009, Plaintiff was seen in the Stateville dental clinic by Dr. Craig.  Plaintiff explained his condition and the events that had occurred since his last visit to Stateville, including the joint replacement surgery and the complete denial of the prescribed post-operative care by the Stateville medical and dental staff. Dr. Craig recommended that plaintiff be seen by U of I for a follow-up visit.

90.     On January 31, the Grievance Office determined that the grievance was being addressed by Dr. Craig's instructions, and noted that the recommended follow-up visit to U of I needed to be scheduled.  In the following month, the Stateville medical and dental staff failed to schedule this follow-up visit.  Plaintiff subsequently filed the original complaint for this action on February 24, 2009.

## PLAINTIFF'S TREATMENT AT STATEVILLE AFTER FILING OF COMPLAINT

91.     Upon information and belief, since the filing of the original complaint, both Plaintiff's condition and his treatment by the Stateville medical and dental staff have significantly deteriorated.  Despite repeated attempts to seek treatment from the medical and dental staff named as defendants in this action, Goshe, Mitchell, Fattore-Bruno, Saffold and Garg have refused provide adequate treatment.

92.     Upon information and belief, on February 26, 2009, Plaintiff informed Assistant Warden of Operations Marvin Reed that his jaw was locking shut and that he was in extreme pain to the point of crying.  Plaintiff's right side of his face was also visibly swollen.  Plaintiff was escorted to health care, but Goshe refused to see him.

93.     Upon information and belief, on March 20, 2009, Plaintiff was finally seen by Garg after repeated requests for treatment.  At this point, Plaintiff's jaw was essentially locked shut, and he was only able to speak through clenched teeth.  Plaintiff informed Garg that he was in intense physical pain and that even the simple act of speaking was extremely painful.  During the visit, Garg refused to physically examine Plaintiff, and simply asked him questions.  No substantive treatment was provided.

94.     Upon information and belief, on March 20, 2009, Plaintiff was sent to the emergency room after being refused treatment at the dental clinic.  Plaintiff was treated by Nurse Practitioner Williams while at the emergency room with a 30 mg injection of Toradol.  Toradol was effective in reducing plaintiff's pain within four hours of the injection and his jaw begin to unlock until the medication wore off.

95.     Upon information and belief, Plaintiff has been unable to eat solid foods since the treatment of March 20, 2009.  However, for a period of time, Stateville was apparently without a

working blender and therefore could not provide Plaintiff with a liquid or pureed diet. Plaintiff has been forced to live off of a diet consisting only of milk. Plaintiff has made repeated requests to see Goshe, Garg, Mitchell, Fattore-Bruno, and Saffold in an effort to provide him with special nutritional drinks, such as Ensure and Boost, to supplement his milk diet. Each request for treatment has been met with denial and Plaintiff has only been supplied with nutritional drinks sporadically.

96. Upon information and belief, on April 14, 2009, Plaintiff was sent to the U of I College of Dentistry for a follow-up visit. Plaintiff was informed that the failure of the prescribed post-operative care has caused his condition to deteriorate to the point that physical therapy is no longer a viable option and that his TheraBite device can no longer be used effectively. The delay to provide Plaintiff with satisfactory post-operative medical treatment has lead to the deterioration of his condition.

97. Upon information and belief, around April of 2009, Plaintiff was also informed by the U of I dentists that his condition is being exacerbated by problems with his facial muscles, and that he needs to see Dr. Klosser, a facial muscle specialist at U of I. The U of I dentists then informed Plaintiff that they would provide Stateville's medical staff with their recommendations, as well as prescriptions for pain medication, muscle relaxers, and a liquid diet.

98. Upon information and belief, around April of 2009, Stateville's medical and dental staff has refused to provide Plaintiff with the prescribed medications or to send Plaintiff to see Dr. Klosser, and has only randomly supplied Plaintiff with limited supplies of nutritional drinks. As a result of this denial of sufficient nutrition, Plaintiff's weight has dropped to 170lbs, down from 194 lbs in September of 2008 – a loss of 24 lbs.

