**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

RAYMOND KING, Inmate No. N54043,    )
                                              )
             Plaintiff,      )
                                              )     No.  09-cv-1184
v.                                    )     Mag. Judge Sidney I. Schenkier
                                            )
DR. CHAPMAN, et al.,        )
                                            )
             Defendants.    )

**DEFENDANTS DR. NATHAN CHAPMAN, DR. PARTHASARATHI GHOSH,
DR. LADEANE FATTORE-BRUNO AND WEXFORD HEALTH SOURCES, INC.'S
LOCAL RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants,  DR. NATHAN CHAPMAN, DR. PARTHASARATHI GHOSH,

DR. LADEANE FATTORE-BRUNO and WEXFORD HEALTH SOURCES, INC., by their

attorneys, Charysh & Schroeder, Ltd., submit the following as their Rule 56 Statement of

Uncontested Facts.

**Uncontested Facts in Plaintiff's Second Amended Complaint**

1.      Mr. King was incarcerated at Menard Correctional Center from approximately

September, 2004, to September 19, 2007.  (Second Amended Complaint, ¶ 16, attached as

**Exhibit A**).

2.      He has been incarcerated at Stateville Correctional Center from September 19,

2007, to the present.  (Ex. A, ¶ 17).

3.      He has undergone a total of four surgeries to the temporomandibular joint (TMJ)

in his jaw.  (Ex. A, ¶ 18).

4.      At Menard, he was initially treated by Dr. Newbold, who ordered a mouth guard (or "splint" or "night guard") for his TMJ issues, ordered x-rays to assess his TMJ and conducted a follow-up visit with Mr. King.  (Ex. A, ¶¶ 24-26).

5.      He received Motrin (Ibuprofen) for his complaints of pain.  (Ex. A, ¶ 27).

6.      At Menard, he was also seen by the Medical Director, Dr. Adrian Feinerman. (Ex. A, ¶¶ 10, 35).

7.      Dr. Feinerman agreed to send him to a TMJ specialist and have a CT scan performed on his jaw.  (Ex. A, ¶ 38).

8.      Mr. King had the CT performed and was seen by Dr. Jay Swanson, an oral surgeon outside the prison system, who treats TMJ disorders.  (Ex. A, ¶ 39).

9.      Dr. Swanson informed Mr. King that, as of May 1, 2007, the only institution performing TMJ replacement was Loyola University Hospital in Chicago (Loyola).  (Ex. A, ¶ 40).

10.      On June 1, 2007, he was sent outside the prison system for an MRI of his TMJ. (Ex. A, ¶ 41).

11.      He was informed by an Assistant Warden at Menard that he was being sent to UIC Medical Center (UIC) for his TMJ treatment.  (Ex. A, ¶ 43).

12.      On September 26, 2007 (one week after his transfer to Stateville), he was seen at the Oral Surgery Clinic at UIC, but he was not admitted to the hospital and was sent back to Stateville.  (Ex. A, ¶¶ 44-45).

13.      He was sent to Emergency Room at UIC on October 19, 2007, after complaining that his, "jaw locked shut causing intense pain and swelling of his face."  (Ex. A, ¶¶ 48-49).

14.     While at Stateville prior to his TMJ replacement surgery, Mr. King was seen by an in-house oral surgeon, Dr. Craig, he was admitted to the infirmary and he was prescribed pain medications and muscle relaxants.  (Ex. A, ¶¶ 52-53).

15.     He was informed by Dr. Ghosh that Loyola was not accepting new TMJ surgical patients.  (Ex. A, ¶ 56; see also Deposition Transcript of Dr. Ghosh, p. 80, lines 11-21, attached as **Exhibit B**).

16.     He received an MRI at UIC on December 7, 2007.  (Ex. A, ¶ 55).

17.     He was seen as an out-patient at UIC in or around February 2008, for surgical evaluation of his TMJ.  (Ex. A, ¶¶ 59-61).

18.      His TMJ replacement surgery proceeded on March 19, 2008.  (Ex. A, ¶¶ 59-61).

### Uncontested Facts From Deposition of Raymond King

19.     Mr. King first injured his jaw in 1987, when a baseball bat struck his face.  (See deposition transcript of Raymond King, p. 22, lines 3-7, attached as **Exhibit C**).

