**IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RAYMOND E. KING, | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 C 1184 |
| | ) | |
| v. | ) | Honorable Sidney I. Schenkier |
| | ) | Judge Presiding |
| CHAPMAN, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' LOCAL RULE 56.1
STATEMENT OF FACTS**

NOW COME Defendants STEVEN NEWBOLD, D.D.S., JACQUELINE MITCHELL-LAWSHEA, D.D.S., incorrectly sued as Dr. Jacqueline Mitchell, SANGITA GARG, D.D.S and JEFFERY SAFFOLD, D.D.S, by their attorney, LISA MADIGAN, Attorney General of Illinois, pursuant to L.R. 56.1 and in support of their Motion for Summary Judgment hereby state the following uncontested facts:

**LOCAL RULE 56.1(a)(1) FILING**

A.  Plaintiff's Second Amended Complaint, attached hereto as Exhibit A.

B.  Deposition of Raymond E. King, February 24, 2011 and July 11, 2011, attached hereto as Exhibit B.

C.  Deposition of Doctor Michael Miloro, January 28, 2011, attached hereto as Exhibit C.

D.  Deposition of Doctor Steven Newbold, June 20, 2011, attached hereto as Exhibit D.

E.  Deposition of Doctor Jacqueline Mitchell-Lawshea, April 20, 2011, attached hereto as Exhibit E.

F.  Deposition of Doctor Partha Ghosh, February 25, 2011, attached hereto as Exhibit F.

G.   Doctor Sangita Garg's Answers to Plaintiff's First Set of Interrogatories, attached hereto as Exhibit G.

H.   Doctor Jeffery Saffold's Answers to Plaintiff's First Set of Interrogatories, attached hereto as Exhibit H.

I.   Selected Portion of Deposition of Doctor Arnold F. Binderman, taken March 9, 2012, attached hereto as Exhibit I.

J.   Deposition of Doctor Nicholas E. Panomitros, taken April 18, 2012, attached hereto as Exhibit J.

K.   Dental Records of Raymond King from August 19, 2004 to December 7, 2010, Bate-Stamped by Plaintiff as KG0152-KG0168; KG1973; KG1972; KG2413, KG2415-17, KG1972, and additional Dental Records Bate-Stamped by IDOC Defendants as IDOC0616-IDOC-0618, attached hereto as Exhibit K.

L.   Report Dated March 26, 2007 and signed by Chung H. Lee, M.D., Bate-Stamped by Plaintiff as KG0514, attached hereto as Exhibit L.

M.   Report Dated April 5, 2007 by Dr. David L. Hunter, Bate-Stamped by Plaintiff as KG0517, attached hereto as Exhibit M.

N.   Prescription Orders from August 22, 2004 to August 28, 2007, Bate-Stamped by Plaintiff as KG0493-KG0508, attached hereto as Exhibit N.

O.   UIC Emergency Department Attending Note Dated October 19, 2007, Prepared by Joseph Lachica, M.D., Bate-Stamped by Plaintiff as KG0590-KG0591, attached hereto as Exhibit O.

P.   Medical Special Services Referral and Report Sheets from October 19, 2007 to April 26, 2009, Bate-Stamped by Plaintiff as KG0127-KG0145, attached hereto as Exhibit P.

Q.   Memorandum from Dr. Ghosh to Stateville Cell House Security, Dated September 23, 2008, Bate-Stamped by Plaintiff as KG0289, attached hereto as Exhibit Q.

R.   Offender Outpatient Progress Notes from Stateville Correctional Center for Raymond King, ID# N54043, dated October 8, 2008 to June 18, 2009, Bate-Stamped by Plaintiff as KG0085-KG0114, attached hereto as Exhibit R.

S.   UIC Neurology Consult Final Report by Jeannie Rhee, M.D., on January 14, 2010, Bate-Stamped by Plaintiff as KG0910-15, attached hereto as Exhibit S.

## LOCAL RULE 56.1 STATEMENT OF FACTS

**THE PARTIES**

1. Plaintiff Raymond E. King ("King" or "Plaintiff") is an inmate currently incarcerated at Stateville Correctional Center ("Stateville") and began serving a sentence of life in prison after being convicted of homicide in 2004.  Ex. B., 20:2-8.

2. The allegations contained in the complaint occurred while the Plaintiff was in the custody of the Illinois Department of Corrections at Menard Correctional Center, Menard, Illinois, which lies within the venue of the United States District Court for the Southern District of Illinois, and Stateville Correctional Center, Joliet, Illinois, which lies within the venue of the United States District Court for the Northern District of Illinois, Eastern Division.  Ex. A, ¶¶ 1, 15, 16, 17.

3. Neither jurisdiction nor venue is contested by the parties. Ex. A, ¶15.

4. Plaintiff alleges that Defendants denied him adequate medical treatment for his temporalmandibular joint disorder ("TMD") while incarcerated in Menard and Stateville Correctional Centers between 2004 and 2010. Ex. A.[1]

5. Dr. Steven Newbold ("Dr. Newbold") was a dentist at Menard Correctional Center ("Menard") from November, 1985 until June, 2008. Ex. C., 8:5-7. Plaintiff alleges that Dr. Newbold denied him adequate treatment for his TMD while he was incarcerated at Menard.  Ex. A, ¶12.

---

[1] To the extent Plaintiff's Second Amended Complaint can be read to allege a continuing violation to the present, the parties only conducted discovery through the time frame of 2010.

