**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RAYMOND E. KING, <br> Inmate No. N54043, <br><br>        Plaintiff, <br><br>          v. <br><br> CHAPMAN, et al., <br><br>        Defendants. | Civil Action No.: 09 CV 1184 <br><br><br> Judge Marvin J. Aspen <br> Magistrate Judge Sidney I. Schenkier |

**PLAINTIFF RAYMOND E. KING'S LOCAL RULE 56.1 RESPONSE
TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF
MATERIAL FACTS AND SUBMISSION OF ADDITION FACTS**

Plaintiff Raymond E. King ("Mr. King") respectfully submits this Local Rule 56.1 Response to Defendants Dr. Nathan Chapman, Dr. Parthasarathi Ghosh, Dr. Ladeane Fattore-Bruno and Wexford Health Sources, Inc.'s Local Rule 56.1 Statement of Uncontested Material Facts In Support of Their Motion for Summary Judgment (Dkt. No. 239) and Defendants' Local Rule 56.1 Statement of Facts (Dkt. No. 243). Additionally, Mr. King submits this Local Rule 56.1(b)(3)(B) Statement of Additional Material Facts. Both are submitted in support of Mr. King's opposition to Defendants' Motions for Summary Judgment (Dkt. Nos. 238 and 246).

I.     **MR. KING'S LOCAL RULE 56.1 RESPONSE TO DEFENDANTS DR. NATHAN CHAPMAN, DR. PARTHASARATHI GHOSH, DR. LADEANE FATTORE-BRUNO AND WEXFORD HEALTH SOURCES, INC.'S LOCAL RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

    1.     Admitted.

    2.     Admitted.

3.      Admitted.

4.      Disputed.  This paragraph states that Dr. Newbold treated Mr. King, ordered a mouth guard and x-rays for him, and conducted a follow-up visit.  Mr. King first saw Defendant Dr. Newbold on August 26, 2004, and on September 9, 2004, Mr. King informed Defendant Dr. Newbold of his history of temporomandibular joint ("TMJ") disorder ("TMD") and that his previous dentist recommended close monitoring because of signs of slight deterioration.  (Ex. A ¶¶9, 10, Ex. B 9:17–10:23, 30:14–31:9.)  Defendant Dr. Newbold recommended a CT scan if clinically warranted, but did not order one.   (Ex. A ¶18; Ex. C KG000259, KG000260, KG002649; Ex. B 19:1–16.)  Defendant Dr. Newbold ordered a new splint[1] for Mr. King on September 9, 2004, eight months passed after Mr. King's initial symptoms were recorded until Newbold took impressions for the splint on, March 4, 2005.  (Ex. A ¶11; Ex. B 31:14-22, 29:12-13:2; Ex.C KG000488; Ex. D at 8; Ex. E 164:3–5.)  On September 16, 2004, Defendant Dr. Newbold ordered x-rays, but the x-rays were useless because the radiologist determined they were unreadable.  (Ex. A. ¶12; Ex. C KG000509; Ex. D at 7–8.)  A month later he ordered oblique projections, but gave a worthless diagnosis of TMJ disorder and hairline fracture to TMJ.  (Ex. D at 9–11.)  He did not refer Mr. King to a TMJ specialist.  (Ex. A ¶¶13, 17, 20.)

5.      Disputed.  This paragraph states that Mr. King received Motrin (Ibuprofen) for his complaints of pain.   (Ex. F 79:8–22.)   Mr. King was prescribed Motrin with deliberate indifference to Mr. King's health, even after other medications were specifically recommended by other doctors, because Ibuprofen was insufficient to alleviate his pain and was causing him ulcers.  (Ex. A ¶¶19–20; Ex. C KG000339, KG000498.)

6.      Disputed.  This paragraph states that Mr. King was seen by the Medical Director, Dr. Adrian Feinerman, at Menard Correctional Center ("Menard").  Defendants Drs. Newbold

---

[1] A night guard is an intra-oral device, sometimes called a "mouth guard" or a "splint".

and Chapman represented to Mr. King that he could not get a referral to an outside TMJ specialist without speaking to Defendnat Dr. Feinerman. (Ex. A ¶22; Ex. B 43:1–14; Ex. F 92:15–23.) But Mr. King was only seen by Defendant Dr. Feinerman on February 23, 2006—a full year-and-a-half after his original screening with Defendant Dr. Newbold—at which point Defendant Dr. Feinerman said that referral to a specialist must be instigated by Defendants Drs. Newbold or Chapman. (Ex. A ¶22; Ex. C KG000410; Ex. D 115:12–14; Ex. G 105:16–18.)

7.      Disputed. This paragraph states that Dr. Feinerman agreed to send Mr. King to a TMJ specialist and have a CT scan performed on his jaw. Defendant Dr. Feinerman said that referral to a specialist was possible, but must be instigated by Defendants Drs. Newbold or Chapman. (Ex. A ¶22; Ex. D 115:112–14.) He did not approve a CT scan until March 2007— over a year after he first saw Mr. King and 3 ½ years after Mr. King arrived at Menard. (Ex. A ¶25; Ex. C KG000154, KG002743; Ex. E 180:12–17; Ex. G 37:10–38, 108:3–6.) Mr. King did not actually see a specialist (Dr. Swanson) until May 2007—nearly four years after he arrived at Menard. (Ex. A ¶27; Ex. B 40:10-13; Ex. G 111:21–112:2.)

8.      Disputed. This paragraph states that Mr. King had the CT performed and was seen by a TMJ specialist outside the prison system. The CT was performed in April 3, 2007—3 ½ years after Mr. King arrived at Menard when Defendant Dr. Newbold recommended a CT if clinically warranted. (Ex. A ¶26; Ex. B 30:1-13.)

9.      Disputed. This paragraph states that Dr. Swanson informed Mr. King that the only institution performing TMJ replacement surgery as of May 1, 2007 was Loyola. On May 1, 2007, Mr. King saw Dr. Swanson, an oral surgeon, who found that Mr. King's TMJ was too badly damaged for "conservative treatment" and prescribed immediate joint replacement, which

Dr. Swanson explained was only available at Loyola University Hospital ("Loyola"). (Ex. A ¶27; Ex. C KG000155; Ex. D 116:9–20; Ex. F 116:1–17, 125:10–16; Ex. H 62:15–63:24.)

10. Disputed. This paragraph states that Mr. King was sent outside the prison system for an MRI of his TMJ on June 1, 2007. Mr. King did not receive an MRI until June 1, 2007—almost three years after his initial intake by Defendant Dr. Newbold. (Ex. C KG000196, KG000518; Ex. G 45:13–15; PE 101.) Only after Mr. King's condition had deteriorated to the point at that joint replacement surgery was the only viable option did Mr. King receive an MRI—a full month after Dr. Swanson recommended "an immediate MRI." (Ex. C KG000196, KG000518; PE 101.)

11. Disputed. This paragraph states that Mr. King was informed by an Assistant Warden at Mendard that he was being sent to UIC Medical Center for his TMJ treatment. On or about July 19, 2007, an assistant warden informed Mr. King that, despite express instructions from Dr. Swanson explaining that he should be sent to Loyola immediately and that there was no one at the UIC capable of performing the needed surgery, Mr. King would go to University of Illinois Chicago Hospital ("UIC") instead of Loyola. (Ex. A ¶29; Ex. C KG000157, KG000443.)

12. Disputed. This paragraph states that Mr. King was seen at the oral surgery clinic at UIC but not admitted on September 26, 2007. Mr. King was transferred to Stateville Correctional Facility ("Stateville") on September 19, 2007 for the purpose of receiving the immediate joint replacement for his TMJ disorder prescribed by Dr. Swanson. (Ex A. ¶¶4, 27, 30; Ex. C KG000445; Ex. F 18:6–21; Ex. I 124:18–21.) On September 26, 2007, Mr. King was sent to the Oral Surgery Clinic at UIC where he was seen by two oral surgeons, one of whom was the director of the Oral Surgery Clinic. (*Id*.) The oral surgeons informed Mr. King that there was no TMJ specialist on staff capable of performing the necessary transplant surgery and

referred him to Loyola for immediate for bone transplant surgery. (*Id.*) This information was relayed to Defendants Dr. Chapman at Menard and Defendant Dr. Mitchell-Lawshea, the dental director and acting health administrator at Stateville, by the correction officers accompanying Mr. King during his medical visit to UIC. (*Id.*) (Ex. A ¶30; Ex C. KG00270; Ex. F 127:3–22.)

13.    Disputed. This paragraph states that Mr. King was sent to the emergency room at UIC on October 19, 2007 after complaining that his jaw locked shut causing intense pain and swelling of his face. On October 19, 2007—1 month after the oral surgeons at UIC recommended Mr. King be sent immediately to Loyola to receive the necessary surgery and 5 ½ months after Dr. Swanson recommended an immediate MRI and TMJ replacement surgery—Mr. King's jaw locked shut and was causing intense pain and swelling in his face. (Ex A. ¶¶27, 30, 33.) A Stateville evaluation report noted Mr. King's inability to open his mouth and that he suffered from a "dislocated" and "reduced" TMJ. (*Id.*) Mr. King repeatedly attempted to receive treatment from 9:00 AM until 11:00 PM, all of which were ignored. (Ex. A ¶33; Ex. I 155:7–12.) Mr. King was finally taken to the emergency room at UIC on October 20, 2007, where he received an X-Ray, pain medications, and an appointment for an immediate MRI. (Ex. A ¶34; Ex. C KG000009, KG000127; Ex. E 215:19–24, 219:12–14; Ex. H 73:6–9.) However, Defendants Drs. Mitchell-Lawshea and Ghosh at Stateville refused to authorize Mr. King to receive the MRI. (*Id.*)

14.    Disputed. This paragraph states that Mr. King was seen by an in-house oral surgeon, Dr. Craig, was admitted to the infirmary, and prescribed pain medications and muscle relaxants prior to his TMJ replacement surgery. On November 27, 2007, Mr. King was allowed to see an oral surgeon visiting Stateville named Dr. Craig, who the staff at Stateville knew did not treat TMJ disorders. (Ex. A ¶37; Ex. C KG000020, KG001810; Ex. H 80:17–81:7; Ex. I

74:8–11.)  Dr. Craig told Defendants Drs. Mitchell-Lawshea, Fattore-Bruno, and Ghosh that Mr. King was not to be prescribed Motrin, Robaxin, Naproxin, or Tylenol as they were insufficient to treat Mr. King's pain.  (Ex. A ¶37; Ex. C KG001570, KG001738; Ex. I 74:16–20.)  He also said the Mr. King *must* see a TMJ specialist.  (Ex. A ¶37.)

15.     Disputed.  This paragraph states that Mr. King was informed by Dr. Ghosh that Loyola was not accepting new TMJ surgical patients.  On December 17, 2007—over two and one half months after the oral surgeons at UIC recommended Mr. King be sent immediately to Loyola to receive the necessary surgery, nearly three months after he was transferred to Stateville to have this critical surgery, and seven and a half months after Dr. Swanson prescribed immediate joint replacement explaining that it was only available at Loyola—Defendant Dr. Ghosh informed Mr. King that he had faxed a referral that day to Loyola for bone transplant surgery, but that Loyola was not accepting any new patients at that time and would be a couple of months before that could get him in.  (Ex. A ¶¶27, 30, 41; Ex. C KG000131; Ex. G 58:18–20; Ex. H 78:12–17 79:1–6.)

16.     Disputed.  This paragraph states that Mr. King received an MRI at UIC on December 7, 2007.  On December 10, 2007, Mr. King was sent to UIC for the MRI that was originally ordered by UIC emergency room physician and scheduled to be conducted on October 22, 2007 but never conducted because of Defendants Drs. Mitchell-Lawshea's and Ghosh's refusal.  (Ex. A ¶34, 40; Ex. C KG000019; Ex. I 126:14–21.)  The MRI revealed "complete disruption" of the right temporomandibular joint with deformity of the mandibular condyle and the "presence of multiple intra and extraarticular calcifications."  (Ex. A ¶40; Ex. J 162:22–163:10.)  Further, the joint space was "completely obliterated," and the articular disk of the joint

was so damaged that it was "not recognized." (Ex. A ¶40; Ex. C KG000726.) The delay in treatment exacerbated Mr. King's TMJ condition. (Ex. A ¶40.)

17.     Disputed. This paragraph states that Mr. King was seen as an out-patient at UIC in or around February 2008, for surgical evaluation of his TMJ. In or around the month of February 2008, Mr. King was sent to Dr. Edwards at UIC for a follow-up visit and was informed that his entire joint needed to be replaced. (Ex. A ¶40; Ex. C KG000135.) Dr. Edwards showed Mr. King at least 10 bone fragments in and around his temporomandibular joint area and recommended immediate surgery. (Ex. A ¶¶40, 45; Ex. H 90:6–16.)

18.     Disputed. This paragraph states that Mr. King's TMJ replacement surgery proceeded on March 19, 2008. On March 16, 2008, Mr. King was admitted into UIC for surgery, and on March 19, 2008 his complete right condylar joint was successfully replaced by Drs. Miloro and Edwards. (Ex. A ¶45–46; Ex. C KG00688–692; Ex. H 89:13–90:4; Ex. K 58:12–14, 58:21–59:13, 59:19–20, 61:3–5.) Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite device." (Ex. A ¶47; Ex. E 268:13–21; Ex. H 97:20–98:2; Ex. I 134:12–15; Ex. L 113:9–114:8.) Dr. Edwards also requested that the Stateville medical staff contact him if there were questions on what type of physical therapy was required for Mr. King. (Ex. A ¶47; Ex. C KG000753; Ex. E 160:2–9; Ex. I 137:21–138.)

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Disputed.  This paragraph states that Mr. King was taking Valium at the time of his deposition.  Plaintiff objects to this paragraph as irrelevant and prejudicial under Federal Rules of Evidence 402, 403, and 404.   Summary judgment must be based on admissible evidence. Fed. R. Civ. P. 56(c)(2); *Verser v. Hubbard*, No. 10 C 7513, 2012 WL 1655960, at \*2 (N.D. Ill. May 9, 2012) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)).

23.     Disputed.  This paragraph states that in the past, Mr. King received relief from his TMJ symptoms with Indocin, which is an NSAID (non-steroidal anti-inflammatory drug).  Mr. King testified that before his symptoms were relieved in 1992, he used Indocin for a period of time to help with his TMJ pain, but that he was taken off of it because of the long-term risk of ulcers.  (Ex. H 55:24–56:3.)

24.     Admitted.

25.     Disputed.  This paragraph states that Mr. King injured his jaw again in June 2004, when his face was slammed into a table.  Mr. King testified that he was symptom free from December 1992 until June of 2004, when, while under the care of the State of Illinois, he was attacked from behind in the Peoria County Courthouse, his face slammed against a table, re-aggravating his TMD.  (Ex. E 105:12–15; Ex. G 87:9–10, 104:5; Ex. H 42:6–44:2; Ex. I 71:15–21, 72:8–20; 98:9–99:2.)

26.     Disputed.  This paragraph states that Mr. King had a night guard for his jaw when he arrived at Menard, which broke and was repaired.  Mr. King had a broken night guard when he arrived at Menard.  (Ex. E 130:1–24; Ex. H 50:18–23, 51:8–14; Ex. I 82:5–12.)   He notified the dental department, but he had to file a grievance before having it repaired.  (Ex. H 51:11–21, 139:17–18.)  Defendant Dr. Newbold ordered a new guard in September, 2004, but did not take

impressions until March 4, 2005—over eight months after the initial symptoms were recorded. (Ex. A ¶11; Ex. B 31:14–22; Ex. C KG000488; Ex. D at 8; Ex. E 164:3–5.) Mr. King was without a night guard for up to eight months. (Ex. D at 8; Ex. H 51:19–2.)

27.     Disputed. This paragraph states that according to Mr. King, the night guard did not help. Mr. King testified that while he was at Menard, the night guard did not help, and that when he did use it, he would constantly wake up with a mouth full of blood. (Ex. H 53:15–54:11.) The persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused Mr. King's condition to continue to deteriorate, and has now caused such a loss of range of motion that Mr. King can no longer open his mouth wide enough to use his night guard. (Ex. A ¶88; Ex. H12:11–19.)

28.     Disputed. This paragraph states that Mr. King had access to warm water to put on washcloths in his cell. Mr. King testified that he did only had access to lukewarm water, not hot water, to put on washcloths, and that putting those lukewarm washcloths on his jaw did nothing. (Ex. H 52:14–24, 110:20–111:8; *see also* Ex D at 15.)

29.     Disputed. This paragraph states that Mr. King was shown home exercises for his jaw by a physical therapist, including how to stretch his mouth with his fingers to increase the range of motion in his jaw in 1992. Mr. King's jaw was wired shut after his surgery in 1992, which lead to a decrease in his range of motion. (Ex. H 57:3–5, 60:6–18.) After the wires were removed, Mr. King received regular physical therapy until he got back the range of motion of his mouth. (Ex. H 57:10–58:13.) In addition to therapy performed on multiple occasions by physical therapists that specialized in the TMJ, Mr. King was also taught some mouth-stretching exercises he could perform on his own. (Ex. H 59:20–60:23.) Mr. King testified that he could

not remember everything that the physical therapists did because it was so long ago. (Ex. H 61:13–15.)

30. Admitted.

31. Disputed. This paragraph states that Mr. King was taken from Stateville to the Emergency Room at UIC on October 19, 2007, but he was not admitted and he was sent back to Stateville. On October 19, 2007—1 month after the oral surgeons at UIC recommended Mr. King be sent immediately to Loyola to receive the necessary surgery and 5 ½ months after Dr. Swanson recommended an immediate MRI and TMJ replacement surgery—Mr. King's jaw locked shut and was causing intense pain and swelling in his face. (Ex. A ¶¶27, 30, 33; Ex. C KG000008.) Mr. King repeatedly attempted to receive treatment from 9:00 AM until 11:00 PM, all of which were ignored. (Ex. A ¶33; Ex. I 155:7–12.) Mr. King was finally taken to the emergency room at UIC on October 20, 2007, where he received an X-Ray, pain medications, and an appointment for an immediate MRI. (Ex. A. ¶34; Ex. C KG000009; Ex. E 215:19–24, 219:12–14; Ex. H 73:6–9,.) However, Mitchell and Ghosh at Stateville refused to authorize Mr. King to receive the MRI. (*Id.*)

32. Disputed. This paragraph states that Mr. King received Ibuprofen, Robaxin (a muscle relaxer) and Tylenol 3 (a pain medication) at Stateville. Mr. King was brought to the Stateville dental clinic on December 6, 2007, where he was seen and ultimately admitted to the infirmary by Defendants Drs. Mitchell-Lawshea and Fattore-Bruno. (Ex. H 84:5–13, 20-24; Ex. M 45:11–13.) He was given Tylenol 3 for pain and Roboxin muscle relaxers to help try to unlock Mr. King jaw, both of which were inadequate for their intended purposes, as noted previously by Dr. Craig. (Ex. A ¶39; Ex. H 85:6–21; Ex. L 112:19–113:1; Ex. M 45:13–16.)

10

33.     Disputed.  This paragraph states that Tylenol 3 helped decrease Mr. King's TMJ pain.  Mr. King was brought to the Stateville dental clinic on December 6, 2007, where he was seen and ultimately admitted to the infirmary by Defendants Drs. Mitchell-Lawshea and Fattore-Bruno. (Ex. H 84:5–13, 20-24; Ex. M 45:11–13.)  He was given Tylenol 3 for pain and Roboxin muscle relaxers to help try to unlock his jaw, both of which were inadequate for their intended purposes, as noted previously by Dr. Craig.  (Ex. A ¶39; Ex. H 85:6–21; Ex. L 112:19–113:1; Ex. M 45:13–16.)

34.     Disputed.  This paragraph states that Mr. King admits that the surgeons at UIC explained that one risk is that surgery could fail.  Dr. Miloro explained that there was a small risk that Mr. King could become paralyzed or that the surgery could fail within a year, but went on to assure Mr. King that had performed this surgery numerous times and hadn't had a patient come back in over ten years.  (Ex. H 91:18–21, 93:7–10).  He told Mr. King that he was going to take care of him, which led Mr. King to believe that he was going to be pain-free after the surgery. (Ex. H 93:11-14.)

35.     Disputed.  This paragraph states that as of the date of his deposition, he did not have TMJ joint pain—the only pain he experiences is from his jaw muscles.  Since filing the present complaint, Mr. King's jaw intermittently locks, and he has been intense physical pain such that even the simple act of speaking was extremely painful.  (Ex. A ¶77.)  UIC dentists have informed Mr. King that his condition is being exacerbated by problems with his facial muscles. (Ex. A ¶¶80, 88.)  His condition has continued to deteriorate, and has now caused his left jaw joint to swell and deteriorate.  (Ex. A ¶88.)

36.     Disputed.  This paragraph states that Mr. King was given and instructed on how to use tongue blades in his cell by Dr. Fattore-Bruno before he received his "TheraBite" device.

Mr. King only saw Defendant Dr. Fattore-Bruno twice between his surgery and the time she was transferred out of Stateville. (Ex. A ¶52.) Mr. King could only increase the amount the tongue blades stretched his jaw by adding more tongue blades, but he was only allowed to get more blades from Defendant Dr. Fattore-Bruno. (Ex. M 65:17–19, 65:21–66:5.) Dr. Binderman testified that using tongue blades (depressors) instead of a "TheraBite" was deviation from the standard of care. (Ex. D at 14; Ex. I 145:5–10.) Tongue depressors were used in the past for TMJ exercise, but their effectiveness is limited because they only passively stretch the jaw and do not more naturally exercise the muscles of the jaw in a more functional manner as is done with the "TheraBite", therefore tongue depressors would not be a controlled, adequate, or effective aid to post-surgical joint replacement therapy in the 2008 time frame. (Ex. D at 14.) The tongue blades were not prescribed by the oral surgeons, and as Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1.) To do otherwise would not be practicing good medicine. (*Id.*)

37. Disputed. This paragraph states that Mr. King received a Therabite device in September, 2008, and, as of the date of his deposition, he still had it. Mr. King was released from UIC after his total jaw replacement surgery on March 20, 2008 and Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including the use of a "TheraBite". (Ex. A ¶47; Ex. E 268:13–21; Ex. H 97:20–98:2; Ex. I 134:12–15; Ex. L 113:9-114:15.) When Mr. King returned to UIC for a follow-up visit on March 25, 2008, Dr. Edwards was surprised to learn that he had not received the "TheraBite" device. (Ex. A ¶49.) Mr. King saw Dr. Edwards again for follow-up care on or around April 1, 2008, where Dr. Edwards again prescribed the use of the "TheraBite" and sent

his instructions to Defendants Drs. Ghosh, Fattore-Bruno, and Mitchell-Lawshea. (Ex. A ¶50; Ex. C KG000139.) Nonetheless, as before, Stateville's medical and dental staff failed to provide Mr. King with the device. (Ex. A ¶51.) On May 13, 2008, Mr. King filed a grievance because of the medical and dental staff's refusal to provide the prescribed "TheraBite". (Ex. A ¶53; Ex. C KG001658–59; Ex. M 92:23–94:5.) On May 15, 2008, Warden McCann deemed the May 13, 2008 grievance an emergency grievance, but Mr. King was not provided with a "TheraBite". (Ex. A ¶55; Ex. C KG001753.) On June 11, 2008, Mr. King visited the Stateville dental clinic and reminded the staff that he needed to go to UIC for a follow-up visit and to pick up the "TheraBite". (Ex. A ¶57; Ex. C KG000159; Ex. M 78:8–17, 79:12–14.) On July 9, 2008, Mr. King was again sent to UIC for follow up care, where an oral surgeon familiar with his case requested that a "TheraBite" device be ordered for him. (Ex. A ¶60; Ex. C KG000140.) Throughout the month of August of 2008, Mr. King repeatedly attempted to gain access to the "TheraBite" device by sending request slips, but when he inquired as to the status of his requests, the medical staff informed Mr. King that Defendant Dr. Mitchell-Lawshea was still upset about a lawsuit that he had instigated against her at Pontiac Correctional Center, and that she would address his requests, "when she does." (Ex. A ¶61; Ex. C KG001757, KG002678.) On September 9, 2008, Mr. King saw Dr. Edwards for another follow-up care visit and explained that he had yet to receive the "TheraBite" device. (Ex. A ¶62; Ex. C KG000755.) In that assessment, Dr. Edwards stated that Mr. King's right "posterior dental [has an] open bite <u>due to lack of physical therapy</u>" and again ordered physical therapy with daily jaw exercises. (*Id.*) (emphasis added). Dr. Edwards was frustrated and stated that he would personally order the "TheraBite" device in view of Stateville Medical Center's refusal to order the device. (*Id.*) On September 23, 2008, Mr. King finally received the "TheraBite" device from Dr. Edwards during

a follow-up visit.  (Ex. A ¶63; Ex. C KG000142.)  By September 29, 2008, Mr. King's jaw had

locked shut, rendering the "TheraBite" useless.  (Ex. A ¶64–65; Ex. H 112:22–113:9.)

38.     Disputed.  This paragraph states that Mr. King received treatment by physical

therapists at Stateville, who provided him with heat packs and neck massages.  Mr. King was

released from UIC after his total jaw replacement surgery on March 20, 2008 and Dr. Edwards

sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory

post-operative treatment, including physical therapy.  (Ex. A ¶47; Ex. D 134:12–15; Ex. E

268:13–21; Ex. H 97:20–98:2; Ex. L 113:9-114:8.)    When Mr. King returned to UIC for a

follow-up visit on March 25, 2008, Dr. Edwards was surprised to learn that he had not received

the prescribed physical therapy.  (Ex A ¶49.)  Mr. King saw Dr. Edwards again for follow-up

care on or around April 1, 2008, where Dr. Edwards again prescribed physical therapy and sent

his instructions to Defendants Drs. Ghosh, Fattore-Bruno, and Mitchell-Lawshea.  (Ex. A ¶50;

Ex. C KG000139.)  Nonetheless, as before, Stateville's medical and dental staff failed to provide

Mr. King with the physical therapy.  (Ex. A ¶51.)  On April 24, 2008, acting on behalf of the

Grievance Office, the director of nursing of Stateville, Mary Purvin, responded to a January 15,

2008 grievance from Mr. King related to Stateville's medical staffs failure to provide him with

pain medication and his jaw locking shut, in which she falsely stated that Mr. King was receiving

weekly treatment by Defendant Dr. Fattore-Bruno and that physical therapy had been ordered.

(Ex. A ¶52; Ex. C KG001745.)  In actuality, Mr. King had not been seen by Dr. Fattore-Bruno

for months prior to his surgery and even after, he had only seen her five times.  (Ex. A  __)  On

May 13, 2008, Mr. King filed a grievance because of the medical and dental staff's refusal to

provide the prescribed physical therapy.  (Ex. A ¶53; Ex. C KG001658–1659; Ex. M 93:23–

94:5.)  On May 15, 2008, Warden McCann deemed the May 13, 2008 grievance an emergency

grievance, but Mr. King was not provided with physical therapy. (Ex. A ¶55; Ex. C KG001753.) Defendant Dr. Ghosh examined Mr. King on June 19, 2008, and noticed swelling of his right TMJ area where he had surgery and that he could barely open his mouth. (Ex. A ¶59; Ex. C KG00166–167.) When Defendant Dr. Ghosh asked what treatment the dental staff was providing, Mr. King informed him that he was not receiving treatment of any kind. (*Id.*) Defendants Dr. Ghosh then asked Defendant Drs. Mitchell-Lawshea and Saffold why Mr. King was not receiving the post-operative treatment prescribed by Dr. Edwards. (*Id.*) Without even examining Mr. King, Defendant Dr. Saffold replied that he did not need physical therapy because it would not help and that no treatment existed for TMD—despite Dr. Edward's post-operative instructions to the contrary. (*Id.*) On July 9, 2008, Mr. King was again sent to UIC for follow up care, where an oral surgeon familiar with his case ordered physical therapy three times a week and the daily use of heat packs. (Ex. A ¶60; Ex. C KG000140.) Throughout the month of August of 2008, Mr. King repeatedly attempted to gain access to heat packs and physical therapy by sending request slips, but when he inquired as to the status of his requests, the medical staff informed Mr. King that Dr. Mitchell was still upset about a lawsuit that he had instigated against her at Pontiac Correctional Center, and that she would address his requests, "when she does." (Ex. A ¶61; Ex. C KG001757, KG002678.) On September 9, 2008, Mr. King saw Dr. Edwards for another follow-up care visit and explained that he had yet to receive the prescribed physical therapy. (Ex. A ¶62; Ex. C KG000755.) In that assessment, Dr. Edwards stated that Mr. King's right "posterior dental [has an] open bite <u>due to lack of physical therapy</u>" and again ordered physical therapy with daily jaw exercises. (*Id.*) (emphasis added). On September 23, 2008, Mr. King finally received the "TheraBite" device from Dr. Edwards during a follow-up visit. (Ex. A ¶63; Ex. C KG000142.) On October 3, 2008, Mr. King's jaw locked

shut and he was seen by Defendant Dr. Garg, whom he reminded that the dental records indicate physical therapy is required and Dr. Edwards's phone number was listed if they did not know what kind of therapy to provide.  (Ex. A ¶65.)  Defendant Dr. Garg returned Mr. King to his cell without treatment or physical therapy order.  (*Id*.)  On October 6, 2008, Mr. King informed Assistant Warden Mark Hosey that he was in incredible pain and that the medical and dental staff had refused to provide the prescribed physical therapy.  (Ex. A ¶66.)  In response to Assistant Warden Hosey's inquiries, Mr. King was finally seen by a physical therapist on October 8, 2008—over six months after his joint replacement surgery.  (Ex. A ¶67; Ex. H 115:10–16, 116:9–117:1.)  During the physical therapy session, the therapist explained that he did not know what kind of therapy to provide, and simply measured Mr. King's ability to open his mouth using tongue blades and provided him with heat packs.  (Ex. A ¶67.)  UIC dental department was never contacted to determine what type of physical therapy to provide.  (*Id*.)  Mr. King finally began to receive regular physical therapy—perhaps in response to a letter from Dr. Miloro ordering specialized TMD related physical therapy (Ex. N)—from a general physical therapist at Stateville, who by his own admission does not have any specialized training or knowledge related to the treatment of TMD, and is incapable of providing Mr. King with the type of specialized TMD therapy ordered.  (Ex. A ¶¶67, 90.)

