IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAYMOND E. KING,                        )
                                        )
            Plaintiff,                  )        Case No. 09 C 1184
                                        )
v.                                      )        Magistrate Judge Sidney I. Schenkier
                                        )
CHAPMAN, et al.,                        )
                                        )
            Defendants.                 )

## MEMORANDUM OPINION AND ORDER[1]

On February 24, 2009, Raymond E. King brought this action under 42 U.S.C. § 1983

against certain medical and dental providers employed by or under contract to the prisons in

which he was incarcerated, alleging that they were deliberately indifferent to his serious medical

needs, in violation of the Eighth Amendment's prohibition on cruel and unusual punishments

(doc. # 1).[2] During the relevant time period, defendants Dr. Nathan Chapman, Dr. Parthasarathi

Ghosh, and Dr. Ladeane Fattore-Bruno were employed by Wexford Health Sources, Inc.

("Wexford") (collectively, the "Wexford Defendants"), and defendants Steven Newbold, D.D.S.,

Jacqueline Mitchell-Lawshea, D.D.S., Sangita Garg, D.D.S., and Jeffery Saffold, D.D.S., were

employed by the State of Illinois (collectively, the "State Defendants").[3] Mr. King alleges that

the defendants denied him adequate treatment for his temporomandibular joint ("TMJ") disorder

("TMD"), which involves the jaw, the jaw joint, and the surrounding facial muscles, while he

---

[1]On January 24, 2011, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the case was assigned to this Court for all proceedings, including the entry of final judgment (doc. # 137).

[2]Plaintiff has since amended his complaint twice. All further citations to plaintiff's complaint in this opinion will be to the latest iteration of his complaint, the Second Amended Complaint ("2d Am. Compl."), which he filed on April 29, 2010 (doc. # 88).

[3]Mr. King also named Robert Cuttano, Dr. Adrian Feinerman, and Nurse Sha'riece as defendants in this case, but never served them with process (doc. # 276: Parties' Joint Status Report). On October 28, 2013, Mr. King dismissed all claims asserted in this action against them (doc. # 293: Notice of Voluntary Dismissal).

was incarcerated at Menard Correctional Facility ("Menard") from August 2004 to September 2007, and while he was incarcerated at Stateville Correctional Facility ("Stateville") from September 2007 through the present (doc. # 88: 2d Am. Compl. at 1-4). Both the Wexford and State Defendants have moved for summary judgment on all of plaintiff's claims (doc. # 246: State Defs.' Mot. for Summ. J; doc. # 238: Wexford Defs.' Mot. for Summ. J.). For the reasons that follow, the Court grants in part and denies in part the State Defendants' motion (doc. # 246), and grants in part and denies in part the Wexford Defendants' motion (doc. # 238).

## I.

The legal standards governing motions for summary judgment are well-established. Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The party seeking summary judgment bears the burden of establishing that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The party moving for summary judgment has an initial burden of production to inform the court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (citing *Celotex*, 477 U.S. at 323). "Where the nonmovant bears the ultimate burden of persuasion on a particular issue, however, the requirements that Rule 56 imposes on the moving party are not onerous. . . . Rather, the movant's initial burden 'may be discharged by showing—

that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Modrowski*, 712 F.3d at 1168 (quoting *Celotex*, 477 U.S. at 325).

Upon such a showing, to withstand the motion for summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on the essential elements of its case. *Celotex*, 477 U.S. at 322. "The nonmovant need not depose her [or his] own witnesses or produce evidence in a form that would be admissible at trial, but she [or he] must 'go beyond the pleadings' (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence 'upon which a jury could properly proceed to find a verdict' in her favor." *Modrowski*, 712 F.3d at 1168-69 (quoting *Anderson*, 477 U.S. at 252; *Celotex*, 477 U.S. at 324).

In deciding a motion for summary judgment, courts may not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence. The courts must view all the evidence in the record in the light reasonably most favorable to the nonmoving parties." *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010). When a material fact or set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. *Coles v. City of Chicago*, 361 F. Supp. 2d 740, 741-42 (N.D. Ill. 2005).

## II.

We begin by setting forth the material undisputed facts established by the parties' submissions, made pursuant to Local Rule 56.1. "In determining what is disputed, we focus not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements." *Barkl v. Kaysun Corp.*, No. 10 C 2469, 2011 WL 4928996, at *1 n.2 (N.D. Ill. Oct. 13, 2011) (citing *Zitzka v. Vill. of Westmont*, 743 F. Supp. 2d 887, 899 n.2 (N.D.

Ill. 2010)). "We review only those facts whose substance would be admissible at trial under a form permitted by the Federal Rules of Evidence, although the form produced at summary judgment need not be admissible." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010).

In their reply briefs, both the State and the Wexford Defendants argue that plaintiff's Additional Statement of Facts ("PSAF") (doc. # 256) and response to defendants' statements of facts do not comport with Local Rule 56.1; specifically, they claim that most of the numbered additional facts and responses combine several discrete statements of facts (*Id.*) (doc. # 288: State Defs.' Reply at 1-2; doc. # 286: Wexford Defs.' Reply at 1-2). Local Rule 56.1 mandates "short numbered paragraphs" in the statement of additional facts and a "concise response" to defendant's statement of facts. Additionally, the State Defendants contend that plaintiff's responses to their statement of facts should be stricken because they are unresponsive and add new and unrelated facts (State Defs. Reply at 1-2).

We do not find that plaintiff's failure to follow Local Rule 56.1 warrants the ultimate sanction of striking his PSAF or his responses because defendants were not prejudiced by his failure to comply with the rules. *See, e.g., Modrowski*, 712 F.3d at 1169 (holding that the decision to enforce or relax the local rules is left to the district court's discretion provided that the rules are applied equally among the parties). The Court granted several extensions of time to defendants to respond to plaintiff's facts and response brief. Defendants used that extra time to respond to the PSAF sentence by sentence (*i.e.*, alleged fact by alleged fact), rather than simply paragraph by paragraph, allowing this Court to accurately gauge what matters are indeed disputed or admitted. In addition, we have reviewed plaintiff's responses to defendants' statements of fact and, while they are far from short and concise, the Court has been able to

4

decipher whether a genuine dispute or valid objection to a fact exists. When we cite as undisputed a statement of fact that a party has attempted to dispute, it reflects our determination that the evidence cited in the response does not show that the fact is in genuine dispute. *See Barkl*, 2011 WL 4928996, at *1; *Zitzka*, 743 F. Supp. 2d at 899 n.2.

The following facts are undisputed unless otherwise noted by the Court.

## A.

Plaintiff first injured his jaw in 1987, when he was struck in the face with a baseball bat while serving time at Pontiac Correctional Center ("Pontiac") (doc. # 283: State Defs.' Corrected L.R. 56.1 Stmt. of Facts ("State DSOF") at ¶ 13). While housed at Pontiac, plaintiff underwent his first two jaw surgeries at the University of Illinois-Chicago ("UIC") hospital, in 1989 and 1990 (*Id.* at ¶¶ 14-15). While on parole in 1992, he injured his jaw again in a car accident (*Id.* at ¶ 16). In December 1992, he had surgery that removed cartilage from his ear to repair the joint in his jaw (*Id.* at ¶ 17). After that third surgery, for many years Mr. King had no pain and full range of motion in his jaw (*Id.*, Ex. B: King Dep. at 42-43).

In June 2004, Mr. King injured his jaw again when his head was slammed into a table while he was on trial for the offense for which he is now incarcerated (State DSOF at ¶ 18). Mr. King was taken to the hospital and x-rayed, then sent back to court without receiving any pain medications (King Dep. at 43-45).

## B.

During the summer of 2004, Mr. King was convicted and sentenced. On August 19, 2004, he entered the Northern Reception Center ("NRC") to be processed before being sent to Menard to begin serving his sentence (doc. # 286: Wexford Reply, Ex. B: King Med. Docs.,

KG000292).[4]  He received a panoramic x-ray of his head ("Panorex") and a dental exam (Id., KG000152). Mr. King's intake form noted that he had TMJ surgery three times in the past, but it did not note any current urgent medical or dental problems (Id., KG000292-KG000293).

Mr. King arrived at Menard on August 24 or 25, 2004. Menard's dental office has a Panorex and equipment for taking individual x-rays of teeth or bite wings (doc. # 241: Wexford Defs.' L.R. 56.1 Stmt. of Facts ("Wexford DSOF"), Ex. D: Chapman Dep. at 13-14). In addition, the medical technician at Menard has access to larger x-ray equipment that could be used for lateral views of a patient's face (Id.). There was no radiologist on staff at Menard, but x-rays could be sent out to be read by a radiologist if needed (Id. at 19-20). Magnetic Resonance Image scans ("MRIs") and Computer Tomography ("CT") scans had to be ordered by a medical doctor, approved by the medical director of Menard, then approved by defendant Wexford, the prison's healthcare vendor (Id. at 22).

Upon Mr. King's intake at Menard, his chart and x-rays were reviewed, and his jaw was found negative for fracture (State DSOF at ¶ 29; KG000152). On August 26, 2004, Dr. Newbold, a part-time dentist at Menard, examined Mr. King for the first time, and Mr. King informed him that he had pain and swelling in his right TMJ (PSAF at ¶¶ 8-9). Mr. King also notified the dental department that his acrylic dental mouth piece (also, "night guard" or "mouth guard") was broken (Id. at ¶ 12).[5] On September 8, 2004, Dr. Newbold saw Mr. King again after

---

[4]The parties have each attached a non-chronological and sometimes overlapping array of Mr. King's medical and dental records and related documents extending from 2004 through 2011, and there are numerous unexplained gaps in the Bates numbers used. These documents are attached in the (1) Wexford Reply, Exhibit B; (2) State DSOF, Exhibits K, L, M, N, O, P, Q, R, and S; and (3) PSAF, Exhibit C. Each of these documents has a Bates number, "KG000XXX." For the sake of clarity, hereinafter, we refer to these documents by their Bates numbers, rather than exhibit number.