99.     Upon information and belief, Plaintiff has subsequently filed multiple grievances requesting to see Dr. Klosser and seeking the necessary pain medication and liquid diet he requires, to no avail.

100.     Plaintiff presently continues to be denied adequate medical treatment to treat his TMJ condition, including filing a number of requests slips to the Stateville dental center to address Plaintiff's on-going pain related to his TMJ disorder.  Gosh and Mitchell have refused to see Plaintiff, and to the extent Plaintiff has seen Gosh and Mitchell, they have not provided him with adequate treatment or care to alleviate his pain related to Plaintiff's TMJ condition.

101.     Plaintiff filed a grievance on September 9, 2009 complaining of his jaw locking shut again and the failure of Mitchell to address plaintiff's condition.  The counselor reported that he spoke with the dental department and that they were aware of Plaintiff's issue and he would be seen soon.

102.     Upon information and belief, Stateville has recently acquired a working blender, but Plaintiff is still being denied a liquid/pureed diet.  Instead, regular meals are being provided, contrary to the orders of the U of I surgeons and doctors.

103.     Upon information and belief, Plaintiff has yet to receive satisfactory care to help alleviate the pain associated with his TMJ condition.

104.     On September 23, 2009, counsel for Plaintiff sent Stateville Acting Warden Anthony Ramos a letter offering to discuss Plaintiff's condition and potential treatment options in an attempt to immediately call attention to, and rectify, the situation and avoid filing this amended complaint.  Ramos never replied.

**COUNT I:**

**DEPRIVATION OF EIGHTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983
FOR DENIAL OF ADEQUATE TREATMENT FOR PLAINTIFF'S CONDITION**

105.    Plaintiff realleges paragraphs 1 through 104 as if fully set forth herein.

106.    Plaintiff suffers from a condition referred to as temporomandibular joint

("TMJ") disorder.  TMJ disorder is frequently a secondary manifestation of underlying primary

problems associated with the craniosacral, nervous, musculoskeletal, myofascial and masticatory

systems.  The severity of TMJ is influenced by factors including traumatic injuries, physical, and

psychological or environmental stressors (past or present) that may cause repeated and chronic

clenching of the jaw.  People suffering from TMJ experience pain throughout the head/neck/face

and upper back.

107.    Mild to moderate cases of TMJ can be treated in a number of ways, including the

use of mouth guards that cushion the jaw/tooth interaction, ice packs/moist heat to relax tense

muscles, ultrasound to provide deep heat to the jaw, trigger point injections of pain/anesthetic

medications to relieve pain and relax the facial muscles, and transcutaneous electrical nerve

stimulation (TENS), which uses low-level electrical currents to relax the jaw and facial muscles.

However, if left untreated, the persistent and prolonged compression of the jaw may compromise

the disc and surrounding soft tissue in the TMJ area, and can ultimately result in structural

damage to the joint itself.  Even the most subtle distortions in the alignment and symmetry of the

cranial and facial bones will have a dramatic affect on the function of the mandibular joint.

108.    The failure to adequately treat TMJ disorder can cause severe pain and

swelling and can result in the worsening of the condition causing the jaw to lock shut, thereby

reducing or eliminating a person's ability to chew, yawn, or even speak.

109.     Once the TMJ disorder escalates to the point that the temporomandibular joint is structurally damaged, the only viable treatment is joint surgery.  This is particularly true in cases where the joint deteriorates to the point that bone fragments are present.

110.     For over three-and-a-half years, all Defendants have failed to adequately treat Plaintiff's TMJ disorder and to provide access to a TMJ specialist capable of providing long-term relief, despite an early diagnosis of the condition.  The failure to provide sufficient medication to alleviate Plaintiff's intense pain and swelling on a daily basis was objectively and sufficiently serious to constitute the denial of the minimal civilized measures of life's necessities.

111.     Upon information and belief, all Defendants were aware that Plaintiff suffered from TMJ disorder.

112.     Upon information and belief, all Defendants were aware that Plaintiff was being denied access to a TMJ specialist and/or medication capable of alleviating Plaintiff's pain and suffering.