20.     He was first diagnosed with TMJ in 1988.  (Ex. C, p. 23, lines 18-20).

21.     He injured his jaw in an automobile accident in 1992.  (Ex. C, p. 31, line 22, to p. 32, line 14).

22.     At the time of his deposition on February 24, 2011, he was taking Valium. (Ex. C, p. 26, lines 10-12).

23.     In the past, he received relief from his TMJ symptoms with Indocin, which is an NSAID (non steroidal anti-inflammatory drug).  (Ex. C, p. 36, line 14, to p. 37, line 4).

24.     He received surgery on his TMJ in 1989, 1990 and 1992.  (Ex. C, p. 39, lines 11-22; p. 40, lines 8-22; p. 42, lines 1-10).

3

25.     He claims he injured his jaw again in June 2004, when his face was slammed into a table.  (Ex. C, p. 43, lines 6-24).

26.     He had a night guard for his jaw when he arrived at Menard, which broke and was repaired.  (Ex. C, p. 51, lines 8-18).

27.     According to Mr. King, the night guard did not help.  (Ex. C, p. 53, lines 12-16).

28.     He had access to warm water to put on washcloths in his cell.  (Ex. C, p. 52, lines 14-22).

29.     In 1992, he was shown home exercises for his jaw by a physical therapist, including how to stretch his mouth with his fingers to increase the range of motion in his jaw.  (Ex. C, p. 56, line 20, to p. 60, line 11).

30.     When he was transferred from Menard to Stateville, medications (Naproxen and Robaxin) were forwarded with him.  (Ex. C, p. 71, lines 11-14).

31.     He was taken from Stateville to the Emergency Room at UIC on October 19, 2007, but he was not admitted and he was sent back to Stateville.  (Ex. C, p. 73, lines 6-9; p. 20, to p. 77, lines 11-19).

32.     He received Ibuprofen, Robaxin (a muscle relaxer) and Tylenol 3 (a pain medication) at Stateville.  (Ex. C, p. 79, lines 21-23; p. 85, lines 2-19).

33.     Tylenol 3 helped decrease his TMJ pain.  (Ex. C, p. 102, lines 8-17).

34.     For his TMJ replacement, Mr. King admits that the surgeons at UIC explained that one risk is that surgery could fail.  (Ex. C, p. 91, lines 16-21).

35.     As of the date of his deposition, he did not have TMJ *joint* pain – the only pain he experiences is from his jaw muscles.  (Ex. C, p. 107, lines 15-22) (emphasis added).

36. Before he received his Therabite device, he was given and instructed on how to use tongue blades in his cell by Dr. Fattore-Bruno. (Ex. C, p. 109, lines 6-24).

37. He received a Therabite device in September, 2008, and, as of the date of his deposition, he still had it. (Ex. C, p. 112, lines 17-21).

38. He received treatment by physical therapists at Stateville, who provided him with heat packs and neck massages. (Ex. C, p. 115, lines 6-20).

39. In addition to taking Valium at Stateville, he has also taken Lodine, which helps his TMJ issues, and Celebrex. (Ex. C, p. 119, lines 10-15; p. 120, lines 5-6).

40. As of the date of his deposition (February 24, 2012), he had a night guard at Stateville. (Ex. D, p. 122, lines 11-12).

41. Dr. Miloro (mispelled as "Malore") explained to him that no other surgeries are available for his TMJ. (Ex. C, p. 124, lines 1-7).

42. Dr. Newbold (at Menard) gave Mr. King a bite splint (or night guard) and prescribed Ibuprofen and Motrin. (Ex. C, p. 139, lines 4-11).

### Uncontested Facts From Deposition of Dr. Chapman

43. Dr. Chapman is the Dental Director at Menard. (See deposition transcript of Dr. Nathan Chapman, p. 6, lines 19-22, attached as **Exhibit D**).

44. He is a Doctor of Medical Dentistry and has been licensed since 1999. (Ex. D, p. 6, line 12).

45. Dr. Feinerman was the Medical Director at Menard for a long time, including 2004-2007. (Ex. D, p. 8, lines 2-5; p. 11, line 19, to p. 12, line 6).

46.     As Dental Director, Dr. Chapman supervises the dental staff and oversees the dental care of the inmates.  (Ex. D, p. 9, lines 1-6).

47.     For an inmate to receive a CT scan, it must be approved by the Medical Director, then the healthcare vendor.  (Ex. D, p. 22, lines 2-15).