6.      Dr. Jacqueline Mitchell-Lawshea ("Dr. Mitchell") has been a dentist at Stateville Correctional Center ("Stateville") and the Northern Reception Center ("NRC") since 2004. Ex. E, 6:4-12. Plaintiff alleges that Dr. Mitchell denied him adequate treatment for his TMD while he was incarcerated at Stateville Correctional Center. Ex. A, ¶4.

7.      Dr. Sangita Garg ("Dr. Garg") was a dentist at Stateville at all times relevant. Plaintiff alleges that Dr. Garg denied him adequate medical treatment for his TMD while incarcerated at Stateville. Ex. A, ¶7.

8.      Dr. Jeffrey Saffold ("Dr. Saffold") was a dentist at Stateville at all times relevant. Plaintiff alleges that Dr. Saffold denied him adequate medical treatment for his TMD while incarcerated at Stateville. Ex. A, ¶6.

**UNDERLYING FACTS AND PLAINTIFF'S TREATMENT PRIOR TO 2004.**

9.      The general phrase used in medical records for temporomandibular joint ("TMJ") issues is "TMD" which stands for temporomandibular joint disorder. Ex. B, 12:13-22; Ex. H, 161:5-13.

10.    The TMJ has three components: the mandibular condyle (the "condyle"), which is part of the jaw; the temporomandibular joint disc (the "disc" or "articular disc"), which is interposed between the skull and mandibular condyle; and the glenoid fossa (the "fossa"), which is part of the temporal bone of the skull. Ex.B., 26:12-22, Ex. H., 97:13-14).

11.    The standard of care in treating TMJ disorders is to manage the pain associated with these disorders, and keep treatment, if any, conservative and reversible, especially in patients with TMD. Ex. I, 217:1-4.

4

12.     According to the American Dental Association ("ADA"), TMD is neither a recognized specialty or considered a part of dentistry, only a facet of oral surgery, prosthodontics, periodontics, and orthodontics. Ex. H., 162:2-3.

13.     Plaintiff first injured his right TMJ in 1987 when he was hit in the face with a baseball bat that had flown out of another inmate's hands while they played baseball at Pontiac. Ex. B, p 22:1-21.

14.     While housed at Pontiac Correctional Center ("Pontiac"), Plaintiff underwent his first jaw surgery at University of Illinois-Chicago ("UIC") in 1989. Ex. B., p. 39:18-20.

15.     In 1990, Plaintiff underwent a second surgery, an arthoscopy on his jaw, while incarcerated at Pontiac. Ex. A., 40:8-13.

16.     Plaintiff was released on parole sometime in 1992, and while on parole, Plaintiff further injured his jaw in 1992 when he was involved in a car accident. Ex. B., 31:21-32:14.

17.     In 1992, Plaintiff underwent a third surgery, where cartilage was removed from Plaintiff's ear to repair the joint in his jaw. Ex. B., 42:1-7.

18.     In June of 2004, Plaintiff injured his jaw again during his trial for the murder of his ex-girlfriend, when his head was slammed into a table by the brother of the deceased. Ex. B., p. 43:8-24.

**TREATMENT AT MENARD CORRECTIONAL CENTER FROM SEPTEMBER 2004 TO SEPTEMBER 17, 2007.**

19.     Plaintiff was transferred to Menard in September 2004, and began serving his current sentence. Ex. B., 46:2-5, 67:13-19.

20.  Dr. Chapman was the Dental Director at Menard from 2004 to 2007. Ex. C., 40:18-20.

21.  Dr. Feinerman was the Medical Director at Menard from 2004 to 2007. Ex I., 40:16-41:6.

22.  Dr. Newbold was a dentist at Menard Correctional Center between 2004 and 2007. Ex. C, 8:1-21.

23.  As a dentist at Menard, Dr. Newbold only had certain authority when treating patients, and could refer inmates to Dr. Chapman when necessary. Ex. C., 40:16-20, 48:6-11.

24.  At Menard, only Dr. Chapman or Dr. Craig (the oral surgeon) had the authority to request that an inmate be seen by an outside doctor or for an outside consult. The request had to be made by Dr. Chapman to Dr. Feinerman. If Dr. Feinerman agreed with Dr. Chapman's recommendation, Dr. Feinerman still needed approval from Wexford Health Services ("Wexford"). Ex. C., 36:4-9, 41:24-44:4.

25.  As part of initial intake at Menard, Plaintiff received an x-ray of his jaw area. Ex. C., 11:5-6.

26.  On September 8, 2004, Dr. Newbold first saw Plaintiff who was complaining of right TMJ pain. Ex. C., 9:17-10:8, Ex. K., KG0152.

27.  Dr. Newbold ordered a new x-ray of Plaintiff's face be taken for Dr. Newbold and a radiologist to review to rule out the possibility of fracture due to the trauma Plaintiff sustained when his head was slammed into the table while in court. Ex. C., 11:2-6.

28. Dr. Newbold referred the x-ray to a radiologist for a second opinion on a possible condylar fracture. Ex. C., 11:7-12:6.

29. The radiologist reported negative for a condylar fracture, and confirmed this on a second viewing of the area. Ex. C., 12:2-13:4, 29:2-10.

30. Dr. Newbold relied on the radiologist reports as a basis for concluding there was no fracture in August, 2004. Ex. C., 12:2-13:4, 29:2-10.