39.    Disputed.  This paragraph states that in addition to taking Valium at Stateville, Mr. King has also taken Lodine, which helps his TMJ issues, and Celebrex.  Throughout his incarceration since 2004, Mr. King has repeatedly been denied pain medication (Ex. A ¶¶36, 37, 38, 71, 81, 82) or prescribed inadequate or inappropriate medication to treat his condition (*Id*. at ¶¶19, 20, 39, 70).

16

40.     Disputed.  This paragraph states that Mr. King had a night guard at Stateville as of February 2012.  The persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused Mr. King's condition to continue to deteriorate, and has now caused such a loss of range of motion that Mr. King can no longer open his mouth wide enough to use his night guard.  (Ex. A ¶88; Ex. H 12:11–19.)

41.     Disputed.  This paragraph states that Dr. Miloro explained to Mr. King that no other surgeries are available for his TMJ.  Mr. King has never complained about not receiving further surgery, only that there was a substantial delay in scheduling his surgery that caused further medical harm.  (Ex. A ¶40; Ex. H 124:10–125:6.)

42.     Disputed.  This paragraph states that Dr. Newbold gave Mr. King a bite splint (or night guard) and prescribed Ibuprofen and Motrin.  Defendant Dr. Newbold ordered a new split, but did not take impressions until March 4, 2005—over eight months after the initial symptoms were recorded.  (Ex. A ¶11; Ex. B 31:14–22; Ex. C KG000488; Ex. D at 8; Ex. E 164:3–5.)  Mr. King testified that the night guard did not help, and that when he did use it, he would constantly wake up with a mouth full of blood.  (Ex. H 53:15–54:11.)  Mr. King was prescribed Motirin even though it was insufficient to alleviate his pain and for long after it was apparent that it was causing him ulcers, even after other medications were specifically recommended by other doctors.  (Ex. A ¶¶19–20; Ex. C KG00339, KG00498)

43.     Admitted

44.     Admitted

45.     Admitted

46.     Disputed. This paragraph states that as Dental Director, Dr. Chapman supervises the dental staff and oversees the dental care of the inmates.  Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 46.

47.     Disputed.  This paragraph states that for an inmate to receive a CT scan, it must be approved by the Medical Director, then the healthcare vendor.  Defendants Drs. Newbold and Chapman represented to Mr. King that he could not get a referral to an outside TMJ specialist without speaking to Defendant Dr. Feinerman.  (Ex. A ¶22.)  But Mr. King was not only seen by Defendant Dr. Feinerman until February 23, 2006—a full year-and-a-half after his original screening with Defendant Dr. Newbold—at which point Defendant Dr. Feinerman said that referral to a specialist must be instigated by Defendant Dr. Newbold or Defendant Dr. Chapman. (Ex. A ¶22; Ex. C KG000410; Ex. D 115:12–14; Ex. G 105:16–18.)

48.     Disputed.  This paragraph states that Dr. Chapman's only training in diagnosing TMJ dysfunctions was through dental school—he was taught how the TMJ area works and the signs and symptoms to look for in order to make a referral.  In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of either an MRI, a CT scan, or preferably both.  (Ex. D at 10.)  As well, in Mr. King's case, a detailed review of his past surgeries and their results was required to give meaning to the information obtained by the scans. (*Id.*)  These steps were never taken while Mr. King was at Menard, and therefore there was never any proper diagnosis of Mr. King's TMJ disorder until 2007 when appropriate imaging was finally performed with CT and MRI scans, showing the actual condition of his TM Joint and the associated tissue at that time.  (*Id.* at 9.)

49.      Disputed.  This paragraph states that if a patient has signs and symptoms of TMJ and conservative treatment does not help, you make referrals to oral surgeons and/or ENTs.

18

Conservative treatment must be based on a meaningful diagnosis. (Ex. D at 10.) In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of either an MRI, a CT scan, or preferably both. (*Id.* at 10.) As well, in Mr. King's case, a detailed review of his past surgeries and their results was required to give meaning to the information obtained by the scans. (*Id.*) These steps were never taken while Mr. King was at Menard, and therefore there was never any proper diagnosis of Mr. King's TMJ disorder until 2007 when appropriate imaging was finally performed with CT and MRI scans, showing the actual condition of his TM Joint and the associated tissue at that time. (*Id.* at 9.)

50.    Disputed. This paragraph states that conservative treatment for TMJ patients includes use of mouth guards, muscle relaxers and pain medications. Conservative treatment must be based on a meaningful diagnosis. (Ex. D at 10.) Mild forms of TMD can be treated with the use of a mouth guard. (Ex. A ¶6.) However, if not properly treated in a timely manner, the disorder can result in significant pain and impairment and/or degradation of the TMJ. (*Id.*) In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of either an MRI, a CT scan, or preferably both. (Ex. D at 10.) As well, in Mr. King's case, a detailed review of his past surgeries and their results was required to give meaning to the information obtained by the scans. (*Id.*) These steps were never taken while Mr. King was at Menard, and therefore there was never any proper diagnosis of Mr. King's TMJ disorder until 2007 when appropriate imaging was finally performed with CT and MRI scans, showing the actual condition of his TM Joint and the associated tissue at that time. (*Id.* at 9.)

51.    Admitted

52.    Disputed.  This paragraph states that Chapman did not seen Mr. King in 2004. Mr. King saw Defendant Dr. Chapman in or around November 2004.  (Ex. A ¶14; Ex. C KG000318, KG000322; Ex. F 38:13-20.)

53.    Disputed.  This paragraph states that Chapman first saw Mr. King on July 3rd or 13th, 2005.  Mr. King saw Defendant Dr. Chapman in or around November 2004.  (Ex. A ¶14; Ex. C KG000318, KG000322; Ex. F 38:13-20.)

54.    Disputed.  This paragraph states that on his first visit with Mr. King, Chapman would review the case to obtain an understanding of what's going on with the patient and what other doctors have done.  In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of either an MRI, a CT scan, or preferably both.  (Ex. D at 10.)  As well, in Mr. King's case, a detailed review of his past surgeries and their results was required to give meaning to the information obtained by the scans. (*Id*.)  These steps were never taken while Mr. King was at Menard, and therefore there was never any proper diagnosis of Mr. King's TMJ disorder until 2007 when appropriate imaging was finally performed with CT and MRI scans, showing the actual condition of his TM Joint and the associated tissue at that time.  (*Id*. at 9.)

55.    Disputed.  This paragraph states that Mr. King had a night guard in July 2005. Mr. King had a broken night guard when he arrived at Menard.  (Ex. E 130:1–24; Ex. H 50:48–23, 51:8–14.)  He notified the dental department, but he had to file a grievance before having it repaired.  (Ex. H 51:11–21, 139:17–18.)  Defendant Dr. Newbold ordered a new guard in September, 2004, but did not take impressions until March 4, 2005—over eight months after the initial symptoms were recorded.  (Ex. A ¶11; Ex. B 31:14–22; Ex. D at 8; Ex. E 164:3–5.)  Mr. King was without a night guard for up to eight months.  (*Id*. at 51:19–2; Ex. D at 8.)

56.     Disputed.  This paragraph states that in July, 2005, Dr. Chapman noted that Mr. King was wearing his night guard—he made adjustments to it.  An intra-oral appliance was constructed on April 1, 2005—over eight months after initial symptoms were recorded.  (Ex. D at 8.)  Then the appliance was never adjusted and Mr. King never benefitted from it.  (*Id.*)

57.     Disputed.  This paragraph states that in August, 2005, Dr. Chapman examined Mr. King, noted that he was wearing his night guard and prescribed Motrin.  Mr. King testified that the night guard did not help, and that when he did use it, he would constantly wake up with a mouth full of blood.  (Ex. H 53:15–54:11.)  On May 14, 2005, Mr. King informed the Menard medical staff that he had stomach ulcers and could no longer take the prescribed Motrin.  (Ex. A ¶19; Ex. C KG000339.)  Prolonged use of Motrin (ibuprofen) can cause ulceration of the stomach or intestines, and exacerbates the condition of existing ulcers.  (Ex. A ¶ 19.)  Mr. King was prescribed Motrin with deliberate indifference to Mr. King's health, even after other medications were specifically recommended by other doctors, because Ibuprofen was insufficient to alleviate his pain and was causing him ulcers.  (Ex. A ¶¶19–20; Ex. C KG000339, KG000498.)

58.     Admitted.

59.     Disputed.  This paragraph states that Dr. Chapman referred Mr. King to Dr. Craig. On November 27, 2007, Mr. King was allowed to see an oral surgeon visiting Stateville named Dr. Craig.  (Ex. C KG000020, KG001810; Ex. D 74:8–11; Ex. H 80:17–81.)The staff at Stateville knew that Dr. Craig did not treat TMJ disorders.  (Ex. A ¶35.)

60.     Disputed.  This paragraph states that referral of Mr. King to an outside specialist, such as an ENT, must be done by the Medical Director.  Defendants Drs. Newbold and Chapman represented to Mr. King that he could not get a referral to an outside TMJ specialist without

21

speaking to Defendant Dr. Feinerman. (Ex. A ¶22.) But Mr. King was only seen by Defendant Dr. Feinerman on February 23, 2006—a full year-and-a-half after his original screening with Defendant Dr. Newbold—at which point Defendant Dr. Feinerman said that referral to a specialist must be instigated by Defendant Dr. Newbold or Defendant Dr. Chapman. (Ex. A ¶22; Ex. C KG000410; Ex. D 115:12–14; Ex. G 105:16–18.)

61.     Disputed. This paragraph states that Dr. Chapman could not refer Mr. King to an outside specialist, that includes seeing an oral surgeon or having a CT scan or MRI completed. Defendants Drs. Newbold and Chapman represented to Mr. King that he could not get a referral to an outside TMJ specialist without speaking to Defendant Dr. Feinerman. (Ex. A ¶22.) But Mr. King was only seen by Defendant Dr. Feinerman on February 23, 2006—a full year-and-a-half after his original screening with Defendant Dr. Newbold—at which point Defendant Dr. Feinerman said that referral to a specialist must be instigated by Defendant Dr. Newbold or Defendant Dr. Chapman. (Ex. A ¶22; Ex C KG000410; Ex. G 105:16–18..)

62.     Disputed. This paragraph states that conservative treatment includes providing the patient with a mouth guard to prevent grinding of the teeth and to keep the jaw in place to alleviate pain, and prescribing pain medications and muscle relaxers. Conservative treatment must be based on a meaningful diagnosis. (Ex. D at 10.) Mild forms of TMD can be treated with the use of a mouth guard. (Ex. A ¶6.) However, if not properly treated in a timely manner, the disorder can result in significant pain and impairment and/or degradation of the TMJ. (*Id.*) In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of an MRI or a CT scan or preferably both. (Ex. D at 10.) As well, in Mr. King's case, a detailed review of his past surgeries and their results was required to give meaning to the information obtained by the scans. (*Id.*) These steps

22

were never taken while Mr. King was at Menard, and therefore there was never any proper diagnosis of Mr. King's TMJ disorder until 2007 when appropriate imaging was finally performed with CT and MRI scans, showing the actual condition of his TM Joint and the associated tissue at that time. (*Id*. at 9.) Proper and accepted treatment of Mr. King in 2004 would require full-time utilization of an intra-oral orthotic TMJ appliance, properly constructed to control physical forces on the TM Joints to help reduce the inflammatory intensity, hands-on physical therapy to control and reverse the muscle pathology, placement of steroid solution in the right TM Joint by one of several methods to attack the inflammation, use of ice over the joint on a daily basis to reduce inflammation, probable reposturing of the mandible (lower jaw) into a slightly more forward position to further unload the joint and to distract the joint to reduce pressure on inflamed intra-joint tissue, and possible adjunctive use of muscle relaxants and low-dose tricyclic antidepressants. (Ex. D at 11–12.) Mr. King received none of these treatments. (Ex. H 49:16–24.)

63.    Disputed.    This paragraph states that Mr. King received that conservative treatment at Menard. Conservative treatment must be based on a meaningful diagnosis. (Ex. D at 10.) Mild forms of TMD can be treated with the use of a mouth guard. (Ex. A. ¶6.) However, if not properly treated in a timely manner, the disorder can result in significant pain and impairment and/or degradation of the TMJ. (*Id*.) In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of an MRI or a CT scan or preferably both. (Ex. D at 10.) As well, in Mr. King's case, a detailed review of his past surgeries and their results was required to give meaning to the information obtained by the scans. (*Id*.) These steps were never taken while Mr. King was at Menard, and therefore there was never any proper diagnosis of Mr. King's TMJ disorder until

2007 when appropriate imaging was finally performed with CT and MRI scans, showing the actual condition of his TM Joint and the associated tissue at that time. (*Id*. at 9.) Proper and accepted treatment of Mr. King in 2004 would require full-time utilization of an intra-oral orthotic TMJ appliance properly constructed to control physical forces on the TM Joints to help reduce the inflammatory intensity, hands-on physical therapy to control and reverse the muscle pathology, placement of steroid solution in the right TM Joint by one of several methods to attack the inflammation, use of ice over the joint on a daily basis to reduce inflammation, probable reposturing of the mandible (lower jaw) into a slightly more forward position to further unload the joint and to distract the joint to reduce pressure on inflamed intra-joint tissue, and possible adjunctive use of muscle relaxants and low-dose tricyclic antidepressants. (Ex. D at 11– 12.) Mr. King received none of these treatments. (Ex. H 49:16–24.)

64.     Disputed.  This paragraph states that conservative treatment also includes jaw exercises that can be performed by Mr. King.  Conservative treatment must be based on a meaningful diagnosis. (Ex. D at 10.) Mild forms of TMD can be treated with the use of a mouth guard. (Ex. A ¶6.)  However, if not properly treated in a timely manner, the disorder can result in significant pain and impairment and/or degradation of the TMJ. (*Id*.)  In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of either an MRI, a CT scan, or preferably both. (Ex. D at 10.) As well, in Mr. King's case, a detailed review of his past surgeries and their results was required to give meaning to the information obtained by the scans. (*Id*.) These steps were never taken while Mr. King was at Menard, and therefore there was never any proper diagnosis of Mr. King's TMJ disorder until 2007 when appropriate imaging was finally performed with CT and MRI scans, showing the actual condition of his TM Joint and the associated tissue at that time.

(*Id*. at 9.) Proper and accepted treatment of Mr. King in 2004 would require full-time utilization of an intra-oral orthotic TMJ appliance properly constructed to control physical forces on the TM Joints to help reduce the inflammatory intensity. hands-on physical therapy to control and reverse the muscle pathology, placement of steroid solution in the right TM Joint by one of several methods to attack the inflammation, use of ice over the joint on a daily basis to reduce inflammation, probable reposturing of the mandible (lower jaw) into a slightly more forward position to further unload the joint and to distract the joint to reduce pressure on inflamed intra-joint tissue, and possible adjunctive use of muscle relaxants and low-dose tricyclic antidepressants. (Ex. D at 11–12.) Dr. Miloro himself told Mr. King that some of his physical therapy would need to be done by a physical therapist. (Ex. H 117:9–13; *see also* Ex. N 3/22/10.)

65. Admitted.

66. Disputed. This paragraph states Dr. Miloro's qualifications. Dr. Miloro is a fact witness, not an expert witness. Plaintiff objects to this paragraph as irrelevant a under Federal Rules of Evidence 401, 402, and 403. Summary judgment must be based on admissible evidence. Fed. R. Civ. P. 56(c)(2); *Verser v. Hubbard*, No. 10 C 7513, 2012 WL 1655960, at *2 (N.D. Ill. May 9, 2012) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)).

67. Disputed. This paragraph states Dr. Miloro's publications. Dr. Miloro is a fact witness, not an expert witness. Plaintiff objects to this paragraph as irrelevant a under Federal Rules of Evidence 401, 402, and 403. Summary judgment must be based on admissible evidence. Fed. R. Civ. P. 56(c)(2); *Verser v. Hubbard*, No. 10 C 7513, 2012 WL 1655960, at *2

(N.D. Ill. May 9, 2012) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)).

68.    Disputed.  This paragraph states that Dr. Miloro's is an "expert."  Dr. Miloro is a fact witness, not an expert witness.  Plaintiff objects to this paragraph as irrelevant a under Federal Rules of Evidence 401, 402, and 403.  Summary judgment must be based on admissible evidence. Fed. R. Civ. P. 56(c)(2); *Verser v. Hubbard*, No. 10 C 7513, 2012 WL 1655960, at *2 (N.D. Ill. May 9, 2012) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)).

69.    Admitted.

70.    Admitted.

71.    Disputed.  This paragraph states that the goal of TMJ replacement surgery is to recreate form and function—pain reduction is a secondary goal and cannot be guaranteed.  Dr. Miloro told Mr. King that he was going to take care of him, which led Mr. King to believe that he was going to be pain-free after the surgery. (Ex. H 93:11-14.)

72.    Disputed.  This paragraph states that some TMJ replacement patients have done little physical therapy, taken no medications and have had successful results following surgery. After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite device."  (Ex. A ¶47; Ex. H 113:9-22.)  Dr. Miloro himself told Mr. King that some of his physical therapy would need to be done by a physical therapist.  (Ex. H 117:9–13; *see also* Ex. N.)

73.     Disputed.  This paragraph states that in terms of scheduling Mr. King's surgery, there was no urgency to get him to surgery after having a chronic condition for 20 years.  On

May 1, 2007, Mr. King saw Dr. Swanson, an oral surgeon, who found that Mr. King's TMJ was too badly damaged for "conservative treatment" and prescribed *immediate* joint replacement. (Ex. A ¶27; Ex. C KG000155; Ex. D 116:9–20.)  On September 26, 2007, Mr. King was seen by two oral surgeons at the Oral Surgery Clinic at UIC, who referred him to Loyola for *immediate* bone replacement surgery.  (Ex. A ¶30; Ex. C KG00270).  Upon examination of Mr. King's CT scan in February 2008, Dr. Edwards at UIC recommended *immediate* surgery.  (Ex. A ¶45.)  The substantial delay in scheduling his surgery caused further medical harm.  (Ex. A ¶40; Ex. H 124:10–125:6.)

74.     Disputed.  This paragraph states that now that Mr. King received his TMJ replacement, there is nothing else that can be done for him surgically.  Mr. King has never complained about not receiving further surgery, only that there was a substantial delay in scheduling his surgery that caused further medical harm.  (Ex. A ¶40; Ex. H 124:10–125:6.)

75.     Disputed.  This paragraph states that Mr. King's post-surgical education was done by UIC surgical team, and the Stateville doctors did not need to add anything to that education. After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite device."  (*See* Ex. A ¶47; Ex. H 113:9-22.)  Dr. Miloro himself told Mr. King that some of his physical therapy would need to be done by a physical therapist.  (Ex. H 117:9–13; *see also* Ex. N.)

76.     Admitted.

77.     Disputed.  This paragraph states that after the convalescence period, physical therapy is instituted, along with NSAIDs and muscle relaxants.  After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and

Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite device." (Ex. A ¶47; Ex. H 113:9-22.) Dr. Miloro himself told Mr. King that some of his physical therapy would need to be done by a physical therapist. (Ex. H 117:9–13; *see also* Ex. N.) As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1.) To do otherwise would not be practicing good medicine. (*Id.*)

78. Disputed. This paragraph states that less than 5% of TMJ replacement patients receive post-surgical physical therapy from a physical therapist, and in the overwhelming majority of cases, the patient can perform physical therapy on his own based on the surgeon's instructions and an exercise machine provided to the patient by the surgeon. After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite device." (Ex. A ¶47; Ex. H 113:9-22.) Dr. Miloro himself told Mr. King that some of his physical therapy would need to be done by a physical therapist. (Ex. H 117:9–13; *see also* Ex. N.) As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1.) To do otherwise would not be practicing good medicine. (*Id.*)

79. Disputed. This paragraph states that although TMJ replacement patients can receive therapy from a physical therapist, the more beneficial and practical application of physical therapy is home exercises. After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory

post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite device." (Ex. A ¶47; Ex. H 113:9-22.) Miloro himself told Mr. King that some of his physical therapy would need to be done by a physical therapist. (Ex. H 117:9–13; *see also* Ex. N.) As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1.) To do otherwise would not be practicing good medicine. (*Id.*)

80.    Disputed. This paragraph states that 85-95% of TMJ replacement patients still have chronic pain following surgery, and the goal of the surgery is not to make the patient pain-free. Dr. Miloro told Mr. King that he was going to take care of him, which led Mr. King to believe that he was going to be pain-free after the surgery. (Ex. H 93:11-14.)

81.    Admitted.

82.    Disputed. This paragraph states that sometimes, tongue depressors are used to perform the physical therapy, and they function essentially the same as a "TheraBite" device – they both allow passive exercising of the jaw. Dr. Binderman testified that using tongue blades (depressors) instead of a "TheraBite" was deviation from the standard of care. (Ex. D at 14; Ex. I 145:5–10.) Tongue depressors were used in the past for TMJ exercise, but their effectiveness is limited because they only passively stretch the jaw and do not more naturally exercise the muscles of the jaw in a more functional manner as is done with the "TheraBite", therefore tongue depressors would not be a controlled, adequate, or effective aid to post-surgical joint replacement therapy in the 2008 time frame. (Ex. D at 14.) After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a "TheraBite". (Ex. A ¶47.) Dr. Miloro himself has stated that "using a 'therabite' appliance…is medically

necessary for [Mr. King]." (Ex. N.) As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1). To do otherwise would not be practicing good medicine. (*Id*.)

83.     Disputed. This paragraph states that a patient can use tongue depressors on his own, and there is no need for a third party to perform the physical therapy. After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendant Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite device." (Ex. A ¶47.) Dr. Miloro himself told Mr. King that some of his physical therapy would need to be done by a physical therapist. (Ex. H 117:9–13; *see also* Ex. N.) As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1). To do otherwise would not be practicing good medicine. (*Id*.) Furthermore, Dr. Binderman testified that using tongue blades (depressors) instead of a "TheraBite" was deviation from the standard of care. (Ex. D at 14; Ex. I 145:5–10.) Tongue depressors were used in the past for TMJ exercise, but their effectiveness is limited because they only passively stretch the jaw and do not more naturally exercise the muscles of the jaw in a more functional manner as is done with the "TheraBite", therefore tongue depressors would not be a controlled, adequate, or effective aid to post-surgical joint replacement therapy in the 2008 time frame. (Ex. D at 14.)

84.     Disputed. This paragraph states that Dr. Fattore-Bruno, who was assisting Mr. King in his posts-surgical exercises, or physical therapy, knew what she was doing and provided Mr. King with adequate physical therapy. After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory

post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite device." (Ex. A ¶47.) Dr. Miloro himself told Mr. King that some of his physical therapy would need to be done by a physical therapist. (Ex. H 117:9–13; Ex. M 15:1–22, 18:12–19:24, 20:24–21:3; *see also* Ex. N.) Defendant Dr. Fattore-Bruno did not provide the prescribed physical therapy. As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1). To do otherwise would not be practicing good medicine. (*Id.*)

85.     Disputed. This paragraph states that people with multiply-operated joints, like Mr. King, are still going to have chronic pain despite anatomic reconstruction. Dr. Miloro told Mr. King that he was going to take care of him, which led Mr. King to believe that he was going to be pain-free after the surgery. (Ex. H 93:11-14.)

86.     Disputed. This paragraph states that any additional treatment for Mr. King's pain is relegated to pharmacologic management. In March 2010—well after Mr. King's severe deterioration due to lack of proper post-operative care following his successful jaw replacement surgery—Dr. Miloro himself said that Mr. King "would benefit from treatment by a physical therapist, warm compresses, jaw exercises, and using a "therabite" appliance." And that he "believe[d] this treatment is medically necessary for [Mr. King]." (Ex. N.)

87.     Disputed. This paragraph states that if Mr. King received his TMJ replacement surgery earlier, it would not have helped to manage his pain. On May 1, 2007, Mr. King saw Dr. Swanson, an oral surgeon, who found that Mr. King's TMJ was too badly damaged for "conservative treatment" and prescribed *immediate* joint replacement. (Ex. A ¶27; Ex. C KG000155; Ex. I 116:9–20.) On September 26, 2007, Mr. King was seen by two oral surgeons at the Oral Surgery Clinic at UIC, who referred him to Loyola for *immediate* bone replacement

31

surgery. (Ex. A ¶30; Ex. C KG000270). Upon examination of Mr. King's CT scan in February 2008, Dr. Edwards at UIC recommended *immediate* surgery. (Ex. A ¶45; Ex. C KG000135; Ex. H 90:5–16.) The substantial delay in scheduling his surgery caused further medical harm. (Ex. A ¶40; Mr. Ex. H 124:10–125:6.)

88. Admitted.

89. Disputed. This paragraph states Dr. Fattore-Bruno's qualifications. Dr. Fattore-Bruno is a fact witness, not an expert witness. Plaintiff objects to this paragraph as irrelevant a under Federal Rules of Evidence 401, 402, and 403. Summary judgment must be based on admissible evidence. Fed. R. Civ. P. 56(c)(2); *Verser v. Hubbard*, No. 10 C 7513, 2012 WL 1655960, at *2 (N.D. Ill. May 9, 2012) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)).

90. Disputed. This paragraph states Dr. Fattore-Bruno's qualifications. Dr. Fattore-Bruno is a fact witness, not an expert witness. Plaintiff objects to this paragraph as irrelevant a under Federal Rules of Evidence 401, 402, and 403. Summary judgment must be based on admissible evidence. Fed. R. Civ. P. 56(c)(2); *Verser v. Hubbard*, No. 10 C 7513, 2012 WL 1655960, at *2 (N.D. Ill. May 9, 2012) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)).

91. Admitted.

92. Disputed. This paragraph states that there is no formal training for treating TMJ. The Defendants recognized and admitted that they are not experts in TMJ disorders and that there are specialists who are better trained and better suited to diagnose and treat TMJ disorders. (*See* Ex. A ¶¶14, 20, 21, 22, 26, 30.)

32

93.     Disputed.  This paragraph states that conservative treatment for TMJ dysfunction involves muscle relaxants to treat spasm, pain medication and night-guards (an acrylic mouth piece to prevent interdigitation of teeth, increase vertical dimension and allow spasmodic muscles to relax).  Conservative treatment must be based on a meaningful diagnosis.  (Ex D at 10.)  Mild forms of TMD can be treated with the use of a mouth guard.  (Ex. A ¶6.)  However, if not properly treated in a timely manner, the disorder can result in significant pain and impairment and/or degradation of the TMJ.  (*Id*.)

94.     Admitted.

95.     Disputed.  This paragraph states that Bruno first saw Mr. King on December 6, 2007 and prescribed Tylenol with Codeine and Robaxin (a muscle relaxant) for severe spasms and pain.  On November 27, 2007, Mr. King was allowed to see an oral surgeon visiting Stateville named Dr. Craig.  (Ex. A ¶37; Ex. C KG00020, KG001810; Ex H 80:17–81:7; Ex I 74:8–11.)  He told Defendants Drs. Mitchell-Lawshea, Fattore-Bruno, and Ghosh that Mr. King was not to be prescribed Motrin, Robaxin, Naproxin, or Tylenol as they were insufficient to treat Mr. King's pain.  (Ex. A ¶37; Ex. C KG001570, KG001738; Ex. I 74:16–20.)  Mr. King was brought to the Stateville dental clinic on December 6, 2007, where he was seen and ultimately admitted to the infirmary by Defendant Drs. Mitchell-Lawshea and Fattore-Bruno.  (Ex A ¶37; Ex. C KG000014; Ex H 84:5–13, 20–24; Ex. M 45:11–13.)  He was given Tylenol 3 for pain and Roboxin muscle relaxers to help try to unlock Mr. King jaw, both of which were inadequate for their intended purposes, as noted previously by Dr. Craig.  (*Id*.; Ex. A ¶37; Ex. H 85:6–21; Ex. L 25:10–14, 112:19–13:1.)

96.     Disputed.  This paragraph states that Bruno saw Mr. King on December 31, 2007, and she gave him muscle relaxants.  On December 31, 2007, in addition to muscle relaxants,

Bruno again prescribed Tylenol 3 for pain which was inadequate for their intended purposes, as noted previously by Dr. Craig. (Ex. A ¶37; Ex. M 47:22–48:6, 48:17–24, 50:9–16, 89:16–22.)