[5]In citing this statement as undisputed fact for purposes of summary judgment, we are mindful that the Wexford Defendants dispute the assertion (doc. # 285: Wexford Defs.' Resp. to PSAF at ¶ 12). However, the State Defendants, which include Dr. Newbold, admit this assertion (doc. # 287: State Defs.' Resp. to PSAF at ¶ 12). We further note that this assertion is supported by plaintiff's testimony, although we find no medical records that reflect

6

Mr. King submitted a medical request complaining of pain in his right jaw (*Id.* at ¶¶ 13-14). Dr. Newbold noted slight swelling and tenderness in the TMJ area and deviation in Mr. King's jaw upon closing, but Dr. Newbold found no joint noises and normal range of motion, and the area appeared solid and stable (State DSOF, Ex. D: Newbold Dep. at 10). Dr. Newbold reviewed the Panorex of Mr. King's jaw and spotted a possible hairline fracture (*Id.*). He ordered a new Panorex to be taken and reviewed by a radiologist (*Id.* at 11). In addition, during the September 8, 2004 visit, Dr. Newbold ordered a new mouth guard for Mr. King.[6] However, as we will see below, Dr. Newbold did not take the impression for it until March 2005 (PSAF at ¶ 14).

A new Panorex of plaintiff's jaw was taken the next day, September 9, 2004 (Newbold Dep. at 13). The radiologist did not see definite evidence of fracture, but noted that the images were suboptimal and recommended oblique projections of the area (*Id.* at 15-16; PSAF at ¶ 15). Dr. Newbold ordered the additional view of the area in question on September 30, 2004 (Newbold Dep. at 12-13). The radiology report from those x-rays was negative, but the radiologist requested another lateral view (State DSOF at ¶ 29). The radiology report from the second lateral view, on October 8, 2004, confirmed no fracture and showed possible slight narrowing of joint space on the right jaw (*Id.*; Newbold Dep. at 20-23).

On November 19, 2004, Dr. Newbold saw Mr. King for his complaints of chronic TMJ pain (KG000319). The next medical note, on December 27, 2004, states that there had been no scheduling of follow-up for Mr. King's TMJ problems (KG000322). On January 25, 2005, Mr.

---

that Dr. Newbold was told of Mr. King's complaint about a mouth guard at this visit. At trial, this point will be a matter for the jury.

[6]We are again mindful that the Wexford Defendants dispute this assertion, which we cite as undisputed for purposes of summary judgment because the State Defendants, which include Dr. Newbold, admit it (*see* Wexford Defs.' Resp. to PSAF at ¶ 14; State Defs.' Resp. to PSAF at ¶ 14). Moreover, while this assertion is supported by plaintiff's testimony, we find no medical records that reflect that Dr. Newbold was told of Mr. King's complaint about a mouth guard during the September 2004 visit or that Dr. Newbold "ordered" a new mouth guard at that time. At trial, Dr. Newbold's knowledge and actions on this point will be a matter for the jury.

King filed a grievance regarding intense pain and swelling in his jaw, and he complained that he had requested numerous times to see a doctor for his TMJ pain, but he had not seen a doctor since September 2004 (PSAF at ¶ 18; KG001588). On February 18, 2005, Dr. Newbold saw Mr. King, and Mr. King reported that his jaw had been popping and that he needed a new night guard (Newbold Dep. at 29-30; KG000152). Dr. Newbold prescribed Tylenol 3 for pain, and he set up an appointment for plaintiff to be fitted for a night guard or splint (State DSOF at ¶ 32).

Dr. Newbold took impressions to fit Mr. King for the upper acrylic splint or night guard on March 4, 2005, and Dr. Newbold provided him with the splint on April 1, 2005 (PSAF at ¶¶ 12, 14). On April 15, 2005, Dr. Newbold saw plaintiff for follow-up. He noted that the splint had good fit and occlusion (how the teeth come together when closing) and did not need adjusting (State DSOF at ¶ 35). On May 14, 2005, Mr. King told a member of Menard's medical staff: "I can't take Motrin. I have ulcers and it tears me up" (PSAF at ¶ 24; KG000339).[7]

Dr. Chapman first saw Mr. King in July 2005 (Wexford DSOF at ¶ 53). Dr. Chapman was the dental director of Menard; he supervised the Menard dental staff, saw patients on a daily basis, answered patient grievances, and attended quality control meetings (Chapman Dep. 6-7, 10). At the July appointment, Dr. Chapman adjusted Mr. King's night guard (Wexford DSOF at ¶ 56). On August 3, 2005, Mr. King reported to Dr. Chapman that his jaw was popping and hurting badly, and Dr. Chapman prescribed Motrin (*Id.* at ¶ 57; State DSOF at ¶ 40). Dr. Chapman also referred Mr. King to Menard's on-site oral surgeon, Dr. Craig; Dr. Craig was contracted to come to Menard one day each month if he was needed (Wexford DSOF at ¶¶ 58-59; Chapman Dep. at 80). To schedule the appointment, Dr. Chapman first had to send a referral to Wexford's utilization department for approval (Chapman Dep. at 80). Dr. Chapman testified

---

[7]Mr. King at times states that he has stomach "ulcers," but there is no medical diagnosis in the record stating that he suffers from that condition.

that he has the training to determine if there is a possible TMJ dysfunction based on a patient's pain, range of motion, and ability to chew, but he was not a TMJ specialist who could make a specific diagnosis (*Id.* at 35, 40, 42). On September 9, 2005, Dr. Craig evaluated Mr. King and recommended that he be sent to an ear, nose, and throat specialist ("ENT") for evaluation (State DSOF at ¶ 41); however, that evaluation never took place.

During a visit on October 31, 2005, Dr. Chapman observed normal range of motion and occlusion in Mr. King's jaw (KG000153). Mr. King, however, reported that his TMJ was deteriorating and his pain had increased almost to the level of pain from before his 1992 surgery, despite wearing his night guard regularly (*Id.*). Dr. Chapman prepared a request for consultation with Dr. Feinerman, the medical director at Menard, for approval of a possible referral of Mr. King to an ENT to evaluate his ear and joint areas because of Dr. Craig's recommendation, Mr. King's continued complaints of severe pain, and the limitations of what Menard could do for him (*Id.*; PSAF at ¶ 26; KG000490). On February 17, 2006, a part-time dentist at Menard, Dr. Henderson, saw Mr. King for his jaw pain; Dr. Henderson noted that Dr. Feinerman should be consulted to review Mr. King's case and refer him to an outside specialist to evaluate Mr. King's TMJ (State DSOF at ¶ 43; Newbold Dep. at 59, 67).

Dr. Feinerman first saw Mr. King on February 22, 2006 (State DSOF at ¶ 43; KG000410). On April 4, 2006, Mr. King filed a grievance regarding the dental department's failure to refer him to a TMJ specialist (PSAF at ¶ 28), and Dr. Chapman next saw Mr. King on April 19, 2006 (State DSOF at ¶ 44; KG000154). Dr. Chapman noted that Mr. King had been referred to see a specialist, but the referral had to be approved by the medical director (Dr. Feinerman) (State DSOF at ¶ 44). Two months later, at Mr. King's bi-annual dental exam on June 16, 2006, Dr. Newbold noted no cavities or gum issues, but Mr. King complained of

unresolved pain in his TMJ (*Id.* at ¶ 45). There is no record of Dr. Feinerman approving a referral at any time in 2006, and Mr. King was not examined by a specialist that year.

The next medical note in the record is dated March 20, 2007. On that date, Dr. Chapman saw Mr. King after reviewing another of Mr. King's grievances, in which he wrote that his jaw was tight and caused him pain, and that despite wearing his night guard, he would wake up with blood in his mouth and a swollen face (State DSOF at ¶ 46; Chapman Dep. at 105). Dr. Chapman noted that there was a slight deviation to the right side of Mr. King's jaw, and Mr. King could not open his jaw all the way (Chapman Dep. at 105). Though Dr. Chapman heard no clicking or popping, the area was slightly swollen and very tender to palpitation (*Id.*). Dr. Chapman ordered Panorex and oblique x-rays and prescribed Motrin, and he noted that he would forward a referral for a CT scan of Mr. King's right TMJ to Dr. Feinerman for approval (*Id.*).

X-rays of five different views of Mr. King's jaw were taken on March 22, 2007 at Menard (State DSOF at ¶ 47). The radiology report stated that there was no fracture or dislocation, no bony erosion at the TMJ, and no evidence of forward translation of the mandibular condyles in the open mouth position (KG000514). On March 28, 2007, Dr. Feinerman approved Mr. King for a CT scan of his right TMJ area (State DSOF at ¶ 48). The CT scan on April 3, 2007, revealed multiple loose bodies (bony fragments) in the TMJ joint space and irregularity of the mandibular condyle (PSAF at ¶ 31; KG000517).

On April 10, 12, and 24, 2007, Dr. Chapman saw Mr. King for his complaints of pain, muscle spasms, swelling, and trouble eating (State DSOF at ¶ 49). Dr. Chapman prescribed an antibiotic, a steroid prednisone to reduce swelling, a muscle relaxer (Robaxin), and Motrin, and he ordered a soft diet for Mr. King (Chapman Dep. at 108; KG000155). Dr. Chapman also indicated that he would fill out paperwork to refer Mr. King to an oral surgeon (*Id.* at 111;

10

KG000155); and on April 24, 2007, Dr. Feinerman signed a medical furlough notification for Mr. King to visit the oral surgeon (KG000240). Dr. Newbold next saw Mr. King on April 26, 2007 (State DSOF at ¶ 50). He renewed Mr. King's prescription for Prednisone and Robaxin and noted that an oral surgeon consult had been ordered (*Id.*).