113.     Upon information and belief, all Defendants were aware that the unsatisfactory treatment of Plaintiff's TMJ disorder would lead to increased pain and suffering and could potentially worsen his condition.

114.     Upon information and belief, all Defendants were aware that Plaintiff's TMJ condition continued to degrade from strong pain and swelling in 2004, to severe pain and swelling that caused his jaw to lock shut and prevented him from consuming solid foods in 2007 and 2008.

115.     Upon information and belief, all Defendants dilatory actions in treating Plaintiff's condition led his condition to severely deteriorate prior to Plaintiff's TMJ surgery.

116.    Upon information and belief, all Defendants, at a minimum, acted with deliberate indifference to Plaintiff's medical needs and treatment by failing to provide Plaintiff adequate medical care to treat his TMJ disorder over the three and a half years.

117.    Upon information and belief, the actions, or lack thereof, of all Defendants have caused Plaintiff physical injury and mental anguish, and have subjected Plaintiff to cruel and unusual punishment in violation of the Eighth Amendment to the Constitution of the United States.

**COUNT II:**

**DEPRIVATION OF EIGHTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983 FOR REFUSAL TO PROVIDE PRESCRIBED MANDATORY POST-OPERATIVE TREATMENT**

118.    Plaintiff realleges paragraphs 1 through 118 as if fully set forth herein.

119.    Serious cases of TMJ disorder require surgery to reconstruct the temporomandibular/condylar joint(s) in order to restore the ability of the jaw to open and close.

120.    The failure to provide adequate and necessary post-operative treatment for temporomandibular replacement surgery can render the surgery moot by preventing restoration of joint articulation and failing to alleviate the pain and swelling associated therewith.

121.    The failure to provide Plaintiff with the prescribed post-operative care was objectively and sufficiently serious to constitute the denial of the minimal civilized measures of life's necessities.

122.    Upon information and belief, Defendants II were aware that Plaintiff underwent oral surgery to repair his right TMJ on March 19, 2008.

123.    Upon information and belief, Defendants II were aware that the surgery immediately improved Plaintiff's TMJ condition.

124.    Upon information and belief, Defendants II were aware that Dr. Edwards had prescribed mandatory physical therapy and the use of the TheraBite device immediately after the surgery was performed on March 19, 2008.

125.    Upon information and belief, Defendants II denied Plaintiff access to both the prescribed physical therapy and/or the TheraBite device.

126.    Defendants II are aware that the failure to provide the prescribed post-operative care can adversely affect a patient's successful recovery from the operation.

127.    Plaintiff and Dr. Edwards reminded Defendants II multiple times after the surgery to provide Plaintiff with the prescribed physical therapy and TheraBite device.

128.    Upon information and belief, Defendants II were aware that over time, Plaintiff began to again experience severe pain, swelling, and jaw locking as a result of the continued failure to provide Plaintiff with the necessary and prescribed post-operative treatment.

129.    Upon information and belief, Defendants II were aware that the failure to provide the prescribed post-operative physical therapy and the TheraBite device in a timely manner has rendered both treatments ineffective for Plaintiff's condition.

130.    The denial of physical therapy and TheraBite device to Plaintiff has caused Plaintiff's condition to worsen to the point that Plaintiff is now experiencing symptoms related to the TMJ disorder that were similar to those experienced prior to the March 19, 2008 surgery.   The failure of Defendants II to provide the TheraBite device and lack immediate of physical therapy has rendered the March 19, 2008 surgery ineffective.

131.    Upon information and belief, Defendants II continue to fail to adequately treat Plaintiff's reaggravated TMJ disorder and fail to provide effective medical treatment to minimize the pain and suffering as a result of Plaintiff's TMJ disorder.

132.    Upon information and belief, Defendants II, at a minimum, acted with deliberate indifference to Plaintiff's medical needs and treatment by failing to provide the prescribed post-operative care.

133.    Upon information and belief, the actions, or lack thereof, of Defendants II have caused Plaintiff physical injury and mental anguish, and have subjected Plaintiff to cruel and unusual punishment in violation of the Eighth Amendment to the Constitution of the United States.