48.     Dr. Chapman's only training in diagnosing TMJ dysfunctions was through dental school – he was taught how the TMJ area works and the signs and symptoms to look for in order to make a referral.  (Ex. D, p. 34, lines 4-8).

49.     If a patient has signs and symptoms of TMJ and conservative treatment does not help, you make referrals to oral surgeons and/or ENTs.  (Ex. D, p. 34, lines 12-18).

50.     Conservative treatment for TMJ patients includes use of mouth guards, muscle relaxers and pain medications.  (Ex. D, p. 44, lines 2-44).

51.     Dr. Swanson is an oral surgeon.  (Ex. D, p. 47, line 22).

52.     Because he had not yet seen Mr. King in 2004, Dr. Chapman did not know the nature of his TMJ condition.  (Ex. D, p. 71, line 22, to p. 72, line 2).

53.     He first saw Mr. King on July 3rd or 13th, 2005.  (Ex. D, p. 73, lines 19-22).

54.     On his first visit with Mr. King, he would review the case to obtain an understanding of what's going on with the patient and what other doctors have done.  (Ex. D, p. 78, lines 3-8).

55.     Mr. King had a night guard at that time. (Ex. D, p. 78, line 16).

56.     In July, 2005, Dr. Chapman noted that Mr. King was wearing his night guard – he made adjustments to it.  (Ex. D, p. 78, lines 9-22).

57.     In August, 2005, Dr. Chapman examined Mr. King, noted that he was wearing his night guard and prescribed Motrin.  (Ex. D, p. 79, lines 8-22).

58.     Dr. Craig is an oral surgeon who is contracted to come to prisons, including Menard, to see patients.  (Ex. D, p. 80, lines 6-16).

59.     Dr. Chapman referred Mr. King to Dr. Craig.  (Ex. D, p. 81, lines 11-14).

60.     Referral of Mr. King to an outside specialist, such as an ENT, must be done by the Medical Director.  (Ex. D, p. 92, lines 15-23; p. 100, lines 3-9; p. 154, lines 18-21).

61.     Dr. Chapman could not refer Mr. King to an outside specialist, that includes seeing an oral surgeon or having a CT scan or MRI completed.  (Ex. D, p.154, line 18, to. p. 155, line 11).

62.     Conservative treatment includes providing the patient with a mouth guard to prevent grinding of the teeth and to keep the jaw in place to alleviate pain, and prescribing pain medications and muscle relaxers.  (Ex. D, p.157, line 7, to p. 158, line 3).

63.     Mr. King received that conservative treatment at Menard.  (Ex. D, p.158, lines 4-6).

64.     Conservative treatment also includes jaw exercises that can be performed by Mr. King.  (Ex. D, p.158, lines 7-10).

**Uncontested Facts from Deposition of Dr. Miloro**

65.     Dr. Michael Miloro is the surgeon who performed Mr. King's TMJ replacement. (See deposition transcript of Dr. Miloro, p. 58, line 21, to. p. 59, line 13, attached as **Exhibit E**).

66.     Dr. Miloro's qualifications are as follows: (a) A Doctorate in Dental Medicine from Tufts University; (b) A Medical Doctorate from the University of Pennsylvania; (c)

Training in general surgery, oral surgery and maxillofacial surgery; (d) An appointment as an assistant professor at Ohio State University; (e) An appointment as an associate professor and director of the OMFS (oral and maxillofacial surgery) residency program at University of Maryland; (f) Program Director, Department Head and professor of OMFS at University of Nebraska; and (g) Program Director, Department Head and professor of OMFS at UIC.  (Ex. E, p. 10, lines 2, to p. 11, line 1).

67.     Dr. Miloro has over 100 peer-reviewed publications and he is the editor of a major OMFS textbook that sets the standard for oral surgery.  He serves on editorial boards of prominent dental and surgical journals and he lectures nationally and internationally.  (Ex. E, p. 11, lines 8-20).

68.     Dr. Miloro is an expert in the management of temporomandibular joint disease, or "TMD" – which is an unique to oral and maxillofacial surgery.  (Ex. E, p. 12, lines 13-21).

69.     There are only a handful of doctors in the United States who perform the TMJ replacement performed on Mr. King.  (Ex. E, p. 159, line 24 to p. 160, line 4).