31. Dr. Panamitros stated that using and relying on x-rays and radiologist reports to rule out a fracture was within the standard of care for a dentist in 2004. Ex. J., 125:23-127:6.

32. On February 18, 2005, Dr. Newbold saw Plaintiff who complained of grinding his teeth, prescribed Plaintiff sixty pills of Tylenol-3 pain, and had Plaintiff scheduled for an impression of his mouth for a hard upper acrylic splint ("night guard"). Ex. C., 29:11-30:2. A night guard is a type of splint therapy used to treat TMJ issues. Ex. J., 65:10-67:14. It is both a protective and therapeutic device that fits over the teeth to put the jaw in a relaxed position to alleviate stress or pressure on the TMJ. Ex. C., 31:23-32:5.

33. On March 4, 2005, Dr. Newbold had an alginate impression for a maxillary hard acrylic night guard taken of Plaintiff to be sent to the lab and be made into a splint. Ex. C., 31:16-22.

34. On April 5, 2005, Dr. Newbold saw Plaintiff and gave him the night guard at that appointment. Ex. C., 31:11-12, 20-22.

35. On April 15, 2005, Dr. Newbold saw Plaintiff for follow-up, noting: the splint did not need to be adjusted; there was a good fit and occlusion; Plaintiff was

still in pain; and Dr. Newbold recommended observation for Plaintiff. Ex. C., 33:15-17.

36. Occlusion is how the teeth come together when closing your teeth, and malocclusion is the term for when teeth incorrectly come together. Ex. J., 21:4-5.

37. During the April 15, 2005 visit, Dr. Newbold warned Plaintiff of the potentially chronic nature of his TMJ condition. Ex. C., p. 33:17-24.

38. On July 3, 2005, Dr. Chapman saw Plaintiff for his TMJ condition. Ex. K., KG0153.

39. After Dr. Chapman began treating Plaintiff, Dr. Newbold had no authority over Dr. Chapman's treatment of Plaintiff. Any conversations between Dr. Newbold and Dr. Chapman about inmate patient care were informational. Ex. C., 49:8-14.

40. On August 3, 2005, Dr. Chapman saw Plaintiff again. Ex. K., KG0153. Plaintiff said his jaw hurt as badly as it did before his last surgery. Id.

41. On September 9, 2005, Dr. Craig saw Plaintiff and referred Plaintiff to be seen by an Ear, Nose and Throat ("ENT") specialist. Ex. C., 34:21-36:9. Dr. Craig was the oral surgeon that took appointments once a month at Menard for impaction surgeries, third molar surgeries, and biopsies. Ex. C., 34:21-36:9. An ENT is an ears, nose, and throat specialist. Ex. C., 35:23-36:7.

42. On October 31, 2005, Dr. Chapman saw Plaintiff and noted he would refer Plaintiff to Dr. Feinerman to evaluate the joint area for possible referral to an ENT. Ex. K., KG0153.

43.     On February 17, 2006, Dr. Henderson, another dentist at Menard, saw Plaintiff and referred Plaintiff to be seen by Dr. Feinerman. Ex. K., KG0154. On February 22, 2006, Plaintiff was seen by Dr. Feinerman, the Medical Director at Menard. Ex. K., KG0154.

44.     On April 19, 2006, Dr. Chapman saw Plaintiff and noted Plaintiff was referred to see a specialist but had to be approved by medical director. Ex. K., KG0154.

45.     On June 16, 2006, Dr. Newbold saw Plaintiff for his bi-annual unscheduled (mandatory) dental exam. Dr. Newbold noted there were no cavities, gum problems, or infections in Plaintiff's mouth, and because Plaintiff complained of pain, he should be seen upon request. Ex. C., 37:18-38:16; Ex. K., KG0154.

46.     On March 20, 2007, Dr. Chapman saw Plaintiff. Ex. K., KG0154. Dr. Chapman noted bleeding gums and Plaintiff's complaints of pain. Ex. K., KG0154.

47.     On March 22, 2007, Dr. Chung H. Lee from Bloomington Radiology in Normal, Illinois reviewed five x-rays of Plaintiff's mandible (jaw) taken at Menard, finding "there is no fracture or dislocation. There is no bony erosion at the TMJ. There is no evidence forward translation of mandibular condyles on open mouth position." Ex. L., KG514.

48.     On March 28, 2007, Dr. Feinerman referred Plaintiff out of prison for a CT scan of the right TMJ area. Ex. K., KG0154. On April 3, 2007, Dr. Hunter took a CT Scan of Plaintiff's jaw and noted his impression of comminuted

chronic fracture of the right TMJ with loose bodies in the joint space.  Ex. M., KG517.

49.    On April 10, 2007, April 12, 2007, and April 24, 2007, Dr. Chapman saw Plaintiff, took Plaintiff's history, renewed his medications, and put Plaintiff on a soft food diet.  Ex. K., KG0155.

50.    On April 26, 2007, Dr. Newbold saw Plaintiff.  Dr. Newbold renewed Plaintiff's prescriptions for Prednisone and Robaxin, put Plaintiff on a dental soft diet, and noted Plaintiff was scheduled for a consultation with an oral surgeon and to follow-up with Plaintiff in two weeks.  Ex. K., KG0155. Robaxin is a muscle relaxant and prednisone is a corticosteroid used to reduce inflammation.  Ex. H., 190:12-19.