97.     Disputed. This paragraph states that Bruno noted in her charts that she saw Mr. King on January 29, 2008, for TMJ pain, she charted that he is awaiting surgery and she gave him Tramadol for pain. On January 12, 2008, Mr. King was seen at the Medical Center at Statesville, crying and clenching his jaw. (Ex. A ¶43; Ex. C KG000037.) He filed another grievance on January 15, 2008 requesting specialist. (Ex. C KG001651-2.) On January 29, 2008, Defendant Dr. Fattore-Bruno was told by Defendant Dr. Ghosh that Mr. King is awaiting surgery at UIC. (Ex. G 54:19–20, 55:18–22.)

98.     Admitted.

99.     Disputed. This paragraph states that Bruno next saw Mr. King on March 28, 2008, where she noted that he received his TMJ replacement surgery and that he needs to follow up with physical therapy to prevent his jaw from "fibrosing down." Mr. King was released from UIC after his total jaw replacement surgery on March 20, 2008 and Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a "TheraBite". (Ex. A ¶47; Ex. L 113:9–114:8; Ex. E 268:13–21; Ex. H 97:20–98:2; Ex I 134:12–15.) When Mr. King returned to UIC for a follow-up visit on March 25, 2008, Dr. Edwards was surprised to learn that he had not received physical therapy or the "TheraBite" device and again informed Stateville's medical staff of the required post-operative care necessary to ensure a successful outcome for the surgery. (*Id.* at ¶49.) The March 28th chart says that Bruno provided tongue blades, but there is no indication on the chart of what, if any, instruction was given. (Ex. C KG000159-60). As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from

therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1). To do otherwise would not be practicing good medicine. (*Id.*)

100.     Disputed. This paragraph states that "tongue blade therapy" is a form of physical therapy. Dr. Binderman testified that using tongue blades (depressors) instead of a "TheraBite" was deviation from the standard of care. (Ex D at 14; Ex. I 145:5–10.) Tongue depressors were used in the past for TMJ exercise, but their effectiveness is limited because they only passively stretch the jaw and do not more naturally exercise the muscles of the jaw in a more functional manner as is done with the "TheraBite", therefore tongue depressors would not be a controlled, adequate, or effective aid to post-surgical joint replacement therapy in the 2008 time frame. (Binderman Rep. at 14.) After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendant Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a "TheraBite". (Ex. A ¶47; Ex. E 268:13–21; Ex. H 97:20–98:2; Ex I 134:12–15; Ex. L 113:9–22.) Dr. Miloro himself has stated that "using a 'therabite' appliance…is medically necessary for [Mr. King]." (Ex. N.) As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1). To do otherwise would not be practicing good medicine. (*Id.*)

101.     Disputed. This paragraph states that Bruno confirmed with an oral surgery resident at UIC that tongue blade therapy was an appropriate form of physical therapy in lieu of a "TheraBite" device. Dr. Binderman testified that using tongue blades (depressors) instead of a "TheraBite" was deviation from the standard of care. (Ex. D at 14; Ex. I 145:5–10.) Tongue depressors were used in the past for TMJ exercise, but their effectiveness is limited because they only passively stretch the jaw and do not more naturally exercise the muscles of the jaw in a

more functional manner as is done with the "TheraBite", therefore tongue depressors would not be a controlled, adequate, or effective aid to post-surgical joint replacement therapy in the 2008 time frame. (Ex. D at 14.) After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a "TheraBite". (Ex. A ¶47; Ex. L 113:9–22.) Dr. Miloro himself has stated that "using a 'therabite' appliance…is medically necessary for [Mr. King]." (Ex. N.) As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1). To do otherwise would not be practicing good medicine. (*Id*.)

102.    Disputed.    This paragraph states that tongue blade therapy, which Dr. Bruno performed at the University of Chicago, consists of having the patient fully open his mouth, fitting the tongue blades between the teeth, recording the dimensions and adding blades as clinically warranted, and that she confirmed with UIC that this treatment was appropriate. Dr. Binderman testified that using tongue blades (depressors) instead of a "TheraBite" was deviation from the standard of care. (Ex. D at 14; Ex. I 145:5–10.) Tongue depressors were used in the past for TMJ exercise, but their effectiveness is limited because they only passively stretch the jaw and do not more naturally exercise the muscles of the jaw in a more functional manner as is done with the "TheraBite", therefore tongue depressors would not be a controlled, adequate, or effective aid to post-surgical joint replacement therapy in the 2008 time frame. (Ex. D at 14.) After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a "TheraBite". (Ex. A ¶47; Ex. L 113:9–22.) Dr. Miloro himself has stated that "using a 'therabite' appliance…is medically necessary for [Mr. King]." (Ex. N.) As

Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1). To do otherwise would not be practicing good medicine. (*Id.*)

103. Disputed. This paragraph states that Bruno instructed Mr. King on the use of tongue blades, explained why he needed to perform the tongue blade therapy and had him demonstrate that he could use the tongue blades. Dr. Binderman testified that using tongue blades (depressors) instead of a "TheraBite" was deviation from the standard of care. (Ex. D at 14; Ex. I 145:5–10.) Tongue depressors were used in the past for TMJ exercise, but their effectiveness is limited because they only passively stretch the jaw and do not more naturally exercise the muscles of the jaw in a more functional manner as is done with the TheraBite, therefore tongue depressors would not be a controlled, adequate, or effective aid to post-surgical joint replacement therapy in the 2008 time frame. (Ex. D at 14.) After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a "TheraBite". (Ex. A ¶47; Ex. L 113:9–22.) Dr. Miloro himself has stated that "using a 'therabite' appliance…is medically necessary for [Mr. King]." (Ex. N.) As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1). To do otherwise would not be practicing good medicine. (*Id.*)

104. Disputed. This paragraph states that Mr. King was shown to place the tongue blades in his mouth, and push the blades up and down to prevent the formation of collagen (or tissue scarring) that could decrease the opening of his jaw. Dr. Binderman testified that using tongue blades (depressors) instead of a "TheraBite" was deviation from the standard of care.

(Ex. D at 14; Ex. I 145:5–10.)  Tongue depressors were used in the past for TMJ exercise, but their effectiveness is limited because they only passively stretch the jaw and do not more naturally exercise the muscles of the jaw in a more functional manner as is done with the "TheraBite", therefore tongue depressors would not be a controlled, adequate, or effective aid to post-surgical joint replacement therapy in the 2008 time frame.  (Ex. D at 14.)  After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a "TheraBite". (Ex. A ¶47; Ex. L 113:9–22.) Dr. Miloro himself has stated that "using a 'therabite' appliance…is medically necessary for [Mr. King]."  (Ex. N.)  As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon.  (Ex. J 69:22–71:1.)  To do otherwise would not be practicing good medicine.  (*Id*.)  Mr. King's range of motion steadily decreased from the successful completion of his surgery in March 2008 until October 2008, at which point his jaw locked shut.  (Ex. A ¶47; Ex. L 113:9–22.)

105.    Disputed.  This paragraph states that Bruno instructed Mr. King to use the tongue blades several times per day.  Dr. Binderman testified that using tongue blades (depressors) instead of a "TheraBite"was deviation from the standard of care.  (Ex. D at 14; Ex. I 145:5–10.) Tongue depressors were used in the past for TMJ exercise, but their effectiveness is limited because they only passively stretch the jaw and do not more naturally exercise the muscles of the jaw in a more functional manner as is done with the "TheraBite", therefore tongue depressors would not be a controlled, adequate, or effective aid to post-surgical joint replacement therapy in the 2008 time frame.  (Ex. D at 14.)  After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendants Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory

post-operative treatment, including physical therapy and the use of a "TheraBite". (Ex. A ¶47; Ex. L 113:9–22.) Dr. Miloro himself has stated that "using a 'therabite' appliance…is medically necessary for [Mr. King]." (Ex. N.) As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1). To do otherwise would not be practicing good medicine. (*Id.*) Mr. King's range of motion steadily decreased from the successful completion of his surgery in March 2008 until October 2008, at which point his jaw locked shut. (Ex. A ¶47; Ex. L 113:9–22.)

106. Admitted.

107. Disputed. This paragraph states that Dr. Ghosh was the only person who could refer patients to outside hospitals like UIC. Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 107.

108. Disputed. This paragraph states that Bruno worked with Mr. King for several weeks before she was transferred. Bruno only saw Mr. King 5 times after his surgery and before she was transferred out of Stateville. (Med Recs.)

109. Admitted.

110. Admitted.

111. Disputed. This paragraph states Dr. Ghosh's qualifications. Defendant Dr. Ghosh is a fact witness, not an expert witness. Plaintiff objects to this paragraph as irrelevant a under Federal Rules of Evidence 401, 402, and 403. Summary judgment must be based on admissible evidence. Fed. R. Civ. P. 56(c)(2); *Verser v. Hubbard*, No. 10 C 7513, 2012 WL 1655960, at *2 (N.D. Ill. May 9, 2012) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)).

112.    Disputed.  This paragraph states that as Medical Director at Stateville, Dr. Ghosh was in charge of arranging and reviewing off-site consultations with outside hospitals - including the determination of whether patients should have CT scans or MRIs.  Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 112.

113.    Disputed.  This paragraph states that the Dental Director at Stateville could not send patients to outside providers – this could only be done by the Medical Director.  Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 113.

114.    Disputed.  This paragraph states that Dr. Ghosh was responsible for referring Mr. King to an outside medical provider for surgical evaluation.  Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 114.

115.    Disputed.   This paragraph states that physicians and physician's assistants at Stateville determine what pain medications to prescribe to patients.  Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 115.

116.    Admitted.

117.    Disputed.  This paragraph states that Dr. Craig was familiar with Mr. King and told Dr. Ghosh to refer him to UIC.  On November 27, 2007, Mr. King was allowed to see an oral surgeon visiting Stateville named Dr. Craig, who the staff at Stateville knew did not treat TMJ disorders.  (Ex. A ¶37.)  Craig told Mitchell, Fattore-Bruno, and Ghosh that Mr. King was not to be prescribed Motrin, Robaxin, Naproxin, or Tylenol as they were insufficient to treat Mr. King's pain.  (*Id*.)  He also said the Mr. King *must* see a TMJ specialist.  (*Id*.)

118.    Disputted.    This paragraph states that Ghosh prescribed Mr. King pain medications prior to his surgery.  .  (Ex. A ¶37; Ex. C KG000020, KG001810; Ex. H 80:17–81:7; Ex. I 74:8–11.)  Dr. Craig told Defendants Drs. Mitchell-Lawshea, Fattore-Bruno, and Ghosh

40

that Mr. King was not to be prescribed Motrin, Robaxin, Naproxin, or Tylenol as they were insufficient to treat Mr. King's pain. (Ex. A ¶37; Ex. C KG001570, KG001738; Ex. I 74:16–20.) He also said the Mr. King *must* see a TMJ specialist. (Ex. A ¶37.) Mr. King was given Tyleno 3 for pain which was inadequate as noted previously by Dr. Craig. (Ex A ¶¶37, 39, Ex. H 85:6–21; Ex. M 45:13–16.)

119.    Disputed. This paragraph states that after Mr. King was transferred to Stateville, Dr. Ghosh attempted to refer him to Loyola for evaluation; however, Loyola was not accepting new patients. On December 17, 2007—over two and one half months after the oral surgeons at UIC recommended Mr. King be sent immediately to Loyola to receive the necessary surgery, nearly three months after he was transferred to Stateville to have this critical surgery, and seven and a half months after Dr. Swanson prescribed immediate joint replacement explaining that it was only available at Loyola—Defendant Dr. Ghosh informed Mr. King that he had faxed a referral that day to Loyola for bone transplant surgery, but that Loyola was not accepting any new patients at that time and would be a couple of months before that could get him in. (Ex. A ¶¶27, 30, 41; Ex. C KG000131; Ex. G 58:18–20; Ex. H 78:14–79:6.)

120.    Admitted.

121.    Disputed. This paragraph states that at Stateville, Mr. King was given prescriptions for Lodine for pain. Throughout his incarceration since 2004, Mr. King has repeatedly been denied pain medication (Ex. A ¶¶36, 37, 38, 71, 81, 82) or prescribed inadequate or inappropriate medication to treat his condition (*Id*. at ¶¶19, 20, 39, 70).

122.    Disputed. This paragraph states that Mr. King also received Tramadol, which is a stronger medication. Throughout his incarceration since 2004, Mr. King has repeatedly been

denied pain medication (Ex. A ¶¶36, 37, 38, 71, 81, 82) or prescribed inadequate or inappropriate medication to treat his condition (*Id*. at ¶¶19, 20, 39, 70).

123.    Disputed.  This paragraph states that Mr. King was also given muscle relaxants and Valium at Stateville.  Throughout his incarceration since 2004, Mr. King has repeatedly been denied pain medication (Ex. A ¶¶36, 37, 38, 71, 81, 82) or prescribed inadequate or inappropriate medication to treat his condition (*Id*. at ¶¶19, 20, 39, 70).

124.    Disputed.  This paragraph states that as of February 25, 2011 (the date of Dr. Ghosh's deposition), Mr. King was on Valium continuously.  Throughout his incarceration since 2004, Mr. King has repeatedly been denied pain medication (Ex. A ¶¶36, 37, 38, 71, 81, 82) or prescribed inadequate or inappropriate medication to treat his condition (*Id*. at ¶¶19, 20, 39, 70). Plaintiff also objects to this paragraph as irrelevant and prejudicial under Federal Rules of Evidence 402, 403, and 404.  Summary judgment must be based on admissible evidence. Fed. R. Civ. P. 56(c)(2); *Verser v. Hubbard*, No. 10 C 7513, 2012 WL 1655960, at *2 (N.D. Ill. May 9, 2012) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)).

125.    Admitted.

126.    Disputed.  This paragraph states that Newbold prescribed prescription Tylenol to Mr. King at Menard.  Mr. King was prescribed Motrin with deliberate indifference to Mr. King's health, even after other medications were specifically recommended by other doctors, because Ibuprofen was insufficient to alleviate his pain and was causing him ulcers.  (Ex. A ¶¶19–20; Ex. C KG000339, KG000498.)

127.    Disputed.  This paragraph states that Newbold scheduled an appointment for Mr. King to be fitted for a splint or night guard (the terms can be used interchangeably), which is a therapeutic device that puts the jaw in a relaxed position and alleviates stress and pressure.  Mr.

King had a broken night guard when he arrived at Menard. (Ex. H 51:11.) He notified the dental department, but he had to file a grievance before having it repaired. (Ex. H 51:11–21.) Defendant Dr. Newbold ordered a new guard in September, 2004, but did not take impressions until March 4, 2005—over eight months after the initial symptoms were recorded. (Ex. A ¶11; Ex. D at 8.) Mr. King was without a night guard for up to eight months. (*Id*. at 51:19–2; Ex. D 8.)

128.    Admitted.

129.    Disputed. This paragraph states that cost of treatment is never a factor in the decision to approve or disapprove treatment for a patient. Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 129.

130.    Admitted.

131.    Disputed. This paragraph states that Wexford's Oral and Maxillofacial Surgery Guidelines prescribe conservative treatment for TMJ disease, which includes muscle relaxants and use of a splint by the patient. Conservative treatment must be based on a meaningful diagnosis. (Ex. D at 10.) In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of either an MRI, a CT scan, or preferably both. (*Id.* at 10.) As well, in Mr. King's case, a detailed review of his past surgeries and their results was required to give meaning to the information obtained by the scans. (*Id*.) These steps were never taken while Mr. King was at Menard, and therefore there was never any proper diagnosis of Mr. King's TMJ disorder until 2007 when appropriate imaging was finally performed with CT and MRI scans, showing the actual condition of his TM Joint and the associated tissue at that time. (*Id*. at 9.)

132.    Disputed.  This paragraph states that Wexford's guidelines also prescribe urgent referral if the patient's jaw is locked or he is in severe pain.  Throughout his incarceration since 2004, Mr. King has repeatedly been denied pain medication (Ex. A ¶¶36, 37, 38, 71, 81, 82) or prescribed inadequate or inappropriate medication to treat his condition (*Id*. at ¶¶19, 20, 39, 70).

133.    Disputed.  This paragraph states that although Wexford has TMJ guidelines, they are only guidelines, and physicians provide care to TMJ patients on an individualized basis.  Throughout his incarceration since 2004, Mr. King has repeatedly been denied pain medication (Ex. A ¶¶36, 37, 38, 71, 81, 82) or prescribed inadequate or inappropriate medication to treat his condition (*Id*. at ¶¶19, 20, 39, 70).

134.    Disputed.   This paragraph states that Wexford also has guidelines for pain management, which includes treatment with Tylenol or Ibuprofen.  Prolonged use of Motrin (ibuprofen) can cause ulceration of the stomach or intestines, and exacerbates the condition of existing ulcers.  (Ex. A ¶19.)  Motrin, Robaxin, Naproxin, or Tylenol were insufficient to treat Mr. King's pain.  (Ex. A ¶37.)  Mr. King was prescribed Motrin with deliberate indifference to Mr. King's health, even after other medications were specifically recommended by other doctors, because Ibuprofen was insufficient to alleviate his pain and was causing him ulcers.  (Ex. A ¶¶19–20.)

## II.    MR. KING'S LOCAL RULE 56.1 RESPONSE TO DEFENDANTS LOCAL RULE 56.1 STATEMENT OF FACTS

1.    Admitted.

2.    Admitted.

3.    Admitted.

4.    Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.     Admitted.

11.     Disputed.   This paragraph states that the standard of care in treating TMJ disorders is to manage the pain associated with these disorders, and keep treatment, if any, conservative and reversible, especially in patients with TMD.  Conservative treatment of TMD must be based on a meaningful diagnosis.  (Ex. D at 10.)  Mild forms of TMD can be treated with the use of a mouth guard.  (Ex. A ¶6.)  However, if not properly treated in a timely manner, the disorder can result in significant pain and impairment and/or degradation of the TMJ.  (*Id.*) In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of either an MRI, a CT scan, or preferably both.  (Ex. D at 10.)

12.     Disputed.   This paragraph states that, according to the American Dental Association ("ADA"), TMD is neither a recognized specialty or considered a part of dentistry, only a facet of oral surgery, prosthodontics, periodontics, and orthodontics.  The Defendants recognized and admitted that they are not experts in TMJ disorders and that there are specialists who are better trained and better suited to diagnose and treat TMJ disorders.  (*See* Ex. A ¶¶14, 20, 21, 22, 26, 30.)

13.     Admitted.

14.     Admitted.

45

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     Disputed.   This paragraph states that In June of 2004, Plaintiff injured his jaw again during his trial for the murder of his ex-girlfriend, when his head was slammed into a table by the brother of the deceased.   Plaintiff objects to this paragraph as irrelevant and prejudicial under Federal Rules of Evidence 402, 403, and 404.   Summary judgment must be based on admissible evidence. Fed. R. Civ. P. 56(c)(2); *Verser v. Hubbard*, No. 10 C 7513, 2012 WL 1655960, at *2 (N.D. Ill. May 9, 2012) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)).

19.     Disputed.   This paragraph states that Plaintiff was transferred to Menard in September 2004, and began serving his current sentence.   Mr. King was incarcerated at Menard Correctional Center, Menard, Illinois ("Menard"), from approximately August 25 of 2004 to September 19, 2007. (Ex. A ¶3; Ex. F 18:1-5; KG000295; Ex. H 20:18-20; Ex. I 37:7-10)

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Disputed.   This paragraph states that as a dentist at Menard, Dr. Newbold only had certain authority when treating patients, and could refer inmates to Dr. Chapman when necessary.   Defendant Drs. Newbold and Chapman represented to Mr. King that he could not get a referral to an outside TMJ specialist without speaking to Defendant Dr. Feinerman.   (Ex. A ¶22; Ex. B 43:1–14; Ex. F 92:15–23.)   But Mr. King was only seen by Defendant Dr. Feinerman on February 23, 2006—a full year-and-a-half after his original screening with Defendant Dr.

46

Newbold—at which point Defendant Dr. Feinerman said that referral to a specialist must be instigated by Defendants Drs. Newbold or Chapman. (Ex. A ¶22; Ex. C KG000410; Ex. D 115:12–14; Ex. G 105:16–18.)

24. Disputed. This paragraph states that at Menard, only Dr. Chapman or Dr. Craig (the oral surgeon) had the authority to request that an inmate be seen by an outside doctor or for an outside consult, that the request had to be made by Dr. Chapman to Dr. Feinerman, and that if Dr. Feinerman agreed with Dr. Chapman's recommendation, Dr. Feinerman still needed approval from Wexford Health Services. Defendants Drs. Newbold and Chapman represented to Mr. King that he could not get a referral to an outside TMJ specialist without speaking to Defendant Dr. Feinerman. (Ex. A ¶22; Ex. B 43:1–14; Ex. F 92:15–23.) But Mr. King was only seen by Defendant Dr. Feinerman on February 23, 2006—a full year-and-a-half after his original screening with Defendant Dr. Newbold—at which point Defendant Dr. Feinerman said that referral to a specialist must be instigated by Defendants Drs. Newbold or Chapman. (Ex. A ¶22; Ex. C KG000410; Ex. D 115:12–14; Ex. G 105:16–18.)

25. Disputed. This paragraph states that as part of initial intake at Menard, Plaintiff received an x-ray of his jaw area. On September 16, 2004, Newbold ordered x-rays, but the x-rays were useless because the radiologist determined they were unreadable. (Ex. A ¶12; Ex. D at 7–8.) A month later he ordered oblique projections, but gave a worthless diagnosis of TMJ disorder and hairline fracture to TMJ. (Ex. D at 9–11.) In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of either an MRI, a CT scan, or preferably both. (Ex. D at 10.)

26. Disputed. This paragraph states that on September 8, 2004, Dr. Newbold first saw plaintiff who was complaining of right TMJ pain. Mr. King first saw Defendant Dr.

Newbold on August 26, 2004; on September 8, 2004, Dr. Newbold recommended a CT scan if clinically warranted, but did not order one. (Ex. A ¶ 18; Ex. C KG000259, KG000260, KG02649; Ex. B 10:4–23.)

27. Disputed. This paragraph states that Dr. Newbold ordered a new x-ray of Plaintiff's face be taken for Dr. Newbold and a radiologist to review to rule out the possibility of fracture due to the trauma Plaintiff sustained when his head was slammed into the table while in court. On September 16, 2004, Defendant Dr. Newbold ordered x-rays, but the x-rays were useless because the radiologist determined they were unreadable. (Ex. A, ¶ 12; Ex. D at 7–8). A month later he ordered oblique projections, but gave a worthless diagnosis of TMJ disorder and hairline fracture to TMJ. (Ex. D at 9–11.) In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of either an MRI, a CT scan, or preferably both. (Ex. D at 10.)

28. Disputed. This paragraph states that Dr. Newbold referred the x-ray to a radiologist for a second opinion on a possible condylar fracture. On September 16, 2004, Defendant Dr. Newbold ordered x-rays, but the x-rays were useless because the radiologist determined they were unreadable. (Ex. A ¶12; Ex. D at 7–8.) A month later he ordered oblique projections, but gave a worthless diagnosis of TMJ disorder and hairline fracture to TMJ. (Ex. D at 9–11.) In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of either an MRI, a CT scan, or preferably both. (Ex. D at 10.)

29. Admitted.

30.     Disputed.  This paragraph states that Dr. Newbold relied on the radiologist reports as a basis for concluding there was no fracture in August, 2004.  Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 30.

31.     Disputed.  This paragraph states that Dr. Panamitros stated that using and relying on x-rays and radiologist reports to rule out a fracture was within the standard of care for a dentist in 2004.  In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of either an MRI, a CT scan, or preferably both.  (Ex. D at 10.)

32.     Disputed.  This paragraph states that on February 18, 2005, Dr. Newbold saw Plaintiff who complained of grinding his teeth, prescribed Plaintiff sixty pills of Tylenol-3 pain, and had Plaintiff scheduled for an impression of his mouth for a hard upper acrylic splint ("night guard").  Mr. King had a broken night guard when he arrived at Menard.  (Ex. H 51:11)  He notified the dental department, but he had to file a grievance before having it repaired.  (Ex. H 51:11–21.)  Defendant Dr. Newbold ordered a new guard in September, 2004, but did not take impressions until March 4, 2005—over eight months after the initial symptoms were recorded.  (Ex. A ¶11; Ex. D at 8)  Mr. King was without a night guard for up to eight months.  (Ex. D at 8; Ex. H 51:19–2.)

33.     Disputed.  This paragraph states that on March 4, 2005, Dr. Newbold had an alginate impression for a maxillary hard acrylic night guard taken of Plaintiff to be sent to the lab and be made into a splint.  Mr. King had a broken night guard when he arrived at Menard.  (Ex. H 51:11; Ex. C)  He notified the dental department, but he had to file a grievance before having it repaired.  (Ex. H 51:11–21.)  Defendant Dr. Newbold ordered a new guard in September, 2004, but did not take impressions until March 4, 2005—over eight months after the initial symptoms

were recorded.  (Ex. A ¶11; Ex. D at 8; Ex. C)  Mr. King was without a night guard for up to eight months.  (Ex. H 51:19–2; Ex. D at 8.)

34.     Disputed.  This paragraph states that on April 5, 2005, Dr. Newbold saw Plainitff [sic] and gave him the night guard at that appointment.  Mr. King had a broken night guard when he arrived at Menard.  (Ex. H 51:11; Ex. C)  He notified the dental department, but he had to file a grievance before having it repaired.  (Ex. H 51:11–21.)  Defendant Dr. Newbold ordered a new guard in September, 2004, but did not take impressions until March 4, 2005—over eight months after the initial symptoms were recorded.  (Ex. A ¶11; Ex. D at 8; Ex. C)  Mr. King was without a night guard for up to eight months.  (Ex. H 51:19–2; Ex. D at 8.)

35.     Admitted.

36.     Admitted.

37.     During the April 15, 2005 visit, Dr. Newbold warned Plaintiff of the potentially chronic nature of his TMJ condition.  Mr. King developed temporomandibular joint ("TMJ") disorder ("TMD") from a series of blunt force traumas to his face in the early 1990s.  (Ex. H 22:1–7, 23:18–24:10, 31:22–32:5.)  After undergoing 3 surgeries, and receiving the proper post-operative care and physical therapy, Mr. King was symptom free until another trauma to his face re-aggravated his TMD in the summer of 2004.  (Ex. H 42:6–44:2; Ex. G 87:9–10, 104:5; Ex. D 71:15–21, 72:8–20, 98:9–99:2; Ex. E 105:12–15.)

38.     Disputed.  This paragraph states that on July 3, 2005, Dr. Chapman saw Plaintiff for his TMJ condition.  Mr. King saw Defendant Dr. Chapman in or around November 2004. (Ex. A ¶14.)  Throughout 2005, Mr. King's condition worsened.  During several visits, Defendant Dr. Newbold and Defendant Dr. Chapman did not administer sufficient treatment for the pain associated with his TMD and consistently denied him access to see a specialist.  On at

least one occasion, Defendant Dr. Chapman stated that he had never treated a patient for TMD and insisted that there was no known treatment for Mr. King's condition, despite his explanation to Defendant Dr. Chapman of his successful treatment for TMD by specialists prior to his incarceration at Menard.  (Ex. A ¶20.)

39.     Disputed.  This paragraph states that after Dr. Chapman began treating Plaintiff, Dr. Newbold had no authority over Dr. Chapman's treatment of Plaintiff, and that any conversations between Dr. Newbold and Dr. Chapman about inmate patient care were informational.  Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 39.

40.     Disputed.  This paragraph states that on August 3, 2005, Dr. Chapman saw Plaintiff again and that Plaintiff said his jaw hurt as badly as it did before his last surgery. Throughout 2005, Mr. King's condition worsened.  His jaw started to "pop" and he began to experience difficulty opening and closing his mouth and chewing.  (Ex. C KG000153; Ex. E 155:10–12, 159:8–10.)  In addition to these new symptoms, he continued to complain of severe pain and swelling caused by TMJ and requested treatment by a specialist.  During several visits, Defendant Dr. Newbold and Defendant Dr. Chapman did not administer sufficient treatment for the pain associated with his TMD and consistently denied him access to see a specialist.  On at least one occasion, Defendant Dr. Chapman stated that he had never treated a patient for TMD and insisted that there was no known treatment for Mr. King's condition, despite his explanation to Defendant Dr. Chapman of his successful treatment for TMD by specialists prior to his incarceration at Menard.  (Ex. A ¶20.)

41.     Disputed.  This paragraph states that on September 9, 2005, Dr. Craig saw Plaintiff and referred Plaintiff to be seen by an Ear, Nose and Throat ("ENT") specialist, that Dr.

Craig was the oral surgeon that took appointments once a month at Menard for impaction surgeries, third molar surgeries, and biopsies, and that ENT is an ears, nose, and throat specialist. On November 27, 2007, Mr. King was allowed to see an oral surgeon visiting Stateville named Dr. Craig, who the staff at Stateville knew did not treat TMJ disorders. (Ex. A ¶37.) Craig told Defendant Drs. Mitchell-Lawshesa, Fattore-Bruno, and Ghosh that Mr. King was not to be prescribed Motrin, Robaxin, Naproxin, or Tylenol as they were insufficient to treat Mr. King's pain. (*Id*.) He also said the Mr. King *must* see a TMJ specialist. (*Id*.)