On May 1, 2007, plaintiff was seen by Dr. Jay Swanson, an oral surgeon (PSAF at ¶ 32). Dr. Swanson consulted with Dr. Chapman and ordered an MRI of plaintiff's bilateral TMJ to determine if the cartilage was loose or if the bone needed reconstruction (Chapman Dep. at 116; KG000435). On May 10, 2007, Dr. Newbold met with plaintiff and prescribed medication for his pain (State DSOF at ¶ 52).

On May 30, 2007, Dr. Chapman evaluated Mr. King again (State DSOF at ¶ 53). Mr. King reported that he had a lot of pain, and he could not take Motrin because it upset his stomach (*Id.*). Dr. Chapman observed that Mr. King's right jaw was very tender on palpitation (Chapman Dep. at 120). He gave Mr. King a prescription for Tylenol, recommended that he apply warm, wet compresses to his jaw, and approved Mr. King for an MRI (*Id.*).

On June 1, 2007, an MRI was taken of Mr. King's temporomandibular joint, and Dr. Chapman received the MRI report on July 2, 2007 (State DSOF at ¶¶ 53-54). The MRI showed bony fragments throughout the joint (Chapman Dep. at 121). Dr. Chapman noted that plaintiff was taking Motrin for his pain (*Id.* at 122). Mr. King's MRI results were sent to Dr. Swanson on July 10, 2007, and Dr. Swanson opined that it appeared that Mr. King would need joint reconstruction, which was a surgery that Dr. Swanson could not perform (*Id.* at 125).

On July 12, 2007, Dr. Chapman noted that Mr. King was doing extremely poorly (Chapman Dep. at 123). Mr. King came to the appointment in tears: he stated that Motrin did not help, his pain was spreading to his left side, his mouth guard caused him too much pain to

wear, and his muscles were tight and spasming (*Id.*; KG000441). Dr. Chapman spoke with Dr. Swanson, who recommended Mr. King be referred to UIC or Loyola for TMJ reconstruction surgery (KG000157). Dr. Chapman also spoke with Dr. Feinerman about Mr. King (Chapman Dep. at 124), and Dr. Feinerman approved transferring Mr. King to "University of Illinois" hospital for "continuing care of [his] TMJ dysfunction" (KG000443). On that date, July 12, 2007, Dr. Feinerman noted that Mr. King would be referred to an oral surgeon at the University of Illinois on September 26, 2007, for evaluation and management of his TMJ dysfunction (KG000126). Dr. Feinerman indicated that the matter was not urgent (*Id.*).

**C.**

On September 19, 2007, plaintiff was transferred from downstate Menard to Stateville Correctional Center ("Stateville") in Crest Hill, Illinois, so Mr. King could be treated by TMJ specialists at UIC (State DSOF at ¶ 57). On September 26, 2007, pursuant to an order from Dr. Ghosh, the Medical Director of Stateville, plaintiff was evaluated at UIC's oral surgery clinic (PSAF at ¶ 39; Ghosh Dep. at 44). Dr. Thomas Rogers from UIC noted that there were no surgeons at UIC qualified to perform TMJ reconstructive surgery (Wexford DSOF at ¶ 70), and he recommended that Stateville follow up with Dr. Mercuri, a TMJ specialist at Loyola (KG000270). Dr. Rogers further wrote that if Dr. Mercuri could not accommodate Mr. King, UIC may have faculty available to perform TMJ surgery in two to three months (*Id.*). As part of his evaluation, Dr. Rogers recommended that Mr. King take Tylenol 3 and Tramadol for pain (*Id.*). Mr. King was given Tylenol 3 at Stateville (Ghosh Dep. at 54).

No one from Stateville contacted Loyola for nearly three months. On October 18, 2007, Mr. King submitted a grievance requesting immediate surgery (PSAF at ¶ 42). The next day, he was sent to the emergency room at UIC because he was in severe pain and his jaw was locked

shut and swollen (*Id.* at ¶ 43; KG000590). The emergency room doctor reported that Mr. King had dislocated his TMJ earlier that day, when he "reduced it himself by hitting his own face" to attempt to unlock his jaw (State DSOF at ¶ 66; KG000582, KG000590). Mr. King was discharged the next day with a prescription for Vicodin, but with a notation that substitution was permissible (KG000271). The emergency room doctor also stated that Mr. King should receive an MRI that week (PSAF at ¶ 43; KG000127).

According to Dr. Ghosh, Mr. King had a "chronic," *i.e.*, long-term, as opposed to "acute" TMJ problem, and, thus, the MRI appointment had to be approved first by Wexford and Stateville (Ghosh Dep. at 59-62). Mr. King filed grievances on October 22, October 26, and November 7, 2007, complaining that he had not yet received an MRI or other necessary medical treatment (PSAF at ¶ 44). On November 8, 2007, Dr. Ghosh referred Mr. King to UIC for an MRI of his TMJ (KG000129).

On November 26, 2007, Mr. King's grievances were consolidated and deemed an emergency by the warden (KG002705). The next day, Mr. King was seen by Dr. Craig, who wrote out an urgent referral to the medical director due to Mr. King's extreme facial pain (PSAF at ¶ 46; KG000128; KG001570). Dr. Ghosh approved the referral, and he noted that Mr. King was to be evaluated in the oral surgery department of UIC (KG000128). On November 30, 2007, Mr. King submitted a formal complaint detailing his intense pain and lack of treatment, and he specifically requested a response from by Dr. Mitchell-Lawshea (PSAF at ¶ 47).

On December 6, 2007, Mr. King was admitted to the infirmary at Stateville because he could not open his mouth, and he was in severe pain (PSAF at ¶48). Dr. Fattore-Bruno, a general dentist at Stateville, prescribed Tylenol with Codeine and Robaxin (a muscle relaxant) for spasms and pain (Wexford DSOF at ¶ 95).

13

Mr. King had an MRI done at UIC on December 10, 2007 (PSAF at ¶ 49), some seven weeks after the UIC emergency room doctor had stated it should take place. The results showed "complete disruption" in his right TMJ joint and deformity and calcification, likely a result of joints and bones rubbing against each other due to loss of cartilage and restrictive range of motion (*Id.*). That month, Dr. Fattore-Bruno prescribed Mr. King more muscle relaxants and Tylenol 3, but this was ineffective to control his pain (PSAF at ¶ 51; KG000162).

On December 18, 2007, Dr. Ghosh referred Mr. King to Loyola University Medical Center to see Dr. Mercuri, a TMJ specialist, for an evaluation (KG000130). That same day, however, Dr. Ghosh noted that Dr. Mercuri at Loyola was not accepting new TMJ surgical patients (*Id.*; Wexford DSOF at ¶ 119).

At the end of December 2007, UIC hired Dr. Michael Miloro, one of a handful of doctors in the country who could perform the TMJ replacement surgery that Mr. King needed (Wexford DSOF at ¶¶ 69, 120). On January 3, 2008, Dr. Ghosh referred Mr. King to UIC's oral surgery department for a January 16, 2008 appointment (KG000132). On January 12, 2008, Mr. King was seen by medical personnel at Stateville crying and clenching his jaw from intense pain (PSAF at ¶ 53). On January 16, 2008, Mr. King was seen as an outpatient at UIC for surgical evaluation by Dr. Jason Edwards, a resident in oral surgery specializing in the treatment of TMD (*Id.* at ¶ 54). Dr. Edwards recommended further scans of the TMJ area and follow-up in one month (*Id.*; KG000132). Dr. Ghosh ordered the scans on January 17, 2008, to be completed on February 6, 2008 (KG000134). On January 29, 2008, after observing Mr. King in continued pain, Dr. Fattore-Bruno prescribed Tramadol and followed up with Dr. Ghosh, who told her that Mr. King was awaiting surgery (Wexford DSOF at ¶¶ 97-98).

Mr. King had CT scans done on February 6, 2008, and on February 14, 2008, Dr. Edwards saw Mr. King at UIC for surgical evaluation (PSAF at ¶ 54; KG000135). Dr. Edwards noted that Mr. King's mandibular condylar had a "grossly comminuted fracture with multiple fragments," and he stated that "surgical intervention is indicated ASAP" (State DSOF at ¶ 77; PSAF at ¶ 56; KG000135). Dr. Miloro did not agree with Dr. Edwards' assessment that surgery was urgent, because Mr. King had suffered from this chronic problem for years (Wexford DSOF, Ex. E: Miloro Dep. at 163-64).

**D.**

On March 14, 2008, Drs. Edwards and/or Miloro discussed the surgery with Mr. King (King Dep. at 90-91). Mr. King was admitted for surgery on March 16, 2008, and the surgery was performed on March 19, 2008 (PSAF at ¶ 57). Dr. Miloro was the attending surgeon; Drs. Edwards, Rogers, Quoc Nguyen, and Tarkan Sidal were the resident surgeons who performed the "highly complex" surgery (Miloro Dep. at 58; KG000688). The surgery successfully replaced Mr. King's complete right condylar joint; there were no surgical complications (PSAF at ¶ 57).

Mr. King was discharged from the hospital on March 20, 2008, with prescriptions for antibiotics, Vicodin, Ibuprofen, and Bacitracin (Miloro Dep. at 63, 66). The discharge instructions recommended that Mr. King rinse with Peridex (an antibiotic) twice daily and use a head wrap/fluff pressure dressing to keep his mouth closed until March 21, 2008 (KG000752). Dr. Miloro testified that the head wrap should have been used for a week (Miloro Dep. at 63, 67).