**COUNT III:**

**DEPRIVATION OF EIGHTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983 BY WEXFORD FOR DENIAL OF ADEQUATE TREATMENT OF PLAINTIFF'S MEDICAL CONDITION AND REFUSAL TO PROVIDE PRESCRIBED MANDATORY POST-OPERATIVE TREATMENT**

134.    Plaintiff realleges paragraphs 1 through 133 as if fully set forth herein.

135.    Upon information and belief, during the time period between 2007-2009 Wexford either had a policy, or alternatively adopted a custom that infringed upon the Eighth Amendment rights of the Plaintiff by 1) refusing to diagnose or provide adequate treatment for Plaintiff's serious TMJ disorder, which was outside the expertise of Wexford's employees, and/or 2) refusing to follow the post-operative care orders and prescriptions issued by Plaintiff's oral surgeons and other specialists at UIC.

136.    Upon information and belief and as alleged in paragraphs 1-133, at least Defendants Ghosh, Fattore-Bruno, and Chapman, who are all Wexford employees, have been deliberately indifferent to Plaintiff's serious medical needs and have subjected Plaintiff to cruel

and unusual punishment in violation of the Eight Amendment to the Constitution of the United States.

137.    Upon information and belief, the conduct of at least Wexford employees Ghosh, Fattore-Bruno, and Chapman, have established a deliberately indifferent custom of refusing to diagnose or provide adequate treatment for serious medical conditions outside their expertise, including Plaintiff's TMJ disorder, and ignoring the orders, prescriptions, and/or advice of outside physicians and specialists, including the post-operative orders issued by Plaintiff's oral surgeons and specialists at UIC.

138.    Upon information and belief, this custom of deliberately indifferent conduct was sufficiently open and obvious that the individuals at Wexford responsible for policy-making or oversight were, or should have been, aware of it.

139.    Upon information and belief, the inaction, or insufficient action taken by the individuals at the policymaking level of Wexford to remedy this custom resulted in Wexford's adoption or encouragement of its employee's deliberately indifferent treatment of Plaintiff's TMJ disorder.

**WHEREFORE**, Plaintiff prays this Honorable Court to:

     A.     Award Plaintiff injunctive relief by:

          a.   Immediately providing Plaintiff with effective pain;

          b.  Providing Plaintiff with an adequate long-term treatment solution for Plaintiff's TMJ condition to;

     B.     Award compensatory damages from all Defendants in an amount to be determined at trial;

     C.     Award Plaintiff damages for suffering mental anguish, pain and suffering to body and mind in an amount to be determined at trial;

     D.     Award Plaintiff attorney fees and costs; and

     E.     Award such other and additional relief that this Honorable Court deems just and equitable.

Dated: April 29, 2010                Respectfully submitted,

                                 /s/  Thomas C. Burton

                                 Meredith Martin Addy
                                 Manish K. Mehta
                                 Thomas C. Burton
                                 BRINKS HOFER GILSON & LIONE
                                 455 North Cityfront Plaza Drive
                                 NBC Tower – Suite 3600
                                 Chicago, Illinois  60611-5599
                                 Telephone:  (312) 321-4200
                                 Facsimile:  (312) 321-4299

                                 Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a true and correct copy of the foregoing

PLAINTIFF'S SECOND AMENDED COMPLAINT is being served by electronic case filing

system (ECF) on the 29 day of April, 2010 to the following attorneys of record:

Saira J. Alikhan
Assistant Attorney General
General Law Bureau
100 W. Randolph St., 13th Floor
Chicago, IL 60601
(312) 814-6131

William Michael LeCrone
Charysh & Schroeder, Ltd.
33 North Dearborn Street
Suite 1300
Chicago, IL 60602
(312) 372-8338


/s/ Thomas C. Burton_____
BRINKS HOFER GILSON & LIONE
455 North Cityfront Plaza Drive
NBC Tower – Suite 3600
Chicago, IL  60611-5599
Telephone:    (312) 321-4200
Facsimile:     (312) 321-4299

Attorney for Plaintiff