70.     When Mr. King was first seen at UIC – prior to Dr. Miloro's arrival – there were no surgeons capable of managing his TMJ.  (Ex. E, p. 65, line 22, to p. 65, line 3).

71.     The goal of TMJ replacement surgery is to recreate form and function – pain reduction is a secondary goal and cannot be guaranteed.  (Ex. E, p. 43, lines 1-3; p. 44, lines 21-24).

72.     Some TMJ replacement patients have done little physical therapy, taken no medications and have had successful results following surgery.  (Ex. E, p. 46, lines 3-9).

73.     In terms of scheduling Mr. King's surgery, there was no urgency to get him to surgery after having a chronic condition for 20 years.  (Ex. E, p. 163, lines 8-20).

74.     Now that Mr. King received his TMJ replacement, there is nothing else that can be done for him surgically (Ex. E, p. 12, lines 13-21).

75.     Mr. King's post-surgical education was done by the UIC surgical team, and the Stateville doctors did not need to add anything to that education.  (Ex. E, p. 161, line 12 to p. 162, line 6).

76.     Following TMJ replacement surgery, there is a period of convalescence with pain and swelling that is treated with anti-inflammatory medications and possibly antibiotics.  (Ex. E, p. 35, lines 15-19).

77.     After this convalescence period, physical therapy is instituted, along with NSAIDs and muscle relaxants.  (Ex. E, p. 35, line 20 to p. 36, line 5).

78.     Less than 5% of TMJ replacement patients receive post-surgical physical therapy from a physical therapist, and in the overwhelming majority of cases, the patient can perform physical therapy on his own based on the surgeon's instructions and an exercise machine provided to the patient by the surgeon.  (Ex. E, p. 167, line 22 to p. 168, line 3; p. 36, lines 6-14).

79.     Although TMJ replacement patients can receive therapy from a physical therapist, the more beneficial and practical application of physical therapy is home exercises.  (Ex. E, p. 21, line 19 to p. 22, line 7).

80.      85-95% of TMJ replacement patients still have chronic pain following surgery, and the goal of the surgery is not to make the patient pain-free.  (Ex. E, p. 169, lines 7-13).

9

81.     A Therabite device is an exercise machine provided to a patient to be used in conjunction with NSAIDs and a hot shower or moist, heated towel.  (Ex. E, p. 37, lines 3-37).

82.     Sometimes, tongue depressors are used to perform the physical therapy, and they function essentially the same as a Therabite device – they both allow passive exercising of the jaw.  (Ex. E, p. 39, line 18 to p. 40, line 19).

83.     A patient can use tongue depressors on his own, and there is no need for a third-party to perform the physical therapy.  (Ex. E, p. 40, lines 18-20).

84.     Dr. Fattore-Bruno, who was assisting Mr. King in his posts-surgical exercises, or physical therapy, knew what she was doing and provided Mr. King with adequate physical therapy.  (Ex. E, p. 82, line 17 to p. 83, line 8).

85.     People with multiply-operated joints, like Mr. King, are still going to have chronic pain despite anatomic reconstruction.  (Ex. E, p. 132, lines 13-19).

86.     Any additional treatment for Mr. King's pain is relegated to pharmacologic management.  (Ex. E, p. 135, lines 4-18).

87.     If Mr. King received his TMJ replacement surgery earlier, it would not have helped to manage his pain.  (Ex. E, p. 139, line 22, to p. 140, line 10).

### Uncontested Facts from Deposition of Dr. Fattore-Bruno

88.     Dr. LaDeane Fattore-Bruno (Dr. Bruno) is a dentist who formerly worked Stateville Correctional Center as an employee of Wexford Health Sources, Inc.  (See deposition transcript of Dr. Bruno, p. 9, line 20, to p. 10, line 17, attached as **Exhibit F**).

89.     Following dental school, she completed prosthodontic training at Loyola University, completed a maxillofacial residency at the University of Chicago, completed a

fellowship at Northwestern University in geriatric dentistry, worked as the director of maxillofacial prosthodontics at University of Chicago, worked as the director of geriatric dentistry at Northwestern University Dental School and University of Illinois College of Dentistry.  (Ex. F, p. 8, lines 13 to p. 9, line 8).