51.    On May 1, 2007, Dr. Swanson, an oral surgeon from Peoria, saw Plaintiff. Dr. Chapman followed up with Plaintiff that day upon Plaintiff returning to prison.  Ex. K., KG0155-56.

52.    On May 10, 2007, Dr. Newbold saw Plaintiff, noted Plaintiff had been seen by the oral surgeon, and increased Plaintiff's medication after consulting the Medical Director.  Ex. K., KG0156

53.    On May 30, 2007, Dr. Chapman saw Plaintiff, noted Plaintiff refused to take Motrin, even with food, because it upset his stomach, and scheduled to follow up with Plaintiff after his MRI.  Ex. K., KG0156.  On June 1, 2007, an MRI was taken of Plaintiff's jaw.  Ex. K., KG0156.

54.    On July 2, 2007, Dr. Chapman received the MRI report, and scheduled Plaintiff to be sent back to the oral surgeon, Dr. Swanson, to determine what treatment Plaintiff needed.  Ex. K., KG01556.

55.    On July 12, 2007, Dr. Chapman saw Plaintiff, encouraged Plaintiff to wear his splint when Plaintiff said he would not wear it anymore, prescribed Robaxin, and referred Plaintiff to mental health for evaluation.  Ex. K., KG01556-57. Dr. Chapman also spoke to Dr. Feinerman and Dr. Swanson about Plaintiff needing surgery.  Ex. K., KG01557.

56.    While at Menard, Plaintiff was prescribed the following medications for his TMD complaints:  Ibuprofen/Motrin (9/16/2004, 9/30/2004, 10/21/2004, 10/22/2004, 5/14/2005, 10/31/2005, 12/20/2006, 3/20/2007, 4/10/2007, 4/12/20078);  Flexerill (10/24/2004);  Tylenol (2/15/2005, 5/14/2005, 3/31/2007, 6/7/2007), Aspirin (5/3/2005), Flexerill (10/24/2004), Naproxen (10/24/2006), Prednisone (4/12/2007, 4/20/2007, 5/10/ 2007), and Robaxin (4/12/2007, 4/20/2007, 5/10/ 2007).  Ex. N., KG0493-KG0508.

## PRE-SURGERY TREATMENT AT STATEVILLE

57.    In September, 2007, Plaintiff was transferred from Menard to Stateville on a medical writ for purposes of receiving surgery for his TMD.  Ex. B, 67:13-17.

58.    At Stateville, the Medical Director makes medical decisions regarding specialized care requiring outside consultations, the ordering of CT scans and MRIs, and physical therapy issues.  Ex. E., 9:9-19.  The Medical Director also issues special needs and medical permits, including permits for a soft/pureed diet.  Ex. E., 112:14-24.  Ex. D., 114:9-11.

59. At Stateville, dental issues are followed by the dentists, but if the inmate has pain issues, the inmate can ask to see a physician. Ex. E., 16:15-18. Generally, if an inmate is in pain, the medical doctors see the inmate, if the inmate is not in pain, the dentists will see them for dental issues. Ex. E., 20:20-21:9.

60. Inmate requests for medical attention at Stateville are put in the certified medical technician ("med-tech") box or given to the med-techs. Ex. D., 108:16-23.

61. If an inmate makes a non-specific dental request, the inmate is seen within fourteen (14) days. Ex. D., 109:3-4. If the inmate makes a request about a specific dental issue, the inmates are fit in the available schedule. Ex. D., p. 109:4-5.

62. Inmates are not allowed to choose when they are seen or which dentist will see them. Ex. D., 109:6-11. Just because an inmate may request to be seen by a specific dentist, the requested dentist may not see that request since all staff read requests for dental care. Ex. D., 109:12-16.

63. For an inmate to be seen by an outside doctor or specialist, there must first be a consultation with the oral surgeon employed by Wexford, the oral surgeon will then make a recommendation to the Medical Director, who in turn decides whether the inmate will be seen outside the prison. Ex. D., 18:21-19:4.

64. Dr. Ghosh was the Medical Director at Stateville from 2003 to March, 2011. Ex. F., 6:15-8:11.

65.    Dr. Mitchell is not a TMJ specialist.  Ex. E., 46:9-11.

66.    On October 19, 2007, Plaintiff was taken to the emergency room at UIC-Chicago Hospital ("UIC") complaining of his jaw locking. The UIC physician noted that the Plaintiff had reduced his dislocation by hitting his own face. Ex. A, 103:2-10; Ex. O., KG0590-91.

67.    On October 22, 2007, Dr. Ghosh noted that a MRI was scheduled and there would be follow-up of Plaintiff's condition at the Stateville Health Care Unit. Ex. P., KG0127.

68.    On November 27, 2007, Dr. Craig, an oral surgeon, prepared a Medical Special Services Referral and Report requesting Dr. Ghosh's assistance since the pain medication he prescribed Plaintiff appeared to be ineffective.  Ex. P., KG0128.

69.    On December 7, 2007, Dr. Ghosh approved Plaintiff to be taken to UIC for a MRI and approved a pureed food diet for Plaintiff.  Ex. E., 62:2-66:21; Ex. P., KG0128.

70.    On December 12, 2007, a MRI of Plaintiff's jaw was taken.  Ex. E., 76:7-8. The MRI results revealed a complete disruption of the TMJ with deformity of the mandibular condyle and calcifications.  Ex. E., 71:22-72:10.