42. Disputed. This paragraph states that on October 31, 2005, Dr. Chapman saw Plaintiff and noted he would refer Plaintiff to Dr. Feinerman to evaluate the joint area for possible referral to an ENT. Defendant Dr. Newbold and Defendant Dr. Chapman represented to Mr. King that he could not get a referral to an outside TMJ specialist without speaking to Defendant Dr. Feinerman. (Ex. A ¶22.) But Mr. King was only seen by Defendant Dr. Feinerman on February 23, 2006—a full year-and-a-half after his original screening with Defendant Dr. Newbold—at which point Defendant Dr. Feinerman said that referral to a specialist must be instigated by Defendant Drs. Newbold or Chapman. (Ex. A ¶22; Ex. C KG000410; Ex. D 115:12–14; Ex. G 105:16–18.)

43. Disputed. This paragraph states that on February 17, 2006, Dr. Henderson, another dentist at Menard, saw Plaintiff and referred Plaintiff to be seen by Dr. Feinerman, and that on February 22, 2006, Plaintiff was seen by Dr. Feinerman, the Medical Director at Menard. On February 23, 2006, Mr. King was seen by Defendant Dr. Feinerman. Defendant Dr. Feinerman informed him that, contrary to Defendant Dr. Newbold's and Defendant Dr. Chapman's assertions, it was possible for him to be seen by a TMJ specialist, but that the request for the specialist would have to be instigated by Menard's dental department, i.e. Defendant Dr.

Newbold or Defendant Dr. Chapman. After his continued complaints of pain and swelling and requests to see a specialist, Defendant Dr. Feinerman requested his old medical records detailing his prior TMJ treatment for review - almost a year and a half after Defendant Dr. Newbold's initial assessment that Mr. King suffered from TMD. (Ex. A ¶22.)

44.     Disputed. This paragraph states that on April 19, 2006, Dr. Chapman saw Plaintiff and noted Plaintiff was referred to see a specialist but had to be approved by medical director. Defendant Drs. Newbold and Chapman represented to Mr. King that he could not get a referral to an outside TMJ specialist without speaking to Defednant Dr. Feinerman. (Ex. A ¶22; Ex. B 43:1–14; Ex. F 92:15–23.) But Mr. King was only seen by Defendant Dr. Feinerman on February 23, 2006—a full year-and-a-half after his original screening with Defendant Dr. Newbold—at which point Feinerman said that referral to a specialist must be instigated by Defendant Drs. Newbold or Chapman. (Ex. A ¶22.)

45.     Disputed. This paragraph states that on June 16, 2006, Dr. Newbold saw Plaintiff for his bi-annual unscheduled (mandatory) dental exam, and that Dr. Newbold noted there were no cavities, gum problems, or infections in Plaintiff's mouth, and because Plaintiff complained of pain, he should be seen upon request. On April 4, 2006, Mr. King filed a grievance complaining about the dental department's continued refusal to refer him to a TMJ specialist. Mr. King explained that he had previously been successfully treated by an oral surgeon specializing in TMJ at the University of Illinois at Chicago Medical Center ("UIC") and that Defendant Dr. Newbold's and Defendant Dr. Chapman's insistence that TMJ was untreatable were false. As with the January 25, 2005 grievance, this grievance was also denied on the grounds that his dental concerns were "being addressed" by the Menard dental care staff. On May 2, 2006, Mr. King's April 4, 2004 grievance was denied for the same reasons by Warden

53

Dan Halick and his appeal was denied by the Administrative Review Board on June 22, 2006. (Ex. A ¶23.)

46.     Disputed.   This paragraph states that on March 20, 2007, Dr. Chapman saw Plaintiff, and that Dr. Chapman noted bleeding gums and Plaintiff's complaints of pain. Between June of 2006 through March of 2007, a period of 9 months, the Menard medical and dental staff continued to ignore Mr. King's requests to see a TMJ specialist and his complaints of severe pain and swelling.   During this time, his jaw began to lock shut and he lost the ability to chew due to the lack of adequate and appropriate treatment.   (Ex. A ¶24.)   In March of 2007, after his jaw had begun to lock shut and Mr. King was no longer able to consume solid foods due to his inability to chew, he was eventually seen by Defendant Dr. Feinerman who finally agreed to send him to a TMJ specialist and have a CT scan performed on his jaw.   (Ex. A ¶25;  Ex. C KG000154, KG002743; Ex. G 37:10–38:3, 108:3–6; Ex. E 180:12–17.)

47.     Disputed.   This paragraph states that on March 22, 2007, Dr. Chung H. Lee from Bloomington Radiology in Normal, Illinois reviewed five x-rays of Plaintiff's mandible (jaw) taken at Menard, finding "there is no fracture or dislocation, [t]here is no bony erosion at the TMJ, [and t]here is no evidence forward translation of mandibular condyles on open mouth position."  On April 3, 2007, the CT scan was performed and revealed fragmentation of the right TMJ, multiple "loose bodies" in the joint space, and irregularity of the mandibular condyle.   The CT scan and x-rays revealed "abnormalities that were not seen before," and which Mr. King has learned were likely a result of the delay associated with receiving the necessary medical treatment.  (Ex. A ¶26; Ex. C KG000155; Ex. I 116:9–20.)

48.     Disputed.   This paragraph states that on March 28, 2007, Dr. Feinerman referred Plaintiff out of prison for a CT scan of the right TMJ area, and on April 3, 2007, Dr. Hunter took

a CT Scan of Plaintiff's jaw and noted his impression of comminuted chronic fracture of the right TMJ with loose bodies in the joint space. Mr. King first saw Defendant Dr. Newbold on August 26, 2004, and on September 9, 2004, Defendant Dr. Newbold recommended a CT scan if clinically warranted, but did not order one. . (Ex. A ¶¶9, 10, 18; Ex. B 9:17–10:23, 19:1–16, 30:14–31:9; Ex. C KG000259, KG000260, KG002649.) On February 23, 2006, Mr. King was first seen by Defendant Dr. Feinerman. (Ex. A ¶25.) In March of 2007, after his jaw had begun to lock shut and Mr. King was no longer able to consume solid foods due to his inability to chew, he was eventually seen by Defendant Dr. Feinerman who finally agreed to send him to a TMJ specialist and have a CT scan performed on his jaw—over a year after he first saw Mr. King and 3½ years after Mr. King arrived at Menard. (Ex. A ¶25; Ex. C KG000154, KG002743; Ex. E 180:12–17; Ex. G 37:10–38:3, 108:3–6.) On April 3, 2007, the CT scan was performed and revealed fragmentation of the right TMJ, multiple "loose bodies" in the joint space, and irregularity of the mandibular condyle. (Ex. C Kg000266; Ex. G 43:1–3.) The CT scan and x-rays revealed "abnormalities that were not seen before," and which Mr. King has learned were likely a result of the delay associated with receiving the necessary medical treatment. (Ex. A ¶26, Ex. F 111:3-19.)

49. Disputed. This paragraph states that on April 10, 2007, April 12, 2007, and April 24, 2007, Dr. Chapman saw Plaintiff, took Plaintiff's history, renewed his medications, and put Plaintiff on a soft food diet. Mr. King first saw Defendnt Dr. Chapman in or around November 2004. (Ex. A ¶14.) In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of either an MRI, a CT scan, or preferably both. (Ex. D at 10.) As well, in Mr. King's case, a detailed review of his past surgeries and their results was required to give meaning to the information

obtained by the scans. (*Id*.) These steps were never taken while Mr. King was at Menard, and therefore there was never any proper diagnosis of Mr. King's TMJ disorder until 2007 when appropriate imaging was finally performed with CT and MRI scans, showing the actual condition of his TM Joint and the associated tissue at that time. (*Id*. at 9.) The CT scan and x-rays revealed "abnormalities that were not seen before," and which Mr. King has learned were likely a result of the delay associated with receiving the necessary medical treatment. (Ex. A ¶26; Ex. F 111:3–19.)

50.     Disputed. This paragraph states that on April 26, 2007, Dr. Newbold saw Plaintiff, renewed Plaintiff's prescriptions for Prednisone and Robaxin, put Plaintiff on a dental soft diet, and noted Plaintiff was scheduled for a consultation with an oral surgeon and to follow-up with Plaintiff in two weeks, and that Robaxin is a muscle relaxant and prednisone is a corticosteroid used to reduce inflammation. Between June of 2006 through March of 2007, a period of 9 months, the Menard medical and dental staff continued to ignore Mr. King's requests to see a TMJ specialist and his complaints of severe pain and swelling. (Ex. A ¶ 24.) During several visits, Defendant Drs. Newbold and Chapman did not administer sufficient treatment for the pain associated with his TMD and consistently denied him access to see a specialist. On at least one occasion, Defendant Dr. Chapman stated that he had never treated a patient for TMD and insisted that there was no known treatment for Mr. King's condition, despite his explanation to Defendant Dr. Chapman of his successful treatment for TMD by specialists prior to his incarceration at Menard. (Ex. A ¶20.) During this time, Mr. King's jaw began to lock shut and he lost the ability to chew due to the lack of adequate and appropriate treatment. (Ex. A ¶24.)

51.     Disputed. This paragraph states that on May 1, 2007, Dr. Swanson, an oral surgeon from Peoria, saw Plaintiff, and that Dr. Chapman followed up with Plaintiff that day

upon Plaintiff returning to prison.  The Defendants recognized and admitted that they are not experts in TMJ disorders and that there are specialists who are better trained and better suited to diagnose and treat TMJ disorders.  (*See* Ex. A ¶¶14, 20, 21, 22, 26, 30.)  Mr. King did not actually see a specialist (Dr. Swanson) until May 2007—nearly four years after he arrived at Menard.  (Ex. A ¶27.; Ex. B 30:1–13.)  Dr. Swanson found that Mr. King's TMJ was too badly damaged for "conservative treatment" and prescribed immediate joint replacement, which Dr. Swanson explained was only available at Loyola.  (Ex. A ¶27.)

52.     Disputed.  This paragraph states that on May 10, 2007, Dr. Newbold saw Plaintiff, noted Plaintiff had been seen by the oral surgeon, and increased Plaintiff's medication after consulting the Medical Director.  Mr. King was seen by Dr. Jay Swanson on May 1, 2007, who prescribed immediate joint replacement.  (Ex. A ¶27; Ex. C KG000155; Ex. G 111:21–112:2; Ex. I 116:9–20.)  On May 14, 2005, Mr. King informed the Menard medical staff that he had stomach ulcers and could no longer take the prescribed Motrin.  (Ex. A ¶19; Ex. C KG00339.) Prolonged use of Motrin (ibuprofen) can cause ulceration of the stomach or intestines, and exacerbates the condition of existing ulcers.  (*Id.*)  Mr. King was prescribed Motrin with deliberate indifference to Mr. King's health, even after other medications were specifically recommended by other doctors, because Ibuprofen was insufficient to alleviate his pain and was causing him ulcers.  (Ex. A ¶¶19–20)  Mr. King's condition remained untreated and he continued to suffer from severe pain and swelling that relegated him to a liquid diet.  By July of 2007, the pain in his jaw had become so severe that he did not think he could go on and he informed a social worker at Menard as much.  (Ex. A ¶28.)

53.     Disputed.  This paragraph states that on May 30, 2007, Dr. Chapman saw Plaintiff, noted Plaintiff refused to take Motrin, even with food, because it upset his stomach, and

scheduled to follow up with Plaintiff after his MRI, and that on June 1, 2007, an MRI was taken of Plaintiff's jaw.  On May 14, 2005, Mr. King informed the Menard medical staff that he had stomach ulcers and could no longer take the prescribed Motrin.  (Ex. A ¶19.)  Prolonged use of Motrin (ibuprofen) can cause ulceration of the stomach or intestines, and exacerbates the condition of existing ulcers.  (*Id.*)  Mr. King was prescribed Motrin with deliberate indifference to Mr. King's health, even after other medications were specifically recommended by other doctors, because Ibuprofen was insufficient to alleviate his pain and was causing him ulcers. (Ex. A ¶¶19–20; MR.)  Mr. King was seen by Dr. Jay Swanson on May 1, 2007, who prescribed immediate joint replacement.  (Ex. A ¶27; Ex. C KG000155; Ex. G 111:21–112:2; Ex. I 116:9– 20.)  Mr. King's condition remained untreated and he continued to suffer from severe pain and swelling that relegated him to a liquid diet.  (Ex. C KG000126, KG000156-7, KG000440.)  By July of 2007, the pain in his jaw had become so severe that he did not think he could go on and he informed a social worker at Menard as much.  (Ex. C KG000157, KG000441; Ex. A ¶28.)

54.     Disputed.  This paragraph states that on July 2, 2007, Dr. Chapman received the MRI report, and scheduled Plaintiff to be sent back to the oral surgeon, Dr. Swanson, to determine what treatment Plaintiff needed.  Mr. King was seen by Dr. Jay Swanson on May 1, 2007, who prescribed immediate joint replacement.  (Ex. A ¶27; Ex. C KG000155; Ex. G 111:21–112:2; Ex. I 116:9–20.)  Only after Mr. King's condition had deteriorated to the point at that joint replacement surgery was the only viable option did Mr. King receive an MRI—a full month after Dr. Swanson recommended "an immediate MRI."  (Ex. E 221:22–222:18.)

55.     Disputed.  This paragraph states that on July 12, 2007, Dr. Chapman saw Plaintiff, encouraged Plaintiff to wear his splint when Plaintiff said he would not wear it anymore, prescribed Robaxin, and referred Plaintiff to mental health for evaluation, and that Dr. Chapman

also spoke to Dr. Feinerman and Dr. Swanson about Plaintiff needing surgery. Mr. King testified that while he was at Menard, the night guard did not help, and that when he did use it, he would constantly wake up with a mouth full of blood. (Ex. H 53:15–54:11.) The persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused Mr. King's condition to continue to deteriorate, and has now caused such a loss of range of motion that Mr. King can no longer open his mouth wide enough to use his night guard. (Ex. A ¶88; Ex. H 12:11–19.)

56. Disputed. This paragraph states that while at Menard, Plaintiff was prescribed the following medications for his TMD complaints: Ibuprofen/Motrin, Flexerill, Tylenol, Aspirin, Flexerill, Naproxen, Prednisone, and Robaxin. On May 14, 2005, Mr. King informed the Menard medical staff that he had stomach ulcers and could no longer take the prescribed Motrin. (Ex. A ¶19.) Prolonged use of Motrin (ibuprofen) can cause ulceration of the stomach or intestines, and exacerbates the condition of existing ulcers. (*Id*.) Mr. King was prescribed Motrin with deliberate indifference to Mr. King's health, even after other medications were specifically recommended by other doctors, because Ibuprofen was insufficient to alleviate his pain and was causing him ulcers. (Ex. A ¶¶19–20; Ex. C KG00339.)

57. Disputed. This paragraph states that in September, 2007, Plaintiff was transferred from Menard to Stateville on a medical writ for purposes of receiving surgery for his TMD. On May 1, 2007, Mr. King saw Dr. Swanson, an oral surgeon, who found that Mr. King's TMJ was too badly damaged for "conservative treatment" and prescribed immediate joint replacement, which Dr. Swanson explained was only available at Loyola. (Ex. A ¶27.) Mr. King was transferred to Stateville on September 19, 2007 for the purpose of receiving the immediate joint replacement for his TMJ disorder prescribed by Dr. Swanson. (Ex. A ¶27, 30.)

58.     Disputed.  This paragraph states that at Stateville, the Medical Director makes medical decisions regarding specialized care requiring outside consultations, the ordering of CT scans and MRIs, and physical therapy issues, and that the Medical Director also issues special needs and medical permits, including permits for a soft/pureed diet. Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 58.

59.     Disputed.  This paragraph states that at Stateville, dental issues are followed by the dentists, but if the inmate has pain issues, the inmate can ask to see a physician, and that generally, if an inmate is in pain, the medical doctors see the inmate, if the inmate is not in pain, the dentists will see them for dental issues.  On October 19, 2007—1 month after oral surgeons at UIC recommended Mr. King be sent immediately to Loyola to receive the necessary surgery and 5½ months after Dr. Swanson recommended an immediate MRI and TMJ replacement surgery—Mr. King's jaw locked shut and was causing intense pain and swelling in his face.  (Ex. A ¶¶27, 30, 33.)  A Stateville evaluation report noted Mr. King's inability to open his mouth and that he suffered from a "dislocated" and "reduced" TMJ.  Mr. King repeatedly attempted to receive treatment from 9:00 AM until 11:00 PM, all of which were ignored.  (Ex. A ¶¶27, 30, 33; Ex. I 155:7–12.)  Around the end of October of 2007 and beginning of November of 2007, Mr. King made several requests to be seen by Stateville's dental staff, particularly by Dr. Mitchell and Dr. Ghosh, which were ignored.  As a result, he filed grievances dated October 22, 2007, October 26, 2007 and November 7, 2007 detailing the excruciating pain he had endured for more than three years and requesting that he be sent to a TMJ specialist to receive the necessary surgery to treat his condition and mitigate his pain (Ex. C KG001705–1706, KG002075–2076; Ex. H 80:17–22.).  These grievances were consolidated with the October 18, 2007 grievance and were ultimately deemed an emergency grievance by Warden McCann on November 26, 2007.

(Ex. C KG002685.) Nonetheless, like the previous grievances, these grievances were also denied based on the assurances by Stateville's medical staff that his health needs were being met. (Ex. A ¶35, Ex. C KG001740.) Between October and November of 2007, Mr. King's gums began to bleed due to his jaw being locked shut. Despite his repeated pleas to Stateville's nursing and medical technician staff, including Nurse Sha'riece and medical technician Cuttano, his requests to see dental staff and to receive pain medication were ignored. (Ex. A ¶36.) The persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused Mr. King's condition to continue to deteriorate, and has now caused such a loss of range of motion that Mr. King can no longer open his mouth wide enough to use his night guard. (Ex. A ¶88; Ex. H 12:11–19.)

60.     Disputed. This paragraph states that inmate requests for medical attention at Stateville are put in the certified medical technician ("med-tech") box or given to the med-techs. On October 19, 2007, Mr. King repeatedly attempted to receive treatment from 9:00 AM until 11:00 PM, all of which were ignored. (Ex. A ¶¶27, 30, 33.) October of 2007 and beginning of November of 2007, Mr. King made several requests to be seen by Stateville's dental staff, particularly by Defendant Drs. Mitchell-Lawshesa and Ghosh, which were ignored. As a result, he filed grievances dated October 22, 2007, October 26, 2007 and November 7, 2007 detailing the excruciating pain he had endured for more than three years and requesting that he be sent to a TMJ specialist to receive the necessary surgery to treat his condition and mitigate his pain. These grievances were consolidated with the October 18, 2007 grievance and were ultimately deemed an emergency grievance by Warden McCann on November 26, 2007. Nonetheless, like the previous grievances, these grievances were also denied based on the assurances by Stateville's medical staff that his health needs were being met. (Ex. A ¶35.) Between October

and November of 2007, Mr. King's gums began to bleed due to his jaw being locked shut. Despite his repeated pleas to Stateville's nursing and medical technician staff, including Nurse Sha'riece and medical technician Cuttano, his requests to see dental staff and to receive pain medication were ignored. (Ex. A ¶36.) The persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused Mr. King's condition to continue to deteriorate, and has now caused such a loss of range of motion that Mr. King can no longer open his mouth wide enough to use his night guard. (Ex. A ¶88; Ex. H 12:11–19.)

61.    Disputed. This paragraph states that if an inmate makes a non-specific dental request, the inmate is seen within fourteen (14) days, and that if the inmate makes a request about a specific dental issue, the inmates are fit in the available schedule. On October 19, 2007, Mr. King repeatedly attempted to receive treatment from 9:00 AM until 11:00 PM, all of which were ignored. (Ex. A ¶¶27, 30, 33.) October of 2007 and beginning of November of 2007, Mr. King made several requests to be seen by Stateville's dental staff, particularly by Defendant Drs. Mitchell-Lawshesa and Ghosh, which were ignored. As a result, he filed grievances dated October 22, 2007, October 26, 2007 and November 7, 2007 detailing the excruciating pain he had endured for more than three years and requesting that he be sent to a TMJ specialist to receive the necessary surgery to treat his condition and mitigate his pain. These grievances were consolidated with the October 18, 2007 grievance and were ultimately deemed an emergency grievance by Warden McCann on November 26, 2007. Nonetheless, like the previous grievances, these grievances were also denied based on the assurances by Stateville's medical staff that his health needs were being met. (Ex. A ¶35.) Between October and November of 2007, Mr. King's gums began to bleed due to his jaw being locked shut. Despite his repeated pleas to Stateville's nursing and medical technician staff, including Nurse Sha'riece and medical

technician Cuttano, his requests to see dental staff and to receive pain medication were ignored. (Ex. A ¶36.)  The persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused Mr. King's condition to continue to deteriorate, and has now caused such a loss of range of motion that Mr. King can no longer open his mouth wide enough to use his night guard.  (A ¶88; Ex. H 12:11–19.)

62.     Disputed.  This paragraph states that inmates are not allowed to choose when they are seen or which dentist will see them, and that just because an inmate may request to be seen by a specific dentist, the requested dentist may not see that request since all staff read requests for dental care.  On October 19, 2007, Mr. King repeatedly attempted to receive treatment from 9:00 AM until 11:00 PM, all of which were ignored.  (Ex. A ¶¶27, 30, 33.)  October of 2007 and beginning of November of 2007, Mr. King made several requests to be seen by Stateville's dental staff, particularly by Defendant Drs. Mitchell-Lawshesa and Ghosh, which were ignored. As a result, he filed grievances dated October 22, 2007, October 26, 2007 and November 7, 2007 detailing the excruciating pain he had endured for more than three years and requesting that he be sent to a TMJ specialist to receive the necessary surgery to treat his condition and mitigate his pain.   These grievances were consolidated with the October 18, 2007 grievance and were ultimately deemed an emergency grievance by Warden McCann on November 26, 2007. Nonetheless, like the previous grievances, these grievances were also denied based on the assurances by Stateville's medical staff that his health needs were being met.  (Ex. A ¶35.) Between October and November of 2007, Mr. King's gums began to bleed due to his jaw being locked shut.  Despite his repeated pleas to Stateville's nursing and medical technician staff, including Nurse Sha'riece and medical technician Cuttano, his requests to see dental staff and to receive pain medication were ignored.  (Ex. A ¶36.)  The persistent and systematic denial of

adequate and medically necessary care has, in the opinion of the doctors at UIC, caused Mr. King's condition to continue to deteriorate, and has now caused such a loss of range of motion that Mr. King can no longer open his mouth wide enough to use his night guard. (Ex. A ¶88; Ex. H 12:11–19.)

63.     Disputed. This paragraph states that for an inmate to be seen by an outside doctor or specialist, there must first be a consultation with the oral surgeon employed by Wexford, the oral surgeon will then make a recommendation to the Medical Director, who in turn decides whether the inmate will be seen outside the prison. Mr. King was transferred to Stateville on September 19, 2007 for the purpose of receiving the immediate joint replacement for his TMJ disorder prescribed by Dr. Swanson. (Ex. A ¶4, 27, 30; Ex. C KG000445; Ex. F 18:6–21; Ex. I 124:18–21.) On December 17, 2007—over two and one half months after the oral surgeons at UIC recommended Mr. King be sent immediately to Loyola to receive the necessary surgery, nearly three months after he was transferred to Stateville to have this critical surgery, and seven and a half months after Dr. Swanson prescribed immediate joint replacement explaining that it was only available at Loyola—Defendant Dr. Ghosh informed Mr. King that he had faxed a referral that day to Loyola for bone transplant surgery, but that Loyola was not accepting any new patients at that time and would be a couple of months before that could get him in. (Ex. A ¶¶27, 30, 41; Ex. C KG000131; Ex. H 78:12–79:6; Ex. G 58:18–20.)

64.     Admitted.

65.     Disputed. This paragraph states that Dr. Mitchell is not a TMJ specialist. The Defendants recognized and admitted that they are not experts in TMJ disorders and that there are specialists who are better trained and better suited to diagnose and treat TMJ disorders. (*See* Ex. A Decl. ¶¶14, 20, 21, 22, 26, 30; Ex. L 26:2-27:18.)

66.     Disputed.  This paragraph states that on October 19, 2007, Plaintiff was taken to the emergency room at UIC Chicago Hospital ("UIC") complaining of his jaw locking. The UIC physician noted that the Plaintiff had reduced his dislocation by hitting his own face.  On October 19, 2007—1 month after oral surgeons at UIC recommended Mr. King be sent immediately to Loyola to receive the necessary surgery and 5½ months after Dr. Swanson recommended an immediate MRI and TMJ replacement surgery—Mr. King's jaw locked shut and was causing intense pain and swelling in his face.  (Ex. A ¶¶27, 30, 33.)  A Stateville evaluation report noted Mr. King's inability to open his mouth and that he suffered from a "dislocated" and "reduced" TMJ.  Mr. King repeatedly attempted to receive treatment from 9:00 AM until 11:00 PM, all of which were ignored.  (Ex. A ¶¶27, 30, 33.)  Mr. King was finally taken to the emergency room at UIC on October 20, 2007, where he received an X-Ray, pain medications, and an appointment for an immediate MRI.  (Ex. A ¶34;  Ex. C KG000009, KG000127; Ex. E 215:19–24, 219:12–14; Ex. H 73:6–9.)  However, Defendant Drs. Mitchell-Lawshesa and Ghosh at Stateville refused to authorize Mr. King to receive the MRI.  (*Id.*)

67.     Disputed.  This paragraph states that on October 22, 2007, Dr. Ghosh noted that a MRI was scheduled and there would be follow-up of Plaintiff's condition at the Stateville Health Care Unit.  Mr. King was finally taken to the emergency room at UIC on October 20, 2007, where he received an appointment for an immediate MRI.  (Ex. A ¶34;  Ex. C KG000009, KG000127; Ex. E 215:19–24, 219:12–14; Ex. H 73:6–9.)  However, Mitchell and Ghosh at Stateville refused to authorize Mr. King to receive the MRI.  (*Id.*)

68.     Disputed.  This paragraph states that on November 27, 2007, Dr. Craig, an oral surgeon, prepared a Medical Special Services Referral and Report requesting Dr. Ghosh's assistance since the pain medication he prescribed Plaintiff appeared to be ineffective.  On

November 27, 2007, Mr. King was allowed to see an oral surgeon visiting Stateville named Dr. Craig, who the staff at Stateville knew did not treat TMJ disorders. (Ex. A ¶37.) Craig told Defendant Drs. Mitchell-Lawshesa, Fattore-Bruno, and Ghosh that Mr. King was not to be prescribed Motrin, Robaxin, Naproxin, or Tylenol as they were insufficient to treat Mr. King's pain. (Ex. A ¶37; Ex. C KG001570, KG001738; Ex. I 74:16–20.) He also said the Mr. King *must* see a TMJ specialist. (*Id*.)

69.     Disputed. This paragraph states that on December 7, 2007, Dr. Ghosh approved Plaintiff to be taken to UIC for a MRI and approved a pureed food diet for Plaintiff. On December 10, 2007, Mr. King was sent to UIC for the MRI that was originally ordered by UIC emergency room physician and scheduled to be conducted on October 22, 2007 but never conducted because of Defendants Drs. Mitchell-Lawshea's and Ghosh's refusal. (Ex. A ¶34, 40; Ex. C KG000019; Ex. I 126:14–21.) The MRI revealed "complete disruption" of the right temporomandibular joint with deformity of the mandibular condyle and the "presence of multiple intra and extraarticular calcifications." (Ex. A ¶40; Ex. J 162:22–163:10.) Further, the joint space was "completely obliterated," and the articular disk of the joint was so damaged that it was "not recognized." (Ex. A ¶40; Ex. C KG000726.) The delay in treatment exacerbated Mr. King's TMJ condition. (Ex. A ¶40.)

70.     Disputed. This paragraph states that on December 12, 2007, a MRI of Plaintiff's jaw was taken, and that the MRI results revealed a complete disruption of the TMJ with deformity of the mandibular condyle and calcifications. On December 10, 2007, Mr. King was sent to UIC for the MRI that was originally ordered by UIC emergency room physician and scheduled to be conducted on October 22, 2007 but never conducted because of Defendant Drs. Mitchell-Lawshesa's and Ghosh's refusal. (Ex. A ¶34, 40; Ex. C KG000019; Ex. I 126:14–21.)

The MRI revealed "complete disruption" of the right temporomandibular joint with deformity of the mandibular condyle and the "presence of multiple intra and extraarticular calcifications." (Ex. A ¶40; Ex. J 162:22–163:10.)  Further, the joint space was "completely obliterated," and the articular disk of the joint was so damaged that it was "not recognized."  (Ex. A ¶40; Ex. C KG000726.)  The delay in treatment exacerbated Mr. King's TMJ condition.  (Ex. A ¶40.)

71.     Disputed.  This paragraph states that Dr. Ghosh attempted to schedule Plaintiff for surgery with Loyola Hospital, Chicago ("Loyola"), but Loyola was not accepting new TMJ patients at that time.  On December 17, 2007, over two and one half months after the oral surgeons at UIC recommended that Mr. King be sent immediately to Loyola to receive the necessary surgery, and nearly three months after he was transferred to Stateville to have this critical surgery, seven and a half months after Dr. Swanson prescribed immediate joint replacement explaining that it was only available at Loyola and over three and a half years since he was first diagnosed.  Defendant Dr. Ghosh informed him that he had faxed a referral that day to Loyola for joint replacement surgery, but that Loyola was not accepting any new patients at that time and that it would be a couple of months before they could get him in.  (Ex. A ¶41; Ex. C KG000131; Ex. G 58:18–20; Ex. H 78:12–17, 79:1–6.)