At Stateville, Mr. King initially received Tylenol 3 for the pain, but he testified that they gave him ibuprofen after 2 or 3 days (King Dep. at 102). Mr. King believed he was supposed to begin exercising his jaw two days post-surgery by opening his mouth with his fingers, but the nurse told him to put his head wrap back on and stop exercising (*Id.* at 95-98, 111-12).

On March 25, 2008, Mr. King returned to UIC for post-operative treatment (KG000753). Dr. Edwards found good mandibular range of motion and mild right-sided discrepancy in occlusion (*Id.*). He noted that jaw exercises/post-operative physical therapy was mandatory to ensure proper functional healing (*Id.*).[8]

On March 28, 2008, Dr. Fattore-Bruno provided Mr. King with thirteen tongue blades (which she estimated at 13 mm) to start physical therapy by stretching his jaw (PSAF at ¶ 62; KG000159). On April 2, 2008, Dr. Fattore-Bruno recorded that she had initially given him 15 tongue blades taped together, and on that day, she added another tongue blade, showing increased vertical dimension (KG000160, KG000158). Dr. Fattore-Bruno noted the importance of therapy to avoid fibrosing and overclosure of the oral opening, and she indicated that she would seek permission from Dr. Ghosh to allow Mr. King to have the tongue blades in his cell (KG000159, KG000158). She reported that Mr. King was still in pain and sensitive in the area of the surgery, and she would follow up with him next week to try to add another tongue blade (KG000160). On April 10, 2008, however, Dr. Fattore-Bruno did not add another tongue blade because Mr. King had pain when opening to 16 mm (KG000158). In response to Mr. King's complaint that he had not been back to UIC hospital for follow-up, Dr. Fattore-Bruno contacted Dr. Ghosh, who informed her that Mr. King had an appointment scheduled for April 17 (*Id.*).

On April 17, 2008, Dr. Edwards saw Mr. King and noted that he was "healing well" (KG000139; State DSOF at ¶ 85). Dr. Edwards also noted that the UIC oral surgery department would acquire a "TheraBite physical therapy device" to give to Mr. King at the next follow-up visit in one month (KG000139; State DSOF at ¶ 86; PSAF at ¶ 63).

---

[8] The Wexford Defendants, which include Drs. Fattore-Bruno and Ghosh, dispute plaintiff's assertion that Dr. Edwards recommended the TheraBite upon discharge from the hospital or at the March 25, 2008 follow-up visit (Wexford Defs.' Resp. to PSAF at ¶¶ 59-61); however, the State Defendants admit plaintiff's assertion (State Defs.' Resp. to PSAF at ¶¶ 59-61). The TheraBite was not mentioned in the March 20, 2008 discharge order or the March 25, 2008, post-operative recommendations (KG000752-753).

16

On April 18, 2008, Dr. Fattore-Bruno recorded that Mr. King could open his mouth to 19 mm, so she added two more tongue blades (KG000158). She noted that she instructed Mr. King to move the tongue blades up and down to stretch his TMJ, and that Mr. King had stated that the UIC doctors told him to do the same thing (*Id.*).

Dr. Fattore-Bruno's last entry on Mr. King before she left Stateville, dated May 14, 2008, recorded that Mr. King could only open his jaw 13 mm, so she removed 6 tongue blades (KG000159). Dr. Fattore-Bruno also contacted Dr. Ghosh to refer Mr. King back to UIC to address his continuing pain and problems with his TMJ (*Id.*).

In the first months after Dr. Fattore-Bruno left Stateville, dental notes indicate that Mr. King's treatment became more sporadic. Mr. King filed a grievance on May 13, 2008, stating that he had not yet received physical therapy or a TheraBite (PSAF at ¶ 67), and on June 5, 2008, a dental note indicates that he requested to be seen for jaw pain (KG000159). On June 11, 2008, Mr. King saw Dr. Garg, a dentist, regarding pain and swelling in his face, difficulty opening his mouth, and his request for a TheraBite (PSAF at ¶¶ 69-70). Dr. Garg's notes indicate that he confirmed with Dr. Ghosh that Mr. King was due for a follow-up appointment at UIC in July to pick up a device to help his jaw (State DSOF at ¶ 89; KG000159). For the next three months (July, August, September 2008), notes from the Stateville dental department indicate that Mr. King was only seen there once, on July 18, 2008, after Dr. Ghosh referred Mr. King to the dental clinic for TMJ issues (KG000159).

During this time, Dr. Ghosh approved a few referrals to UIC. On July 9, 2008, Dr. Rogers saw Mr. King at UIC for a follow-up appointment (PSAF at ¶ 73). He recommended a soft diet, ibuprofen, warm compresses, and physical therapy to exercise Mr. King's jaw (KG000140). Dr. Rogers also stated that Mr. King required a TheraBite appliance and that one

should be made available to him (PSAF at ¶ 73; KG000140). In an undated letter, Dr. Miloro agreed with these recommendations (PSAF: Ex. N).

On September 9, 2008, Dr. Edwards saw Mr. King for another follow-up visit (PSAF at ¶ 75; KG000141). Dr. Edwards noted that Mr. King had pain in his TMJ, but no sign of inflammation (KG000141). In addition, Mr. King had a right posterior dental open bite due to lack of physical therapy (*Id.*). Dr. Edwards recommended the TheraBite, ibuprofen, Amitriptyline for insomnia and pain, and physical therapy with daily jaw exercises, but a note from Stateville indicated that Mr. King would be given an alternative to Amitriptyline (*Id.*). That month, Mr. King filed several grievances complaining that he was receiving inadequate pain medication, diet, and other treatment for his TMJ problems (KG001693-94 (9/2/2009 grievance); KG001695-98 (9/12/2009 grievance); KG001701 (9/22/2009 grievance)).

On September 23, 2008, Mr. King received the TheraBite device from Drs. Edwards and Miloro, who assembled and demonstrated it for Mr. King (PSAF at ¶ 76; KG000142). Mr. King had an initial opening of 24 mm with 6 mm deviation to the right (State DSOF at ¶ 92; KG000142). Drs. Edwards and Miloro recommended exercises with the TheraBite four times daily, ibuprofen, and Amitriptyline at bed time for pain (KG000142). On September 29, 2008, however, Mr. King reported that the TheraBite was causing his jaw to lock, and he was given a muscle relaxant to unlock it (PSAF at ¶¶ 77-78). Mr. King again complained of locked jaw on October 3, 2008, and he demanded physical therapy for his jaw (PSAF at ¶ 79; State DSOF at ¶ 93). Dr. Garg noted that Mr. King was "very rude and d[id] not follow directions," and that Dr. Edwards should be called to find out what kind of physical therapy was needed (KG000164).

On October 6, 2008, Mr. King complained to the assistant warden of his pain and lack of prescribed physical therapy, and two days later, a physical therapist visited Mr. King (PSAF at ¶

80). This was the first therapy assistance Mr. King received at Stateville since Dr. Fattore-Bruno's departure in May 2008. The physical therapist who visited Mr. King was not a TMJ specialist; the therapist only provided him with heat packs and massaged his neck (*Id.*; King Dep. at 115-16). During a subsequent visit on October 18, 2008, the physical therapist offered Mr. King an analgesic in addition to muscle relaxants and Motrin, but Mr. King declined it (KG000088). Mr. King saw the physical therapist weekly until November 19, 2008, at which point the physical therapist noted that continued benefit from physical therapy was unlikely, as Mr. King continued to complain of the same or worse pain, despite the physical therapy (KG000085-88, KG000091-92, KG000095). The physical therapist referred Mr. King to Dr. Ghosh for further pain treatment (KG000092, KG000095), and in October and November 2008, Mr. King received various pain medications from Stateville (KG000087-90; KG000094).

On October 23, 2008, Mr. King saw another physician at UIC, Dr. Lukasavaya (State DSOF at ¶ 96; PSAF at ¶ 83), who found that Mr. King had TMJ pain consistent with myofascial pain disorder (KG000143). Dr. Lukasavaya recommended a soft diet, TheraBite, heat to the face, Tylenol and Vicodin for pain, and a muscle relaxant (*Id.*). Stateville's notes indicated that Vicodin would not be provided (*Id.*).

Mr. King continued to complain of pain, and on November 10, 2008, Drs. Rogers and Miloro saw plaintiff at UIC (State DSOF at ¶ 98). They noted that Mr. King had full range of motion and mild myofascial pain on the left side (KG000144). The doctors recommended daily exercise with the TheraBite, Lodine (an alternative to Motrin), Valium (diazepam) as a muscle relaxant, and warm compresses (*Id.*).

Between November 10, 2008, and April 14, 2009, Mr. King continued to be seen in the Stateville dental or medical infirmary for medication management, and he filed a grievance on

December 30, 2008, stating that his complaints of pain and locked jaw were not being adequately addressed (KG001764-65). During that time, he was prescribed diazepam, Robaxin (muscle relaxant), Clindamyicin (antibiotic), and Motrin (KG000094; KG000099; KG000101; KG000104; KG000165). Mr. King saw Dr. Craig on January 6, 2009; he recommended that Mr. King be scheduled for a follow-up at UIC (PSAF at ¶ 86; KG000165; KG001664; State DSOF at ¶ 103). Dr. Ghosh saw Mr. King for his complaints of pain on January 23, February 2, and March 2, 2009, and Dr. Ghosh ordered bite parts for the TheraBite (State DSOF at ¶¶ 104-06; KG000101-102; KG000104).

On March 20, 2009, plaintiff complained of a locked jaw to Dr. Garg, but Dr. Garg noted that plaintiff was very rude and upset, and he walked out of the examination and refused Robaxin (State DSOF at ¶ 107; KG000107; KG000165). Nevertheless, that day plaintiff received Ativan (anti-anxiety medication) and an injection of Toradol (severe pain medication), which helped unlock his jaw temporarily (PSAF at ¶ 90; KG000106). On April 8, 2009, Dr. Garg saw plaintiff on an emergency basis because he could not open his mouth, and in consultation with Dr. Ghosh, Dr. Garg treated Mr. King with muscle relaxants and pain medication (DSOF at ¶ 108). Dr. Garg again noted that Mr. King was rude and threatening (KG000165).