90.     She was in charge of a clinic for TMJ patients at the University of Chicago. There, she would treat patients to determine if conservative TMJ treatment helped prior to evaluation for TMJ surgery.  (Ex. F, p. 6, lines 2-17).

91.     She began her employment as a dentist at Stateville in October, 2007.  (Ex. F, p. 10, lines 5-7).

92.     There is no formal training for treating TMJ.  (Ex. F, p. 11, lines 3-4).

93.     Conservative treatment for TMJ dysfunction involves muscle relaxants to treat spasm, pain medication and night-guards (an acrylic mouth piece to prevent interdigitation of teeth, increase vertical dimension and allow spasmodic muscles to relax).   (Ex. F, p. 6, line 22 to p. 7, line 10).

94.     She spoke with the Medical Director at Stateville, Dr. Ghosh, who informed her of Mr. King's medical condition and surgery.  (Ex. F, p. 18, lines 16-25).

95.      She first saw Mr. King on December 6, 2007.  (Ex. F, p. 45, lines 18-22).  She prescribed Tylenol with Codeine and Robaxin (a muscle relaxant) for severe spasms and pain. (Ex. F, p. 45, lines 11-17).

96.     She saw Mr. King on December 31, 2007, and she gave him muscle relaxants. (Ex. F, p. 48, lines 6-16).

97.     She noted in her charts that she saw Mr. King on January 29, 2008, for TMJ pain, she charted that he is awaiting surgery and she gave him Tramadol for pain.  (Ex. F, p. 54, lines 7-16).

98.     She also noted that she saw Dr. Ghosh and confirmed that Mr. King was awaiting surgery.  (Ex. F, p. 55, lines 17-22).

99.     She next saw Mr. King on March 28, 2008, where she noted that he received his TMJ replacement surgery and that he needs to follow up with physical therapy to prevent his jaw from "fibrosing down."  (Ex. F, p. 56, line 24 to p. 57, line 9).

100.     "Tongue blade therapy" is a form of physical therapy.  (Ex. F, p. 20, lines 15-18).

101.     She confirmed with an oral surgery resident at UIC that tongue blade therapy was an appropriate form of physical therapy in lieu of a Therabite device.  (Ex. F, p. 19, line 2, to p. 20, line 6).

102.     Tongue blade therapy, which Dr. Bruno performed at the University of Chicago, consists of having the patient fully open his mouth, fitting the tongue blades between the teeth, recording the dimensions and adding blades as clinically warranted.  (Ex. F, p. 19, line 2, to p. 20, line 6).  She confirmed with UIC that this treatment was appropriate.  Id.

103.     She instructed Mr. King on the use of tongue blades, explained why he needed to perform the tongue blade therapy and had him demonstrate that he could use the tongue blades. (Ex. F, p. 27 lines 2-17).

104.     Mr. King was shown to place the tongue blades in his mouth, and push the blades up and down to prevent the formation of collagen (or tissue scarring) that could decrease the opening of his jaw.  (Ex. F, p. 28, lines 2-19).

12

105.    She instructed Mr. King to use the tongue blades several times per day.  (Ex. F, p. 31, lines 7-13).

106.    She discussed Mr. King's treatment with Dr. Ghosh, and she updated Dr. Ghosh on the status of the physical therapy.  (Ex. F, p. 33, lines 7-17).

107.    Dr. Ghosh was the only person who could refer patients to outside hospitals like UIC.  (Ex. F, p. 34, lines 3-9).

108.    Dr. Bruno worked with Mr. King for several weeks before she was transferred. (Ex. F, p. 28, line 20, to p. 19, line 1).

109.    Upon her transfer, she informed a full-time dentist at Stateville about Mr. King's treatment and his need for follow-up care.  (Ex. F, p. 34, line 20, to p. 25, line 9).

**Uncontested Facts from Deposition of Dr. Ghosh**

110.    Dr. Partha Ghosh was the Medical Director at Stateville, (Ex. A, ¶ 3), and he retired in March, 2011.  (Ex. B, p. 6, lines 12-14).

111.    His qualifications are as follows: (a) He graduated from the University of Calcutta and completed his medical training at the New Dehli All India Institute of Medical Science; (b) He completed his residency and an endocrinology fellowship at Cook County Hospital; (c) He worked as an attending physician at Cook County Hospital and taught at Rush Presbyterian-St. Luke's Medical Center.  (Ex. B, p. 7, line 10, to p. 8, line 5).