71.    Dr. Ghosh attempted to schedule Plaintiff for surgery with Loyola Hospital, Chicago ("Loyola"), but Loyola was not accepting new TMJ patients at that time.  Ex. E., 80:16-21.

72. Upon learning that Loyola's TMJ surgeon could not accept Plaintiff, on December 18, 2007, Dr. Ghosh approved Plaintiff to be evaluated by the UIC Oral Surgery Department. Ex. P., KG0131.

73. At UIC Plaintiff's treatment was overseen by Dr. Miloro, an oral maxiofacial surgeon, who specializes in treating TMD. Ex. B., 11:24-12:4. Dr. Miloro supervised the medical resident at UIC who would perform Plaintiff's surgery, Dr. Edwards. Ex. B., 50:16-22.

74. On December 6, 2007, Dr. Fattore Bruno saw Plaintiff at UIC and prescribed him Tylenol with codeine as well as robaxin. Ex. K., KG0163. On December 21, 2007, Dr. Fattore-Bruno saw Plaintiff again and prescribed Tylenol with codeine again. Ex. K., KG0162

75. On January 16, 2008, Dr. Edwards saw Plaintiff at UIC and recommended that a CT scan be taken and to follow-up in one month to discuss surgery. Ex. P., KG0133.

76. On January 17, 2008, Dr. Ghosh referred Plaintiff for a CT scan, and Plaintiff received a CT scan on February 6, 2008. Ex. P., KG0134.

77. On February 14, 2008, Dr. Edwards saw Plaintiff at UIC and recommended that Plaintiff receive a total joint replacement surgery. Ex. P., KG0135.

78. On February 15, 2008, Dr. Ghosh approved Dr. Edward's recommendation for surgery. Ex. P., KG0135.

**TREATMENT AT STATEVILLE AFTER PLAINTIFF'S TOTAL JOINT REPLACEMENT SURGERY**

79.     On March 16, 2008, Dr. Edwards performed joint replacement surgery installing a right condylar prosthesis in Plaintiff's right TMJ at the UIC Medical Clinic.  Ex. P., KG0136.

80.     Dr. Miloro noted there was no delay in surgery.  Ex. B., 164:17-165:12.

81.     At Stateville, due to the backlog in requests for surgery, five or six months for surgery was average for surgeries that were not life threatening or related to cancer.  Ex. E., 82:19-22.

82.     On March 20, 2008, following surgery, Dr. Edwards recommended Clinda, Tylenol 3, Ibuprofen, Peridex rinses, a head wrap, and for Plaintiff to return in a week for suture removal and evaluation.  Ex. P., KG0137.

83.     On April 2, 2008, Dr. Fattore-Bruno saw Plaintiff and gave him a 15 mm stack of tongue blades to use in stretching his jaw.  Ex. K., KG0158, KG0160. On April 10, 2008, Dr. Fattore-Bruno saw Plaintiff again, and while she added one tongue blade, she also noted Plaintiff was confirmed to be sent to UIC on medical writ for follow-up on April 17, 2008.  Ex. K., KG0158.

84.     Tongue depressors are used with patients as post TMJ surgery therapy.    Ex. B., p. 168:24-169:6.

85.     On April 17, 2008, Dr. Edwards saw Plaintiff for a follow-up visit to remove the sutures, and he noted Plaintiff was healing well.  Ex. P., KG0139.

86.     At the April 17, 2008 post-surgery follow-up, Dr. Edwards also noted a Therabite device would be acquired by Oral Maxio-Facial Surgery

Department ("OMFS") at UIC to give to Plaintiff at the next follow-up for increasing his ability to open his jaw. Ex. P., KG0139.

87. On April 18, 2008 and May 14, 2008, Dr. Fattore-Bruno saw Plaintiff, noting Dr. Ghosh already had referred Plaintiff to be seen at UIC in June 2008. Ex. K., KG0159.

88. On June 9, 2008, Plaintiff was seen by Dr. Thomas Rogers at UIC. Ex. P., KG0140. Dr. Rogers decided to not provide a Therabite device at this appointment, and recommended conservative treatment including Plaintiff maintaining a soft diet and to take 400mg of ibuprofen three times a day. Ex. P., KG0140.

89. On June 11, 2008, Dr. Garg saw Plaintiff. Ex. F., ¶1. At that time Dr. Garg confirmed with Dr. Ghosh that Plaintiff was scheduled for a follow-up appointment at UIC in July, 2008, when Plaintiff was expected to pick up a Therabite jaw device. Ex. F, ¶1; Ex. K., KG0159.

90. On September 10, 2008, Dr. Edwards recommended Plaintiff take ibruprofen with food to avoid his gastrointestinal ulcer and made another note to procure a Therabite device for Plaintiff. Ex. P., KG0141.

91. While UIC did not provide a Therabite device at the Plaintiff's first two follow up appointments following surgery on June 9, 2008 and September 10, 2008, on September 23, 2008, Dr. Edwards saw Plaintiff and provided Plaintiff with an assembled Therabite device. Ex. P., KG0142.

92. Despite not having the Therabite device prior to his September 23, 2008 appointment, Plaintiff was able to open his mouth 24mm at that appointment

with Dr. Edwards. Ex. P., KG0142. The device was demonstrated to plaintiff, and Dr. Edwards recommended that Plaintiff continue to be prescribed ibuprofen. Ex. P., KG0142. Later, on September 23, 2008, Dr. Ghosh initialed a memorandum to Stateville's Cell House Security that Plaintiff had permission to have the Therabite device in his cell from September 23, 2008 until March 31, 2009. Ex. Q., KG0289.