72.     Disputed.  This paragraph states that upon learning that Loyola's TMJ surgeon could not accept Plaintiff, on December 18, 2007, Dr. Ghosh approved Plaintiff to be evaluated by the UIC Oral Surgery Department.  On December 17, 2007, over two and one half months after the oral surgeons at UIC recommended that Mr. King be sent immediately to Loyola to receive the necessary surgery, and nearly three months after he was transferred to Stateville to have this critical surgery, seven and a half months after Dr. Swanson prescribed immediate joint replacement explaining that it was only available at Loyola and over three and a half years since

he was first diagnosed. Defendant Dr. Ghosh informed him that he had faxed a referral that day to Loyola for joint replacement surgery, but that Loyola was not accepting any new patients at that time and that it would be a couple of months before they could get him in. (Ex. A ¶41; Ex. C KG000131; Ex. G 58:18–20; Ex. H 78:12–17, 79:1–6.)

73. Admitted.

74. Disputed. This paragraph states that on December 6, 2007, Dr. Fattore Bruno saw Plaintiff at UIC and prescribed him Tylenol with codeine as well as robaxin. On December 21, 2007, Defendant Dr. Fattore-Bruno saw Plaintiff again and prescribed Tylenol with codeine again. On November 27, 2007, Dr. Craig told Defendant Drs. Mitchell-Lawshesa, Fattore-Bruno, and Ghosh that Mr. King was not to be prescribed Motrin, Robaxin, Naproxin, or Tylenol as they were insufficient to treat Mr. King's pain. (Ex. A ¶37, Ex. C KG001570, Ex. I 74:16–20.) Mr. King was brought to the Stateville dental clinic on December 6, 2007, where he was seen and ultimately admitted to the infirmary by Defendant Drs. Mitchell-Lawshesa and Fattore-Bruno. He was given Tylenol 3 for pain and Roboxin muscle relaxers to help try to unlock Mr. King's jaw, both of which were inadequate for their intended purposes, as noted previously by Dr. Craig. (Ex. A ¶39; Ex. H 85:6–21; Ex. L 25:8-14, Ex. M 45:13–16; see Ex. A ¶37.)

75. Disputed. This paragraph states that on January 16, 2008, Dr. Edwards saw Plaintiff at UIC and recommended that a CT scan be taken and to follow-up in one month to discuss surgery. On January 12, 2008, Mr. King was seen by the Medical Center at Stateville. During his assessment, he was crying and clenching his jaw due to the intense pain he was suffering. (Ex. A ¶43, Ex. C KG000037.) Mr. King filed another grievance on January 15, 2008, requesting to see a TMJ specialist regarding his condition and the necessary surgery (Ex. C KG001651–KG001652. He was finally sent to meet with Dr. James Edwards, an oral surgeon

specializing in the treatment of TMD at the UIC oral surgery clinic (Ex. C KG000132; Ex. G 58:16–18).  Dr. Edwards immediately ordered a CT scan to determine the extent of damage to his TMJ area, which was performed toward the end of the same month.  (*Id.*;  Ex. A ¶44.)

76.     Disputed.  This paragraph states that on January 17, 2008, Dr. Ghosh referred Plaintiff for a CT scan, and Plaintiff received a CT scan on February 6, 2008.  In the fall of 2007, Defendant Dr. Ghosh delayed more than a month in approving the MRI that was originally ordered by UIC emergency room physician.  (Ex. A ¶¶34, 40.)

77.     Disputed.  This paragraph states that on February 14, 2008, Dr. Edwards saw Plaintiff at UIC and recommended that Plaintiff receive a total joint replacement surgery.  Upon examination of Mr. King's CT scan in February 2008, Dr. Edwards at UIC recommended *immediate* surgery.  (Ex. A ¶¶40, 45; Ex. C KG000135; Ex. H 90:5–16.)  The substantial delay in scheduling his surgery caused further medical harm.  (Ex. A ¶40; Ex. H 124:10–125:6.)

78.     Disputed.  This paragraph states that on February 15, 2008, Dr. Ghosh approved Dr. Edward's recommendation for surgery.  In the fall of 2007, Defendant Dr. Ghosh delayed more than a month in approving the MRI that was originally ordered by UIC emergency room physician.  (Ex. A ¶¶34, 40.)  On December 17, 2007, over two and one half months after the oral surgeons at UIC recommended that Mr. King be sent immediately to Loyola to receive the necessary surgery, and nearly three months after he was transferred to Stateville to have this critical surgery, seven and a half months after Dr. Swanson prescribed immediate joint replacement explaining that it was only available at Loyola and over three and a half years since he was first diagnosed.  Defendant Dr. Ghosh informed him that he had faxed a referral that day to Loyola for joint replacement surgery, but that Loyola was not accepting any new patients at that time and that it would be a couple of months before they could get him in.  (Ex. A ¶41; Ex.

C KG00131; Ex. G 58:18–20; Ex. H 78:12–17, 79:1–6.)  Upon examination of Mr. King's CT scan in February 2008, Dr. Edwards at UIC recommended *immediate* surgery.  (Ex. A ¶45.)  The substantial delay in scheduling his surgery caused further medical harm.  (Ex. A ¶40; Ex. H 124:10–125:6.)

79.     Admitted.

80.     Disputed.  This paragraph states that Dr. Miloro noted there was no delay in surgery.  On December 17, 2007, over two and one half months after the oral surgeons at UIC recommended that Mr. King be sent immediately to Loyola to receive the necessary surgery, and nearly three months after he was transferred to Stateville to have this critical surgery, seven and a half months after Dr. Swanson prescribed immediate joint replacement explaining that it was only available at Loyola and over three and a half years since he was first diagnosed.  Defendant Dr. Ghosh informed him that he had faxed a referral that day to Loyola for joint replacement surgery, but that Loyola was not accepting any new patients at that time and that it would be a couple of months before they could get him in.  (Ex. A ¶41; Ex. C KG00131; Ex. G 58:18–20; Ex. H 78:12–17, 79:1–6.)  Upon examination of Mr. King's CT scan in February 2008, Dr. Edwards at UIC recommended *immediate* surgery.  (Ex. A ¶45.)  On March 16, 2008, Mr. King was admitted into the UIC for surgery, and, finally, on March 19, 2008 his complete right condylar joint was successfully replaced.  (Ex. A ¶46; Ex. C KG000688–KG0000692; Ex. H 89:13–90:4; Ex. K 58:12–14, 58:21–59:13; 59:1920; 61:3–5.)  The substantial delay in scheduling his surgery caused further medical harm.  (Ex. A ¶40; Ex. H 124:10–125:6.)

81.     Disputed.  This paragraph states that at Stateville, due to the backlog in requests for surgery, five or six months for surgery was average for surgeries that were not life

70

threatening or related to cancer. Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 81.

82. Disputed. This paragraph states that on March 20, 2008, following surgery, Dr. Edwards recommended Clinda, Tylenol 3, Ibuprofen, Peridex rinses, a head wrap, and for Plaintiff to return in a week for suture removal and evaluation. Mr. King was released on March 20, 2008 and Dr. Edwards sent instructions to Dr. Ghosh, Dr. Mitchell, and Dr. Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite" device. (Ex. E 268:13–21; Ex. H 97:20–98:2; Ex. I 134:12–15; Ex. L 113:9–114:8.) Dr. Edwards also requested that the Stateville medical staff contact him if there were questions on what type of physical therapy was required for him. (Ex. C KG000753; Ex. E 260:2-9; Ex. I 137:21–138:6; Dr. Edwards' mandatory post-operative treatment plan was ignored by the Stateville dental and medical staff and he was not provided with the required physical therapy or the TheraBite device. (Ex. A ¶47.) On November 27, 2007, Dr. Craig told Mitchell, Fattore-Bruno, and Ghosh that Mr. King was not to be prescribed Motrin, Robaxin, Naproxin, or Tylenol as they were insufficient to treat Mr. King's pain. (Ex. A ¶37; Ex. C KG 001570, KG001738; Ex. I 74:16–20.)

83. Disputed. This paragraph states that on April 2, 2008, Dr. Fattore-Bruno saw Plaintiff and gave him a 15 mm stack of tongue blades to use in stretching his jaw, and that on April 10, 2008, Dr. Fattore-Bruno saw Plaintiff again, and while she added one tongue blade, she also noted Plaintiff was confirmed to be sent to UIC on medical writ for follow-up on April 17, 2008. Mr. King only saw Defendant Dr. Fattore-Bruno twice between his surgery and the time she was transferred out of Stateville. (Ex. A ¶52.) Mr. King could only increase the amount the tongue blades stretched his jaw by adding more tongue blades, but he was only allowed to get

more blades from Defendant Dr. Fattore-Bruno. (Ex. M 65:17–19, 65:21–66:5.) Dr. Binderman testified that using tongue blades (depressors) instead of a "TheraBite" was deviation from the standard of care. (Ex. D at 14; Ex. I 145:5–10.) Tongue depressors were used in the past for TMJ exercise, but their effectiveness is limited because they only passively stretch the jaw and do not more naturally exercise the muscles of the jaw in a more functional manner as is done with the "TheraBite," therefore tongue depressors would not be a controlled, adequate, or effective aid to post-surgical joint replacement therapy in the 2008 time frame. (Ex. D at 14.) The Tongue blades were not prescribed by the oral surgeons, and as Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1.) To do otherwise would not be practicing good medicine. (*Id.*)

84. Disputed. This paragraph states that tongue depressors are used with patients as post TMJ surgery therapy. Dr. Binderman testified that using tongue blades (depressors) instead of a Therabite was deviation from the standard of care. (Ex. D at 14; Ex. I 145:5–10.) Tongue depressors were used in the past for TMJ exercise, but their effectiveness is limited because they only passively stretch the jaw and do not more naturally exercise the muscles of the jaw in a more functional manner as is done with the TheraBite, therefore tongue depressors would not be a controlled, adequate, or effective aid to post-surgical joint replacement therapy in the 2008 time frame. (Ex. D at 14.) The Tongue blades were not prescribed by the oral surgeons, and as Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1.) To do otherwise would not be practicing good medicine. (*Id.*)

85.     Disputed.  This paragraph states that on April 17, 2008, Dr. Edwards saw Plaintiff for a follow-up visit to remove the sutures, and he noted Plaintiff was healing well.  When Mr. King returned to UIC for a follow-up visit on March 25, 2008, Dr. Edwards was surprised to learn that he had not received the TheraBite device.  (Ex. A ¶49.)  Mr. King saw Dr. Edwards again for follow-up care on or around April 1, 2008, where Dr. Edwards again prescribed the use of the TheraBite and sent his instructions to Dr. Ghosh, Dr. Fattore-Bruno, and Dr. Mitchell. (Ex. A ¶50; Ex. C KG000139; Ex. L 113:9-22.)  Nonetheless, as before, Stateville's medical and dental staff failed to provide Mr. King with the device.  (Ex. A ¶1. )  On September 9, 2008, Mr. King saw Dr. Edwards for another follow-up care visit and explained that he had yet to receive the TheraBite device.  (Ex. A ¶62, Ex. C KG000755.)  In that assessment, Dr. Edwards stated that Mr. King's right "posterior dental [has an] open bite <u>due to lack of physical therapy</u>" and again ordered physical therapy with daily jaw exercises.  (*Id*.) (emphasis added).  Dr. Edwards was frustrated and stated that he would personally order the TheraBite device in view of Stateville Medical Center's refusal to order the device.  (*Id.*)  On September 23, 2008, Mr. King finally received the TheraBite device from Dr. Edwards during a follow-up visit.  (Ex. A ¶63, Ex. C KG000142.)  By September 29, 2008, Mr. King's jaw had locked shut, rendering the "TheraBite" useless.  (Ex. A ¶64–65; Ex. H 112:22–113:9.)

86.     Disputed.  This paragraph states that at the April 17, 2008 post-surgery follow-up, Dr. Edwards also noted a Therabite device would be acquired by Oral Maxio-Facial Surgery Department ("OMFS") at UIC to give to Plaintiff at the next follow-up for increasing his ability to open his jaw.  Mr. King was released from UIC after his total jaw replacement surgery on March 20, 2008 and Dr. Edwards sent instructions to Defendant Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including the use of a "TheraBite."

(Ex. A ¶47; Ex. L 113:9-22.)  When Mr. King returned to UIC for a follow-up visit on March 25,

2008, Dr. Edwards was surprised to learn that he had not received the TheraBite device.  (Ex. A

¶49.)  Mr. King saw Dr. Edwards again for follow-up care on or around April 1, 2008, where Dr.

Edwards again prescribed the use of the TheraBite and sent his instructions to Dr. Ghosh, Dr.

Fattore-Bruno, and Dr. Mitchell.  (Ex. A ¶50; Ex. C KG000139; Ex. L 113:9-22.)  Nonetheless,

as before, Stateville's medical and dental staff failed to provide Mr. King with the device.  (Ex. A

¶1)  On May 13, 2008, Mr. King filed a grievance because of the medical and dental staff's

refusal to provide the prescribed "TheraBite."  (Ex. A ¶53, Ex. C KG001658–KG001659; Ex. M

93:23–94:5.)  On May 15, 2008, Warden McCann deemed the May 13, 2008 grievance an

emergency grievance, but Mr. King was not provided with a TheraBite. (Ex. A ¶55, Ex. C

KG001753.)  On June 11, 2008, Mr. King visited the Stateville dental clinic and reminded the

staff that he needed to go to UIC for a follow-up visit and to pick up the "TheraBite."  (Ex. A

¶57, Ex. C KG000159; Ex. M 78:8–17, 79:12–24.)  On July 9, 2008, Mr. King was again sent to

UIC for follow up care, where an oral surgeon familiar with his case requested that a TheraBite

device be ordered for him.  (Ex. A ¶60; Ex. C KG000140.)  Throughout the month of August of

2008, Mr. King repeatedly attempted to gain access to the TheraBite device by sending request

slips, but when he inquired as to the status of his requests, the medical staff informed Mr. King

that Defendant Dr. Mitchell-Lawshea was still upset about a lawsuit that he had instigated

against her at Pontiac Correctional Center, and that she would address his requests, "when she

does."  (Ex. A ¶61, Ex. C KG001757, KG002678.)  On September 9, 2008, Mr. King saw Dr.

Edwards for another follow-up care visit and explained that he had yet to receive the "TheraBite"

device.  (Ex. A. ¶62, Ex. C KG000755.)  In that assessment, Dr. Edwards stated that Mr. King's

right "posterior dental [has an] open bite <u>due to lack of physical therapy</u>" and again ordered

physical therapy with daily jaw exercises. (*Id.*) (emphasis added). Dr. Edwards was frustrated and stated that he would personally order the TheraBite device in view of Stateville Medical Center's refusal to order the device. (*Id.*) On September 23, 2008, Mr. King finally received the "TheraBite" device from Dr. Edwards during a follow-up visit. (Ex. A ¶63, Ex. C KG000142.) By September 29, 2008, Mr. King's jaw had locked shut, rendering the "TheraBite" useless. (Ex. A ¶64–65; Ex. H 112:22–113:9.)

87.    Disputed. This paragraph states that on April 18, 2008 and May 14, 2008, Dr. Fattore-Bruno saw Plaintiff, noting Dr. Ghosh already had referred Plaintiff to be seen at UIC in June 2008. Plaintiff admits that on April 18, 2008 and May 14, 2008, Dr. Fattore-Bruno saw Palintiff, but lacks knowledge or information sufficient to form a belief about paragraph 87.

88.    Disputed. This paragraph states that on June 9, 2008, Plaintiff was seen by Dr. Thomas Rogers at UIC, and that Dr. Rogers decided to not provide a Therabite device at this appointment, and recommended conservative treatment including Plaintiff maintaining a soft diet and to take 400mg of ibuprofen three times a day. Dr. Edwards expressly prescribed the "TheraBite" on March 20, 2008. (Ex. A ¶47.) Mr. King was released from UIC after his total jaw replacement surgery on March 20, 2008 and Dr. Edwards sent instructions to Defendant Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including the use of a "TheraBite." (Ex. A ¶47; Ex L 113:9-22.) When Mr. King returned to UIC for a follow-up visit on March 25, 2008, Dr. Edwards was surprised to learn that he had not received the "TheraBite" device. (Ex. A ¶49.) Mr. King saw Dr. Edwards again for follow-up care on or around April 1, 2008, where Dr. Edwards again prescribed the use of the "TheraBite" and sent his instructions to Defendant Drs. Ghosh, Fattore-Bruno, and Mitchell-Lawshea. (Ex. A ¶50; Ex. C KG000139; Ex. L 113:9–22.) Nonetheless, as before, Stateville's medical and dental staff

failed to provide Mr. King with the device. (Ex. A ¶1) On May 13, 2008, Mr. King filed a grievance because of the medical and dental staff's refusal to provide the prescribed "TheraBite." (Ex. A ¶53, Ex. C KG001658–KG001659; Ex. M 93:23–94:5.) On May 15, 2008, Warden McCann deemed the May 13, 2008 grievance an emergency grievance, but Mr. King was not provided with a "TheraBite." (Ex. A ¶55. Ex. C KG001753.) On June 11, 2008, Mr. King visited the Stateville dental clinic and reminded the staff that he needed to go to UIC for a follow-up visit and to pick up the "TheraBite." (Ex. A ¶57, Ex. C KG000159; Ex. M 78:8–17, 79:12–24.) On July 9, 2008, Mr. King was again sent to UIC for follow up care, where an oral surgeon familiar with his case requested that a "TheraBite" device be ordered for him. (Ex. A Decl. ¶60; Ex. C KG000140.)

89.    Disputed.  This paragraph states that on June 11, 2008, Dr. Garg saw Plaintiff, and that at that time Dr. Garg confirmed with Dr. Ghosh that Plaintiff was scheduled for a follow-up appointment at UIC in July, 2008, when Plaintiff was expected to pick up a Therabite jaw device. On May 13, 2008, Mr. King filed a grievance because of the medical and dental staff's refusal to provide the prescribed "TheraBite." (Ex. A ¶53, Ex. C KG001658–KG001659; Ex. M 93:23–94:5.) On May 15, 2008, Warden McCann deemed the May 13, 2008 grievance an emergency grievance, but Mr. King was not provided with a "TheraBite." (Ex. A ¶55, Ex. C KG001753.) On June 11, 2008, Mr. King visited the Stateville dental clinic and reminded the staff that he needed to go to UIC for a follow-up visit and to pick up the "TheraBite." (Ex. A ¶57, Ex. C KG000159; Ex. M 78:8–17, 79:12–24.)

90.    Disputed.  This paragraph states that on September 10, 2008, Dr. Edwards recommended Plaintiff take ibruprofen with food to avoid his gastrointestinal ulcer and made another note to procure a Therabite device for Plaintiff.  On July 9, 2008, Mr. King was again

sent to UIC for follow up care, where an oral surgeon familiar with his case requested that a "TheraBite" device be ordered for him. (Ex. A ¶60; Ex. C KG000140.) Throughout the month of August of 2008, Mr. King repeatedly attempted to gain access to the "TheraBite" device by sending request slips, but when he inquired as to the status of his requests, the medical staff informed Mr. King that Defendant Dr. Mitchell-Lawshea was still upset about a lawsuit that he had instigated against her at Pontiac Correctional Center, and that she would address his requests, "when she does." (Ex. A ¶61, Ex. C KG001757, KG002678.) On September 9, 2008, Mr. King saw Dr. Edwards for another follow-up care visit and explained that he had yet to receive the "TheraBite" device. (Ex. A ¶62, Ex. C KG000755.) In that assessment, Dr. Edwards stated that Mr. King's right "posterior dental [has an] open bite <u>due to lack of physical therapy</u>" and again ordered physical therapy with daily jaw exercises. (*Id*.) (emphasis added). Dr. Edwards was frustrated and stated that he would personally order the "TheraBite" device in view of Stateville Medical Center's refusal to order the device. (*Id*.)

91.     Disputed.  This paragraph states that while UIC did not provide a Therabite device at the Plaintiff's first two follow up appointments following surgery on June 9, 2008 and September 10, 2008, on September 23, 2008, Dr. Edwards saw Plaintiff and provided Plaintiff with an assembled Therabite device. Dr. Edwards expressly prescribed the Therabite on March 20, 2008. (Ex. A¶47.)

92.     Disputed.  This paragraph states that despite not having the Therabite device prior to his September 23, 2008 appointment, Plaintiff was able to open his mouth 24mm at that appointment with Dr. Edwards, that the device was demonstrated to plaintiff, and Dr. Edwards recommended that Plaintiff continue to be prescribed ibuprofen, and that later, on September 23, 2008, Dr. Ghosh initialed a memorandum to Stateville's Cell House Security that Plaintiff had

permission to have the Therabite device in his cell from September 23, 2008 until March 31, 2009. Mr. King was released from UIC after his total jaw replacement surgery on March 20, 2008 and Dr. Edwards sent instructions to Defendant Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including the use of a "TheraBite." (Ex. A ¶47; Ex. E 268:13–21; Ex. H 97:20–98:2; Ex. I 134:12–15; Ex. L 113:9–114:8.) When Mr. King returned to UIC for a follow-up visit on March 25, 2008, Dr. Edwards was surprised to learn that he had not received the "TheraBite" device. (Ex. A ¶49.) Mr. King saw Dr. Edwards again for follow-up care on or around April 1, 2008, where Dr. Edwards again prescribed the use of the "TheraBite" and sent his instructions to Defendant Drs. Ghosh, Fattore-Bruno, and Mitchell-Lawshea. (Ex. A ¶1; Ex. C KG000139; Ex. L 113:9-22.) Nonetheless, as before, Stateville's medical and dental staff failed to provide Mr. King with the device. (Ex. A ¶1.) On May 13, 2008, Mr. King filed a grievance because of the medical and dental staff's refusal to provide the prescribed "TheraBite." (Ex. A ¶53, Ex. C KG001658–KG001659; Ex. M 93:23–94:5.) On May 15, 2008, Warden McCann deemed the May 13, 2008 grievance an emergency grievance, but Mr. King was not provided with a "TheraBite." (Ex. A ¶55, Ex. C KG001753.) On June 11, 2008, Mr. King visited the Stateville dental clinic and reminded the staff that he needed to go to UIC for a follow-up visit and to pick up the "TheraBite." (Ex. A ¶57, Ex. C KG000159 Ex. M 78:8–17; 79:12-14.) On July 9, 2008, Mr. King was again sent to UIC for follow up care, where an oral surgeon familiar with his case requested that a "TheraBite" device be ordered for him. (Ex. A ¶60, Ex. C KG000140.) Throughout the month of August of 2008, Mr. King repeatedly attempted to gain access to the "TheraBite" device by sending request slips, but when he inquired as to the status of his requests, the medical staff informed Mr. King that Defendant Dr. Mitchell-Lawshea was still upset about a lawsuit that he had instigated against her

at Pontiac Correctional Center, and that she would address his requests, "when she does." (Ex. A ¶61, Ex. C KG001757, KG002678.) On September 9, 2008, Mr. King saw Dr. Edwards for another follow-up care visit and explained that he had yet to receive the "TheraBite" device. (Ex. A ¶62, Ex. C KG000755.) In that assessment, Dr. Edwards stated that Mr. King's right "posterior dental [has an] open bite <u>due to lack of physical therapy</u>" and again ordered physical therapy with daily jaw exercises. (*Id.*) (emphasis added). Dr. Edwards was frustrated and stated that he would personally order the "TheraBite" device in view of Stateville Medical Center's refusal to order the device. (*Id.*) On September 23, 2008, Mr. King finally received the "TheraBite" device from Dr. Edwards during a follow-up visit. (Ex. A ¶63, Ex. C KG000142.) By September 29, 2008, Mr. King's jaw had locked shut, rendering the "TheraBite" useless. (Ex. A. ¶64–65; Ex. H 112:22–113:9.)

93. Disputed. This paragraph states that on October 3, 2008, Dr. Garg saw Plaintiff, that in response to Plaintiff's demand for physical therapy, Dr. Garg noted Dr. Edwards should be asked what kind of physical therapy, if any, was needed that Plaintiff could not do on his own, and that Dr. Garg also noted that Plaintiff was rude, did not follow directions, demanded physical therapy, and stated that he already had ibuprofen. Dr. Edwards sent instructions to Dr. Ghosh, Dr. Mitchell, and Dr. Fattore-Bruno for mandatory post-operative treatment, including the use of a TheraBite. (Ex. A ¶47; Ex. E 268:13–21; Ex. H 97:20–98:2; Ex. I 134:12–15; Ex. L 113:9–114:8.) On October 3, 2008, Mr. King's jaw locked shut and he was seen by Dr. Garg, whom he reminded that the dental records indicate physical therapy is required and Dr. Edwards's phone number was listed if they did not know what kind of therapy to provide. (Ex. A ¶65.) Dr. Garg returned Mr. King to his cell without treatment or physical therapy order. (*Id.*) Miloro himself told Mr. King that some of his physical therapy would need to be done by a physical therapist.

(Ex. H 117:9–13; *see also* Miloro Letter from 3/22/10.)  As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon.  (Ex. J 69:22–71:1).  To do otherwise would not be practicing good medicine.  (*Id.*)  Additionally, Plaintiff objects to this paragraph as irrelevant a under Federal Rules of Evidence 401, 402, and 403.  Summary judgment must be based on admissible evidence. Fed. R. Civ. P. 56(c)(2); *Verser v. Hubbard*, No. 10 C 7513, 2012 WL 1655960, at *2 (N.D. Ill. May 9, 2012) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)).

94.    Disputed.  This paragraph states that on October 8, 15, 24, 28, and 29, 2008, Plaintiff was seen by various other Stateville medical providers in the Health Care Unit ("HCU") for complaints related to his TMJ pain.  On October 3, 2008, Mr. King's jaw locked shut and he was seen by Dr. Garg, whom he reminded that the dental records indicate physical therapy is required and Dr. Edwards's phone number was listed if they did not know what kind of therapy to provide.  (Ex. A ¶65.)  Dr. Garg returned Mr. King to his cell without treatment or physical therapy order.  (*Id.*)  On October 6, 2008, Mr. King informed Assistant Warden Mark Hosey that he was in incredible pain and that the medical and dental staff had refused to provide him with the prescribed physical therapy.  (Ex. A ¶66.)  In response to Assistant Warden Hosey's inquiries, he was finally seen by a physical therapist on October 8, 2008 - over six months after his joint replacement surgery. (Ex. A ¶67.)  During the physical therapy session, the therapist explained that he did not know what kind of therapy to provide, and simply measured his ability to open his mouth using tongue blades and provided him with heat packs.  (Ex. H 115:10–16, 116:9–117:1)  The UIC dental department was never contacted to determine what type of physical therapy to provide to him.  (Ex. A ¶67.)  Throughout the month of October of 2008, Mr.

King sent multiple request slips to Drs. Mitchell and Saffold informing them that his jaw was locking shut but the requests went unanswered. (Ex. A ¶68.) On October 23, 2008, Mr. King was sent to UIC for a follow-up visit with a new oral surgeon because Dr. Edwards had left the clinic. (Ex. C KG000089, KG000143.) The new surgeon prescribed muscle relaxers and Vicodin for pain and explicitly ordered that he should not be given ibuprofen due to his ulcers. (Ex. A ¶69.) On October 28, 2008, Mr. King was seen by Defendant Dr. Ghosh, who informed him that the only pain medication he would prescribe was ibuprofen, despite his knowledge of his ulcers and the oral surgeon's notes to the contrary. (Ex. A ¶70.)

95. Disputed. This paragraph states that on October 14, 2008, Plaintiff's Motrin prescription was refilled at his request. On October 6, 2008, Mr. King informed Assistant Warden Mark Hosey that he was in incredible pain and that the medical and dental staff had refused to provide him with the prescribed physical therapy. (Ex. A ¶66.) Throughout the month of October of 2008, Mr. King sent multiple request slips to Drs. Mitchell and Saffold informing them that his jaw was locking shut but the requests went unanswered. (Ex. A ¶68.) On October 23, 2008, Mr. King was sent to UIC for a follow-up visit with a new oral surgeon because Dr. Edwards had left the clinic. (Ex. C KG000089, KG000143.) The new surgeon prescribed muscle relaxers and Vicodin for pain and explicitly ordered that he should not be given ibuprofen due to his ulcers. (Ex. A ¶69.)

96. Disputed. This paragraph states that on October 23, 2008, Dr. Lakasuya, a physician at UIC, saw Plaintiff at UIC and recommended a soft food diet, use of the Therabite, heat to the face, and Vicodin, and that Dr. Ghosh approved everything but the Vicodin. On October 23, 2008, Mr. King was sent to UIC for a follow-up visit with a new oral surgeon because Dr. Edwards had left the clinic. (Ex. C KG000089, KG000143.) The new surgeon

prescribed muscle relaxers and Vicodin for pain and explicitly ordered that he should not be given ibuprofen due to his ulcers.  (Ex. A ¶69.)  On October 28, 2008, Mr. King was seen by Defendant Dr. Ghosh, who informed him that the only pain medication he would prescribe was ibuprofen, despite his knowledge of his ulcers and the oral surgeon's notes to the contrary.  (Ex. A ¶70.)  Throughout the month of November of 2008, Mr. King submitted multiple request slips to be seen by Drs. Garg, Mitchell, Saffold, and Ghosh and for the prescribed muscle relaxers and Vicodin.  He never received Vicodin during this period.  (Ex. A ¶71, Ex. C KG 000143.)  As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon.  (Ex. J 69:22–71:1.)  To do otherwise would not be practicing good medicine.  (*Id.*)

97.     Disputed.  This paragraph states that on November 5, 2008, Dr. Ghosh again referred Plaintiff to UIC for Plaintiff's complaints of persistent pain.  Throughout the month of November of 2008, Mr. King submitted multiple request slips to be seen by Drs. Garg, Mitchell, Saffold, and Goshe and for the prescribed muscle relaxers and Vicodin.  He never received Vicodin during this period.  (Ex. A ¶71, Ex. C KG 000143.)