On April 14, 2009, Mr. King was seen by Dr. Lukasavaya at UIC, and she recommended referral to Dr. Gary Klasser, a specialist in oral/facial pain, and noted that Valium, Lodine, and a soft diet "must be given" (PSAF at ¶ 92; KG000145). From May to July 2009, Mr. King received Valium, Lodine, and soft or pureed meals (State DSOF at ¶ 111; KG000167; KG000110-11). Nevertheless, he continued to file grievances, blaming primarily Drs. Garg and Mitchell-Lawshea, stating that the pain medications were not adequately addressing his pain and locked jaw (or that he was not receiving refills of Lodine and Valium quickly enough) and that

20

he needed a referral to Dr. Klasser (*see, e.g.*, KG001678-79 (5/18/2009 grievance); KG001829-30 (5/28/2009 grievance); KG001832 (6/28/2009 grievance)). Mr. King saw Dr. Garg again on May 8 and May 22, 2009, and Dr. Garg consulted with Dr. Ghosh on Mr. King's complaints (KG000165; KG000167). Only Dr. Ghosh could offer Lodine (KG001833; KG000110).

Mr. King's jaw appeared to deteriorate further in the summer of 2009. Stateville dentists repeatedly noted that his problems were not a dental issue (KG000167), and in August 2009, Dr. Mitchell-Lawshea noted that she could not clean Mr. King's teeth because he could not open his mouth wide enough (KG002413). She referred Mr. King to Dr. Ghosh for pain medication (*Id.*), and in August 2009, Stateville doctors increased Mr. King's pain medication, trying Tramadol (an oral pain medication), Toradol, and Valium to get Mr. King's pain under control and relax his jaw to help with movement (Miloro Dep. 111-12, 114-16). Dr. Miloro thought these were "excellent options" for a patient like Mr. King, who had already tried muscle relaxants like Baclofen and Flexeril (*Id.* at 115, 125-26).

Nevertheless, by September 2009, Mr. King's severe pain and jaw locking continued, and he had lost weight (PSAF at ¶ 93). On September 10, 2009, Mr. King filed a grievance complaining that his jaw was locking open and he was in extreme pain (KG001838). In addition, he complained that Drs. Saffold and Ghosh knew little of his condition, so he demanded that Dr. Mitchell-Lawshea address his TMJ condition (KG001839). On September 11, 2009, Dr. Mitchell-Lawshea saw plaintiff and noted that he was scheduled to see Dr. Klasser (KG002415; State DSOF at ¶ 115). Dr. Mitchell-Lawshea also saw him on September 21, 2009 (KG002415), and the next day, Mr. King filed another grievance complaining that he needed to be referred to Dr. Klasser (KG001701). In October 2009, Stateville dentists again noted that Mr. King's pain was not a dental issue, and that he needed a referral for his TMJ problems (*see, e.g.*, KG002413).

In October or November 2009, Dr. Klasser observed that Mr. King had an opening of 25 mm, but Mr. King could not move his jaw to the side (Miloro Dep. at 118-19). He prescribed Neurontin or Gabapentin to help with Mr. King's chronic facial pain (*Id.*). For the remainder of 2009, Mr. King was seen by dentists at Stateville who continued to refer Mr. King to Dr. Ghosh because the dental department did not have the capability to treat him (*see* KG002413).

On January 14, 2010, Mr. King saw a neurosurgeon, Dr. Jeannie Rhee, to address his persistent facial pain (KG000910; State DSOF at ¶ 138). Dr. Rhee observed that Mr. King had not lost weight and appeared well-nourished (KG000910; KG000912). She stated that it was "possible" that Mr. King's extreme pain may stem from a nerve injury caused intraoperatively, or from subsequent scar tissue due to abnormal healing causing entrapment of the trigeminal (fifth cranial) nerve (KG000913). Dr. Rhee prescribed Gabapentin and recommended referral to a pain clinic to consider a nerve block (KG000914).

For the remainder of 2010, notes from Stateville dental indicated that Mr. King had continued pain and could barely open his mouth (*see, e.g.*, KG001973 (2/16/2010 dental note); KG001973 (5/20/2010 dental note); KG002416-17 (7/27/2010; 7/14/2010; 8/16/2010 dental notes)). On June 1, 2010, Mr. King filed a grievance complaining that he was suffering tremendous pain, and Dr. Saffold refused to see him (KG001705-06). Dr. Craig saw Mr. King on June 15, 2010, and also noted his continued pain (KG001973). On July 23, 2010, Dr. Garg saw Mr. King and noted his TMJ pain, limited jaw opening, and his rude and uncooperative behavior (KG002416). Dr. Garg followed up with Dr. Ghosh (*Id.*). Dr. Garg next saw Mr. King on October 8, 2010, for bleeding gums (KG001972).

It is unclear when Mr. King was first treated by Dr. Saffold. Though Mr. King complained about Dr. Saffold before, the first dental note from Dr. Saffold was September 16,

2010 (KG001972). Dr. Saffold agreed with the other dentists at Stateville that there was nothing more he could do to address Mr. King's pain, and he also spoke with Dr. Ghosh about possible referral to a TMJ specialist (*Id.*). Mr. King continued to see Dr. Saffold throughout the fall of 2010 for his complaints of pain, locked jaw, and bleeding gums, and Dr. Saffold continued to consult with Dr. Ghosh about Mr. King's problems, including recommending referral to a TMJ specialist and physical therapist and additional pain medication (State DSOF at ¶¶ 121-22).[9]

In 2011, Mr. King's jaw continued to lock up and cause him pain. He occasionally saw Drs. Saffold and Ghosh, who prescribed him at times with Valium to relax his jaw, and Celebrex or Lodine for pain (King Dep. at 119, 131). Dr. Ghosh also gave him Ativan injections when his jaw locked (Ghosh Dep. at 108-09). Mr. King no longer had tongue blades, just the TheraBite, despite his requests for tongue blades to prop his mouth open to make the TheraBite to fit (King Dep. at 112-13).

### III.

Defendants seek summary judgment, arguing that Mr. King has not established a genuine issue of material fact that they were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.[10] The Eighth Amendment's prohibition against cruel and unusual punishment, as incorporated by the Fourteenth Amendment, imposes a duty on states "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials violate

---

[9] The State Defendants attached some of Dr. Saffold's treatment notes on Mr. King to Exhibit K of the State DSOF, but after KG001972, the documents are not Bates-stamped. Some of these facts are derived from the un-stamped documents.

[10] The Eighth Amendment has been made applicable to state action by interpretation of the due process clause of the Fourteenth Amendment. *See Withers v. Wexford Health Sources, Inc.*, 710 F.3d 688, 688 (7th Cir. 2013). In a suit under Section 1983, a state contractor's employees are also deemed agents of the state. *Id.*

this mandate when they act with "deliberate indifference to the serious medical needs" of an inmate. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

To succeed on a deliberate indifference claim, a plaintiff must demonstrate that (1) his medical condition is "objectively, sufficiently serious," and (2) the defendant acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. None of the defendants dispute that Mr. King's TMJ disorder constituted an objectively serious medical condition for the purpose of their summary judgment motions. Therefore, the issue here is whether plaintiff has "presented sufficient evidence of deliberate indifference to survive a motion for summary judgment." *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012).

"To demonstrate that a defendant acted with a "sufficiently culpable state of mind," a plaintiff must put forth evidence that the defendant knew of a serious risk to the prisoner's health and consciously disregarded the risk. *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006). "Negligence – even gross negligence – is insufficient to meet this standard, but the plaintiff is not required to show intentional harm." *Farmer*, 511 U.S. at 836. The standard is comparable to that required for criminal recklessness. *Id.* at 839. "[A] fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. A medical professional's deliberate indifference may be inferred where his or her decision "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *King v. Kramer*, 680 F.3d 1013, 1018-19 (7th Cir. 2012) (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)).

The Eighth Amendment does not require that prisoners receive "unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), and medical malpractice is not

24

actionable under section 1983. *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013). *See also Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [the plaintiff] is not entitled to demand specific care"). "There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the inmate's acting primary care doctor, the prison doctor is "free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards." *Holloway*, 700 F.3d at 1074.

## IV.

The question of whether Mr. King has presented enough evidence of deliberate indifference to survive summary judgment varies among the seven defendants. *See King*, 680 F.3d at 1018. Therefore, we discuss each defendant separately below.

## A.

We first address the actions of the defendants who worked at Menard: Drs. Newbold and Chapman. Mr. King alleges that both of them failed to provide him with adequate care despite knowing of his serious condition since his arrival at Menard (Pl.'s Resp. at 24).

## 1.

Dr. Newbold, a part-time dentist working for the State, first saw Mr. King on August 26, 2004, and he continued to treat Mr. King occasionally through April 2005, after which he rarely saw Mr. King. Mr. King alleges that Dr. Newbold was deliberately indifferent to his serious medical needs by failing to: timely replace his night guard, review his medical records, order

soft tissue scans, diagnose his TMD, and provide proper treatment, including sending him to a specialist (Pl.'s Resp. at 25).