112.    As Medical Director at Stateville, Dr. Ghosh was in charge of arranging and reviewing off-site consultations with outside hospitals – including the determination of whether patients should have CT scans or MRIs.  (Ex. B, p. 8, line 17, to p. 9, line 19).

13

113.    The Dental Director at Stateville could not send patients to outside providers – this could only be done by the Medical Director.  (Ex. B, p. 14, lines 10-20).

114.    Dr. Ghosh was responsible for referring Mr. King to an outside medical provider for surgical evaluation.  (Ex. B, p. 48, lines 21-24).

115.    Physicians and physician's assistants at Stateville determine what pain medications to prescribe to patients.  (Ex. B, p. 48, lines 21-24).

116.    Dr. Craig is an oral surgeon for Wexford who comes to Stateville once per month to see patients.   (Ex. B, p. 63, lines 9-14).

117.    Dr. Craig was familiar with Mr. King and told Dr. Ghosh to refer him to UIC. (Ex. B, p. 63, lines 9-14).

118.    Dr. Ghosh prescribed Mr. King pain medications prior to his surgery.  (Ex. B, p. 76, lines 2-23).

119.    After Mr. King was transferred to Stateville, Dr. Ghosh attempted to refer him to Loyola for evaluation; however, Loyola was not accepting new patients.  (Ex. B, p. 80, lines 11-21).

120.    Dr. Ghosh then referred Mr. King to UIC and they accepted him.  Surgery was ultimately performed at UIC by Dr. Miloro.  (Ex. B, p.80, line 22, to p. 81, line 19).

121.    At Stateville, Mr. King was given prescriptions for Lodine for pain.  (Ex. B, p.88, line 16, to p. 89, line 12).

122.    He also received Tramadol, which is a stronger medication.  (Ex. B, p.90, lines 18-22).

14

123.    Mr. King was also given muscle relaxants and Valium at Stateville.  (Ex. B, p.90, lines 18-22).

124.    In fact, as of February 25, 2011 (the date of Dr. Ghosh's deposition), Mr. King was on Valium continuously.   (Ex. B, p.98, lines 14-15).

### Uncontested Facts from Depostiion of Dr. Newbold

125.    Dr. Steven Newbold is a dentist at Menard Correctional Center.  (See deposition transcript of Dr. Newbold, p. 7, lines 12-13, attached as **Exhibit G**).

126.    He prescribed prescription Tylenol to Mr. King at Menard.  (Ex. G, p. 29, lines 11-24).

127.    He also scheduled an appointment for Mr. King to be fitted for a splint or night guard (the terms can be used interchangeably), which is a therapeutic device that puts the jaw in a relaxed position and alleviates stress and pressure.   (Ex. G, p. 30, line 1, to p. 32, line 5).

### Uncontested Facts from Deposition of Dr. Funk

128.    Dr. Arthur Funk is a regional Medical Director for Wexford.  (See deposition transcript of Dr. Funk, p. 5, lines 14-16, attached as **Exhibit H**).

129.    Cost of treatment is never a factor in the decision to approve or disapprove treatment for a patient.  (Ex. H, p. 65, lines 15-23).

130.    Wexford maintains Oral and Maxillofacial Surgery Guidelines.  (Ex. H, p. 115, lines 13-17).

131.    Those guidelines prescribe conservative treatment for TMJ disease, which includes muscle relaxants and use of a splint by the patient.  (Ex. H, p. 117, line 22, to p. 118, line 6).

132.    Those guidelines also prescribe urgent referral if the patient's jaw is locked or he is in severe pain.  (Ex. H, p. 118, lines 3-20).

133.    Although Wexford has TMJ guidelines, they are only guidelines, and physicians provide care to TMJ patients on an individualized basis.  (Ex. H, p. 119, lines 4-17).

134.    Wexford also has guidelines for pain management, which includes treatment with Tylenol or Ibuprofen.  (Ex. H, p. 119, line 22, to p. 123, line 5).

Respectfully submitted,

CHARYSH & SCHROEDER, LTD.

By:     /s/ John Beribak

Michael J. Charysh (#6187455)
John J. Beribak (#6269405)
CHARYSH & SCHROEDER, LTD.
33 North Dearborn St., Suite 1300
Chicago, Illinois 60602
(312) 372-8338