93.     On October 3, 2008, Dr. Garg saw Plaintiff. In response to Plaintiff's demand for physical therapy, Dr. Garg noted Dr. Edwards should be asked what kind of physical therapy, if any, was needed that Plaintiff could not do on his own. Ex. F., # 1. Dr. Garg also noted that Plaintiff was rude, did not follow directions, demanded physical therapy, and stated that he already had ibuprofen. Ex. K., KG0164.

94.     On October 8, 15, 24, 28, and 29, 2008, Plaintiff was seen by various other Stateville medical providers in the Health Care Unit ("HCU") for complaints related to his TMJ pain. Ex. R., KG0086-91.

95.     On October 14, 2008, Plaintiff's Motrin prescription was refilled at his request. Ex. R., KG0086-87.

96.     On October 23, 2008, Dr. Lakasuya, a physician at UIC, saw Plaintiff at UIC and recommended a soft food diet, use of the Therabite, heat to the face, and Vicodin. Ex. P., KG0143. Dr. Ghosh approved everything but the Vicodin. Ex. P., KG0143.

97.     On November 5, 2008, Dr. Ghosh again referred Plaintiff to UIC for Plaintiff's complaints of persistent pain. Ex. P., KG0143.

98.     On November 10, 2008, Dr. Rogers and Dr. Miloro saw Plaintiff at UIC. Ex. P., KG0143.

99.     On November 11, 2008 Stateville medical staff examined Plaintiff and referred Plaintiff to Dr. Ghosh. Ex. R., KG0092-93.

100.    On November 17, 2008 and November 19, 2008, Plaintiff was seen by Dr. Ghosh, who took Plaintiff off Flexeril and placed Plaintiff on Diazepam (valium). Ex. R., KG0094-95.

101.    On December 10, 2008, Plaintiff had a follow up appointment with Dr. Ghosh, who renewed Plaintiff's Diazepam (Valium) prescription and discussed jaw pain treatment with the Plaintiff. Ex. R., KG0099.

102.    On December 16, 2008, Dr. Mitchell scheduled Plaintiff to be seen by Dr. Craig, the oral surgeon, on January 6, 2009. Ex. K., KG0164.

103.    On January 6, 2009, Dr. Craig saw Plaintiff and referred Plaintiff to Dr. Ghosh. Ex. K., KG0165.

104.    On January 23, 2009, Plaintiff saw Dr. Ghosh who noted "the offender needs removal of diazepam" and prescribed six weeks of Diazepam as "watch take." Ex. R., KG0101.

105.    On February 2, 2009, Dr. Ghosh saw Plaintiff who was still complaining of the pain he was in, and Dr. Ghosh recommended Plaintiff use the Therabite device and ordered bite plates for Plaintiff to use. Ex. R., KG0102-03.

106.    On March 2, 2009, Dr. Ghosh saw Plaintiff, Plaintiff's jaw issues, prescribed Plaintiff Clindamyein, advised Plaintiff to use the Therabite device for a year,

continued to prescribe Diazepam, and noted Plaintiff should be sent on medical writ to UIC for follow-up. Ex. R., KG0104.

107. On March 20, 2009, Plaintiff was seen by Dr. Garg, and despite Plaintiff stating it was an emergency that he could not open his mouth, he refused the muscle relaxant Robaxin, and walked out; at which time Dr. Garg notified Dr. Ghosh that Plaintiff needed to be evaluated by Dr. Ghosh. Ex. F, # 1, Ex. K., KG0165.

108. On April 8, 2009, Dr. Garg saw Plaintiff for an emergency situation where Plaintiff could not open his mouth. Dr. Garg consulted with Dr. Ghosh, who made sure Plaintiff had his Therabite appliance and noted Plaintiff was being treated with muscle relaxants and pain medication. Ex. F, # 1, Ex. K., KG0165.

109. On April 14, 2009, Plaintiff was seen by Dr. Klasser at UIC. Ex. L., KG0145.

110. On May 8, 2009 and May 22, 2009, Dr. Garg saw Plaintiff because he complained he could not open his mouth, and at that time she consulted with Dr. Ghosh who informed her that Plaintiff was on 5mg valium daily at bedtime for three months and was on a soft diet. Ex. F, # 1; Ex. K., KG0165-66.

111. On May 29, 2009, Plaintiff was seen at the Stateville Dental Clinic, and it was noted that Dr. Ghosh made a request for Lodine, a non-formulary drug, to be approved for Plaintiff. Ex. K., KG0167.

112. On June 15, 2009 and July 1, 2009, Dr. Fishman saw Plaintiff and noted Plaintiff's issues were medical issues not dental issues. Ex. K., KG0167.

113.    On July 10, 2009, Dr. Thomas saw Plaintiff, prescribed Lodin and Valium, referred Plaintiff to the Stateville sick call and for referral to UIC for TMJ evaluation, and noted Plaintiff refused Tylenol.  Ex. K., KG0168.