98.     Admitted.

99.     Disputed.  This paragraph states that on November 11, 2008 Stateville medical staff examined Plaintiff and referred Plaintiff to Dr. Ghosh.  Throughout the month of November of 2008, Mr. King submitted multiple request slips to be seen by Defendant Drs. Garg, Mitchell-Lawshea, Saffold, and Ghosh and for the prescribed muscle relaxers and Vicodin.  He never received Vicodin during this period.  (Ex. A ¶71, Ex. C KG000143.)

100.    Disputed.  This paragraph states that on November 17, 2008 and November 19, 2008, Plaintiff was seen by Dr. Ghosh, who took Plaintiff off Flexeril and placed Plaintiff on

Diazepam (valium). Throughout the month of November of 2008, Mr. King submitted multiple request slips to be seen by Drs. Garg, Mitchell, Saffold, and Ghosh and for the prescribed muscle relaxers and Vicodin. He never received Vicodin during this period. (Ex. A ¶71, Ex. C KG000171.)

101.    Disputed. This paragraph states that on December 10, 2008, Plaintiff had a follow up appointment with Dr. Ghosh, who renewed Plaintiff's Diazepam (Valium) prescription and discussed jaw pain treatment with the Plaintiff. Throughout the month of November of 2008, Mr. King submitted multiple request slips to be seen by Defendant Drs. Garg, Mitchell, Saffold, and Ghosh and for the prescribed muscle relaxers and Vicodin. He never received Vicodin during this period. (Ex. A ¶71, Ex. C KG000143.) On December 30, 2008, Mr. King submitted a grievance again detailing the intense pain he was experiencing and the failure of Stateville's medical and dental staff to provide him with the prescribed treatment. (Ex. A, ¶72, Ex. C KG001764–KG001765.)

102.    Disputed. This paragraph states that on December 16, 2008, Dr. Mitchell scheduled Plaintiff to be seen by Dr. Craig, the oral surgeon, on January 6, 2009. On December 30, 2008, Mr. King submitted a grievance again detailing the intense pain he was experiencing and the failure of Stateville's medical and dental staff to provide him with the prescribed treatment. (Ex. A ¶72, Ex. C KG 001764–KG001765.)

103.    Disputed. This paragraph states that on January 6, 2009, Dr. Craig saw Plaintiff and referred Plaintiff to Dr. Ghosh. On January 6, 2009, Mr. King was seen by Dr. Craig in the Stateville dental clinic. (Ex. C KG001663-KG001664.) He explained his condition and the events that had occurred since his last visit to Stateville, including the joint replacement surgery and the complete denial of the prescribed postoperative care by the Stateville medical and dental

staff.  (*Id.*)  Dr. Craig recommended that he be seen by UIC for a follow-up visit.  (*Id.*; Ex. A ¶73.)

106.    Disputed.  This paragraph states that on January 23, 2009, Plaintiff saw Dr. Ghosh who noted "the offender needs removal of diazepam" and prescribed six weeks of Diazepam as "watch take."

105.    Disputed.  This paragraph states that on February 2, 2009, Dr. Ghosh saw Plaintiff who was still complaining of the pain he was in, and Dr. Ghosh recommended Plaintiff use the Therabite device and ordered bite plates for Plaintiff to use.  On December 30, 2008, Mr. King submitted a grievance again detailing the intense pain he was experiencing and the failure of Stateville's medical and dental staff to provide him with the prescribed treatment.  (Ex. A ¶72, Ex. C KG001764-KG001765.)  On January 31, 2009, the Grievance Office determined that the grievance was being addressed by Dr. Craig's instructions, and noted that the recommended follow-up visit to UIC needed to be scheduled.  (Ex. C KG001663.)  In the following month, the Stateville medical and dental staff failed to schedule this follow-up visit.  (Ex. A ¶74.)  By September 29, 2008, Mr. King's jaw had locked shut, rendering the Therabite useless.  (Ex. A ¶64–65; Ex. H 112:22–113:9.)  The persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused Mr. King's condition to continue to deteriorate, and has now caused such a loss of range of motion that Mr. King can no longer open his mouth wide enough to use his night guard.  (Ex. A ¶88; Ex. H 12:11–19.)

106.    Disputed.  This paragraph states that on March 2, 2009, Dr. Ghosh saw Plaintiff, Plaintiff's jaw issues, prescribed Plaintiff Clindamyein, advised Plaintiff to use the Therabite device for a year, continued to prescribe Diazepam, and noted Plaintiff should be sent on medical writ to UIC for follow-up.  On February 26, 2009, Mr. King informed Assistant Warden of

Operations Marvin Reed that his jaw was locking shut and that he was in extreme pain to the point of crying. (Ex. C KG00003.) The right side of his face was also visibly swollen. He was escorted to health care, but Dr. Ghosh refused to see him. (Ex. A ¶76.)

107. Disputed. This paragraph states that on March 20, 2009, Plaintiff was seen by Dr. Garg, and despite Plaintiff stating it was an emergency that he could not open his mouth, he refused the muscle relaxant Robaxin, and walked out; at which time Dr. Garg notified Dr. Ghosh that Plaintiff needed to be evaluated by Dr. Ghosh. On March 20, 2009, Mr. King was finally seen by Dr. Garg after repeated requests for treatment. At this point, his jaw was essentially locked shut, and he could only speak through clenched teeth. Mr. King informed Dr. Garg that he was in intense physical pain and that even the simple act of speaking was extremely painful. During the visit, Dr. Garg refused to physically examine him, and simply asked him questions. Dr. Garg provided no substantive treatment. (Ex. A ¶77.) On March 20, 2009, Mr. King was sent to the emergency room after the dental clinic refused treatment (Ex. C KG000106-KG000107). Nurse Practitioner Williams treated him while at the emergency room with a 30 mg injection of Toradol. The Toradol was effective in reducing his pain and within four hours of the injection and his jaw began to unlock. His jaw remained unlocked until the medication wore off. (Ex. A ¶78.)

108. Disputed. This paragraph states that on April 8, 2009, Dr. Garg saw Plaintiff for an emergency situation where Plaintiff could not open his mouth. Dr. Garg consulted with Dr. Ghosh, who made sure Plaintiff had his Therabite appliance and noted Plaintiff was being treated with muscle relaxants and pain medication. Around April of 2009, the UIC dentists also informed him that his condition is being exacerbated by problems with his facial muscles, and that he need to see Dr. Klosser, a facial muscle specialist at UIC (Ex. A ¶ 80; Ex C KG000145.)

The UIC dentists then informed him that they would provide Stateville's medical staff with their recommendations, as well as prescriptions for pain medication, muscle relaxers, and a liquid diet. (Ex. A ¶80.) Stateville's medical and dental staff has refused to provide him with the prescribed medications and has only randomly supplied him with limited supplies of nutritional drinks. As a result of this denial of sufficient nutrition, his weight has dropped to 170 lbs., down from 194 lbs. in September of 2008 - a loss of 24 lbs. (Ex. A ¶81.)

109.    Disputed. This paragraph states that on April 14, 2009, Plaintiff was seen by Dr. Klasser at UIC. Around April of 2009, the UIC dentists also informed him that his condition is being exacerbated by problems with his facial muscles, and that he need to see Dr. Klosser, a facial muscle specialist at UIC. (Ex. A ¶80.) Mr. King filed multiple grievances requesting to see Dr. Klosser and seeking the necessary pain medication and liquid diet he requires, to no avail. (Ex. A ¶82.)

110.    Disputed. This paragraph states that on May 8, 2009 and May 22, 2009, Dr. Garg saw Plaintiff because he complained he could not open his mouth, and at that time she consulted with Dr. Ghosh who informed her that Plaintiff was on 5mg valium daily at bedtime for three months and was on a soft diet. Throughout 2009, Mr. King continued to be denied adequate and timely medical treatment for his TMD. Mr. King filed a number of request slips to the Stateville dental center to address his on-going pain related to his TMD. Drs. Ghosh and Mitchell refused to see him, and to the extent Mr. King has seen Drs. Ghosh and Mitchell, they have not provided him with adequate treatment or care to alleviate his TMD related pain and suffering. (Ex. ¶83.)

111.    Disputed. This paragraph states that on May 29, 2009, Plaintiff was seen at the Stateville Dental Clinic, and it was noted that Dr. Ghosh made a request for Lodine, a non-formulary drug, to be approved for Plaintiff. Throughout 2009, Mr. King continued to be denied

adequate and timely medical treatment for his TMD. Mr. King filed a number of request slips to the Stateville dental center to address his on-going pain related to his TMD. Drs. Ghosh and Mitchell refused to see him, and to the extent Mr. King has seen Drs. Ghosh and Mitchell, they have not provided him with adequate treatment or care to alleviate his TMD related pain and suffering. (Ex. A ¶83.)

112.    Disputed. This paragraph states that on June 15, 2009 and July 1, 2009, Dr. Fishman saw Plaintiff and noted Plaintiff's issues were medical issues not dental issues. Around April of 2009, the UIC dentists also informed him that his condition is being exacerbated by problems with his facial muscles, and that he need to see Dr. Klosser, a facial muscle specialist at UIC. (Ex. A ¶80.) Mr. King filed multiple grievances requesting to see Dr. Klosser and seeking the necessary pain medication and liquid diet he requires, to no avail. (Ex. A ¶82.) Mr. King's neurologist, Dr. Rhee, informed him that the neurological issues affecting his facial and jaw muscles are most likely caused by his ongoing and unresolved TMD. (Ex. A ¶89.)

113.    Disputed. This paragraph states that on July 10, 2009, Dr. Thomas saw Plaintiff, prescribed Lodin and Valium, referred Plaintiff to the Stateville sick call and for referral to UIC for TMJ evaluation, and noted Plaintiff refused Tylenol. On November 27, 2007, Dr. Craig told Mitchell, Fattore-Bruno, and Ghosh that Mr. King was not to be prescribed Motrin, Robaxin, Naproxin, or Tylenol as they were insufficient to treat Mr. King's pain. (Ex A ¶37.)

114.    Disputed. This paragraph states that on August 10, 2009, Dr. Mitchell saw Plaintiff for Plaintiff's complaints of tooth pain and ordered an x-ray to rule out tooth decay, and on August 17, 2009, Dr. Mitchell determined no evidence of tooth decay, and noted the med-tech could not completely clean the mouth since Plaintiff could not open his mouth, and that she also referred Plaintiff to Dr. Ghosh for pain medication. Persistent and systematic denial of adequate

and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate. (Ex. A ¶88.)

115.    Disputed.  This paragraph states that on September 11, 2009, Dr. Mitchell saw Plaintiff and advised him to follow UIC's recommendations since she was not a TMJ specialist, noted Plaintiff was scheduled to see Dr. Klasser, and referred Plaintiff to see Dr. Ghosh on September 14, 2009.  On September 9, 2009 Mr. King filed a grievance complaining of his jaw locking shut again and Dr. Mitchell's failure to address his condition.  The grievance counselor reported that he spoke with the dental department and that they were aware of his issues and that he would be seen soon.  (Ex. A ¶84.)

116.    Disputed.  This paragraph states that on October 19, 2009, Plaintiff was seen at the Dental Clinic, and referred to the Medical Director, that on November 6, 2009, Dr. Garg also made a request for referral review on Plaintiff's TMJ, that on December 23, 2011, Dr. Fishman saw Plaintiff and noted Plaintiff was making unreasonable demands since Plaintiff could not take ibuprofen and refused Tylenol, and that Dr. Fishman also made a referral for a TMJ Specialist and requested that Plaintiff no longer be seen in the Dental Clinic for his TMJ complaints.  Since the filing of Mr. King's First Amended Complaint in October of 2009, the Stateville Medical and Dental Staff, including Drs. Ghosh, Mitchell, Fattore-Bruno, Saffold, Garg, and Nurse Sha'riece have continued to deny him access to the necessary physical therapy prescribed by his specialists at UIC.  They have also failed to provide him with consistent access to a liquid and/or soft diet as also prescribed by his specialists.  This persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate.  Mr. King

remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain. (Ex. A ¶88.)

117. Disputed. This paragraph states that on February 16, 2010, a Wexford employed physician, Dr. Thomas saw Plaintiff and noted that Dr. Fishman submitted a referral to Wexford on December 23, 2009 for a TMJ Specialist and the facility had not received any information back, that Dr. Thomas noted that Plaintiff would not take Tylenol or Motrin, and that Dr. Thomas referred Plaintiff to Dr. Ghosh and suggested that Dr. Ghosh refer Plaintiff to a TMJ specialist. Prolonged use of Motrin (ibuprofen) can cause ulceration of the stomach or intestines, and exacerbates the condition of existing ulcers. (Ex. A ¶19.) Motrin, Robaxin, Naproxin, or Tylenol were insufficient to treat Mr. King's pain. (Ex. A ¶37.) Since the filing of Mr. King's First Amended Complaint in October of 2009, the Stateville Medical and Dental Staff, including Drs. Ghosh, Mitchell, Fattore-Bruno, Saffold, Garg, and Nurse Sha'riece have continued to deny him access to the necessary physical therapy prescribed by his specialists at UIC. They have also failed to provide him with consistent access to a liquid and/or soft diet as also prescribed by his specialists. This persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate. Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain. (Ex. A ¶88.) In March 2010—well after Mr. King's severe deterioration due to lack of proper post-operative care following his successful jaw replacement surgery—Miloro himself said that Mr. King "would benefit from treatment by a physical therapist, warm compresses, jaw exercises, and using a "therabite" appliance." And that

he "believe[d] this treatment is medically necessary for [Mr. King]." (Miloro Letter from 3/22/10.)

118.     Disputed.  This paragraph states that On May 5, 2010 and May 19, 2010, Dr. Fishman saw Plaintiff for bleeding gums and referred Plaintiff to the Dental Clinic, and on May 20, 2010 Dr. Saffold treated Plaintiff for his bleeding gums.  Since the filing of Mr. King's First Amended Complaint in October of 2009, the Stateville Medical and Dental Staff, including Drs. Ghosh, Mitchell, Fattore-Bruno, Saffold, Garg, and Nurse Sha'riece have continued to deny him access to the necessary physical therapy prescribed by his specialists at UIC.  They have also failed to provide him with consistent access to a liquid and/or soft diet as also prescribed by his specialists.  This persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate.  Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain.  (Ex. A ¶88.)

119.     Disputed.  This paragraph states that On June 15, 2010, Dr. Craig saw Plaintiff and noted Plaintiff thought Dr. Craig was the wrong surgeon and that Plaintiff was in pain, and that on July 23, 2010, Dr. Garg saw Plaintiff and noted Plaintiff should be seen for follow up with Dr. Ghosh.  Since the filing of Mr. King's First Amended Complaint in October of 2009, the Stateville Medical and Dental Staff, including Drs. Ghosh, Mitchell, Fattore-Bruno, Saffold, Garg, and Nurse Sha'riece have continued to deny him access to the necessary physical therapy prescribed by his specialists at UIC.  They have also failed to provide him with consistent access to a liquid and/or soft diet as also prescribed by his specialists.  This persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused

his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate. Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain. (Ex. A ¶88.)

120. Disputed. This paragraph states that On July 27, 2010, Dr. Fischman saw Plaintiff who was complaining of wanting pain medication, that Dr. Fischman explained to Plaintiff that the Dental Clinic could not help Plaintiff and discussed with Dr. Ghosh that Dr. Fischman still believed the Dental Clinic could not handle Plaintiff's TMJ issues, and that on August 16, 2010, Dr. Fischman saw Plaintiff and reiterated Plaintiff had a medical issue. Since the filing of Mr. King's First Amended Complaint in October of 2009, the Stateville Medical and Dental Staff, including Defendant Drs. Ghosh, Mitchell-Lawshea, Fattore-Bruno, Saffold, Garg, and Nurse Sha'riece have continued to deny him access to the necessary physical therapy prescribed by his specialists at UIC. They have also failed to provide him with consistent access to a liquid and/or soft diet as also prescribed by his specialists. This persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate. Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain. (Ex. A ¶88.)

121. Disputed. This paragraph states that On September 16, 2010, Dr. Saffold saw Plaintiff, explained that the Dental Clinic could not do anything for Plaintiff, and that Dr. Saffold would schedule Plaintiff for an oral surgeon consultation, and that on September 28, 2010, Dr. Craig, the oral surgeon, saw Plaintiff, spoke to Dr. Ghosh about Plaintiff's treatment, and

recommended heating packs for Plaintiff and to have updated x-rays taken. Since the filing of Mr. King's First Amended Complaint in October of 2009, the Stateville Medical and Dental Staff, including Defendant Drs. Ghosh, Mitchell-Lawshea, Fattore-Bruno, Saffold, Garg, and Nurse Sha'riece have continued to deny him access to the necessary physical therapy prescribed by his specialists at UIC. They have also failed to provide him with consistent access to a liquid and/or soft diet as also prescribed by his specialists. This persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate. Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain. (Ex. A ¶88.) In March 2010—well after Mr. King's severe deterioration due to lack of proper post-operative care following his successful jaw replacement surgery—Miloro himself said that Mr. King "would benefit from treatment by a physical therapist, warm compresses, jaw exercises, and using a "therabite" appliance." And that he "believe[d] this treatment is medically necessary for [Mr. King]." (Ex. N.)

122. Disputed. This paragraph states that on October 8, 2010, Dr. Garg referred Plaintiff to Dr. Saffold for Plaintiff's bleeding gum issue, that on October 14, 2010, Dr. Saffold saw Plaintiff, addressed Plaintiff's gum issues, and spoke to Dr. Ghosh about Plaintiff being referred to a TMJ clinic, that on November 4, 2010 Dr. Saffold saw Plaintiff who was complaining of locked jaw, that Dr. Saffold advised Plaintiff to reschedule the cleaning and that Plaintiff should see an oral surgeon for consultation, that on November 25, 2010 and November 30, 2010, Dr. Saffold did follow up with Dr. Ghosh on Plaintiff's treatment and rescheduled Plaintiff's mouth cleaning since Plaintiff could not open his mouth, and that on December 7,

2010 Dr. Saffold saw Plaintiff and again rescheduled Plaintiff's mouth cleaning since Plaintiff could not open his mouth. Since the filing of Mr. King's First Amended Complaint in October of 2009, the Stateville Medical and Dental Staff, including Defendant Drs. Ghosh, Mitchell-Lawshea, Fattore-Bruno, Saffold, Garg, and Nurse Sha'riece have continued to deny him access to the necessary physical therapy prescribed by his specialists at UIC. They have also failed to provide him with consistent access to a liquid and/or soft diet as also prescribed by his specialists. This persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate. Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain. (Ex. A ¶88.) In March 2010—well after Mr. King's severe deterioration due to lack of proper post-operative care following his successful jaw replacement surgery—Miloro himself said that Mr. King "would benefit from treatment by a physical therapist, warm compresses, jaw exercises, and using a "therabite" appliance." And that he "believe[d] this treatment is medically necessary for [Mr. King]." (Ex. N.)

123. Admitted.

124. Disputed. This paragraph states that Dr. Mitchell is not comfortable in her clinical experience prescribing a higher schedule of drugs than Ibuprofen/Motrin, and that Dr. Mitchell was not comfortable prescribing muscle relaxants since she did not have clinical experience dispensing them. On October 23, 2008, Mr. King was sent to UIC for a follow-up visit with a new oral surgeon because Dr. Edwards had left the clinic (Ex. C KG000089, KG000143.) The new surgeon prescribed muscle relaxers and Vicodin for pain and explicitly ordered that he should not be given ibuprofen due to his ulcers. (Ex. A ¶69.) As Defendants'

expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1). To do otherwise would not be practicing good medicine. (*Id.*)

125. Disputed. This paragraph states that Dr. Mitchell-Lawshea could not offer any treatment beyond what Dr. Ghosh provided. (Ex. E. 116:20-23.) Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 125.

126. Disputed. This paragraph states that Dr. Ghosh stated that even in the hypothetical event that Dr. Mitchell refused to treat Plaintiff's pain, there were providers, medical technicians, and medical doctors available to treat Plaintiff's pain. Since the filing of Mr. King's First Amended Complaint in October of 2009, the Stateville Medical and Dental Staff, including Defendant Drs. Ghosh, Mitchell-Lawshea, Fattore-Bruno, Saffold, Garg, and Nurse Sha'riece have continued to deny him access to the necessary physical therapy prescribed by his specialists at UIC. They have also failed to provide him with consistent access to a liquid and/or soft diet as also prescribed by his specialists. This persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate. Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain. (Ex. A ¶88.) In March 2010—well after Mr. King's severe deterioration due to lack of proper post-operative care following his successful jaw replacement surgery—Miloro himself said that Mr. King "would benefit from treatment by a physical therapist, warm compresses, jaw exercises, and using a "therabite" appliance." And that he "believe[d] this treatment is medically necessary for [Mr. King]." (Ex. N.)

94

127.    Disputed.  This paragraph states that on at least four occasions while Dr. Mitchell worked on other inmates, Plaintiff would come in and demand Dr. Mitchell stop what she was doing and work on him, that one time Plaintiff's intrusion required Plaintiff to be removed by security, and that in Dr. Mitchell's experience with Plaintiff after July 2008, she was often concerned for her safety.  Plaintiff objects to this paragraph as irrelevant and prejudicial under Federal Rules of Evidence 402, 403, and 404.  Summary judgment must be based on admissible evidence. Fed. R. Civ. P. 56(c)(2); *Verser v. Hubbard*, No. 10 C 7513, 2012 WL 1655960, at *2 (N.D. Ill. May 9, 2012) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)).

128.    Disputed.   This paragraph states that Dr. Garg did not provide input into Plaintiff's treatment for his TMD or TMD related issues, and that Dr. Garg never prescribed any medication to Plaintiff.  Mr. King was seen by Defendant Dr. Garg at the Stateville dental clinic in the Spring of 2008.  He explained that he was suffering from severe pain in both his right and left TMJ areas and that he had been unable to open his mouth after surgery.  He also inquired about the prescribed physical therapy and TheraBite device.  Defendant Dr. Garg responded that physical therapy was unnecessary despite the fact that she was not a TMJ specialist.  (Ex. A ¶56.) On October 3, 2008, Mr. King's jaw locked shut and he was seen by Defendant Dr. Garg, whom he reminded that the dental records indicate physical therapy is required and Dr. Edwards's phone number was listed if they did not know what kind of therapy to provide.  (Ex. A ¶65.) Defendant Dr. Garg returned Mr. King to his cell without treatment or physical therapy order. On March 20, 2009, Mr. King was finally seen by Defendant Dr. Garg after repeated requests for treatment.  At this point, his jaw was essentially locked shut, and he could only speak through clenched teeth. Mr. King informed Defendant Dr. Garg that he was in intense physical pain and

that even the simple act of speaking was extremely painful. During the visit, Defendant Dr. Garg refused to physically examine him, and simply asked him questions. Defendant Dr. Garg provided no substantive treatment. (Ex. A ¶77.)

129. Disputed. This paragraph states that Dr. Saffold's experience in treating TMD or TMD-related conditions is limited to analgesics and muscle relaxers, and that Dr. Saffold never treated Plaintiff for his TMD condition. Defendant Dr. Ghosh examined Mr. King on June 19, 2008, and noticed swelling of his right TMJ area where he had surgery and that he could barely open his mouth. (Ex. A ¶59; Ex. C KG000166-167.) When Defendant Dr. Ghosh asked what treatment the dental staff was providing, Mr. King informed him that he was not receiving treatment of any kind. (Ex. A ¶59.) Defendant Dr. Ghosh then asked Defendant Drs. Mitchell-Lawshea and Saffold why Mr. King was not receiving the post-operative treatment prescribed by Dr. Edwards. (Ex. A ¶59.) Without even examining Mr. King, Defendant Dr. Saffold replied that he did not need physical therapy because it would not help and that no treatment existed for TMD—despite Dr. Edward's post-operative instructions to the contrary (*Id.*). Since the filing of Mr. King's First Amended Complaint, Defendant Dr. Saffold has continued to deny him access to the necessary physical therapy prescribed by his specialists at UIC. He has also failed to provide him with consistent access to a liquid and/or soft diet as also prescribed by his specialists. This persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate. Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain. (Ex. A ¶88; Ex. H 12:11-19.)

130.     Disputed.   This paragraph states that Plaintiff never had an appointment with Defendant Dr. Saffold prior to filing this suit.   From October, 2010 to December, 2010, Defendant Dr. Saffold mainly worked on issues with Plaintiff's bleeding gums, and did not have the ability to address Plaintiff's TMJ issues.   Defendant Dr. Ghosh examined Mr. King on June 19, 2008, and noticed swelling of his right TMJ area where he had surgery and that he could barely open his mouth.   (Ex. A ¶59.)   When Defendant Dr. Ghosh asked what treatment the dental staff was providing, Mr. King informed him that he was not receiving treatment of any kind.   (Ex. A ¶59.)   Defendant Dr. Ghosh then asked Defendant Drs. Mitchell-Lawshea and Saffold why Mr. King was not receiving the post-operative treatment prescribed by Dr. Edwards. (Ex. A ¶59.)   Without even examining Mr. King, Defendant Dr. Saffold replied that he did not need physical therapy because it would not help and that no treatment existed for TMD—despite Dr. Edward's post-operative instructions to the contrary.   Since the filing of Mr. King's First Amended Complaint, Defendant Dr. Saffold has continued to deny him access to the necessary physical therapy prescribed by his specialists at UIC.   He has also failed to provide him with consistent access to a liquid and/or soft diet as also prescribed by his specialists.   This persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate.   Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain.   (Ex. A Decl. ¶88.)

131.     Disputed.   This paragraph states that Plaintiff's prescriptions were mainly based on physician decisions, not dental decisions.   As Defendants' expert Dr. Panomitros explained, a

doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1). To do otherwise would not be practicing good medicine. (*Id*.)

132. Disputed. This paragraph states that Some of Plaintiff's medications, such as the anti-inflammatory Lodine, were non-formulary, meaning they had to be approved by the medical director, Dr. Ghosh, before being ordered from outside the prison. Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 132.

133. Disputed. This paragraph states that According to Dr. Ghosh, Plaintiff did not need to see a dentist unless a dental problem arose, and that Plaintiff could manage his TMJ issues by dealing with people other than dentists. Plaintiff lacks knowledge or information sufficient to form a belief about paragraph 133.

134. Disputed. This paragraph states that Dr. Ghosh's clinical judgment was that Plaintiff did not need a physical therapist, that Ghosh tried to teach Plaintiff the physical therapy exercises for Plaintiff's TMJ treatment, but Plaintiff would not cooperate, and that Dr. Ghosh has observed Plaintiff eat solid food on at least one occasion since surgery despite the soft diet ordered by Dr. Ghosh. After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendant Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite device." (Ex. A ¶47; Ex. N.) Miloro himself told Mr. King that some of his physical therapy would need to be done by a physical therapist, and that "using a 'therabite' appliance…is medically necessary for [Mr. King]." (Ex. H 117:9–13; *see also* Ex. N.; Ex. A ¶47) As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon. (Ex. J 69:22–71:1). To do otherwise would not be practicing good medicine. (*Id*.) Plaintiff also objects to portions of this paragraph

as irrelevant a under Federal Rules of Evidence 401, 402, and 403. Summary judgment must be based on admissible evidence. Fed. R. Civ. P. 56(c)(2); *Verser v. Hubbard*, No. 10 C 7513, 2012 WL 1655960, at *2 (N.D. Ill. May 9, 2012) (citing *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000))

135. Disputed. This paragraph states that Plaintiff's diagnosis after surgery was myofascial spasm of the masseter muscle, that Dr. Ghosh ensured Plaintiff received muscle relaxants or Ativan injections were given when Plaintiff had masseter muscle spasms, and that Dr. Ghosh's prognosis is that Plaintiff's condition will not improve. The Defendants recognized and admitted that they are not experts in TMJ disorders and that there are specialists who are better trained and better suited to diagnose and treat TMJ disorders. (*See* Ex. A ¶¶12, 14, 20, 21, 22, 26, 30, 37.) In March 2010—well after Mr. King's severe deterioration due to lack of proper post-operative care following his successful jaw replacement surgery—Miloro himself said that Mr. King "would benefit from treatment by a physical therapist, warm compresses, jaw exercises, and using a "therabite" appliance." And that he "believe[d] this treatment is medically necessary for [Mr. King]." (Ex. N; Ex. H 117:9-13.)

136. Admitted.

137. Disputed. This paragraph states that Dr. Miloro stated a neurologist is the best person for helping Plaintiff tolerate his daily pain. (Ex. B. 131:13-17.) In March 2010—well after Mr. King's severe deterioration due to lack of proper post-operative care following his successful jaw replacement surgery—Miloro himself said that Mr. King "would benefit from treatment by a physical therapist, warm compresses, jaw exercises, and using a "therabite" appliance." And that he "believe[d] this treatment is medically necessary for [Mr. King]." (Ex. N; Ex. H 117:9-13.)