On August 26, 2004, Dr. Newbold reviewed Mr. King's intake information, which included a Panorex and his medical history of three prior TMJ surgeries. Mr. King testified that he told Dr. Newbold that he had pain and swelling in his right TMJ and that his night guard was broken. Dr. Newbold saw Mr. King again on September 8, 2004, after Mr. King submitted a medical request complaining of pain in his right jaw. Dr. Newbold ordered several x-rays of Mr. King's jaw, which eventually ruled out a hairline fracture. Dr. Newbold next saw Mr. King on November 19, 2004, in response to his complaints of TMJ pain, but then Dr. Newbold did not see Mr. King again until February 18, 2005, after Mr. King filed a grievance on January 25, 2005, complaining that he was being denied access to a doctor despite his repeated complaints of TMJ pain. At the February 18 visit, Dr. Newbold prescribed Tylenol 3 for pain, and his treatment notes mention Mr. King's need to be fitted for a new night guard. Dr. Newbold fitted Mr. King for the night guard on March 4, 2005, and Mr. King received it on April 5, 2005.

While "[d]elay is not a factor that is either always, or never, significant . . . the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). There is evidence that Dr. Newbold was aware of Mr. King's need for a new night guard in August and/or September 2004; indeed, for purposes of summary judgment, Dr. Newbold has not disputed this point (State Defs.' Resp. to PSAF at ¶¶ 12, 14). Yet, Dr. Newbold waited until February 2005 to schedule an appointment to fit Mr. King for a new night guard. It is undisputed that Mr. King claimed to be suffering from serious pain in his jaw, and Mr. King used the night guard to help reduce his pain. Dr. Newbold does not claim that the night guard was difficult to provide; from the date Dr.

Newbold scheduled the appointment to fit Mr. King for the night guard, it only took about six weeks for the night guard to arrive. We conclude that Mr. King has established an issue of material fact as to whether the delay in providing a new night guard constituted deliberate indifference to his serious medical needs.

Mr. King's remaining complaints against Dr. Newbold, however, fall short of creating a triable issue. We find insufficient evidence from which a jury could reasonably conclude that Dr. Newbold was deliberately indifferent to Mr. King's needs with respect to those complaints. When Mr. King entered Menard, Dr. Newbold promptly reviewed his medical intake records, ordered multiple x-rays, and prescribed narcotic pain medication for Mr. King. Beyond the delay in obtaining a new night guard for Mr. King, there is no evidence that Dr. Newbold, a part-time dentist, improperly delayed providing any other treatment for Mr. King.

Accordingly, the State Defendants' motion for summary judgment on the claims against Dr. Newbold are granted in part and denied in part. We deny the State Defendants' motion for summary judgment as to Dr. Newbold's role in the delay of Mr. King's receipt of the night guard, and we grant summary judgment on Mr. King's remaining claims against Dr. Newbold.

**2.**

While Dr. Newbold rarely treated Mr. King after spring 2005, Dr. Chapman, the dental director at Menard, saw Mr. King often from July 2005 until Mr. King was transferred to Stateville in September 2007. Mr. King claims that Dr. Chapman was deliberately indifferent to his serious medical needs for failing to timely order soft tissue scans, diagnose his TMD, and provide him with proper treatment, including sending him to a specialist and prescribing appropriate pain medication (Pl.'s Resp. at 25). The Wexford Defendants argue that summary judgment as to Dr. Chapman, a Wexford employee, is warranted because he provided

appropriate and timely treatment to Mr. King, and any delays in CT scans, MRIs, and referrals to outside specialists cannot constitute deliberate indifference by Dr. Chapman because only the medical director, Dr. Feinerman, could obtain final approval from Wexford to procure these services (doc. # 240: Wexford Defs.' Mem. in Supp. of Mot. for Summ. J. at 2, 12).

Based on the record evidence submitted on summary judgment, we disagree. On August 3, 2005, after meeting with Mr. King, Dr. Chapman obtained Wexford approval to schedule an appointment for Mr. King with an oral surgeon, Dr. Craig, on September 9, 2005. Dr. Craig recommended Mr. King be referred to an ENT, but this referral never happened. On October 31, 2005, Mr. King told Dr. Chapman that his TMJ was deteriorating and his pain was increasing, and Dr. Chapman noted that he would contact Dr. Feinerman for referral to an outside specialist. Dr. Feinerman, however, did not see Mr. King until February 22, 2006, nearly four months later. On April 4, 2006, Mr. King filed a grievance regarding the dental department's failure to refer him to a TMJ specialist. An eleven month gap in treatment followed; Dr. Chapman did not see Mr. King again until March 20, 2007, after Mr. King filed a grievance stating that his jaw was painful, bloody, swollen, and deviating to the right. Dr. Chapman ordered x-rays and prescribed Motrin, and he sought approval for a CT scan of Mr. King's TMJ, which took place on March 28, 2007. In April 2007, Dr. Chapman prescribed an antibiotic, a steroid to reduce swelling, a muscle relaxer, and Motrin to address Mr. King's TMD, and he referred Mr. King to an oral surgeon, Dr. Swanson. Dr. Swanson saw Mr. King on May 1, 2007; he ordered an MRI of Mr. King's TMJ, which took place on June 1, 2007.

Defendants argue that the failure to refer Mr. King to a TMJ specialist between September 2005 and April 2007 cannot be due to deliberate indifference by Dr. Chapman, because Dr. Feinerman and Wexford had to give ultimate approval for referral to a specialist.

Dr. Chapman cannot escape liability, however, if he unreasonably delayed contacting Dr. Feinerman to seek referral to the specialist. *See Gaston v. Ghosh*, 498 Fed. App'x 629, 633-34 (7th Cir. 2012); *see also Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (reversing grant of summary judgment for nurse who lacked authority to obtain referral for inmate to dentist because nurse had the ability to recommend referral or contact the dentist or other supervisory personnel to voice concerns about the inmate's treatment); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (reversing grant of summary judgment for prison doctor, where doctor failed to obtain needed appointment with a neurologist for six months). The undisputed facts show that Dr. Chapman had the ability to contact Dr. Feinerman to seek referrals for specialists, as he did in September 2005 and March 2007, but no referrals happened in the interim 18 months, during which there is evidence that Mr. King's condition significantly deteriorated. Plaintiff has thus established a genuine issue of material fact that the delay in sending Mr. King to specialists, with the corresponding decline in his condition and increase in his pain, were a result of Dr. Chapman's deliberate indifference.

Furthermore, there is a genuine issue of material fact as to whether Dr. Chapman was deliberately indifferent in prescribing medication for Mr. King. On May 30, 2007, Mr. King reported to Dr. Chapman that he could not take Motrin because it upset his stomach, so Dr. Chapman prescribed Tylenol. Nevertheless, Mr. King was soon put back on Motrin; and on July 12, 2007, he came to his appointment with Dr. Chapman in tears because Motrin was not helping his severe pain. Evidence that Dr. Chapman continued to prescribe medication that was ineffective in the face of Mr. King's escalating pain is sufficient to maintain a claim of deliberate indifference against Dr. Chapman. *See Arnett v. Webster*, 658 F.3d 742, 753-54 (7th Cir. 2011) (plaintiff may sustain a claim of deliberate indifference against a prison medical official who

"simply continue[s] with a course of treatment that he knows is ineffective in treating an inmate's condition," or "chooses an easier and less efficacious treatment without exercising his professional judgment"); *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) ("defendants' obdurate refusal to alter [plaintiff's] course of treatment despite his repeated reports that the medication was not working and his condition was getting worse" stated a claim for deliberate indifference). Consequently, the Wexford Defendants' motion for summary judgment is denied as to Mr. King's claims against Dr. Chapman.

**B.**

Plaintiff next contends that Drs. Ghosh, Fattore-Bruno, and Mitchell-Lawshea were deliberately indifferent to his serious medical needs in the six months between when he entered Stateville and when he had TMJ reconstructive surgery on March 19, 2008. Mr. King argues that they delayed his surgery and prolonged his suffering with inadequate medication (Pl.'s Mem. at 30-31).

The relevant, undisputed facts during this time period are as follows. Dr. Ghosh, the medical director and a Wexford employee, was aware of Mr. King's condition upon his arrival at Stateville in September 2007, and plaintiff was evaluated at UIC's oral surgery clinic within a week. At that time, there were no surgeons at UIC qualified to perform TMJ reconstructive surgery, but Dr. Ghosh was informed that Loyola had a qualified surgeon, Dr. Mercuri. Stateville gave Mr. King Tylenol 3 for his pain because Stateville did not carry Vicodin.

On November 30, 2007, Mr. King filed a grievance complaining that he was not being treated by Dr. Mitchell-Lawshea, a State Defendant. On December 6, 2007, Dr. Fattore-Bruno, a Wexford employee, saw Mr. King in the Stateville infirmary because he could not open his mouth, and he was in severe pain. She prescribed Tylenol with Codeine and Robaxin. On

December 10, 2007, Mr. King had an MRI, which showed a chronic fracture with loose bodies in his TMJ. On December 18, 2007, Dr. Ghosh contacted Loyola about scheduling Mr. King for an appointment with Dr. Mercuri, but Dr. Mercuri was not accepting new patients at that time. On January 3, 2008, Dr. Ghosh scheduled an appointment with the oral surgery department at UIC, which by then had engaged a surgeon qualified to perform the TMJ reconstructive surgery.

Mr. King continued to receive pain medication and muscle relaxers at Stateville, but he still complained of severe pain when he saw Dr. Fattore-Bruno on December 27, 2007, and January 29, 2008. At the latter visit, she prescribed Tramadol and contacted Dr. Ghosh, who assured her that Mr. King was approved for surgery at UIC. On February 8, 2008, he was seen at UIC for surgical evaluation, and TMJ replacement surgery was performed on March 19, 2008.