114.    On August 10, 2009, Dr. Mitchell saw Plaintiff for Plaintiff's complaints of tooth pain and ordered an x-ray to rule out tooth decay.  Ex. K., KG0168.  On August 17, 2009, Dr. Mitchell determined no evidence of tooth decay, and noted the med-tech could not completely clean the mouth since Plaintiff could not open his mouth.  Ex. K., KG2413.  She also referred Plaintiff to Dr. Ghosh for pain medication.  Id..

115.    On September 11, 2009, Dr. Mitchell saw Plaintiff and advised him to follow UIC's recommendations since she was not a TMJ specialist, noted Plaintiff was scheduled to see Dr. Klasser, and referred Plaintiff to see Dr. Ghosh on September 14, 2009.  Ex. K., KG2415.

116.    On October 19, 2009, Plaintiff was seen at the Dental Clinic, and referred to the Medical Director.  Ex. K., KG2413.  On November 6, 2009, Dr. Garg also made a request for referral review on Plaintiff's TMJ.  Id.  On December 23, 2011, Dr. Fishman saw Plaintiff and noted Plaintiff was making unreasonable demands since Plaintiff could not take ibuprofen and refused Tylenol.  Id.  Dr. Fishman also made a referral for a TMJ Specialist and requested that Plaintiff no longer be seen in the Dental Clinic for his TMJ complaints.  Id.

117.    On February 16, 2010, a Wexford employed physician, Dr. Thomas saw Plaintiff and noted that Dr. Fishman submitted a referral to Wexford on December 23, 2009 for a TMJ Specialist and the facility had not received any

information back. Ex. K., KG1973. Dr. Thomas noted that Plaintiff would not take Tylenol or Motrin. Id. Dr. Thomas referred Plaintiff to Dr. Ghosh and suggested that Dr. Ghosh refer Plaintiff to a TMJ specialist. Id.

118. On May 5, 2010 and May 19, 2010, Dr. Fishman saw Plaintiff for bleeding gums and referred Plaintiff to the Dental Clinic. Ex. K., KG1973. On May 20, 2010 Dr. Saffold treated Plaintiff for his bleeding gums. Id.

119. On June 15, 2010, Dr. Craig saw Plaintiff and noted Plaintiff thought Dr. Craig was the wrong surgeon and that Plaintiff was in pain. Ex. K., KG1973. On July 23, 2010, Dr. Garg saw Plaintiff and noted Plaintiff should be seen for follow up with Dr. Ghosh. Ex. K., KG2416.

120. On July 27, 2010, Dr. Fischman saw Plaintiff who was complaining of wanting pain medication. Ex. K., KG2416. Dr. Fischman explained to Plaintiff that the Dental Clinic could not help Plaintiff and discussed with Dr. Ghosh that Dr. Fischman still believed the Dental Clinic could not handle Plaintiff's TMJ issues. Id. On August 16, 2010, Dr. Fischman saw Plaintiff and reiterated Plaintiff had a medical issue. Ex. K., KG1972.

121. On September 16, 2010, Dr. Saffold saw Plaintiff, explained that the Dental Clinic could not do anything for Plaintiff, and that Dr. Saffold would schedule Plaintiff for an oral surgeon consultation. Ex. K., KG1972. On September 28, 2010, Dr. Craig, the oral surgeon, saw Plaintiff, spoke to Dr. Ghosh about Plaintiff's treatment, and recommended heating packs for Plaintiff and to have updated x-rays taken. Ex. K., KG1972.

122.    On October 8, 2010, Dr. Garg referred Plaintiff to Dr. Saffold for Plaintiff's bleeding gum issue.  Ex. K., KG1972.  On October 14, 2010, Dr. Saffold saw Plaintiff, addressed Plaintiff's gum issues, and spoke to Dr. Ghosh about Plaintiff being referred to a TMJ clinic.  Ex. K., KG1972, IDOC616.  On November 4, 2010 Dr. Saffold saw Plaintiff who was complaining of locked jaw.  Ex. K., IDOC616.  Dr. Saffold advised Plaintiff to reschedule the cleaning and that Plaintiff should see an oral surgeon for consultation.  Ex. K., IDOC616.  On November 25, 2010 and November 30, 2010, Dr. Saffold did follow up with Dr. Ghosh on Plaintiff's treatment and rescheduled Plaintiff's mouth cleaning since Plaintiff could not open his mouth.  Ex. K., IDOC617.  On December 7, 2010 Dr. Saffold saw Plaintiff and again rescheduled Plaintiff's mouth cleaning since Plaintiff could not open his mouth.  Ex. K., IDOC618.

123.    From August, 2009 to September, 2010, Dr. Mitchell was working almost exclusively at NRC, not Stateville.  Ex. D., 73:19-74:23.

124.    Dr. Mitchell is not comfortable in her clinical experience prescribing a higher schedule of drugs than Ibuprofen/Motrin.  Ex. D., 69:5-19, 70:16-21. Additionally, Dr. Mitchell was not comfortable prescribing muscle relaxants since she did not have clinical experience dispensing them.  Ex. D., 74:24-75:9.

125.    Dr. Mitchell could not offer any treatment beyond what Dr. Ghosh provided. Ex. E., 116:20-23.

126. Dr. Ghosh stated that even in the hypothetical event that Dr. Mitchell refused to treat Plaintiff's pain, there were providers, medical technicians, and medical doctors available to treat Plaintiff's pain. Ex. E., 117:15-21.