138.    Disputed.   This paragraph states that In a January, 2010, Dr. Jeannie Rhee, a Neurologist, performed a neurology consultation of Plaintiff at UIC. She could not make a precise evaluation or recommendation, but assessed Plaintiff's pain as neuropathic pain attributable to his trigeminal nerve.   Mr. King's neurologist, Dr. Rhee, informed him that the neurological issues affecting his facial and jaw muscles are most likely caused by his ongoing and unresolved TMD.  (Ex. A ¶89.)

139.    Disputed.   This paragraph states that even if a patient has joint replacement, followed by active physical therapy, they can still develop symptoms on the non-surgical side of their face.   After undergoing 3 surgeries, and receiving the proper post-operative care and physical therapy, Mr. King was symptom free until another trauma to his face re-aggravated his TMD in the summer of 2004.  Miloro told Mr. King that he was going to take care of him, which led Mr. King to believe that he was going to be pain-free after the surgery. (Ex. H 93:11-14.)

140.    Disputed.  This paragraph states that Dr. Miloro stated Plaintiff might be relegated to drug therapy for a long period of time, maybe the rest of his life to handle his facial pain, and that over 90% of patients who have a total joint replacement surgery have chronic pain.   After undergoing 3 surgeries, and receiving the proper post-operative care and physical therapy, Mr. King was symptom free until another trauma to his face re-aggravated his TMD in the summer of 2004.  Miloro told Mr. King that he was going to take care of him, which led Mr. King to believe that he was going to be pain-free after the surgery. (Ex. H 93:11-14.)  Persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate.  Mr. King remains in persistent, excruciating pain and his jaw regularly swells and

intermittently locks, preventing him from eating and speaking without intense physical pain. (Ex. A ¶88.)

141.    Admitted.

142.    Disputed.  This paragraph states that Managing Plaintiff on a long-term basis is a clinical dilemma since there are no simple answers to the treatment of his TMD.  After undergoing 3 surgeries, and receiving the proper post-operative care and physical therapy, Mr. King was symptom free until another trauma to his face re-aggravated his TMD in the summer of 2004.  Miloro told Mr. King that he was going to take care of him, which led Mr. King to believe that he was going to be pain-free after the surgery. (Ex. H 93:11-14.)  In March 2010—well after Mr. King's severe deterioration due to lack of proper post-operative care following his successful jaw replacement surgery—Miloro himself said that Mr. King "would benefit from treatment by a physical therapist, warm compresses, jaw exercises, and using a "therabite" appliance."  And that he "believe[d] this treatment is medically necessary for [Mr. King]."  (Ex. N; Ex. H 117:9-13.) Persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate.  Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain.  (Ex. A ¶88.)

143.    Disputed.  This paragraph states that Dr. Miloro stated that even with 100% compliance with treatment, Plaintiff could still be in pain. Miloro told Mr. King that he was going to take care of him, which led Mr. King to believe that he was going to be pain-free after the surgery. (Ex. H 93:11-14.)  In March 2010—well after Mr. King's severe deterioration due to lack of proper post-operative care following his successful jaw replacement surgery—Miloro

himself said that Mr. King "would benefit from treatment by a physical therapist, warm compresses, jaw exercises, and using a "therabite" appliance." And that he "believe[d] this treatment is medically necessary for [Mr. King]." (Miloro Letter from 3/22/10.) Persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate. Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain. (Ex. A ¶88.)

144. Disputed. This paragraph states that when reviewing Plaintiff's medical records, Dr. Miloro stated he was satisfied with Plaintiff's recovery through 2008, and he opined it is an involved process for the muscles to reattach to the metal and plastic elements of the TMJ prosthesis. Miloro told Mr. King that he was going to take care of him, which led Mr. King to believe that he was going to be pain-free after the surgery. (Ex. H 93:11-14.) In March 2010— well after Mr. King's severe deterioration due to lack of proper post-operative care following his successful jaw replacement surgery—Miloro himself said that Mr. King "would benefit from treatment by a physical therapist, warm compresses, jaw exercises, and using a "therabite" appliance." And that he "believe[d] this treatment is medically necessary for [Mr. King]." (Ex. N; Ex. H 117:9-13.) Persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate. Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain. (Ex. A ¶88.)

145.    Disputed.  This paragraph states that total joint replacement surgery is considered a salvage, or end-stage procedure; nothing else can be done surgically after the replacement surgery, and the after TMJ surgery, patients rarely, if ever, go to physical therapy.  After Mr. King's successful surgery, Dr. Edwards sent instructions to Ghosh, Mitchell, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite device."  (Ex. A ¶47.)  Miloro himself told Mr. King that some of his physical therapy would need to be done by a physical therapist.  (Ex. H 117:9–13; *see also* Ex. N.)  As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon.  (Ex. J 69:22–71:1).  To do otherwise would not be practicing good medicine.  (*Id.*)

146.    Disputed.   This paragraph states that Dr. Panamitros stated that there is no statistical data proving any specific treatment plan for TMJ issues will guarantee to correlate in disease-modifying or even curative effects.  After Mr. King's successful surgery, Dr. Edwards sent instructions to Defendant Drs. Ghosh, Mitchell-Lawshea, and Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite device."  (Ex. A ¶47; .)  Miloro himself told Mr. King that some of his physical therapy would need to be done by a physical therapist.  (Ex. H 117:9–13; *see also* Ex. N.)  As Defendants' expert Dr. Panomitros explained, a doctor providing post-operative care should not deviate from therapy prescribed by the attending surgeon.  (Ex. J 69:22–71:1).  To do otherwise would not be practicing good medicine.  (*Id.*)

147.    Disputed.   This paragraph states that Dr. Miloro stated that even if Plaintiff received surgery at an earlier date, this would not affect Plaintiff's current outcome.  On April 3, 2007, the CT scan was performed and revealed fragmentation of the right TMJ, multiple "loose

bodies" in the joint space, and irregularity of the mandibular condyle.  The CT scan and x-rays revealed "abnormalities that were not seen before," and which Mr. King has learned were likely a result of the delay associated with receiving the necessary medical treatment.  (Ex. A ¶26)  The substantial delay in scheduling Mr. King's surgery caused further medical harm.  (Ex. A ¶40; Ex. H 124:10–125:6.)  Persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate.  Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain.  (Ex. A ¶88.)

## III.  MR. KING'S LOCAL RULE 56.1(B)(3)(B) STATEMENT OF ADDITIONAL MATERIAL FACTS

1. Mr. King developed temporomandibular joint ("TMJ") disorder ("TMD") from a series of blunt force traumas to his face in the early 1990s.  (Ex. H 22:1–7, 23:18–20, 31:22–32:5.)

2. TMD involves acute or chronic inflammation of the TMJ, which connects the mandible to the skull.  Mild forms of TMD can be treated with the use of a mouth guard.  However, if not properly treated in a timely manner, the disorder can result in significant pain and impairment and/or degradation of the TMJ.  (Ex. A ¶6.)

3. Before his symptoms were relieved Mr. King used Indocin for a period of time to help with his TMJ pain, but that he was taken off of it because of the long-term risk of ulcers.  (Ex. H 55:24–56:3.)  Mr. King received surgery to treat his TMD prior to his incarceration at Menard and Stateville.  (Ex. H 39:18–40:15; Ex. C KG000292.)  The surgery was successful and Mr. King no longer suffered any discomfort from the TMD.  (Ex. H 42:8–43:1; Ex. A ¶7; Ex. I 71:15–21.)

4.     Mr. King's jaw was wired shut after his surgery in 1992, which lead to a decrease in his range of motion.  (Ex. H 57:3–5, 60:6–18.)   After the wires were removed, Mr. King received regular physical therapy until he got back the range of motion of his mouth.  (Ex. H 57:10–58:13.)  In addition to therapy performed on multiple occasions by physical therapists that specialized in TMJ treatment, Mr. King was taught some mouth-stretching exercise he could perform on his own.  (Ex. H 59:20–60:23.)   Mr. King testified that he could not remember everything that the physical therapists did because it was so long ago.  (Ex. H 61:13–15.)

5.     After undergoing 3 surgeries, and receiving the proper post-operative care and physical therapy, Mr. King was symptom free from December 1992 until June of 2004 while under the care of the State of Illinois, when he was attacked from behind in the Peoria County Courthouse, his face slammed against a table, re-aggravating his TMD. (Ex. H 42:6–44:2; Ex. G 87:9–10, 104:5; Ex. I 71:15–21, 72:8–20, 98:9–99:2; Ex. E 105:12–15.)

6.     Defendants recognized and admitted that they are not experts in TMJ disorders and that there are specialists who are better trained and better suited to diagnose and treat TMJ disorders.  (Ex. A ¶12, 20, 21, 22, 26, 30, 37.)

**MR. KING'S TREATMENT WHILE AT MENARD**

7.     Mr. King was incarcerated at Menard Correctional Center, Menard, Illinois ("Menard"), from approximately August 25 of 2004 to September 19, 2007.  (Ex. A ¶3; Ex. H 20:18-20; Ex. I 37:7–10; Ex. F 18:1–5; Ex. C KG000295.)

8.     Upon his arrival at Menard, Mr. King informed Menard's medical and dental staff that he suffered from pain and swelling in his right TMJ.  (Ex. C KG000152, 000295, 000493, 000292, 002656, 000293, 002659; Ex. A ¶9; Ex. B 10:4-23; Ex. G 33:6–24.)

105

9.      Mr. King first saw Defendant Dr. Newbold on August 26, 2004, on September 8, 2004, Dr. Newbold recommended a CT scan if clinically warranted, but did not order one.  (Ex. A ¶18; Ex. C KG000259, KG000260, KG02649; Ex. B 10:4-23.)

10.      Conservative treatment must be based on a meaningful diagnosis.  (Ex. D at 10.)

11.      In 2004, the standard practice for diagnosing a patient with this type of multiple surgical histories along with a new trauma to the jaw was to include imaging of either an MRI, or CT scan, or preferably both.  (Ex. D at 10.)  As well, in Mr. King's case, a detailed review of his past surgeries and their results was required to give meaning to the information obtained by the scans.  (*Id.*)  These steps were never taken while Mr. King was at Menard, and therefore there was never any proper diagnosis of Mr. King's TMJ disorder until 2007 when appropriate imaging was finally performed with CT and MRI scans, showing that the actual condition of his TM joint and the associated tissues at that time.  (*Id.* at 9.) Proper and accepted treatment of Mr. King in 2004 would require full-time utilization of an intra-oral orthotic TMJ appliance properly constructed to control physical forces on the TM Joint to help reduce the inflammatory intensity, hands-on physical therapy to control are reverse the muscle pathology, placement of steroid solution in the right TM Joint by one of several methods to attach the inflammation, use of ice over the joint on a daily basis to reduce inflammation, probable reposturing of the mandible (lower jaw) into a slightly more forward position to further unload the joint and to distract the joint to reduce pressure on inflamed intra-joint tissue, and possible adjunctive use of muscle relaxants and low-dose tricyclic antidepressants.  (Ex. D at 11–12.)  Mr. King received none of these treatments. (Ex. H 49:16–24.)

12.      Mr. King had a broken night guard when he arrived at Menard.  (Ex. H 50:18–23, 51:8–14; Ex. D 82:5–12; Ex. E 130:1–24)  He notified the dental department, but he had to file a grievance before he was able to have it repaired.  (Ex. H 51:11–21; 139:17–18.)

13.      On September 8, 2004, during a visit to the dental clinic, Mr. King explained to Defendant Dr. Newbold his history with TMD and the treatments he received prior to his current incarceration, including three successful surgeries to his right TMJ that were successful in diminishing his symptoms.  (Ex. C KG000152; Ex. G 34:5–12.)  Mr. King also informed Dr. Newbold that Dr. Walz, his TMJ specialist prior to his incarceration at Menard, had recommended that his TMJ be closely monitored because it had shown signs of slight deterioration.  (Ex. A ¶¶9, 10; Ex. B 9:17-10:23; 30:14 - 31:9.)

14.      During that same visit Defendant Dr. Newbold ordered a new mouth guard and noted that a radiologist would review his previous x-ray films to help determine his condition. (Ex. A ¶11, Ex. B 31:10-32:21.) Dr. Newbold ordered a new splint, but did not take the impression for it until March 4, 2005–over eight months after the initial symptoms were recorded.  (Ex. C KG000488, Ex. A ¶11; Ex. D at 8; Ex. B 31:14–22; Ex. E 164:3–5.)  An intra-oral appliance was constructed on April 1, 2005 – over eight months after initial symptoms were recorded.  (Ex. D at 8.)  Then the appliance was never adjusted and Mr. King never benefited from it. (Id.)

15.      On or around September 16, 2004, Defendant Dr. Newbold ordered an x-ray of his jaw to further assess the condition of his TMJ that the radiologist found to be "unusable". (Ex. E 154:22–155:2.)  Dr. Newbold ordered a follow-up visit after the x-ray report issued.  (Ex. A ¶12; Ex. B 9:17–11:1; Ex. D at 8; Ex. E 115:6.) Dr. Newbold ordered x-rays, but the x-rays were useless because the radiologist determined they were unreadable. ( Ex. A ¶12; Ex. C

KG000509; Ex. D at 7–8)  Around October 8, 2004 Dr. Newbold ordered oblique projections but gave a worthless diagnosis of TMJ disorder and hairline fraction to TMJ. (Ex. D at 9–11.) Despite his diagnosis, Dr. Newbold did not to refer him to a TMJ specialist for another two-and-a-half years.  (Ex. A ¶¶13, 17, 20; Ex. C KG000435.)  The official x-ray report had yet to issue. (Ex. A ¶13.)

16.     In or around November of 2004, after repeatedly requesting treatment for his TMD and informing the medical staff that he had been suffering from constant pain and other TMD related complications since his arrival at Menard, Mr. King saw Defendants Dr. Newbold again, as well as Dr. Chapman, the dental director at Mendard's dental clinic.  (Ex. A ¶14; Ex. F 38:13-20; Ex. C KG000318, KG00322.)  Both Dr. Newbold and Dr. Chapman told him that the Menard medical center did not have the expertise to treat his TMD.  (Ex. G 87:10–11; 87:20–88:3, 88:5–6.)  Dr. Newbold and Dr. Chapman then informed him that Mr. King would not be sent to a TMJ specialist, despite Dr. Newbold's TMD diagnosis and the acknowledged inability of the Menard medical and dental staff to treat his condition.  Mr. King was prescribed Motrin (ibuprofen) for pain and returned to his cell.  No x-ray report had issued as of this visit.  (Ex. A ¶14; Ex. F 61:15–20.)

17.     On January 25, 2005, Mr. King complained of pain and swelling in his right TMJ again and noted to the medical department that Mr. King had yet to see the dental center since his x-rays to discuss the results of the x-ray report.  (Ex. C KG001812.)  Nurse Janet Brauew noted that no dental visit was scheduled since x-rays taken in September of 2004 and she assured him that scheduling would be discussed with dental.  (Ex. A ¶15.)

18.     That same day, Mr. King filed a grievance explaining that he suffered from TMD and detailed the intense pain and swelling he was experiencing.  (Ex. C KG001588-89.)  He also

explained his successful treatment for TMD by specialists prior to his incarceration at Menard, and requested that he be sent to see a TMJ specialist.  (Ex. A ¶16; Ex. B 50:10–15.)

19.     On February 18, 2005, Mr. King's January 25, 2005 grievance was denied on the grounds that his dental concerns were "being addressed" by the Menard dental care staff.  (Ex. C KG001591.)  Defendants Dr. Newbold and Dr. Chapman continued to refuse to send him to see a TMJ specialist.   In denying his grievance, Grievance Officer Ryone Murray noted that Dr. Newbold had received the x-ray report on November 19, 2004, but had not requested or received the x-ray films and had made no effort to further assess his condition in over six months despite initially diagnosing him with TMD.  (Ex. C KG001591; Ex. A ¶17.)

20.     On February 18, 2005, Defendant Dr. Newbold noted that Mr. King may need a CT scan or a MRI of his right jaw; however no further action was taken by Dr. Newbold or Dr. Chapman to schedule these additional tests.  (Ex. A ¶18; Ex. B 51:5-52:4.)

21.     Mr. King testified that while he was at Menard, the night guard did not help, and that when he did use it, he would constantly wake up with a mouth full of blood.  (Ex. H 53:15–54:11.)

22.     The persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused Mr. King's condition to continue to deteriorate, and by 2010 had caused such a loss of range of motion that Mr. King could no longer open his mouth wide enough to use his night guard.  (Ex. A ¶88; Ex. H 12:11–19.)

23.     Mr. King testified that he did not have access the hot water necessary to create a hot compress with a washcloth; instead he only had access to lukewarm water, which did nothing to relieve his pain and suffering. (Ex. H 52:14–24, 110:20–111:8; *see also* Ex. D at 15.)

24.      On May 14, 2005, Mr. King informed the Menard medical staff that he had stomach ulcers and could no longer take the prescribed Motrin. (Ex. C KG000339; Ex. A ¶19) Prolonged use of Motrin (ibuprofen) can cause ulceration of the stomach or intestines, and exacerbates the condition of existing ulcers. (Ex. A ¶19.) Mr. King was prescribed Motrin even though it was insufficient to alleviate his pain and for long after it was apparent that it was causing him ulcers, even after other medications were specifically recommended by other doctors. (Ex. A ¶19–20; Ex. C KG000339, KG000498.)

25.      Throughout the remainder of 2005, Mr. King's condition worsened. His jaw started to "pop" and he began to experience difficulty opening and closing his mouth and chewing. (Ex. C KG00153; Ex. E 155:10–12, 159:8–10.) In addition to these new symptoms, he continued to complain of severe pain and swelling caused by TMJ and requested treatment by a specialist. *Id.* During several visits, Defendant Dr. Newbold and Dr. Chapman did not administer sufficient treatment for the pain associated with his TMD and consistently denied him access to see a specialist. On at least one occasion, Dr. Chapman stated that he had never treated a patient for TMD and insisted that there was no known treatment for Mr. King's condition, despite Mr. King's explanation to Dr. Chapman of his successful treatment for TMD by specialists prior to his incarceration at Menard. (Ex. A ¶20.)

26.      On October 31, 2005, Defendant Dr. Newbold told him that "there may not be much else [Menard] can do" about Mr. King's TMD and referred him to Defendant Dr. Feinerman, the Medical Director at Menard. (Ex. C KG000490; Ex. A ¶21.)

27.      On February 23, 2006, Mr. King was seen by Defendant Dr. Feinerman. (Ex. A, ¶22, Ex. G 105:16–18; Ex. C KG000410.) Dr. Feinerman informed him that, contrary to Defendants Dr. Newbold's and Dr. Chapman's assertions, it was possible for him to be seen by a

TMJ specialist, but that the request for the specialist would have to be instigated by Menard's dental department, i.e. Dr. Newbold or Dr. Chapman. (Ex. I 115:12–14; Ex. A ¶22) After his continued complaints of pain and swelling and requests to see a specialist, Dr. Feinerman requested his old medical records detailing his prior TMJ treatment for review—almost a year and a half after Dr. Newbold's initial assessment that Mr. King suffered from TMD. (Ex. A ¶22.)

28.     On April 4, 2006, Mr. King filed a grievance complaining about the dental department's continued refusal to refer him to a TMJ specialist. (Ex. C KG001815–16.) Mr. King explained that he had previously been successfully treated by an oral surgeon specializing in TMJ at the University of Illinois at Chicago Medical Center ("UIC") and that Defendants Dr. Newbold's and Dr. Chapman's insistence that TMJ was untreatable were false. (*Id.*) As with the January 25, 2005 grievance, this grievance was also denied on the grounds that his dental concerns were "being addressed" by the Menard dental care staff. (Ex. C KG001817–18.) Mr. King's April 4, 2004 grievance was again denied for the same reasons by Warden Dan Halick and his appeal was denied by the Administrative Review Board on June 22, 2006. (Ex. C KG001820; Ex. A ¶23.)

29.     Between June of 2006 through March of 2007, a period of 9 months, the Menard medical and dental staff continued to ignore Mr. King's requests to see a TMJ specialist and his complaints of severe pain and swelling. During this time, his jaw began to lock shut and he lost the ability to chew due to the lack of adequate and appropriate treatment. (Ex. A ¶24.)

30.     Eventually, in March of 2007, after his jaw had begun to lock shut and Mr. King was no longer able to consume solid foods due to his inability to chew, he was seen by Defendant Dr. Feinerman who finally agreed to send him to a TMJ specialist and have a CT scan

performed on his jaw.  (Ex. C KG000154, Ex. C KG002743; Ex. A ¶25; Ex. G 37:10–38:3, 108:3–6; Ex. E 180:12–17.)

31.     Defendant Dr. Chapman referred him to Dr. Jay Swanson, an outside oral surgeon who specializes in TMD, for further treatment. (Ex. G 110:22–23, 111:2–5; Ex. C KG002740.) On April 3, 2007, the CT scan was performed and revealed fragmentation of the right TMJ, multiple "loose bodies" in the joint space, and irregularity of the mandibular condyle. (Ex. C KG000266; Ex. G 43:1–3.)  The CT scan and x-rays revealed "abnormalities that were not seen before," and which Mr. King has learned was likely a result of the delay associated with receiving the necessary medical treatment.  (Ex. A ¶26; Ex. F 111:3–19.)

32.     On May 1, 2007, Mr. King was seen by Dr. Jay Swanson.  (Ex. A ¶27; Ex. G 111:21–112:2; Ex. B 40:10-13.) After reviewing the recent CT scan, Dr. Swanson informed Defendant Dr. Chapman and him that the "loose bodies" were bone fragments located in and around his TMJ area and that his condylar joint was too badly damaged for conservative treatment.   Dr. Swanson prescribed immediate joint replacement.  (Ex. C KG000155; Ex. D 116:9–20; Ex. A ¶27.)  According to Dr. Swanson, the only institution performing such surgery in Illinois at the time was Loyola University Hospital in Chicago, ("Loyola").  (Ex. A ¶27; Ex. H 62:15–63:24; Ex. F 116:1–17, 125:10–16.)

33.     Mr. King was provided Ibuprofen for his pain, even after other medications were specifically recommended by other doctors because Ibuprofen was insufficient to alleviate his pain. (Ex. A ¶¶12, 17, 20.)

34.     The substantial delay in scheduling Mr. King's jaw replacement surgery caused further harm.  (Ex. A ¶40; Ex. H 124:10–125:6.)

35.     Mr. King did not receive an MRI until June 1, 2007—almost 3 years after his initial intake by Defendant Dr. Newbold.  (Ex. H 45:13–15; Ex. C KG000196, KG00518.)  Only after Mr. King's condition had deteriorated to the point that joint replacement surgery was the only viable option, did Mr. King receive an MRI—a full month after Dr. Swanson recommend and "immediate MRI."  (Ex. E 221:22–222:18; Ex. C KG000196, KG000518.)

36.     Mr. King's condition remained untreated and he continued to suffer from severe pain and swelling that relegated him to a liquid diet.  (Ex. C KG000126, KG000156-7, KG000440.)  By July of 2007, the pain in his jaw had become so severe that he did not think he could go on and he informed a social worker at Menard as much.  (Ex. C KG000157, KG000441; Ex. A ¶28.)

37.     Around July 19, 2007, Mr. King was informed by Assistant Warden of Programs at Menard, Gary Conder, that he would be sent to UIC, and not Loyola, despite Dr. Swanson's recommendation and belief that Loyola was the only hospital in the state capable of performing the necessary surgery to treat his TMD.  (Ex. C KG000157, KG000443; Ex. A ¶29.)

**MR. KING'S PRE-SURGERY TREATMENT AT STATEVILLE**

38.     On September 19, 2007, Mr. King was transferred to Stateville on September 19, 2007 and assigned inmate number N54043 for the purpose of receiving the immediate joint replacement for his TMJ disorder prescribed by Dr. Swanson.  (Ex. C KG000445; Ex. A ¶¶4, 27, 30; Ex. D 124:18–21; Ex. F 18:6–21.)

39.     On September 26, 2007, Mr. King was sent to the Oral Surgery Clinic at UIC where he was seen by two oral surgeons, one of whom was the director of the Oral Surgery Clinic.  The oral surgeons informed him that there was no TMJ specialist on staff capable of performing the necessary replacement surgery at that time and referred him to Loyola for

immediate bone replacement surgery. (Ex. C KG000270; Ex. A ¶30.) This information was relayed to Defendant Dr. Chapman at Menard and Defendant Dr. Mitchell, the dental director and acting health administrator at Stateville, by the correction officers accompanying him during his medical visit to UIC. (Ex. A ¶30; Ex. F 127:3–22.)

40.     A Stateville evaluation report noted Mr. King's inability to open his mouth and that he suffered from a "dislocated" and "reduced" TMJ. (Ex. C KG000127.)

41.     After his return to Stateville around September 26, 2007, Mr. King informed Defendant Nurse Sha'riece of his TMD. He explained that he was in severe pain and that his jaw was locking shut, and he requested to see any dentist, but preferably Defendant Dr. Mitchell-Lawshea [confirm this is correct Mitchell], who was then the dental Director of Stateville who had treated him between 1988 and 1990. His requests for treatment and to be seen by Dr. Mitchell-Lawshea or other dentists were ignored. (Ex. H 103:2–18; Ex. A ¶31.) Dr. Mitchell-Lawshea was the dental director at Pontiac during his incarceration in 1988, and diagnosed and treated him for TMD. (Ex. H 23:10–24:4; Ex. L 2:8–9.) As part of his treatment, Dr. Mitchell-Lawshea sent him to UIC for surgery in 1989 and 1990 and prescribed muscle relaxers and heat treatment to prevent his jaw from locking shut. (Ex. H 39:18–40:15.)

42.     On October 18, 2007, Mr. King subsequently filed a grievance requesting the joint replacement surgery prescribed by Dr. Swanson and explained that he was in tremendous pain. (Ex. C KG002057.) Mr. King also explained that the sole reason he was transferred to Stateville was to receive a bone replacement from a TMJ specialist at UIC, but that according to the oral surgeons at U IC, no such specialist was present to perform the operation. (Ex. A ¶32. *Id.*)

Case: 1:09-cv-01184 Document #: 256 Filed: 03/23/13 Page 115 of 132 PageID #:2618

43.     On October 19, 2007, Mr. King's jaw locked shut causing intense pain and swelling of his face. (Ex. C KG000008; Ex. A ¶¶27, 30, 33.) Despite his repeated attempts to receive treatment beginning at 9:00 AM that day, Mr. King was ignored and left in his cell until 11:00 PM. (Ex. A ¶¶27, 30, 33; Ex. I 155:7–12.) On October 19, 2007, Mr. King was finally taken to the UIC Emergency Room. (Ex. H 73:6–9; Ex. E 215:19–24; Ex. C KG000009; Ex. A ¶34.) The UIC doctors took x-rays of his jaw and administered pain medication. (Ex. E 219:12–14; *Id.*) An oral surgeon was consulted and a decision was made to perform a MRI at the oral surgery clinic at UIC. The MRI was scheduled for October 22, 2007, but was not conducted because Defendants Dr. Ghosh and Dr. Mitchell-Lawshea refused to issue a writ authorizing the test. (Ex. C KG000127; Ex. A ¶34.)

44.     Around the end of October 2007 and beginning of November of 2007, Mr. King made several requests to be seen by Stateville's dental staff, particularly by Defendants Dr. Mitchell-Lawshea and Dr. Ghosh, which were ignored. As a result, he filed grievances dated October 22, 2007, October 26, 2007 and November 7, 2007 detailing the excruciating pain he had endured for more than three years and requesting that he be sent to a TMJ specialist to receive the necessary surgery to treat his condition and mitigate his pain. (Ex. H 80:17–22; Ex. C KG001705-06, KG002075–76.) These grievances were consolidated with the October 18, 2007 grievance and were ultimately deemed an emergency grievance by Warden McCann on November 26, 2007. (Ex. C KG001811.) Nonetheless, like the previous grievances, these grievances were also denied based on the assurances by the Stateville Defendants that his health needs were being met. (Ex. A ¶35.)

45.     Between October and November of 2007, Mr. King's gums began to bleed due to his jaw being locked shut. (*See* Ex. C KG002685.) Despite his repeated pleas to Stateville's

nursing and medical technician staff, his requests to see dental staff and to receive pain medication were ignored. (Ex. C KG001740; Ex. A ¶36.)

46.     On November 27, 2007, Stateville health administrator Carol Vance arranged for him to see Stateville's visiting oral surgeon, Dr. Craig. (Ex. C KG000020, KG001810; Ex. H 80:17–81:7; Ex. I 74:8–11.) However, as Stateville's medical staff was well aware, Dr. Craig does not treat TMD (Ex. A ¶35). Accordingly, Dr. Craig recommended that Mr. King be seen by a TMJ specialist immediately and advised Dr. Mitchell-Lawshea, Dr. Fattore-Bruno, and Dr. Ghosh not to prescribe ibuprofen, Motrin, Roboxin, Naproxen or Tylenol as they were insufficient to treat his pain. (Ex. C KG001570, KG001738; Ex. I 74:16–20; Ex. A ¶37.) Mr. King was then sent back to his cell without receiving any pain medication and with his jaw still locked shut. (Ex. A ¶37.)