We conclude that Mr. King's claims against Drs. Fattore-Bruno and Mitchell-Lawshea for the period preceding his surgery fail to present a triable issue. *First*, although Dr. Mitchell-Lawshea did not personally respond to plaintiff's requests that she treat him, Mr. King was treated by other medical and dental personnel during this time period. Inmates are not entitled to treatment by the medical personnel of their choice. *See Forbes*, 112 F.3d at 267 ("[u]nder the Eighth Amendment, [the plaintiff] is not entitled to demand specific care"). Mr. King cites cases that are inapposite, where inmates were denied access to all medical personnel or treatment. *See, e.g., Kelley v. McGinnis*, 899 F.2d 612, 616 (7th Cir. 1990) (prison personnel repeatedly denied plaintiff access to doctor and gave him ineffective treatments and sent him on his way). Mr. King, however, saw other medical and dental personnel during this time period. As Mr. King cannot sustain a deliberate indifference claim based on his preference for Dr. Mitchell-Lawshea over other dentists, the State Defendants' motion for summary judgment as to the claims against Dr. Mitchell-Lawshea during this time period are granted.

*Second*, although he was rarely treated by Dr. Mitchell-Lawshea, Mr. King was appropriately treated by Dr. Fattore-Bruno during this time period. Though Stateville did not carry Vicodin, Dr. Fattore-Bruno treated Mr. King with Tylenol with codeine and then Tramadol to try to get Mr. King's pain under control. In addition, she sought the counsel of her supervisor, Dr. Ghosh, when Mr. King's pain continued unabated, and Dr. Ghosh assured her that Mr. King's surgery was imminent. In the face of this treatment and attention, Mr. King has not put forth evidence that Dr. Fattore-Bruno "consciously disregarded" a serious risk to his health. *Johnson*, 433 F.3d at 1010. Thus, the Wexford Defendants' motion for summary judgment as to the claims against Dr. Fattore-Bruno for this time period is granted.

By contrast, Dr. Ghosh delayed seeking a qualified surgeon for Mr. King for almost three months. UIC informed Dr. Ghosh in September 2007 that they did not have a qualified surgeon for Mr. King, but that Loyola did. However, Dr. Ghosh waited until December 18, 2007, before attempting to refer Mr. King to Loyola. At that time, however, the Loyola surgeon was not accepting new patients, and defendants have offered no evidence that Loyola's oral surgery department would not have accepted new patients before then. From September 2007 until Mr. King finally met with a surgeon in February 2008, he suffered extreme pain, as shown by the numerous grievances he filed and his complaints to medical staff. In light of the increasing pain Mr. King suffered, and the ease with which Dr. Ghosh could have contacted Loyola sooner, the unexplained delay is sufficient to create a triable issue on Mr. King's claim that Dr. Ghosh was deliberately indifferent to his serious medical needs. *See McGowan*, 612 F.3d at 640 (". . . the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment").

## C.

By all accounts, Mr. King's TMJ replacement surgery was completed according to plan and without complications. The surgery was performed by a team of surgeons: Dr. Miloro was the attending, and Drs. Edwards, Nguyen, Sidal, and Rogers were residents. Mr. King was discharged from the hospital the next day with prescriptions for antibiotics, Vicodin, ibuprofen, and Bacitracin, and instructions to use a head wrap to keep his mouth closed for a short period of time, to be followed by physical therapy for his jaw. At one of Mr. King's follow-up appointments, Dr. Edwards recommended a TheraBite to stretch his jaw. Plaintiff contends that upon returning to Stateville, defendants Drs. Fattore-Bruno, Ghosh, Mitchell-Lawshea, Garg, and Saffold were deliberately indifferent to his serious medical needs because they: prescribed him Motrin rather than other medication, delayed his receipt of a TheraBite, and delayed getting him a physical therapist specializing in TMJ, thus causing his recovery from the surgery to ultimately fail. We again address plaintiff's claims against each defendant separately.

### 1.

Plaintiff claims that Dr. Fattore-Bruno was deliberately indifferent to his serious medical needs for failing to follow his surgeon's instructions to obtain a TheraBite and physical therapist (Pl.'s Resp. at 31). After his surgery, Dr. Fattore-Bruno treated Mr. King until she left Stateville in May 2008. She used tongue blades to exercise his jaw, and she instructed Mr. King to perform these exercises several times daily. On April 17, 2008, Dr. Edwards stated that the UIC oral surgery department would acquire a TheraBite device to give Mr. King at his next follow-up visit to UIC. However, at the time of Dr. Fattore-Bruno's last entry on Mr. King, dated May 14, 2008, Stateville still did not have a TheraBite, and Dr. Fattore-Bruno continued to use tongue blades to exercise his jaw. On that date, Dr. Fattore-Bruno noted that Mr. King could only open

his jaw 13 millimeters, so she contacted Dr. Ghosh to refer Mr. King back to UIC to address his continuing pain and problems with his TMJ.

The parties' experts disagree as to the efficacy of using tongue blades as opposed to a TheraBite as part of physical therapy after TMJ surgery. However, it is undisputed that in the seven weeks post-surgery that Dr. Fattore-Bruno treated Mr. King, he did not yet possess a TheraBite, and, in light of the surgeon's notes that UIC would obtain the TheraBite, there is no evidence that Dr. Fattore-Bruno delayed Mr. King's receipt of the TheraBite. Instead, Dr. Fattore-Bruno exercised her professional judgment and used an alternative method to the TheraBite: tongue blades. As the inmate's acting primary care doctor, the prison doctor is "free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards." *Holloway*, 700 F.3d at 1074. Dr. Fattore-Bruno also trained Mr. King to exercise his jaw with tongue blades, going so far as to seek and obtain permission for Mr. King to bring tongue blades into his cell to continue his exercises. Dr. Fattore-Bruno also contacted Dr. Ghosh to recommend that Mr. King be referred back to UIC due to his continued pain and limited jaw opening.

On this record, plaintiff has not created a triable issue on his claim that Dr. Fattore-Bruno's treatment was deliberately indifferent to his serious medical needs. Thus, Dr. Fattore-Bruno, a Wexford Defendant, is entitled to summary judgment on all of Mr. King's claims against her.

**2.**

Despite Dr. Fattore-Bruno's recommendation to Dr. Ghosh in May 2008 that Mr. King be referred back to UIC, Mr. King did not return to UIC's oral surgery department until July 9,

2008. On May 13, 2008, Mr. King filed a grievance requesting physical therapy and a TheraBite, and in June and July 2008, Stateville provided him with various medications in an attempt to address his pain, including ibuprofen, Zantac (to help with gastrointestinal upset), and Amitriptyline (an anti-depressant) to reduce teeth grinding (which causes myofascial pain). At Mr. King's visit to UIC on July 9, 2008, Dr. Rogers did not provide Mr. King with a TheraBite, but he stated that physical therapy and a TheraBite appliance should be made available to Mr. King, a request that was reiterated by Dr. Edwards on September 9, 2008, at Mr. King's next visit to UIC. On September 23, 2008, Drs. Edwards and Miloro provided Mr. King with the TheraBite. Then, on October 8, 2008, after Mr. King complained to the assistant warden, a physical therapist began to visit Mr. King for the next several weeks.

Mr. King claims that Dr. Ghosh's delay in following his surgeons' advice in obtaining the TheraBite and physical therapy constitutes deliberate indifference to Mr. King's serious medical needs. Dr. Ghosh argues, in response, that he is entitled to summary judgment because there is no evidence that his actions or inaction contributed to the delay in Mr. King receiving the TheraBite and physical therapy, and Mr. King nevertheless received adequate treatment in the absence of the TheraBite and physical therapy. We find that Mr. King has established a triable issue of fact that Dr. Ghosh's delay in following his surgeon's advice in obtaining the TheraBite and physical therapy constituted deliberate indifference.

It is undisputed that in the months after Dr. Fattore-Bruno left Stateville, Mr. King filed grievances requesting a TheraBite and physical therapy, and Mr. King's UIC surgeons continued to recommend a TheraBite and physical therapy for Mr. King. Dr. Ghosh admittedly had authority to order the TheraBite and physical therapy for Mr. King (with approval from

Wexford), but he declined to do so. Whether it was reasonable for Dr. Ghosh to refrain from obtaining the device in the expectation that UIC would do so is a question for the jury.

Defendants argue that any delay in supplying the TheraBite is of no consequence since Mr. King received therapy using tongue blades. As we noted above, the parties' experts disagree as to the adequacy of tongue blades as a substitute for a TheraBite and as to the meaning of post-TMJ surgery physical therapy. Plaintiff's expert, Dr. Binderman, maintains that tongue blade therapy is "inherently inadequate" as compared to a TheraBite for a post-TMJ surgical patient, and "[w]hat is required for such a patient is a trained and TMJ experienced physical therapist, to teach and train Mr. King in resistance exercises" (Binderman Report at 15-16). By contrast, Dr. Miloro, Mr. King's surgeon, testified that using tongue blades or one's fingers for post-operative jaw exercises was "typical," "really appropriate," and "acceptable in lieu of the TheraBite" for physical therapy on the jaw (Miloro Dep. at 169, 80-83). The State's and Wexford's experts agree that tongue blades and hand/finger manipulation constitute adequate post-surgery physical therapy (PSAF, Ex. J: Nicholas Panomitros (State expert) Dep. at 178-79, 209; PSAF, Ex. E: Paul Chaiken (Wexford expert) Dep. at 265-66).