127. On at least four occasions while Dr. Mitchell worked on other inmates, Plaintiff would come in and demand Dr. Mitchell stop what she was doing and work on him. Ex. D., 121:15-24. One time Plaintiff's intrusion required Plaintiff to be removed by security. Ex. D., 121:21-24. In Dr. Mitchell's experience with Plaintiff after July 2008, she was often concerned for her safety. Ex. D., 70:22-71:18.

128. Dr. Garg did not provide input into Plaintiff's treatment for his TMD or TMD related issues. Ex. A, 148:12-19, 181:6-16; Ex. E., 134:22-135:1; Ex. F, Garg Int. ¶ 2. Dr. Garg never prescribed any medication to Plaintiff. Ex. A, 181:6-10.

129. Dr. Saffold's experience in treating TMD or TMD-related conditions is limited to analgesics and muscle relaxers. Ex. G, ¶3. Dr. Saffold never treated Plaintiff for his TMD condition. Ex. A, 177:23-24; Ex. E., 134:19-21; Ex. G, ¶1.

130. Plaintiff never had an appointment with Dr. Saffold prior to filing this suit. Ex. A, 181:21-182:5. From October, 2010 to December, 2010, Dr. Saffold mainly worked on issues with Plaintiff's bleeding gums, and did not have the ability to address Plaintiff's TMJ issues. Ex. A, 144:24-145:9.

131. Plaintiff's prescriptions were mainly based on physician decisions, not dental decisions. Ex. E., 90:23-91:4.

132.   Some of Plaintiff's medications, such as the anti-inflammatory Lodine, were non-formulary, meaning they had to be approved by the medical director, Dr. Ghosh, before being ordered from outside the prison.  Ex. E., 130:2-18.

133.   According to Dr. Ghosh, Plaintiff did not need to see a dentist unless a dental problem arose.  Ex. E., 117:19-22.  Plaintiff could manage his TMJ issues by dealing with people other than dentists.  Ex. E., 118:2-7.

134.   Dr. Ghosh's clinical judgment was that Plaintiff did not need a physical therapist.  Ex. E., 100:5-17.  Dr. Ghosh tried to teach Plaintiff the physical therapy exercises for Plaintiff's TMJ treatment, but Plaintiff would not cooperate.  Ex. E., 99:23-100:10.  Dr. Ghosh has observed Plaintiff eat solid food on at least one occasion since surgery despite the soft diet ordered by Dr. Ghosh.  Ex. E., 106:7-8.

135.   Plaintiff's diagnosis after surgery was myofascial spasm of the masseter muscle.  Ex. E., 124:13-24.  Dr. Ghosh ensured Plaintiff received muscle relaxants or Ativan injections were given when Plaintiff had masseter muscle spasms.  Ex. E., 107:19-108:12, 109:3-5.  Dr. Ghosh's prognosis is that Plaintiff's condition will not improve.  Ex. E., 111:8-14.

136.   When a patient has pre-existing pain due to a TMD, the pain can be either from the TMJ itself, but it can also be myofascial, or soft-tissue pain from the muscles around the joint.  Ex. B., 46:16-19.

137.   Dr. Miloro stated a neurologist is the best person for helping Plaintiff tolerate his daily pain.  Ex. B., 131:13-17.

138. In a January, 2010, Dr. Jeannie Rhee, a Neurologist, performed a neurology consultation of Plaintiff at UIC. Ex. S., KG913. She could not make a precise evaluation or recommendation, but assessed Plaintiff's pain as neuropathic pain attributable to his trigeminal nerve. Ex. S., KG913.

139. Even if a patient has joint replacement, followed by active physical therapy, they can still develop symptoms on the non-surgical side of their face. Ex. B., 92:9-15.

140. Dr. Miloro stated Plaintiff might be relegated to drug therapy for a long period of time, maybe the rest of his life to handle his facial pain. Ex. B., 48:2-5. Over 90% of patients who have a total joint replacement surgery have chronic pain. Ex. B., 169:7-13.

141. Dr. Miloro stated the stress of incarceration has likely contributed to Plaintiff's symptoms of TMD. Ex. B., 168:14-23.

142. Managing Plaintiff on a long-term basis is a clinical dilemma since there are no simple answers to the treatment of his TMD. Ex. B., 131:18-132:4.

143. Dr. Miloro stated that even with 100% compliance with treatment, Plaintiff could still be in pain. Ex. B., 140:20-23.

144. When reviewing Plaintiff's medical records, Dr. Miloro stated he was satisfied with Plaintiff's recovery through 2008, and he opined it is an involved process for the muscles to reattach to the metal and plastic elements of the TMJ prosthesis. Ex. B., 98:12-99:11, 105:2-10.

145. Total joint replacement surgery is considered a salvage, or end-stage procedure; nothing else can be done surgically after the replacement surgery.

25

Ex. B., 159:24-160-4.   After TMJ surgery, patients rarely, if ever, go to physical therapy.  Ex. B., 36:6-10.

146.    Dr. Panamitros stated that there is no statistical data proving any specific treatment plan for TMJ issues will guarantee to correlate in disease-modifying or even curative effects.  Ex. J., 122:9-12.

147.    Dr. Miloro stated that even if Plaintiff received surgery at an earlier date, this would not affect Plaintiff's current outcome.  Ex. B., 141:11-14.

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

/s/ Saira Alikhan
SAIRA ALIKHAN
Assistant Attorney General
General Law Bureau
100 W. Randolph  St., 13th Fl.
Chicago, Illinois 60601
(312) 814-6122