47.     Mr. King wrote a formal complaint to Carol Vance on November 30, 2007, explaining the intense pain he was experiencing and that he was unable to open his mouth, as well as the failure of the Stateville dental staff to provide him with any treatment or pain medication during his November 27, 2007 visit. (Ex. C KG001738-39.) He also wrote a formal complaint to Dr. Mitchell, detailing the same facts, and inquiring why he was not receiving, at a minimum, the muscle relaxers and heat packs which had prevented his jaw from locking when she treated him at Pontiac Correctional Facility in the late 1980's. (Ex. C KG001740-41.) Neither Ms. Vance nor Dr. Mitchell responded to his complaints. (Ex. A ¶38.)

48.     At Carol Vance's request, Mr. King was brought to the Stateville dental clinic on December 6, 2007, where he was seen and ultimately admitted to the infirmary by Defendants Dr. Mitchell-Lawshea and Dr. Fattore-Bruno. (Ex. H 84:5–13, 20–24; Ex. M Fattore-Bruno 45:11–13; Ex. C KG000014.) He was given Tylenol 3 for pain and Roboxin muscle relaxers to

help try to unlock his jaw, both of which were inadequate for their intended purposes, as noted previously by Dr. Craig. (Ex. H 85:6–21; Ex. M 45:13–16; *see* Ex. A ¶37; Ex. L 25:10–14, 112:19–113:1.) He was then informed by Defendant Dr. Ghosh and Dr. Fattore-Bruno that he would be sent to Loyola the following week, nearly three months after his arrival at Stateville. Mr. King was never sent to Loyola. (Ex. A ¶39.)

49. On December 10, 2007, Mr. King was sent to UIC for the MRI that was originally ordered by the UIC emergency room physician and scheduled to be conducted on October 22, 2007. (Ex. A ¶¶34, 40; Ex. C KG000019; Ex. I 126:14–21.) The MRI revealed "complete disruption" of the right TMJ with deformity of the mandibular condyle and the "presence of multiple intra and extra-articular calcifications." (Ex. A ¶40; Ex. J 162:22–163:10.) Further, the joint space was "completely obliterated," and the articular disk of the joint was so damaged that it was "not recognized." (Ex. C KG000726.) In short, as Drs. Swanson and Craig had previously indicated, his TMJ was completely beyond repair and needed to be immediately replaced with surgery. (Ex. H 66:4–10.) The delay in treatment for Mr. King's condition exacerbated his TMJ condition. (Ex. A ¶40.)

50. On December 17, 2007, over two and one half months after the oral surgeons at UIC recommended that Mr. King be sent immediately to Loyola to receive the necessary surgery, and nearly three months after he was transferred to Stateville to have this critical surgery, seven and a half months after Dr. Swanson prescribed immediate joint replacement explaining that it was only available at Loyola and over three and a half years since he was first diagnosed. Defendant Dr. Ghosh informed him that he had faxed a referral that day to Loyola for joint replacement surgery, but that Loyola was not accepting any new patients at that time

and that it would be a couple of months before they could get him in. (Ex. C KG00131; Ex. H 78:12–17, 79:1–6; Ex. G 58:18–20; Ex. A ¶¶27, 30, 41.)

51.     On December 31, 2007, in addition to muscle relaxants, Defendant Dr. Fattore-Bruno prescribed Tylenol 3 for pain, which was inadequate for their intended purposes, as noted previously by Dr. Craig. (Ex. A ¶37; Ex. M 47:22–48:6, 48:17–24, 50:9–16, 89:16–22.)

52.     On January 7, 2008, Mr. King's appeal of his November 7, 2007 grievance was denied by the Administrative Review Board for [A]ppeal, on the ground that "inmate's medical needs were being addressed," despite the fact that his pain was completely unmitigated and that he had yet to be seen by a TMJ specialist capable of treating his condition. (Ex. C KG001644; Ex. A ¶42.)

53.     On January 12, 2008, Mr. King was seen by the Medical Center at Stateville. During his assessment, he was crying and clenching his jaw due to the intense pain he was suffering. (Ex. C KG000037; Ex. A ¶43.)

54.     Mr. King filed another grievance on January 15, 2008, requesting to see a TMJ specialist regarding his condition and the necessary surgery. (Ex. C KG001651–52.) He was finally sent to meet with Dr. James Edwards, an oral surgeon specializing in the treatment of TMD at the UIC oral surgery clinic. (Ex. G 58:16–18; Ex. C KG000132.) Dr. Edwards immediately ordered a CT scan to determine the extent of damage to his TMJ area, which was performed toward the end of the same month. (*Id.*; Ex. A ¶44.)

55.     On January 29, 2008, Defendants Dr. Fattore-Bruno was told by Dr. Ghosh that Mr. King is awaiting surgery at UIC. (*Id.* Ex. G 54:19–20, 55:18–22.)

56.     In or around the month of February 2008, Mr. King was sent to Dr. Edwards at UIC and was informed that his entire joint needed to be replaced. (Ex. C KG000135; Ex. A

¶40.)  Dr. Edwards showed him at least 10 bone fragments in and around his TMJ area and recommended immediate surgery.  (*Id.*; Ex. H 90:5–16; Ex. A ¶45.)

57.    On March 16, 2008, Mr. King was admitted into the UIC for surgery, and on March 19, 2008 his complete right condylar joint was successfully replaced by Drs. Miloro and Edwards.  (Ex. C KG00688-92; Ex. A ¶¶45, 46; Ex. H 89:13–90:4; Ex. K 58:12–14, 58:21–59:13; 59:1920; 61:3–5.)  This was his fourth surgery to repair his TMJ.  (Ex. A ¶5; Ex. B 24:1-2; Ex. D 73:14–18.)

58.    Dr. Miloro told Mr. King that he was going to take care of him, which lead Mr. King to believe that he was going to be pain-free after the surgery.  (Ex. H 93:11-14.)

**MR. KING'S POST-SURGERY TREATMENT AT STATEVILLE**

59.    Mr. King was sent back to Stateville from UIC on March 20, 2008 and Dr. Edwards sent instructions to Defendants Dr. Ghosh, Dr. Mitchell-Lawshea, and Dr. Fattore-Bruno for mandatory post-operative treatment, including physical therapy and the use of a particular medical device called a "TheraBite" device. (Ex. A ¶47; Ex. L 113:9–114:8; Ex. H 97:20–98:2; Ex. I 134:12–15; Ex. E 268:13–21.)   Specifically, Dr. Edwards instructed the Stateville Defendants to provide Mr. King immediate access to the "TheraBite" device, to provide warm compresses to both of his jaw joints five to six times per day, and to provide physical therapy focusing on right and left TMJ three times a week. (*Id.*; Ex. N 92:17–18, 92:24–93:15, 96:23–97:16; Ex. I 128:16–129:8, 134:12–22.)  This treatment was critical to ensure the success of the replacement procedure, Dr. Edwards also requested that the Stateville medical staff contact him if there were questions on what type of physical therapy was required for him. (Ex. C KG000753; Ex. I 137:21–138:6, Ex. E 260:2–9.)  Dr. Edwards' mandatory post-operative treatment plan was ignored by the Stateville dental and medical staff and he was not provided

with the required physical therapy or the "TheraBite" device. (Ex. A ¶47.) The "Medical Special Services Referral and Reports" indicate that Dr. Edwards's orders were conveyed directly to the Stateville medical and dental staff. (Ex. C KG000139-40, KG000142-44, KG000150, KG000753, KG000755; (specialist orders reviewed and signed by Defendant Dr. Ghosh.)) However, Mr. King did not receive this prescribed, mandatory care. (Ex. M 90:17–18, 91:1–6.)

60. From March 20, 2008 to March 25, 2008, Mr. King did not receive the necessary postoperative treatment prescribed by Dr. Edwards. (Ex. A ¶48.) Dr. Fattore-Bruno was responsible but did not provide the prescribed physical therapy until she left the Stateville facility and handed it off to Defendant Mitchell who also failed to provide the prescribed therapy. (*Id.* Ex. M 15:1–22, 18:12–19:24, 20:24–21:3.)

61. When Mr. King returned to UIC for a follow-up visit on March 25, 2008, Dr. Edwards was surprised to learn that he had not received any physical therapy or the "TheraBite" device. (Ex. A ¶49.) On or around March 25, 2008, Dr. Edwards again informed Stateville's medical staff of the required post-operative care necessary to ensure a successful outcome for the surgery. (Ex. E 270:18–271:1, 272:2–10; Ex. C KG000065, KG000138, KG001573.) Mr. King did not receive the prescribed treatment. (Ex. A ¶50; Ex. M 57:6–15.)

62. The March 28, 2008 chart says that Defendant Dr. Fattore-Bruno provided tongue blades, but there is no indication on the chart of what, if any instruction was given. (Ex. C KG000159–60.)

63. Mr. King saw Dr. Edwards again for follow-up care on or around April 1, 2008. Dr. Edwards again prescribed mandatory physical therapy and use of the "TheraBite" device and sent his instructions to Defendants Dr. Ghosh, Dr. Fattore-Bruno, and Dr. Mitchell. (Ex. C

KG000139; Ex. A ¶50; Ex. L 113:9–22.)  Nonetheless, as before, Stateville's medical and dental staff failed to provide him with either the device or the physical therapy.  (Ex. A ¶51.)

64.     Defendant Dr. Fattore-Bruno was aware of the precise instructions from the attending surgeon, Dr. Edwards, and ignored those instructions. (Ex. M 91:1–6.)   Furthermore, she admitted that she knew that Mr. King only had between six months and a year after his surgery to keep his collagen from closing down his jaw.  (Ex. M 22:5–20.)

65.     On April 24, 2008, acting on behalf of the Grievance Office, the director of nursing of Stateville, Mary Purvin, responded to his January 15, 2008 grievance related to Stateville's medical staff's failure to provide him with pain medication and his jaw locking shut. (Ex. C KG001745; Ex. A ¶52.)  Ms.  Purvin falsely stated that Mr. King was receiving weekly treatment by Defendant Dr. Fattore-Bruno and that physical therapy had been ordered for him. In actuality, he had not been seen by Dr. Fattore-Bruno for months prior to his surgery he only saw Dr. Fattore-Bruno twice after his surgery.  (Ex. A ¶52.)

66.     Instead of providing the TheraBite expressly prescribed by Dr. Edwards, Defendant Bruno substituted tongue-blades.   Mr. King could only increase the amount the tongue blades stretched his jaw by adding more tongue blades, but he was only allowed to get more blades from Dr. Fattore-Bruno.  (Ex. M 65:17-19, 65:21-66:5.)  Dr. Binderman testified that using tongue blades (depressors) instead of a TheraBite was deviation from the standard of care. (Ex. I 145:5-10; Ex. D at 14.)  Tongue depressors were used in the past for TMJ exercises, but their effectiveness is limited because they only passively stretch the jaw and do not more naturally exercise the muscles of the jaw in a more functional manner as is done with the TheraBite, therefore tongue depressors would not be a controlled, adequate, or effective aid to post-surgical join replacement therapy in the 2008 time frame.  (Ex. D at 14.)  The tongue blades

121

were not prescribed by the oral surgeons, and as Defendants' expert Dr. Panomitros explained

during his deposition:

> Q: How do you treat patients coming back from total jaw replacement?
>
> A. I would get instruction from the surgeon who performed the surgery.
>
> Q. What does that instruction usually involve?
>
> A. I don't recall offhand, but, generally, they - they - they will give you a – a prescription of what they want managed and how they want it managed. But it's the surgeon who performed the surgery who knows exactly what he did and what was the reason he did it and if he had any complications, issues, with the surgery. And so we follow the surgeon's orders. And to do otherwise I think is not practicing good medicine. That's my personal opinion.
>
> Q. Does your personal opinion differ from the opinion that you've provided in this case?
>
> * * *
>
> A. Based on what I've seen, I would not calling the—the surgeon who performed the surgery to the TMJ and say that I'm going to do a treatment without consulting him, So I would not challenge it. Unless he gave me explicit authority to do so. I don't think it's in the best interest of the patent to do so.

(Ex. J 69:22-71:1.)

     67.    On May 13, 2008, Mr. King filed a grievance because of the medical and dental

staff's refusal to provide the prescribed physical therapy and the "TheraBite" device. (Ex. C

KG001658–59; Ex. M 93:23–94:5, Ex. A ¶53.) On May 14, 2008, Mr. King could only open his

mouth 13 mm, which was less than the 19 mm that he could open his mouth on April 18, 2008.

(Ex. E 254:8–16, Ex. N 85:22–24; Ex. M 74:12–13; Ex. A ¶54.) On May 15, 2008, Warden

McCann deemed the May 13, 2008 grievance an emergency grievance. In response to his

grievance, Mr. King was given tongue depressors for therapy. (Ex. C KG001753; Ex. A ¶55.)

However, he was not given access to a physical therapist and did not receive the "TheraBite"

device or the physical therapy prescribed by Dr. Edwards. (Ex. A ¶55.)

68.     Dr. Miloro himself stated that "using a 'TheraBite' appliance . . . is medically necessary for [Mr. King]." (Ex. N; Ex. A ¶47; Ex. H 117:9-13.)

69.     Shortly thereafter, Mr. King was seen by Defendant Dr. Garg at the Stateville dental clinic.  He explained that he was suffering from severe pain in both his right and left TMJ areas and that he had been unable to open his mouth after surgery.  He also inquired about the prescribed physical therapy and "TheraBite" device.  Dr. Garg responded that physical therapy was unnecessary despite the fact that she was not a TMJ specialist.  (Ex. A ¶56.)

70.     On June 11, 2008, Mr. King visited the Stateville dental clinic and reminded the staff that he needed to go to UIC for a follow-up visit and to pick up the "TheraBite" device to help his jaw heal.  (Ex. M 78:8–17, 79:12–14; Ex. C KG000159.)  He also reminded the staff that Dr. Edwards requested physical therapy for his Jaw.  (*Id.*; Ex. A ¶57.)

71.     On June 19, 2008, Mr. King approached Assistant Warden Melvin Reed and Major Wright regarding the TMJ surgery he had recently undergone and the medical/dental staffs' denial of the prescribed post-operative care.  Despite Assistant Warden Reed's assurances that he would "look into it," the medical staff continued to deny him the prescribed postoperative care.  (Ex. A ¶58.)

72.     Mr. King was taken to the Stateville medical unit on June 19, 2008 and seen by Defendant Dr. Ghosh regarding his TMJ condition.  (Ex. C KG00166–67; Ex. A ¶59.)  Dr. Ghosh examined him and noticed swelling of his right TMJ area where he had surgery and that he could barely open his mouth.  When Dr. Ghosh asked him what treatment the dental staff was providing, he informed him that he was not receiving treatment of any kind.  Dr. Ghosh then asked Defendants Drs. Mitchell-Lawshea and Saffold why he was not receiving the post-operative treatment prescribed by Dr. Edwards.  Without even examining him, Dr. Saffold

replied that he did not need physical therapy because it would not help and that no treatment existed for TMD—despite Dr. Edward's post-operative instructions to the contrary. (Ex. A ¶59.)

73.     On July 9, 2008, Mr. King was again sent to UIC for follow up care. He was seen by Dr. Thomas Rogers, an oral surgeon at UIC familiar with his case. (Ex. C KG000140; Ex. A ¶60.) Dr. Rogers ordered physical therapy three times a week and the daily use of heat packs. (*Id.*) Dr. Rogers also requested that a "TheraBite" device be ordered for him. (*Id.*) Stateville's medical and dental staff completely ignored Dr. Rogers's orders. (Ex. A ¶60.)

74.     Throughout the month of August of 2008, Mr. King repeatedly attempted to gain access to heat packs, physical therapy, and the "TheraBite" device by sending request slips through medical staff to Defendants Drs. Mitchell-Lawshea and Dr. Ghosh. (Ex. C KG001757, KG002678; Ex. A ¶61.) When he inquired as to the status of his requests, the medical staff informed him that Dr. Mitchell was still upset about a lawsuit that he had instigated against her at Pontiac Correctional Center, and that she would address his requests, "when she does." (Ex. A ¶61.)

75.     On September 9, 2008, Mr. King was seen by Dr. Edwards for another follow-up care visit. (Ex. C KG000755; Ex. A ¶62.) When he explained that he had yet to receive either the prescribed physical therapy or the "TheraBite" device, Dr. Edwards was frustrated and stated that he would personally order the "TheraBite" device in view of Stateville Medical Center's refusal to order the device for him. (*Id.*) Six months had passed since his TMJ surgery and he had yet to receive any of the prescribed physical therapy or the "TheraBite" device. (*Id.*) At this point, Mr. King weighed 194 lbs. (Ex. A ¶62.) In Dr. Edwards assessment of Mr. King, he stated that Mr. King's right "posterior dental [has an] open bite <u>due to lack of physical therapy</u>" and again ordered physical therapy with daily jaw exercises. (*Id.*)

76.     On September 23, 2008, Mr. King finally received the TheraBite device from Dr. Edwards during a follow-up visit.  (Ex. C KG000142; Ex. A ¶63.)

77.     On September 29, 2008, Mr. King's jaw locked shut, rendering the TheraBite useless.  (Ex. A ¶64-65; Ex. H 112:22–113:9.)

78.     On September 29, 2008, Mr. King sent a request slip to Dr. Mitchell explaining that his jaw was locking shut and that he was in severe pain.  Despite his requests to see Dr. Mitchell, he was not seen by a dentist and was instead given a muscle relaxer in an attempt to unlock his jaw. (Ex. C KG000083.)  The following day, he was taken to health care unit at Stateville by a medical assistant, but none of the dentists would agree to see him.  Instead, Dr. Zang, a non-dentist saw him in the emergency room.  Dr. Zang stated she didn't treat TMJ because it is a dental Issue.  Dr. Zang gave him an injection for pain and sent him to his cell. (Ex. A ¶64.)

79.     On October 3, 2008, Mr. King's jaw locked shut and he was seen by Defendant Dr. Garg.  Mr. King reminded her that the dental records indicate physical therapy is required and Dr. Edwards's phone number was listed if they did not know what kind of therapy to provide him with.  Dr. Garg returned him to his cell without treatment or a physical therapy order.  (Ex. A ¶65.)

80.     On October 6, 2008, Mr. King informed Assistant Warden Mark Hosey that he was in incredible pain and that the medical and dental staff had refused to provide him with the prescribed physical therapy.  (Ex. A ¶66.)  In response to Assistant Warden Hosey's inquiries, Mr. King was finally seen by a general physical therapist on October 8, 2008—over six months after his joint replacement surgery, perhaps in response to a letter from Defendant Dr. Miloro ordering specialized TMD related physical therapy. (Ex. A ¶67; Ex. N.)  The therapist admitted

not having any specialized training or knowledge, that he did not know what kind of therapy to provide, and during the physical therapy sessions simply measured Mr. King's ability to open his mouth using tongue blades and provided him with heat packs. (Ex. H 115:10–16, 116:9–117:1.) The UIC dental department was never contacted to determine what type of physical therapy to provide to him. (Ex. A ¶67.)

81.    Throughout the month of October of 2008, Mr. King sent multiple request slips to Defendants Drs. Mitchell-Lawshea and Saffold informing them that his jaw was locking shut but the requests went unanswered. (Ex. A ¶68.)

82.    Mr. King's range of motion steadily decreased from the successful completion of his surgery in March 2008 until October 2008, at which point his jaw locked shut. (Ex. A ¶ 47–56; Ex. L 113:9-22.)

83.    On October 23, 2008, Mr. King was sent to UIC for a follow-up visit with a new oral surgeon because Dr. Edwards had left the clinic. (Ex. C KG000089, KG000143.) The new surgeon prescribed muscle relaxers and Vicodin for pain and explicitly ordered that Mr. King should not be given ibuprofen due to his ulcers. (Ex. A ¶69.) On October 28, 2008, Mr. King was seen by Defendant Dr. Ghosh, who informed him that the only pain medication he would prescribe was ibuprofen, despite his knowledge of his ulcers and the oral surgeon's notes to the contrary. (Ex. A ¶70.)

84.    Throughout the month of November, 2008, Mr. King submitted multiple request slips to be seen by Defendants Drs. Garg, Mitchell-Lawshea, Saffold, and Ghosh and for the prescribed muscle relaxers and Vicodin. He never received Vicodin during this period. (*See* Ex. C KG000143; Ex. A ¶71.)

85.     On December 30, 2008, Mr. King submitted a grievance again detailing the intense pain he was experiencing and the failure of Stateville's medical and dental staff to provide him with the prescribed treatment.  (Ex. C KG001764-65; Ex. A ¶72.)

86.     On January 6, 2009, Mr. King was again seen by Dr. Craig in the Stateville dental clinic.  (Ex. C KG001663–64.)  He explained his condition and the events that had occurred since his last visit to Stateville, including the joint replacement surgery and the complete denial of the prescribed postoperative care by the Stateville medical and dental staff. (*Id.*) Dr. Craig recommended that he be seen by UIC for a follow-up visit.  (*Id.*; Ex. A ¶73.)

87.     On January 31, 2009, the Grievance Office determined that the grievance was being addressed by Dr. Craig's instructions, and noted that the recommended follow-up visit to UIC needed to be scheduled. (Ex. C KG001663.)  In the following month, the Stateville medical and dental staff failed to schedule this follow-up visit.  Mr. King subsequently filed the original complaint for this action on February 24, 2009.  (Ex. A ¶74.  Additional complaints as exhibit.)

## MR. KING'S TREATMENT AT STATEVILLE AFTER FILING OF COMPLAINT

88.     After the filing of the original complaint, both Mr. King's condition and his treatment by the Stateville medical and dental staff significantly deteriorated.  Despite repeated attempts to seek treatment from the medical and dental staff named as defendants in this action, Defendants Drs. Ghosh, Mitchell-Lawshea, Fattore-Bruno, Saffold and Garg have refused provide adequate treatment.  (Ex. A ¶75.)

89.     On February 26, 2009, Mr. King informed Assistant Warden of Operations Marvin Reed that his jaw was locking shut and that he was in extreme pain to the point of crying.

(Ex. C KG000103.)  The right side of his face was also visibly swollen.  He was escorted to health care, but Defendant Dr. Ghosh refused to see him.  (Ex. A ¶76.)

90.     On March 20, 2009, Mr. King was sent to the emergency room after the dental clinic refused treatment.  (Ex. C KG000106-07.)  Nurse Practitioner Williams treated him while at the emergency room with a 30 mg injection of Toradol.  (Ex. K 116:1–5.)  The Toradol was effective in reducing his pain and within four hours of the injection and his jaw began to unlock.  His jaw remained unlocked until the medication wore off.  (Ex. A ¶78.)

91.     Mr. King was unable to eat solid foods from his treatment of March 20, 2009 until at least 2010.  For a period of time, Stateville was apparently without a working blender and therefore could not provide him with a liquid or pureed diet.  (Ex. C KG002054–55.)  He was forced to live off of a diet consisting only of milk.  Mr. King has made repeated requests to see Defendants Drs. Ghosh, Garg, Mitchell-Lawshea, Fattore-Bruno, and Saffold in an effort to provide him with special nutritional drinks, such as "Ensure" and "Boost", to supplement his milk diet.  Each request for treatment has been met with denial and Mr. King has only been supplied with nutritional drinks sporadically.  Even when Mr. King has been supplied with nutritional drinks, they are typically beyond their expiration date.  (Ex. A ¶79.)

92.     Around April of 2009, the UIC dentists also informed him that his condition is being exacerbated by problems with his facial muscles, and that he need to see Dr. Klosser, a facial muscle specialist at UIC.  (Ex. C KG00145.)  The UIC dentists then informed him that they would provide Stateville's medical staff with their recommendations, as well as prescriptions for pain medication, muscle relaxers, and a liquid diet.  (Ex. A ¶80.)

93.     Stateville's medical and dental staff refused to provide him with the prescribed medications and only randomly supplied him with limited supplies of nutritional drinks. (Ex. C

KG002054-55.)  As a result of this denial of sufficient nutrition, his weight has dropped to 170 lbs., down from 194 lbs. in September of 2008 - a loss of 24 lbs.  (Ex. A ¶81; Ex. H 105:18–106:8.)

94.     Mr. King subsequently filed multiple grievances requesting to see Dr. Klosser and seeking the necessary pain medication and liquid diet he requires, to no avail.  (Ex. C KG001673–74, KG001678–79, KG001695–98, KG001699–1700, KG001701, KG001829–30; Ex. A ¶82.)  Mr. King also filed a number of request slips to the Stateville dental center to address his on-going pain related to his TMD.  (*See* Ex. C KG001831.)  Drs. Ghosh and Mitchell have refused to see him, and to the extent Mr. King has seen Drs. Ghosh and Mitchell, they have not provided him with adequate treatment or care to alleviate his TMD related pain and suffering.  (Ex. A ¶83.)  In a grievance dated April 17, 2009, Mr. King complained of not seeing a specialist as prescribed by the UIC surgeons and that he was in extreme pain and unable to eat.  (Ex. C KG001673–74.)  Mr. King also complained that the Stateville dental staff ignored the methods of treatment explicitly ordered by the UIC surgeons.  (Ex. C KG00678–79.)  In a letter to Plaintiff's counsel dated August 18, 2009, Mr. King noted that he was unable to eat solid foods and had yet to be seen by a physical therapist specializing in TMD.  [Make An Exhibit.]  A UIC medical report dated August 31, 2009, confirmed that Mr. King experienced difficulty chewing/swallowing and noted an "unintentional weight change of 10 lbs. or more in the last 6 months."  (Ex. C KG000874–75.)

95.     On September 9, 2008 Mr. King filed a grievance complaining of his jaw locking shut again and Defendant Dr. Mitchell-Lawshea's failure to address his condition.  (Ex. K 112:12–22; Ex. C KG001838–39.)  The grievance counselor reported that he spoke with the dental department and that they were aware of his issues and that he would be seen soon.  (Ex. A

¶84.)   On March 20, 2009, Mr. King was finally seen by Defendant Dr. Garg after repeated requests for treatment.   At this point, his jaw was essentially locked shut, and he could only speak through clenched teeth.   Mr. King informed Dr. Garg that he was in intense physical pain and that even the simple act of speaking was extremely painful.   During the visit, Dr. Garg refused to physically examine him, and simply asked him questions.   (Ex. A ¶77.)

96.     Since the filing of Mr. King's First Amended Complaint, the Stateville Medical and Dental Staff, including Defendants Drs. Ghosh, Mitchell-Lawshea, Fattore-Bruno, Saffold, Garg, and Nurse Sha'riece have continued to deny him access to the necessary physical therapy prescribed by his specialists at UIC.   They have also failed to provide him with consistent access to a liquid and/or soft diet as also prescribed by his specialists.   This persistent and systematic denial of adequate and medically necessary care has, in the opinion of the doctors at UIC, caused his condition to continue to deteriorate, and has now caused his left jaw joint to swell and deteriorate.   Mr. King remains in persistent, excruciating pain and his jaw regularly swells and intermittently locks, preventing him from eating and speaking without intense physical pain. (Ex. A ¶88; Ex. H 12:11–19.)

97.     On March 22 2010–well after Mr. King's severe deterioration due to lack of proper post-operative care following his successful jaw replacement surgery–Dr. Miloro himself said that Mr. King "would benefit from treatment by a physical therapist, warm compresses, jaw exercises, and using a "TheraBite appliance," and that he "believe[d] this treatment is medically necessary for [Mr. King]."   (Ex. N; Ex. H 117:9–13.)

98.     For the past three years, and still after considerable delay in each instance, Mr. King has been sent to UIC to meet with various specialists, including a facial muscle specialist, a neurologist, and oral surgeons at UIC medical center in an attempt to address his TMD, as well

as additional complications that have arisen regarding his facial and jaw muscles. In a recent visit with his neurologist, Dr. Rhee, she informed him that the neurological issues affecting his facial and jaw muscles are most likely caused by his ongoing and unresolved TMD. (Ex. A. ¶89.)

99.    Mr. King has never complained about not receiving further surgery, only that there was a substantial delay in scheduling his surgery that caused further medical harm. (Ex. A ¶40; Ex. H 124:10–125:6.)

100.    Perhaps in response to the orders of his oral surgeon at UIC, Defendant Dr. Miloro, to provide him with specialized TMD related physical therapy, Mr. King began to be seen by a general physical therapist at Stateville. By his own admission, this physical therapist does not have any specialized training or knowledge related to the treatment of TMD, and is incapable of providing him with the type of specialized TMD therapy ordered by Dr. Miloro. Instead, during each visit, the therapist simply applies a heat pack to his jaw and returns him to his cell. (Ex. A ¶90).

March 22, 2013                                      Respectfully Submitted,

                                            By:____/s/  *Meredith Martin Addy*____
                                                   Meredith Martin Addy
                                                   Robert G Pluta
                                                   Steptoe & Johnson LLP
                                                   115 South LaSalle Street
                                                   Suite 3100
                                                   Chicago, IL  60603
                                                   Telephone: (312) 577-1300
                                                   Facsimile: (312) 577-1370
                                                   tpasternak@steptoe.com

                                                   *Attorneys for Raymond E. King*

## <u>CERTIFICATE OF SERUICE</u>

I hereby certify that on March 22, 2013, I caused a copy of the foregoing PLAINTIFF RAYMOND E. KING'S LOCAL RULE 56.1 RESPONSE TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AND SUBMISSION OF ADDITION FACTS to be electronically filed with the Clerk of the Court using the ECF system that will send notification of such filing to attorneys of record.

By:    /s/ *Meredith Martin Addy*    
Meredith Martin Addy