On summary judgment, it is not our province to resolve this dispute among the experts as to whether tongue blades or manipulation of the jaw with fingers "go[es] against accepted professional standards." *Holloway*, 700 F.3d at 1074. Mr. King is entitled to have that question resolved by a jury. Furthermore, irrespective of whether tongue blades are a sufficient substitute for a TheraBite, Dr. Ghosh's failure to follow Mr. King's surgeons' continued orders for the TheraBite and physical therapy in July and August – and his failure to refer Mr. King to UIC before July 2008, despite Dr. Fattore-Bruno's recommendation – raises an issue of material fact that Dr. Ghosh's inaction constituted deliberate indifference to Mr. King's serious medical

needs. *See Gil v. Reed*, 381 F.3d 649, 664 (7th Cir. 2004) (a prison physician's contravention of a surgeon's explicit orders may support a claim of deliberate indifference). And, even if tongue depressors are an adequate substitute, there is evidence that Mr. King did not sufficiently receive that therapy. While Dr. Fattore-Bruno actively assisted Mr. King in using the tongue blades as a substitute for the TheraBite, there is no evidence that Mr. King received any such therapeutic assistance after she left. When a physical therapist was ultimately arranged for Mr. King – some five months after Dr. Fattore-Bruno left and only after Mr. King complained to the assistant warden – the therapy lasted only approximately five weeks and was not performed by a TMJ specialist. Thus, Wexford's motion for summary judgment as to Dr. Ghosh is denied.

### 3.

By contrast, Mr. King's claims against State Defendants Drs. Mitchell-Lawshea, Garg, and Saffold do not survive summary judgment. *First*, Mr. King contends that Dr. Mitchell-Lawshea essentially "refused" to treat him and was thus deliberately indifferent to his serious medical needs. As explained above, however, Mr. King is not entitled to choose his dentist or doctor at Stateville. *See Forbes*, 112 F.3d at 267. The evidence shows that Dr. Mitchell-Lawshea saw Mr. King on December 16, 2008, August 10, 2009, and in September 2009, during which she scheduled him to see Dr. Craig and ordered a Panorex. While Mr. King asked to see Dr. Mitchell-Lawshea on more than just these occasions – at times shouting for her – he received the same treatment from other dentists that Dr. Mitchell-Lawshea would have provided, including analgesics to relieve pain, muscles relaxants, night guards, soft diets, and warm compresses (PSAF, Ex. L: Mitchell-Lawshea Dep. at 16). Mr. King has thus not presented sufficient evidence to raise a genuine issue of material fact that Dr. Mitchell-Lawshea was deliberately indifferent to his serious medical needs.

*Second*, Mr. King contends that Dr. Garg was deliberately indifferent for failing to treat his pain with stronger medications, and failing to obtain the TheraBite and physical therapy for him. Dr. Garg first treated King on June 11, 2008, regarding pain and swelling in his face, difficulty opening his mouth and speaking, and his request for a TheraBite. Dr. Garg admitted that she knew little about TMD, but she followed up with Dr. Ghosh. When Dr. Garg next saw Mr. King on October 3, 2008 – after he had received the TheraBite – he complained of a locked jaw and demanded physical therapy, but refused the proffered ibuprofen. Mr. King saw a physical therapist a few days later, after complaining to the assistant warden. When plaintiff next saw Dr. Garg on March 20, 2009, he walked out of the examination and refused the muscle relaxant Robaxin, but that same day, someone else gave him an injection of Toradol to unlock his jaw. On April 8, May 8, and May 22, 2009, Dr. Garg saw plaintiff on an emergency basis for his complaints that he could not open his mouth. Dr. Garg consulted with Dr. Ghosh, and they treated Mr. King with muscle relaxants and pain medication.

This evidence cannot sustain a claim of deliberate indifference against Dr. Garg. Besides the October 3, 2008, meeting where Dr. Garg offered only ibuprofen, Dr. Garg consulted with Dr. Ghosh and offered stronger pain medication. In addition, in response to Mr. King's demands for the TheraBite and physical therapy, Dr. Garg also consulted with the medical director. The undisputed evidence thus shows that Dr. Garg performed to the limits of her dental ability, then conducted appropriate follow up when Mr. King complained that he needed more. Accordingly, summary judgment for Dr. Garg is granted.

*Third*, plaintiff contends that Dr. Saffold was deliberately indifferent for the same reasons. However, plaintiff first saw Dr. Saffold in 2010, after Mr. King had received his TheraBite and his brief physical therapy. Dr. Saffold's treatment was limited to routine dental

needs, such as cleanings, and when Mr. King's jaw would lock up in January and April 2011, Dr. Saffold would prescribe mild to strong pain relievers (such as Celebrex or Lodine), or at times, Valium to relax his jaw. Plaintiff has presented no additional evidence as to Dr. Saffold, and this evidence is insufficient to sustain a claim of deliberate indifference against him.

Accordingly, we grant the State Defendants' motion for summary judgment on all of plaintiff's claims against Drs. Mitchell-Lawshea, Garg, and Saffold.

### D.

Lastly, Mr. King claims that Wexford maintained an unconstitutional policy or custom between 2007 and 2009 that infringed on Mr. King's Eighth Amendment rights by: "1) refusing to diagnose or provide adequate treatment for Plaintiff's serious TMJ disorder, which was outside the expertise of Wexford's employees, and/or 2) refusing to follow the post-operative care orders and prescriptions issued by Plaintiff's oral surgeons and other specialists at UIC" (2d Am. Compl. at ¶ 135). Mr. King alleges that the Wexford Defendants' "custom of deliberately indifferent conduct was sufficiently open and obvious that the individuals at Wexford responsible for policy-making or oversight were, or should have been aware of it," and that by not acting to stop that conduct, Wexford itself adopted or encouraged it (*Id.* at ¶¶ 138-39). Wexford argues that it is entitled to summary judgment because there is no evidence that any deliberate indifference by the individual defendants was the result of a policy or custom of Wexford (Wexford Reply at 8).

Wexford, a private corporation holding a contract to provide medical care in Illinois's prisons, may be liable as a state actor under section 1983 if it maintains an unconstitutional policy or adopts a custom of deliberate indifference to the known or obvious consequences of its practice. *See Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013);

*Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004). An unconstitutional policy could also be shown by "a series of bad acts and inviting the court to infer from them that the policymaking level of government [or the corporation] was bound to have noticed what was going on and failing to do anything must have encouraged or at least condoned . . . the misconduct of subordinate officers." *Woodward*, 368 F.3d at 927 (citations and quotations omitted). Section 1983 does not create vicarious liability, so if a given policy causes no harm to the plaintiff, there is no possible relief. *Ray*, 706 F.3d at 866 (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978)).

Here, as explained above, Mr. King has raised a material issue of fact that Wexford employees Dr. Chapman and Dr. Ghosh were deliberately indifferent to his serious medical needs. Mr. King attempts to rely on their alleged "bad acts" – delays in referring him to a specialist, dispensing of insufficient medication, and delays in obtaining physical therapy, MRI and CT scans, and the TheraBite – to show that Wexford's policies were unconstitutional. Mr. King argues that Wexford must have or should have known that the individual defendants were violating his rights because the individual defendants "attempt to hide behind" Wexford's policies requiring supervisor and Wexford corporate approval to justify those delays (Pl.'s Resp. at 35). To survive summary judgment on his claims against Wexford, Mr. King must provide enough evidence of a custom or practice that was so widespread as to permit an inference that Wexford chose an impermissible way of operating. *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008). Mr. King's policy claim against Wexford fails to meet this standard.

*First*, the purported policy of which Mr. King complains is a policy only unto himself: he alleges that the individual defendants refused to diagnose or provide adequate treatment for him and that they refused to follow the post-operative care orders and prescriptions of his

surgeons. Mr. King does not even "suggest" or generally allege that the individual defendants maintained a practice of delaying such treatment to other inmates. *See Grieveson*, 538 F.3d at 774. Though the Seventh Circuit has not foreclosed a plaintiff from pursuing Section 1983 claims where he or she "can demonstrate that repeated actions directed at her truly evince the existence of a policy," the appeals court has reiterated "that the word 'widespread' must be taken seriously." *Phelan v. Cook County*, 463 F.3d 773, 789-90 (7th Cir. 2006). "It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once. The plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.* As in *Phelan* and *Grieveson*, Mr. King "falls short of this mark." *See Phelan*, 463 F.3d at 790. Though "it is not impossible" for a plaintiff to demonstrate the existence of an official policy or custom by presenting evidence of repeated bad actions directed at him, Mr. King's evidence of certain incidents "that he alone experienced fails to meet the test of a widespread unconstitutional practice by the Jail's staff that is so well settled that it constitutes a custom or usage with the force of law." *Grieveson*, 538 F.3d at 774 (citations and quotations omitted).

*Second*, Mr. King has the burden to show that the alleged policy "created a risk of serious harm that was so patently obvious that the municipality must have been aware of a risk of harm and, by failing to act to rectify it, sanctioned the harmful conduct." *Smith v. Sangamon County Sheriff's Dep't*, 715 F.3d 188, 192 (7th Cir. 2013) (citations and quotations omitted) (affirming summary judgment where the plaintiff presented no evidence that the Department had notice of a particular threat of harm to the plaintiff, or even that the Department knew of a more generalized risk and ignored it). Mr. King, however, presents no evidence that anyone at the policymaking

41

level at Wexford was aware that the individual defendants were repeatedly denying his grievances and other requests for further treatment of his TMD. As such, there is no evidence that Wexford ratified or condoned any individual defendant's decision not to seek further treatment or specialist referrals for Mr. King. Thus, we grant the Wexford Defendants' motion for summary judgment as to Wexford itself.

## CONCLUSION

For the foregoing reasons, the Court grants the State Defendants' motion for summary judgment as to Dr. Mitchell-Lawshea, Dr. Garg, and Dr. Saffold, but we deny the State Defendants' motion for summary judgment as to plaintiff's claim that Dr. Newbold was deliberately indifferent by delaying obtaining a night guard for Mr. King (doc. # 246). In addition, we grant the Wexford Defendants' motion for summary judgment as to plaintiff's claims against Dr. Fattore-Bruno and Wexford, but we deny the motion for summary judgment as to the claims against Dr. Chapman and Dr. Ghosh as identified in this opinion (doc. # 238).

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: December 16, 2013